**DAVIS POLK & WARDWELL LLP**
450 Lexington Avenue
New York, NY 10017
Tel.: (212) 450-4000
Brian M. Resnick
Angela M. Libby
Stephen D. Piraino
Richard J. Steinberg
Sihui (Sophy) Ma (*pro hac vice* pending)
Mordechai Rivkin

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>**SLEEP NUMBER CORPORATION,** *et al.*,<br><br>Debtors.[1] | **Chapter 11**<br><br>**Case No. 26-11399 ([●])**<br><br>**[Joint Administration Requested]** |

**MOTION OF DEBTORS FOR ENTRY OF ORDERS (I)(A) APPROVING BIDDING PROCEDURES FOR SALE OF THE DEBTORS' ASSETS, (B) APPROVING THE DESIGNATION OF SNBR INC., AN AFFILIATE OF SLEEP COUNTRY CANADA, INC., AS THE STALKING HORSE BIDDER FOR THE ASSETS, (C) AUTHORIZING AND APPROVING ENTRY INTO THE STALKING HORSE ASSET PURCHASE AGREEMENT, (D) APPROVING BID PROTECTIONS, (E) SCHEDULING AN AUCTION FOR, AND HEARING TO APPROVE, THE SALE OF THE DEBTORS' ASSETS, (F) APPROVING THE FORM AND MANNER OF NOTICES OF SALE, AUCTION, AND SALE HEARING, AND (G) APPROVING THE ASSUMPTION AND ASSIGNMENT PROCEDURES, (II)(A) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES AND (B) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF**

---

[1] The Debtors' names and last four digits of their respective employer identification numbers are as follows: Sleep Number Corporation (7886); Select Comfort Retail Corporation (9757); Select Comfort Canada Holding Inc. (4273); Select Comfort SC LLC (5901); and Sleep Number Health Corporation (2499). The Debtors' mailing address is 1001 Third Avenue South, Minneapolis, MN 55404.

**EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (III) GRANTING
RELATED RELIEF**

Sleep Number Corporation and its direct and indirect subsidiaries (collectively, the "**Debtors**," the "**Company**," or "**Sleep Number**"), each of which is a debtor and debtor in possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby file this *Motion of Debtors for Entry of Orders (I)(A) Approving Bidding Procedures for Sale of the Debtors' Assets, (B) Approving the Designation of SNBR Inc., an affiliate of Sleep Country Canada, Inc., as the Stalking Horse Bidder for the Assets, (C) Authorizing and Approving Entry into the Stalking Horse Asset Purchase Agreement, (D) Approving Bid Protections, (E) Scheduling an Auction for, and Hearing to Approve, the Sale of the Debtors' Assets, (F) Approving the Form and Manner of Notices of Sale, Auction, and Sale Hearing, and (G) Approving the Assumption and Assignment Procedures, (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances and (B) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* (this "**Motion**"). This Motion is supported by (a) the *Declaration of Michael Gottlieb in Support of the Motion of Debtors for Entry of Orders (I)(A) Approving Bidding Procedures for Sale of the Debtors' Assets, (B) Approving the Designation of SNBR Inc., an affiliate of Sleep Country Canada, Inc., as the Stalking Horse Bidder for the Assets, (C) Authorizing and Approving Entry into the Stalking Horse Asset Purchase Agreement, (D) Approving Bid Protections, (E) Scheduling an Auction for, and Hearing to Approve, the Sale of the Debtors' Assets, (F) Approving the Form and Manner of Notices of Sale, Auction, and Sale Hearing, and (G) Approving the Assumption and Assignment Procedures, (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances and (B) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* (the "**Gottlieb Declaration**"),

2

which is attached hereto as **Exhibit C** and incorporated by reference herein, and (b) the

*Declaration of Amy O'Keefe in Support of the Chapter 11 Proceedings and First Day Pleadings*

(the "**First Day Declaration**" and, together with the Gottlieb Declaration, the "**Declarations**"),

filed contemporaneously herewith and incorporated herein by reference.[2] In further support of this

Motion, the Debtors respectfully state as follows:

### Relief Requested

1.       By this Motion, and pursuant to sections 105(a), 363 and 365 of title 11 of the

United States Code (the "**Bankruptcy Code**"), rules 2002, 6004, 6006, 9007 and 9014 of the

Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), rules 6004-1 and 6006-1 of

the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**"), and the

United States Bankruptcy Court for the Southern District of New York's (the "**Court**") *Guidelines*

*for the Conduct of Asset Sales*, dated June 17, 2013 (the "**Sale Guidelines**"), the Debtors request

entry of the following:

> a.       an order, substantially in the form attached hereto as **Exhibit A** (the "**Bidding Procedures Order**"),
>
> > i.       authorizing and approving the bidding procedures, substantially in the form attached to the Bidding Procedures Order as Exhibit 1 thereto (the "**Bidding Procedures**"), in connection with the sale of all or substantially all of the Debtors' assets (collectively, the "**Assets**," and such sale, the "**Sale Transaction**");
> >
> > ii.      authorizing and approving the Debtors' entry into the Asset Purchase Agreement, dated as of June 12, 2026, by and among the Debtors and SNBR Inc. (the "**Stalking Horse Bidder**"), attached hereto as **Exhibit B** (the "**Stalking Horse Agreement**");
> >
> > iii.     approving the Bid Protections (as defined herein) in favor of the Stalking Horse Bidder in connection with the Stalking Horse

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Bidding Procedures (as defined herein), the Declarations, or the DIP Motion, as applicable.

Agreement and in accordance with the terms and conditions set forth in the Bidding Procedures and the Stalking Horse Agreement;

iv.     scheduling an auction, to the extent necessary in accordance with the Bidding Procedures, for the sale of the Assets (the "**Auction**") to be held on July 13, 2026, at 10:00 a.m.;[3]

v.      scheduling a hearing (the "**Sale Hearing**") to consider approval of the proposed Sale Transaction to be held on July 15, 2026 at [●].m., subject to the Court's availability;

vi.     authorizing and approving the (A) notice of the sale of the Assets, the Bid Deadline (as defined herein), the Auction, and the Sale Hearing, substantially in the form attached to the Bidding Procedures Order as Exhibit 2 (the "**Sale Notice**"), (B) notice to each relevant non-Debtor counterparty (each, a "**Counterparty**") to an executory contract or unexpired lease listed on a schedule (collectively, the "**Contracts and Leases**" and each, an "**Assumed Contract**" or "**Assumed Lease**") regarding the Debtors' potential assumption and assignment of each such Counterparty's Assumed Contract or Assumed Lease (collectively, the "**Potential Assumed Contracts**") and the amount that must be paid and obligations that otherwise must be satisfied, pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in order to effectuate the assumption and assignment to Purchaser of any of the Assumed Contract or Assumed Lease (the "**Cure Costs**"), substantially in the form attached to the Bidding Procedures Order as Exhibit 3 (the "**Potential Assumption and Assignment Notice**"), and (C) notice to each Counterparty listed on a schedule regarding the Debtors' proposed assumption and assignment of each such Counterparty's Contracts and Leases (collectively, the "**Proposed Assumed Contracts**"), substantially in the form attached to the Bidding Procedures Order as Exhibit 4 (the "**Proposed Assumption and Assignment Notice**"); and

vii.    authorizing and approving procedures for the assumption and assignment of the Contracts and Leases and the determination of Cure Costs with respect thereto (collectively, the "**Assumption and Assignment Procedures**");

b.      an order (the "**Sale Order**")[4] authorizing and approving the following:

---

[3] All times herein are expressed in prevailing Eastern Time.

[4] The proposed form of Sale Order will be filed with the Court sufficiently in advance of the Sale Hearing.

i.     the sale of the "Transferred Assets" (as defined in the Stalking Horse Agreement), which consist of the Assets conveyed to SNBR Inc. ("**Purchaser**") pursuant to the Stalking Horse Agreement (or any similar purchase agreement, substantially in the same form as the Stalking Horse Agreement, entered into with a Successful Bidder (other than the Stalking Horse Bidder)), free and clear of all liens, claims, encumbrances, and interests to the fullest extent permitted by law and except for "Permitted Liens" and "Assumed Liabilities" (each solely as defined in the Stalking Horse Agreement and set forth in the schedules thereto); and

ii.    the assumption and assignment of the Proposed Assumed Contracts in connection with the proposed Sale Transaction; and

c.    granting related relief.

### Preliminary Statement

2.    The Debtors commenced these Chapter 11 Cases to effectuate a sale of substantially all of the Company's Assets. The Debtors seek approval of the bidding procedures and the related relief requested herein, which is designed to maximize value while creating a swift, efficient, and consensual path to confirming a chapter 11 plan. To that end, on the eve of this chapter 11 filing, the Debtors entered into an asset purchase agreement with the Stalking Horse Bidder to sell the Assets. The Stalking Horse Agreement contemplates a purchase price of $415,000,000 million in upfront cash, and includes a $41,500,000 million good faith money deposit. The Stalking Horse Bidder is a well-established industry participant with significant operational expertise and the financial resources necessary to consummate the Sale Transaction, making it a credible and well-qualified prospective purchaser of the Assets.

3.    Prior to commencing the Chapter 11 Cases, the Debtors and their advisors began a robust marketing process for the sale of all or substantially all of the Debtors' assets. The filing of this Motion is the culmination of a 14-week prepetition marketing process, which included extensive negotiations and due diligence with multiple bidders. The Debtors have determined, in an exercise of their business judgment, that the best way to maximize the value of the Assets for

the benefit of all stakeholders is through a chapter 11 sale process, leveraging the Debtors' extensive prepetition marketing efforts.

4. But time is of the essence. The Debtors believe that, in light of the extensive marketing process and the time that a number of the most likely interested parties have already engaged in due diligence during the prepetition marketing process, the timeline proposed herein is appropriate and essential to maximizing the value of the estates. As evidenced by the milestones included in the Stalking Horse Agreement and the DIP Loan Agreement, both the Stalking Horse Bidder and the DIP Lenders insisted on this expedited timeframe, which is designed to preserve the going-concern value of the Debtors' business until a sale can be successfully effectuated. Moreover, the Debtors' DIP Facility was sized to fund an expedited sale process that complies with the DIP milestones.

5. The Debtors respectfully submit that the post-petition marketing process proposed herein is appropriate to test whether a higher or better bid is available for the Debtors' Assets.

## Jurisdiction and Venue

6. The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference M-431*, dated January 31, 2012 (Preska, C.J.).

7. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b). The Debtors confirm their consent to the entry of a final order by the Court in connection with this Motion. Venue of the Chapter 11 Cases and related proceedings is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

**A.    General Background**

8. On June 12, 2026 (the "**Petition Date**"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors remain in possession of their

property and continue to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner, and no statutory committee has been appointed in the Chapter 11 Cases. The Debtors have filed a motion requesting joint administration of the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).

9. Sleep Number is the leader in personalized sleep wellness. Its mattresses are designed to evolve with each sleeper to help them feel and perform their best. With adjustable firmness, pressure-relieving support, and temperature-balancing comfort built into every mattress, Sleep Number beds adapt to customers' changing needs, night after night, year after year. Backed by over 40 years of innovation, over 1,000 patents and patents pending, and billions of hours of sleep data, Sleep Number has helped more than 16 million people achieve their best sleep. Headquartered in Minneapolis, Minnesota, Sleep Number employs approximately 2,920 employees and operates 572 Sleep Number stores with locations in 50 U.S. states.

10. Additional information about the events leading up to the Petition Date and the Debtors' businesses, affairs, capital structure, and prepetition indebtedness can be found in the First Day Declaration.

**B.     Marketing and Sale Process**

As described in the Gottlieb Declaration, beginning in February 2026, the Debtors, with the assistance of Guggenheim Securities, LLC ("**Guggenheim Securities**") as its investment banker, prepared marketing materials and contacted approximately 53 potential strategic and financial purchasers. Of those potential purchasers, 19 entities executed non-disclosure agreements and were provided with a confidential information memorandum and granted access to a virtual data room containing confidential information regarding the Assets.

7

11.     The Debtors were successful in negotiating a going-concern sale transaction for the Assets with the Stalking Horse bidder, setting the floor for other potential bids to acquire the Assets during the Chapter 11 Cases. Under the Stalking Horse Agreement, the Stalking Horse Bidder has committed, subject to Court approval, to acquire the Assets in exchange for a purchase price of $415,000,000 million and the assumption of certain liabilities on the terms and conditions set forth in the Stalking Horse Agreement (the "**Stalking Horse Bid**").

12.     The Stalking Horse Agreement is the product of the extensive marketing efforts of the Debtors and their advisors, which efforts are more fully described above and in the Gottlieb Declaration. The time periods set forth in the Bidding Procedures are prudent and consistent with both the Debtors' extensive marketing efforts to date and the Debtors' efforts to timely close the Sale Transaction in a manner that maximizes value for the benefit of their estates and stakeholders.

13.     The Stalking Horse Bidder is an affiliate of Sleep Country Canada Inc., which is an established specialty sleep and wellness retailer with significant industry experience, a long operating history and a demonstrated track record of serving consumers across multiple channels. The Stalking Horse Bidder's familiarity with the sleep products sector, customer preferences, supply chain dynamics and retail operations positions it as a credible and well-qualified prospective owner of the Assets.

14.     The Debtors believe that the Stalking Horse Bidder's industry knowledge, operational capabilities and experience managing a large-scale retail platform support the viability of the Stalking Horse Bid and provide a strong foundation for a going-concern transaction that would facilitate continuity for customers, vendors and other stakeholders. The Stalking Horse Bid provides an important benchmark against which competing bids may be evaluated.

15.     To ensure that the Stalking Horse Bid is in fact the highest or otherwise best offer for the purchase of the Assets, the Debtors have developed Bidding Procedures to allow interested parties to submit competing bids for the Assets. The Stalking Horse Agreement, therefore, sets a floor for value to be obtained in the sale of the Assets in a competitive bidding process, which will benefit all of the Debtors' stakeholders by providing certainty while also helping to ensure the highest or otherwise best offer for the Assets.

16.     The Debtors and their advisors have carefully evaluated a number of qualitative and quantitative factors to design a chapter 11 sale process that builds on the momentum from their prepetition marketing process in order to maximize the value of their estates for the benefit of all stakeholders.  This process principally includes both entry into the Stalking Horse Agreement and approval of the Bidding Procedures, which are designed to (a) promote active bidding from interested parties and (b) elicit the highest or otherwise best offers available for the Assets. Moreover, the Bidding Procedures provide the Debtors with the flexibility to consummate the Sale Transaction pursuant to section 363 of the Bankruptcy Code or, in the alternative, as part of a chapter 11 plan of reorganization.

17.     Specifically, the Bidding Procedures will enable the interested parties to submit bids for the Assets, subject to the terms of the Bidding Procedures, and facilitate such potential buyers' access to diligence materials.  Such materials will include a non-confidential presentation and, for those executing a confidentiality agreement with the Debtors, access to a virtual data room, which will contain confidential presentation materials, additional legal, financial, operational, and other information on the Debtors, and, as appropriate, meetings with management.

18.     The Debtors believe that their proposed sale process and the time periods set forth in the Bidding Procedures are reasonable and will provide parties with sufficient time and

9

information necessary to formulate bids to purchase the Assets.  In formulating the Bidding Procedures and time periods contained therein, the Debtors balanced the need to provide adequate and appropriate notice to parties in interest and to potential purchasers with the need to efficiently sell the Assets to maximize realizable value, all the while preventing the disclosure of confidential information to competitors that could be damaging to the business going forward.  As described above and more fully in the Gottlieb Declaration, the Assets have been extensively marketed by Guggenheim Securities over approximately 14 weeks to a broad group of over 53 potential strategic and financial buyers determined by Guggenheim Securities to be most likely to have interest in and wherewithal to consummate a transaction with the Debtors, each of which has been provided with substantial information regarding the Assets.

19.    Given the Debtors' liquidity profile and the contemplated chapter 11 case timeline, the Debtors believe that speed and efficiency are critical to preserving the value of the business and maximizing the proceeds of the Sale Transaction.  The time periods set forth in the Bidding Procedures are prudent and consistent with the Debtors' case milestones, and failure to adhere to such time periods could jeopardize the closing of the Sale Transaction (the "**Closing Date**").  Thus, the Debtors have determined that pursuing a Sale Transaction in the manner and within the time periods prescribed in the Bidding Procedures is in the best interest of the Debtors' estates and stakeholders and will provide interested parties with sufficient opportunity to participate.

20.    Accordingly, the Debtors believe that approval of the Bidding Procedures, entry into the Stalking Horse Agreement and the related relief requested in this Motion will allow the Debtors to efficiently maximize value and are in the best interests of the Debtors' estates and their stakeholders.  Therefore, the Debtors respectfully request that the Court grant the relief requested herein.

**B.       The Proposed Sale and Bidding Procedures**

*i.        Summary of Key Terms of the Stalking Horse Bid*

21.       The Stalking Horse Agreement represents a binding bid to purchase the Assets. By this Motion, the Debtors request authority to provide the Stalking Horse Bidder with customary stalking horse protections that take into consideration, among other things, that the Stalking Horse Bid establishes a minimum purchase price for the Assets, for the benefit of the Debtors' creditors and other parties in interest and that the Stalking Horse Bidder has expended significant resources to date in connection with the sale process and has committed its capital notwithstanding the open auction of the Assets. In particular, the stalking horse protections consist of (a) the payment of a break-up fee in an amount equal to 3% of the purchase price (the "**Break-Up Fee**") and (b) reimbursement of up to $4,000,000 for reasonable and documented costs and expenses incurred by the Stalking Horse Bidder in connection with the negotiation and execution of, and the carrying out of its obligations under, the Stalking Horse Agreement (other than such costs or expenses that the Stalking Horse Bidder has agreed to pay thereunder) (the "**Expense Reimbursement**" and, together with the Break-Up Fee, the "**Bid Protections**"), the terms and conditions of which are further set forth in the Stalking Horse Agreement.

22.       The Stalking Horse Agreement includes various customary representations, warranties, and covenants by and from the Debtors and the Stalking Horse Bidder. In addition, the Stalking Horse Agreement includes certain conditions to closing of the contemplated Sale Transaction and termination rights related to the Chapter 11 Cases.

23.       The pertinent terms of the proposed Stalking Horse Agreement are summarized in the following table.[5]

---

[5] This summary is provided for the convenience of the Court and parties in interest. To the extent that there is any conflict between this summary and the Stalking Horse Agreement, the latter governs in all respects. Capitalized

| Term | Summary Description |
|---|---|
| **Purchase Price** | $415,000,000 |
| **Assets** | The Assets are defined in the Stalking Horse Agreement as the "Transferred Assets." The Assets include all of the rights, title and interests in, to and under the assets and interests of the Seller Group that are used, held for use or useful in connection with the Business (other than the Excluded Assets) as the same shall exist on the Closing Date:<br><br>(a) to the extent transferable, the Permits held by the Seller Group used in the Business or used in connection with the Transferred Assets;<br><br>(b) all Contracts to which a member of the Seller Group is a party that Purchaser elects to assume pursuant to Section 2.4 but excluding any Seller Plan and Contracts that expire or are terminated prior to the Closing or during the Designation Rights Period, as applicable (each, an "**Assigned Contract**," and collectively, the "**Assigned Contracts**");<br><br>(c) all books and records, documents, files, data and information of the Seller Group, other than the Excluded Books and Records;<br><br>(d) the Owned Intellectual Property, together with all (i) royalties, fees, income, payments, and other proceeds now or hereafter due or payable to Seller with respect to such Owned Intellectual Property; (ii) claims and causes of action with respect to such Owned Intellectual Property, including all past, present and future rights to and claims for damages, restitution, and injunctive and other legal or equitable relief for infringement, misappropriation, or other violation thereof; and (iii) all tangible embodiments of the Owned Intellectual Property, including software, works of authorship, data, documentation, websites, website content and technology;<br><br>(e) all personal property and interests therein, including machinery, equipment, furniture, office equipment, communications equipment, information technology systems, computer systems, hardware, vehicles, spare and replacement parts, fuel, and other tangible personal property used in the Business and owned by the Seller Group;<br><br>(f) all of the Seller Group's rights, claims or causes of action (including, for the avoidance of doubt, any Avoidance Actions or any Action against any officer, director, manager, stockholder, agent, Affiliate, advisor, Representative or employee of the Seller Group) against third parties or any Transferred Employees relating to the assets, properties, business or operations of the Seller Group that are related to the Business, the Transferred Assets or the Assumed Liabilities, except for such rights, claims and causes of action solely related to the Excluded Assets or Excluded Liabilities (the "**Acquired Claims**");<br><br>(g) all Inventory;<br><br>(h) all Accounts Receivable; |

terms used but not otherwise defined in this summary shall have the meanings ascribed to such terms in the Stalking Horse Agreement.

|  | (i) all marketing, advertising, and promotional materials and product samples and designs used in the Business and owned by the Seller Group; |
|---|---|
|  | (j) all prepaid expenses of the Seller Group, including deposits, security deposits, merchant deposits, prepaid rent, escrow monies, and prepaid expenses previously paid by the Seller Group to fulfill the Seller Group's obligations under any Transferred Assets; |
|  | (k) the right to receive and retain mail and other communications of the Seller Group and the right to bill and receive payment for services performed or transactions processed that are unbilled or unpaid as of the Closing, in each case, to the extent related to the Transferred Assets or the Assumed Liabilities; |
|  | (l) all third-party warranties, guarantees, refunds, rights of recovery, rights of set-off or counter-claim and rights of recoupment of every kind and nature for the benefit of, or enforceable by, any member of the Seller Group, in each case that are related to the Business, the Transferred Assets or the Assumed Liabilities; and |
|  | (m) all goodwill, customer and referral relationships, and other intangible assets related to the Business or the Transferred Assets. |
| **Excluded Assets** | The Excluded Assets shall include:<br><br>(a) all (i) cash and cash equivalents (including the Customer Deposit Balance), wherever located, including bank balances and bank accounts or safe deposit boxes, monies in the possession of any banks, savings and loans or trust companies and similar cash items, (ii) except to the extent related to an Assigned Contract, escrow monies and deposits in the possession of landlords and utility companies, and (iii) investment securities and other short- and medium-term investments;<br><br>(b) all rights of the Seller Group under this Agreement or the Related Documents, including, without limitation, the right to receive the Purchase Price and to enforce the Seller Group's rights and remedies thereunder;<br><br>(c) all Excluded Contracts, other than the Assigned Contracts, to which any member of the Seller Group or any of their respective Affiliates is a party;<br><br>(d) (i) any attorney-client privilege and attorney work-product protection of any member of the Seller Group or associated with the Business as a result of legal counsel representing any member of the Seller Group or the Business, including in connection with the Transactions; (ii) all documents subject to the attorney-client privilege and work-product protection described in the foregoing clause (i); (iii) all documents maintained by any member of the Seller Group relating to the drafting, negotiation, execution, delivery and performance of this Agreement, any Related Document or any agreements with any other bidder in connection with any sale process previously conducted by or in which any member of the Seller Group was previously involved, including the sale process leading to the entry into this Agreement; and (iv) claims (and resulting proceeds) under any director and officer, errors and omissions, fiduciary, commercial crime insurance and other insurance policies;<br><br>(e) any rights of the Seller Group to Tax refunds (including any rights to refunds, credits or other rebates arising from or relating to tariffs, duties or similar charges) or credits for overpayment of Taxes in lieu of a refund, in each case |

13

| | |
|---|---|
| | attributable to (i) Taxes that the Seller Group paid prior to the Closing, (ii) Taxes that are Excluded Liabilities or (iii) Property Taxes for which the Seller Group is liable pursuant to Section 7.3; |
| | (f) the Excluded Books and Records; |
| | (g) any capital stock, shares, warrants, stock options, membership interests, partnership interests, units, or other equity or equity-linked securities of any member of the Seller Group or of any other Person; |
| | (h) all Seller Plans and all assets, trusts, accounts, insurance policies and other rights and interests relating thereto; |
| | (i) any assets not otherwise designated as Transferred Assets; |
| | (j) all rights and interests of the Seller Group to the assets, claims and other matters listed on Schedule 2.2(j); |
| | (k) except for Acquired Claims, all of the Seller Group's rights, claims or causes of action against third parties relating to the assets, properties, business or operations of the Seller Group (including all guaranties, warranties, indemnities and similar rights in favor of the Seller Group or any of their Affiliates) to the extent arising under the Bankruptcy Code or relating to any of the Excluded Assets or Excluded Liabilities, in each case, whether arising by way of counterclaim or otherwise, and whether arising out of transactions occurring prior to, on or after the Closing Date; and |
| | (l) all prepaid expenses, claims, deposits, prepayments, refunds, causes of action, demands, Actions, suits, rights of recovery, rights under guarantees, warranties, indemnities and all similar rights against third parties, rights of setoff and rights of recoupment, in each case, to the extent related to or used in or held for use for the Excluded Assets listed in clauses (a) through (k) above |
| **Assumed Liabilities** | The Assumed Liabilities shall include: |
| | (a) all Liabilities (other than Taxes) arising under the Assigned Contracts, that first are incurred or arise after the Closing Date and to the extent they are not the result of a breach of any Assigned Contract prior to the Closing; |
| | (b) all Liabilities (other than Taxes) arising from the Transferred Assets, that first are incurred or arise after the Closing Date; |
| | (c) all Liabilities outstanding as of or arising after the Closing for returns of merchandise previously sold to customers, to the extent such returns are in compliance with the applicable return policy in effect as of the time of such sale; |
| | (d) all Liabilities for gift cards or gift certificates validly issued by the Seller Group in the ordinary course of business and outstanding as of the Closing, including any outstanding customer loyalty, rewards or similar program obligations to the extent such rewards are redeemable for gift cards, gift certificates or other merchandise; |
| | (e) all Liabilities for orders placed by the Seller Group's customers for Inventory that has not been shipped to such customer prior to the Closing and all orders for goods, materials or services placed by the Seller Group in good faith and in the ordinary course of business and that are reasonably necessary to fulfill such orders placed by the Seller Group's customers in respect of such Inventory; |

14

| | |
|---|---|
| | (f) all Liabilities arising from any warranties relating to or arising out of any Transferred Asset that are first incurred or arise after the Closing; |
| | (g) (i) all Liabilities for Taxes imposed with respect to or arising out of the Transferred Assets for any Post-Closing Tax Period, (ii) Property Taxes for which Purchaser is liable pursuant to Section 7.3; |
| | (h) solely to the extent such Liabilities relate to periods following the Closing (i) all accounts payable of the Seller Group to the extent related to the Business, arising out of or related to the purchase of goods, materials or services in the ordinary course of business by or on behalf of the Seller Group and (ii) all other trade payables of the Seller Group incurred in the ordinary course of business, to the extent related to the Business or the Transferred Assets; |
| | (i) all Liabilities arising out of or relating to any of the Transferred Employees solely to the extent such Liabilities are first incurred or arise after the Closing; |
| | (j) all Liabilities related to or arising out of the ownership and operation of the Transferred Assets or the Business from and after the Closing; |
| | (k) all Cure Costs (subject to the Cure Costs Deductions as set forth in Section 2.10(a)); |
| | (l) Liabilities equal to $10,278,441 in Accounts Payable in respect of Inventory (the "**Inventory Accounts Payable Cap**"); and |
| | (m) all Liabilities for which the Purchaser is responsible pursuant to Section 2.4(j) of this Agreement during the Designation Rights Period. |
| **Excluded Liabilities** | Purchaser is assuming only the Assumed Liabilities of the Seller Group and shall not assume, be obligated to pay, perform or otherwise discharge, or in any other manner be liable or responsible for any other Liabilities of, or Action against, the Seller Group or relating to the Transferred Assets or the Business, of any kind or nature whatsoever, whether absolute, accrued, contingent, or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing or arising thereafter as a result of any act, omission, or circumstance taking place prior to the Closing. |
| **Transferred Employees** | Prior to the Closing, the Purchaser shall offer employment to the Business Employees determined by the chief executive officer of Seller, which must be approved by the Purchaser (not to be unreasonably withheld), on such terms and conditions as set forth in Section 6.7(c). In no event shall the Purchaser be obligated to hire or engage any Business Employees for any period following the Closing. The Purchaser shall have no obligation to continue or assume any employee plan of the Seller Group or to offer any employee plan to service providers, other than as set forth in Section 6.7(c). Subject to Section 6.7(b) below, those Business Employees to whom offers of employment are made, who accept such offer of employment within the time period set forth in the offer, and who commence employment as of the Closing Date shall be collectively referred to as the "**Transferred Employees**." |
| **Termination** | The Stalking Horse Agreement may be terminated:<br><br>(a) by mutual written consent of Purchaser and the Seller; |

15

(b) by Purchaser or the Seller, by written notice to Purchaser or the Seller from the other, if (i) the Bankruptcy Court shall enter an order approving a Competing Bid or any sale or other disposition of all or substantially all of the Transferred Assets to a Person other than Purchaser or any of its Affiliates (each, an "**Alternate Transaction**") and (ii) either (A) the Purchaser is not serving as the Back-Up Bid or (B) such Alternate Transaction is consummated;

(c) by Purchaser if (i) the Bid Procedures Motion is withdrawn, or the Seller publicly announces its intention to withdraw such motion, (ii) a motion is filed to voluntarily dismiss the Bankruptcy Cases, (iii) a motion is filed for conversion of the Bankruptcy Cases to Chapter 7 of the Bankruptcy Code, or (iv) a motion is filed for appointment of an examiner with expanded powers pursuant to Section 1104 of the Bankruptcy Code or a trustee in the Bankruptcy Cases;

(d) by Purchaser, by written notice from Purchaser to Seller, if any of the Bankruptcy Court Milestones set forth in Section 5.9 are not met and have not been extended by written agreement between Purchaser and Seller (email from counsel being sufficient);

(e) by Purchaser if (i) following entry by the Bankruptcy Court of the Bid Procedures Order, such order is (x) amended, modified or supplemented in a manner materially adverse to Purchaser without Purchaser's prior written consent or (y) voided, reversed or vacated, or (ii) following entry by the Bankruptcy Court of the Sale Order, the Sale Order is (x) amended, modified or supplemented in a manner materially adverse to Purchaser without Purchaser's prior written consent or (y) voided, reversed or vacated;

(f) by Purchaser, by written notice from Purchaser to the Seller, if there has been a breach or inaccuracy of a covenant, representation or warranty made by the Seller in this Agreement, such that the conditions in Section 8.1 or Section 8.2 are not capable of being satisfied and which breach is incapable of being cured or, if capable of being cured, has not been cured by the Seller prior to the earlier of (i) fifteen (15) Business Days after receipt of written notice from Purchaser requesting such breach be cured or (ii) the Outside Date; provided, however, that the right to terminate this Agreement pursuant to Section 9.1(e) shall not be available to Purchaser if the conditions in Section 8.1 or Section 8.2 are not capable of being satisfied because there is then a breach or inaccuracy of a covenant, representation or warranty made by Purchaser in this Agreement;

(g) by the Seller, by written notice from the Seller to Purchaser, if there has been a breach or inaccuracy of a covenant, representation or warranty made by Purchaser in this Agreement, such that the conditions in Section 8.1 or Section 8.3 are not capable of being satisfied and which breach is incapable of being cured or, if capable of being cured, has not been cured by Purchaser prior to the earlier of (i) fifteen (15) Business Days after receipt of written notice from the Seller requesting such breach be cured or (ii) the Outside Date; provided, however, that the right to terminate this Agreement pursuant to Section 9.1(f) shall not be available to the Seller if the conditions in Section 8.1 or Section 8.3 are not capable of being satisfied because there is then a breach or inaccuracy of a covenant, representation or warranty made by the Seller in this Agreement;

(h) by Purchaser or the Seller, by written notice from Purchaser or the Seller to the other, if any Governmental Authority of competent jurisdiction shall have issued an Order that has become a Final Order or enacted any Law, in each case,

16

| | |
|---|---|
| | restraining, enjoining or otherwise prohibiting the consummation of the Transactions; |
| | (i) by Purchaser or the Seller, by written notice from Purchaser or the Seller to the other, if the Closing has not occurred on or prior to the Outside Date; provided, however, that the party exercising the right to terminate this Agreement pursuant to Section 9.1(i) shall not have been primarily responsible for such failure of the Closing to occur through a breach or inaccuracy of a covenant, representation or warranty contained in this Agreement; or |
| | (j) by Seller by written notice to Purchaser if the boards of directors of any of Seller Group determine that proceeding with the Transactions or failing to terminate this Agreement would be inconsistent with their fiduciary obligations under applicable Law consistent with Section 10.19. |
| **Bid Protections** | The Bid Protections shall include: (a) Break-Up Fee in the amount of 3% of the Purchase Price; and (b) Expense Reimbursement in an amount not to exceed $4,000,000. |

### ii.   The Bidding Procedures

24.   The Bidding Procedures are designed to promote a competitive and efficient sale process either to confirm that the Stalking Horse Bid is, indeed, the highest or otherwise best offer for the Assets or to identify one or more alternative bids (if any) that are higher or otherwise better with respect to the sale of the Assets.  If approved, the Bidding Procedures will allow the Debtors to solicit and identify bids from potential buyers or investors that constitute the highest or otherwise best offer for the Assets on a schedule consistent with the deadlines under the Stalking Horse Agreement, the Bidding Procedures, the DIP Loan Agreement, and the Debtors' strategy for maximizing value for their stakeholders.

25.   As the Bidding Procedures are attached to the Bidding Procedures Order, they are not restated herein in their entirety.  Certain of the key terms of the Bidding Procedures are highlighted in the chart below.[6]

---

[6] To the extent that there is any inconsistency between the terms of the Bidding Procedures and the summary of such terms in this Motion, the terms of the Bidding Procedures shall control. Capitalized terms used but not otherwise defined in this summary shall have the meanings ascribed to such terms in the Bidding Procedures.

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| **Provisions Governing Qualification of Bidders and Qualified Bids** | **Parts 1 and 2 of the Bidding Procedures set forth the Qualified Bid and Qualified Bidder requirements.** |
| | A party may participate in the bidding process by submitting a bid for the Assets. |
| | **A.      Interested Parties.**   Unless otherwise ordered by the Court for cause shown, to participate in the bidding process described herein (the "Bidding Process"), each interested person or entity (other than the Stalking Horse Bidder, which shall be deemed a Potential Bidder and a Qualified Bidder and is deemed to have satisfied each of the below requirements) (each, an "Interested Party") must deliver the following items (unless previously delivered) to Guggenheim Securities: |
| | 1.   an executed confidentiality agreement in form and substance satisfactory to the Debtors; <u>provided</u> that Interested Parties that executed a confidentiality agreement with the Debtors concerning a Sale Transaction within 12 months of the Petition Date and which confidentiality agreement remains in full force and effect will not be required to execute an additional confidentiality agreement to participate in the Bidding Process; |
| | 2.   a statement and other factual support demonstrating, to the Debtors' satisfaction, that the Interested Party has a *bona fide* interest in purchasing the Assets; |
| | 3.   a description of the nature and extent of any due diligence the Interested Party wishes to conduct and the date in advance of the Bid Deadline (as defined below) by which such due diligence will be completed; and |
| | 4.   sufficient information, to the Debtors' satisfaction, to allow the Debtors to determine that the Interested Party has the financial wherewithal and any required internal corporate, legal, or other authorizations to close the Sale Transaction pursuant to these Bidding Procedures, which may include current audited financial statements of the Interested Party (or such other form of financial disclosure acceptable to the Debtors) or, if the Interested Party is an entity formed for the purpose of acquiring the Assets, (A) current audited financial statements of the equity holder(s) (the "**Sponsor(s)**") of the Interested Party (or such other form of financial disclosure acceptable to the Debtors), (B) a written commitment acceptable to the Debtors that the Sponsor(s) are responsible for the Interested Party's obligations in connection with the Bidding Process, and (C) copies of any documents evidencing any financing commitments necessary to consummate the Sale Transaction. |
| | If the Debtors determine, after receipt of the items identified in Section 1(a)(i)-(iv) above and after consultation with the DIP Agent, that an Interested Party has a *bona fide* interest in purchasing the Assets, such Interested Party will be deemed a "**Potential Bidder**" and the Debtors will provide such Potential Bidder with (a) an electronic copy of the Stalking Horse Agreement and (b) access to the Debtors' confidential electronic data room concerning the Assets (the "**Data Room**"), which shall include a form of Sale Order. |

18

| MATERIAL TERMS OF THE BIDDING PROCEDURES |
|---|

**B.     Due Diligence.**  Until the Bid Deadline, in addition to granting access to the Data Room, the Debtors will provide Potential Bidders with due diligence access and additional information as may be requested by a Potential Bidder, to the extent that the Debtors determine that such requests are reasonable and appropriate under the circumstances.  All due diligence requests for the Debtors shall be directed to Guggenheim Securities.  The Debtors, with the assistance of Guggenheim Securities and/or their other advisors, will coordinate all reasonable requests for additional information and due diligence access from Potential Bidders.

The Debtors reserve the right to withhold any diligence materials from any Potential Bidder that the Debtors determine are commercially sensitive or otherwise not appropriate for disclosure to such Potential Bidder, or to require that the Potential Bidder enter into a "clean team" or similar arrangement acceptable to the Debtors in order to receive such diligence materials.

Unless otherwise determined by the Debtors, the availability of due diligence to a Potential Bidder will cease if (a) the Potential Bidder does not become a Qualified Bidder or (b) the Bidding Process is terminated in accordance with its terms.

**C.     Bid Deadline.**  A Potential Bidder who desires to be deemed a Qualified Bidder must deliver to Guggenheim Securities, with copies to Davis Polk & Wardwell LLP ("**Davis Polk**") (Attn:     Brian M. Resnick (brian.resnick@davispolk.com),     Angela     M.     Libby (angela.libby@davispolk.com), Brian Wolfe (brian.wolfe@davispolk.com); Lee Parnes     (lee.parnes@davispolk.com);     and     Richard J. Steinberg (richard.steinberg@davispolk.com)), the Required Bid Documents (as defined below), so as to be received no later than **4:00 p.m. on July 8, 2026** (the "**Bid Deadline**").  The Debtors will subsequently deliver copies of the Required Bid Documents to the DIP Agent.  The Debtors, with the consent of the DIP Agent (not to be unreasonably withheld) and without the need for further Court approval, may extend the Bid Deadline by a reasonable period of time if the Debtors believe that such extension would further the goal of attaining the highest or otherwise best offer for the Assets.  If the Debtors extend the Bid Deadline, the Debtors will notify all Potential Bidders of such extension.

**D.     Bid Requirements.**

1.    Required Bid Documents.  All bids (other than the Stalking Horse Bid, which has satisfied or is deemed to have satisfied each of the below requirements, and with respect to which the deposit requirements will be governed by the Stalking Horse Agreement), must include the following items (collectively, the "**Required Bid Documents**"):

   a.  a letter stating that the bidder's offer is irrevocable until consummation of the Sale Transaction;

   b.  a duly authorized and executed (a) purchase agreement satisfactory to the Debtors, based on the form of the Stalking Horse Agreement, and a redline marked to show any revisions to the form Stalking Horse Agreement, or (b) an equity investment agreement (as applicable), in each case, which shall include the

19

| MATERIAL TERMS OF THE BIDDING PROCEDURES |
|---|

purchase price for the Assets.  For the avoidance of doubt, a "conceptual" or "issues list"-style markup of the form asset purchase agreement would not satisfy this requirement;

   c.   written evidence acceptable to the Debtors, demonstrating a firm commitment for financing to consummate the Sale Transaction (or evidence of an ability to consummate the Sale Transaction without financing), operational ability, and corporate authorization to consummate the Sale Transaction, including the payment of any contingent or deferred consideration; and

   d.   a written acknowledgment that the Potential Bidder (a) has had an opportunity to conduct any and all due diligence regarding the Assets and the Sale Transaction, (b) has relied solely upon its own independent review, investigation, and/or inspection of any documents and any other information in making the bid, (c) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, by the Debtors or any of their advisors (including Guggenheim Securities, AlixPartners, and Davis Polk) or other representatives regarding the bid, the Assets or the Sale Transaction, or the completeness or accuracy of any information provided in connection therewith or with the Auction, except solely with respect to the Debtors, as expressly stated by them in these Bidding Procedures, and (d) did not engage in any collusive conduct and acted in good faith in submitting its bid.

2.   <u>Identity of Purchaser</u>.  Full disclosure of the legal name of the purchaser (including any Sponsor(s), if the purchaser is an entity formed for the purpose of consummating the Sale Transaction).

3.   <u>Bid Assets; Consideration</u>.

   a.   Identification of the Assets to be acquired and the Contracts, Leases, and liabilities (if any) to be assumed.

   b.   A statement of the Potential Bidder's intentions with respect to the relevant members of the Debtors' current management team and other employees.

   c.   The consideration, including the form thereof, for the Assets to be purchased and the Contracts and Leases to be assumed (the "**Bid Consideration**"); <u>provided</u> that the consideration must be at least equal to the following:  (a) the Stalking Horse Purchase Price; *plus* (b) a cash component equal to $4,000,000 plus 3% of the Purchase Price (which consists of an amount equal to the Bid Protections (as defined below); *plus* (c) cash or non-cash consideration in the amount of $10,000,000 (the "**Minimum Overbid Amount**").

   d.   Clear indication of which portion of the Bid Consideration will be paid at Closing and which portion (if any) will be deferred or

| MATERIAL TERMS OF THE BIDDING PROCEDURES |
|---|

contingent (and, in the event that a portion is deferred or contingent, clearly indicates when such amount would be due and payable) and any conditions or prerequisites to payment of such deferred or contingent consideration.

4. <u>No Financing/Diligence Contingency</u>.   No condition on (a) obtaining financing or (b) the outcome of unperformed due diligence.

5. <u>Regulatory Approvals</u>.   A description of all governmental, licensing, regulatory, or other approvals or consents that are required to consummate the Sale Transaction (including any antitrust approval related to the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended or any other Antitrust Law (as defined in the Stalking Horse Agreement), together with evidence satisfactory to the Debtors of the ability to obtain such approvals or consents as soon as reasonably practicable, as well as a description of any material contingencies or other conditions that will be imposed upon, or that will otherwise apply to, the obtainment or effectiveness of any such approvals or consents.

6. <u>Alternate Bidder</u>.   A statement that the Potential Bidder agrees to serve as a Back-Up Bidder (as defined below) if such Potential Bidder's Qualified Bid is selected as the next highest or next best bid after the Successful Bid (as defined below) with respect to the Assets.

7. <u>Good Faith Deposit</u>.   A cash deposit by wire transfer to an escrow agent selected by the Debtors (the "**Deposit Agent**") in an amount equal to ten (10) percent of the consideration set forth in connection with such bid (any such deposit, a "**Good Faith Deposit**"); <u>provided</u> that a Credit Bid (as defined below) need not be accompanied by a Good Faith Deposit.

8. <u>Authorized Representatives</u>.   A list setting forth the representatives that are authorized to appear and act on behalf of the Potential Bidder in connection with the Sale Transaction.

9. <u>No Bid Protections</u>.   A statement that the Potential Bidder will not seek any transaction or break-up fee, expense reimbursement, or similar type of payment, and that it waives any substantial contribution administrative expense claims under section 503(b) of the Bankruptcy Code.

10. <u>Adequate Assurance</u>. Evidence of the Potential Bidder's ability to comply with section 365 of the Bankruptcy Code (to the extent applicable), including providing adequate assurance of such Potential Bidder's ability to perform in the future the Contracts and Leases proposed in its bid to be assumed by the Debtors and assigned to the Potential Bidder, in a form that will permit the Debtors to disseminate immediately such evidence to the non-Debtor counterparties to such Contracts and Leases, which such adequate assurance information may include: (a) the specific name of the proposed assignee, the proposed name under which the proposed assignee intends to operate the leased premises if not the current trade-name of the Debtors, (b) a corporate organizational chart or similar disclosure identifying corporate ownership and control, (c) audited or unaudited financial statements, tax returns, bank account statements or annual reports; (d) the proposed assignee's intended use of the leased premises

21

| MATERIAL TERMS OF THE BIDDING PROCEDURES |
|---|

and a description of the proposed business to be conducted at the premises; (e) a contact person for the proposed assignee; and/or (f) any other documentation that the Debtors may further request.

11. Cure Costs. Indication that the Potential Bidder will assume all Cure Costs associated with any Contracts and Leases it intends to assume.

12. Gift Card Treatment. A description of the Potential Bidder's proposed treatment of the Debtors' outstanding gift cards and gift certificates following the closing of the Sale Transaction.

13. Transition Services. An estimation the types of transition services, if any, the Potential Bidder would require of and/or provide to the Debtors, including an estimate of the time any such transition services would be required of and/or provided to the Debtors, if the Potential Bidder's bid were selected as the Successful Bid for the applicable Assets.

14. Employee Retention. (i) Indicates whether the Potential Bidder intends to hire all or some of the employees who are primarily employed in connection with the Assets to be included in the proposed Sale Transaction and (ii) confirms whether the Potential Bidder will assume any severance, state or federal WARN Act, or similar obligations of the Debtors arising prior to the Closing.

**E.    Designation of Qualified Bids; Cure of Non-Qualifying Bids.**  The Debtors shall have the right, in consultation with the DIP Agent, to deem a bid a Qualified Bid even if such bid does not conform to one or more of the requirements above or does not include one or more Required Bid Documents, provided that such bid (i) must include a cash component sufficient to satisfy the Bid Protections and (ii) must satisfy the Minimum Overbid Amount.  The Debtors will be authorized to approve joint bids in their reasonable discretion on a case-by-case basis, in consultation with the DIP Agent.

If the Debtors receive a bid prior to the Bid Deadline that is not a Qualified Bid, the Debtors may provide the Potential Bidder with the opportunity to remedy any deficiencies up to one (1) business day prior to the Auction.  If any bid is determined by the Debtors not to be a Qualified Bid, and the applicable Potential Bidder fails to remedy such bid in accordance with these Bidding Procedures, the Debtors, to the extent applicable, shall promptly instruct the Deposit Agent to return such Potential Bidder's Good Faith Deposit.  For the avoidance of doubt, the Stalking Horse Bidder shall be deemed a Qualified Bidder and the Stalking Horse Agreement shall be deemed a Qualified Bid for all purposes in connection with these Bidding Procedures, and the Stalking Horse Bidder shall, without any further action, be entitled to participate in any Auction.

**F.    Deemed Acknowledgments and Representations.**    Each Qualified Bidder shall be deemed to acknowledge and represent that:

1.   has reviewed, understands, and accepts these Bidding Procedures;

2.   has consented to the jurisdiction of the Court;

3.   intends to consummate its Qualified Bid if it is selected as the Successful Bidder;

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| | 4. has had an opportunity to conduct any and all due diligence regarding the Assets that are the subject of the Auction prior to making any such bid;<br><br>5. has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the assets in making its bid; and<br><br>6. did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith, except as expressly stated in these Bidding Procedures or, as to the Stalking Horse Bidder, the Stalking Horse Agreement, or, as to any other Successful Bidder, the Asset Purchase Agreement with such Successful Bidder. |
| **Provisions Providing Bid Protections to Stalking Horse Bidder** | **Part 3 outlines the terms of the Bid Protections being provided to the Stalking Horse Bidder.**<br><br>If the Stalking Horse Bidder is not the Successful Bidder or the Back-Up Bidder until the Back-Up Termination Date (as defined in the Stalking Horse Agreement), the Debtors will pay to the Stalking Horse Bidder the Break-Up Fee and the Expense Reimbursement (collectively, the "**Bid Protections**"). The payment of the Break-Up Fee, which is $3% of the Purchase Price, and Expense Reimbursement, which shall not exceed $4,000,000, will be governed by the provisions of the Stalking Horse Agreement and the Bidding Procedures Order.<br><br>Other than any Bid Protections provided to the Stalking Horse Bidder pursuant to the terms of the Stalking Horse Agreement, no bidder or other party shall be entitled to any termination or "break-up" fee, expense reimbursement, or any other bidding protection in connection with the submission of a bid for the Assets. |
| **Provisions Governing the Auction and Permitting the Modification of Bidding and Auction Procedures** | **Part 4 of the Bidding Procedures sets forth the procedures governing the Auction.**<br><br>**A.   Date, Time, and Location.**  The Auction shall be conducted in accordance with these Bidding Procedures and upon notice to all Qualified Bidders that have submitted Qualified Bids.  The Auction shall be conducted at the offices of Davis Polk, 450 Lexington Avenue, New York, NY 10017 on **July 13, 2026 at 10:00 a.m.**, or such later time on such day, such other day, or such other place (including remotely via videoconference) as the Debtors shall notify all Participating Parties (as defined below).  If no Qualified Bids other than the Stalking Horse Bid are submitted by the Bid Deadline, the Debtors shall, within two (2) business days after the Bid Deadline, cancel the Auction and seek approval of the Sale Transaction contemplated in the Stalking Horse Bid at the Sale Hearing.<br><br>**B.   Participants and Attendees.**  Attendance will be limited to the representatives or agents of the Debtors, the DIP Agent, and the Qualified Bidders, and the legal, financial and investment banking advisors to each of the foregoing (collectively, the "**Participating Parties**"), will be entitled to attend the Auction, and only Qualified Bidders will be entitled to make any Subsequent Bids at the Auction.  The Debtors may, in consultation with the DIP Agent, establish a reasonable limit on the number of representatives and professional |

| MATERIAL TERMS OF THE BIDDING PROCEDURES |
|---|

advisors that may appear on behalf of or accompany each Qualified Bidder at the Auction; <u>provided</u> that the Stalking Horse Bidder shall not be subject to such limitation.

**C.   Auction Procedures.**

1.   <u>Notice of Qualification</u>.  At least one (1) day prior to the Auction, the Debtors (either directly or through or their advisors) will (a) notify each Qualified Bidder that has timely submitted a Qualified Bid that its bid is a Qualified Bid and (b) provide all Qualified Bidders (including the Stalking Horse Bidder) with (i) a list identifying all Qualified Bidders and their respective Qualified Bids, (ii) copies of all Qualified Bids (including any redline marked to show any revisions to the form Stalking Horse Agreement); (iii) a statement that identifies which Qualified Bid it deems the highest or otherwise best bid at the outset of the Auction (the "**Starting Bid**") and (iv) an explanation of how the Debtors value the Starting Bid (including, to the extent that the Debtors ascribe value to non-cash components, an explanation of the valuation of each such component).

2.   <u>Starting Bid</u>.  The first round of bidding at the Auction shall commence at the Starting Bid.

3.   <u>Subsequent Bids</u>.  Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding in the presence of all parties at the Auction, so long as during each round at least one subsequent bid (a "**Subsequent Bid**") is submitted by a Qualified Bidder that (a) provides for a higher or otherwise better offer than such Qualified Bidder's immediately prior Qualified Bid and (b) the Debtors, in their discretion, determine that such Subsequent Bid is (i) with respect to the first round, a higher or otherwise better offer than the Starting Bid and (ii) with respect to subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined below); <u>provided</u> that, the Debtors, in their discretion, may determine appropriate minimum bid increments or requirements for each round of bidding. For the avoidance of doubt, in any round of bidding, the Stalking Horse Bidder will be entitled to a "credit" in the amount of the Bid Protections to be counted toward its bid in such round.

4.   <u>Highest or Best Offer</u>.  After the first round of bidding and between each subsequent round of bidding, as applicable, the Debtors, in their discretion, will determine and announce the bid or bids that they believe to be the highest or otherwise best offer (the "**Leading Bid**"). Additional consideration in excess of the amount set forth in the Starting Bid may include cash and/or non-cash consideration; <u>provided</u> that the value for such non-cash consideration shall be determined by the Debtors, in their discretion and in consultation with the DIP Agent.  In connection with each such determination, the Debtors shall provide all Qualified Bidders with an explanation of how the Debtors are valuing the bids submitted in such round.

24

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| | 5. <u>Modification of Bidding and Auction Procedures</u>.  The Debtors may, in consultation with the DIP Agent, employ and announce at the Auction additional procedural rules for conducting the Auction (*e.g.*, governing the amount of time allotted to submit Subsequent Bids); <u>provided</u> that such rules shall (a) not be inconsistent with the Bankruptcy Code, the Bidding Procedures Order, or any other order of the Court entered in connection herewith, (b) be disclosed to all Qualified Bidders, and (c) apply equally to each Qualified Bidder in a round and shall not be changed within any given round of bidding. |
| **Provisions Regarding Selection of Successful Bid and Alternate Bid** | **Part 5 of the Bidding Procedures sets forth procedures by which the Debtors shall select the Successful Bid and Alternate Bid.**<br><br>**A.    Selection of Successful Bids.**  Prior to the conclusion of the Auction, the Debtors shall in their discretion and in consultation with the DIP Agent (i) review and evaluate each bid made at the Auction on the basis of financial and contractual terms and other factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Sale Transaction, (ii) determine and identify the highest or otherwise best offer (the **"Successful Bid"**), (iii) determine and identify the next highest or otherwise best offer (the **"Back-Up Bid"**), and (iv) notify all Qualified Bidders participating in the Auction, prior to its adjournment, of (a) the identity of the party that submitted the Successful Bid, which may be the Stalking Horse Bidder (the **"Successful Bidder"**), (b) the amount and other material terms of the Successful Bid, (c) the identity of the party that submitted the Back-Up Bid (the **"Back-Up Bidder"**), and (d) the amount and other material terms of the Back-Up Bid.  Each Qualified Bidder shall agree and be deemed to agree to be the Back-Up Bidder if so designated in accordance with terms of the applicable definitive agreement.<br><br>Absent irregularities in the conduct of the Auction or reasonable and material confusion during the bidding, each as determined by the Court, the Debtors will not consider bids after the Auction has closed.<br><br>**B.    Execution of Definitive Documentation.**  As soon as reasonably practicable after the completion of the Auction, the Successful Bidder and the applicable Debtors shall complete and execute all agreements, instruments, and other documents necessary to consummate the applicable sale or other transaction contemplated by the Successful Bid.  Promptly following the selection of the Successful Bid and Back-Up Bid, the Debtors shall file a notice of the Successful Bid and Back-Up Bid on the Court's docket, together with a revised proposed order approving the Sale Transaction (the **"Sale Order"**). |
| **Provisions Regarding Sale Hearing and Closing with Successful Bidders and Alternative Bidders** | **Part 6 of the Bidding Procedures sets forth procedures regarding closing a Sale Transaction with the Successful Bidder or Alternate Bidder.**<br><br>The hearing to consider the proposed Sale Order (the "**Sale Hearing**") will be held on **July 15, 2026 at [●].m.**, subject to Court availability, before the Honorable Judge [●], in the United States Bankruptcy Court for the Southern District of New York, [●], or by such other virtual or electronic means as may be determined by the Court.  The Sale Hearing may be adjourned by the Debtors by an announcement at a hearing before the Court or by filing a notice on the Court's docket.  At the Sale Hearing, |

25

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| | the Debtors will seek the Court's approval of the Successful Bid and the Back-Up Bid in the event that the Successful Bidder fails to consummate the transaction contemplated by its Successful Bid. |
| | The Debtors' presentation to the Court of the Successful Bid and Back-Up Bid will not constitute the Debtors' acceptance of such bids, which acceptance will only occur upon approval of such bids by the Court. Following the Court's entry of the Sale Order, the Debtors and the Successful Bidder shall proceed to consummate the Sale Transaction contemplated by the Successful Bid in accordance with the terms of the applicable definitive agreement. If the Debtors and the Successful Bidder fail to consummate the proposed transaction in accordance with the terms of the applicable definitive agreement, then the Debtors shall file a notice with the Court advising of such failure. Upon the filing of such notice with the Court, the Back-Up Bid will be deemed to be the Successful Bid and the Debtors will be authorized, but not directed, to effectuate the Sale Transaction with the Back-Up Bidder, subject to the terms of the Back-Up Bid and in accordance with the terms of the applicable definitive agreement, without further order of the Court. If the failure to consummate the transactions contemplated by either the Successful Bid or the Back-Up Bid is the result of a breach by the Successful Bidder or Back-Up Bidder, as applicable (the **"Breaching Bidder"**), of its definitive agreement, the Debtors reserve the right to seek all available remedies from such Breaching Bidder, subject to the terms of the applicable definitive agreement (which shall include, as applicable to the Stalking Horse Bidder, the terms of the Stalking Horse Agreement). |

### iii.    *Extraordinary Provisions*

26.    Section I.D of the Sale Guidelines provides that the Debtors must conspicuously disclose any "Extraordinary Provisions" in connection with the conduct of certain asset sales. Out of an abundance of caution, the Debtors disclose that the relief sought herein may include the following Extraordinary Provisions:

| Provision | Summary Description |
|---|---|
| **Use of Proceeds** <br> Guideline I.D.7 | The Debtors seek approval in the Sale Order to use sale proceeds to fund a reserve (the "**Reserve**") to ensure that sufficient proceeds are set aside to make required payments with respect to administrative claims (including purchase price adjustments), priority claims, tax claims and a wind-down budget, in connection with the prosecution and continuation of the Chapter 11 Cases. In accordance with the mandatory prepayment provisions of the DIP Loan Agreement, the Debtors also seek approval in the Sale Order to use sale proceeds to satisfy outstanding DIP Obligations; provided, that, prior to the distribution of any sale proceeds to the DIP Lenders, the Reserve shall be established and funded. This construct protects the estates by preventing sale proceeds from being applied at closing of the sale in a manner that could leave the estates unable |

26

| | |
|---|---|
| | to satisfy administrative claims or otherwise successfully administer the Chapter 11 Cases following the sale closing. *See* DIP Loan Agreement, § 2.11(a)(iii). |
| **Record Retention** Guideline I.D.9 | The Stalking Horse Agreement provides that the Stalking Horse Bidder will acquire the books and records related to the Assets (save those the Debtors are required by Law to retain, for which access will be made available to the Stalking Horse Bidder post-Closing). The Stalking Horse Agreement grants the Debtors reasonable access to such records, and the Debtors will be able to administer their bankruptcy cases, notwithstanding the sale of any books and records. *See* APA, § 7.1. |
| **Sale of Avoidance Actions** Guideline I.D.11 | The Transferred Assets include all of the Debtors' claims or causes of action to avoid a transfer of property or an obligation incurred by the Debtors pursuant to any applicable section of the Bankruptcy Code, including sections 502, 510, 542, 544, 545, 547 through 553, and 724(a), or any similar actions under any other applicable Law. *See* APA, § 2.1(f). |
| **Requested Findings as to Successor Liability** Guideline I.D.12 | The Stalking Horse Agreement contains a pre-closing covenant that limits the Stalking Horse Bidder's successor liability. *See* APA, § 6.10. |
| **Requested Findings as to Fraudulent Conveyance** Guideline I.D.14 | The Sale Order will include findings that (a) the consideration provided for the Transferred Assets constitutes reasonably equivalent value and fair consideration, and (b) the Stalking Horse Agreement was not entered into, and the Debtors and the Stalking Horse Bidder have not entered into the Stalking Horse Agreement to consummate the Sale for the purpose of hindering, delaying, or defrauding the Debtors' present or future creditors or otherwise fraudulently for the purpose of statutory or common-law fraudulent conveyance and fraudulent transfer claims. |
| **Relief from Bankruptcy Rule 6004(h)** Guideline I.D.16 | The Debtors seek relief from the fourteen-day stay imposed by Bankruptcy Rule 6004(h) on the grounds set forth below. |

27.     To the extent that the Debtors' sale process results in a proposed Sale Transaction that includes additional or modified Extraordinary Provisions, the Debtors will file a supplemental statement on the Court's docket disclosing such Extraordinary Provisions in advance of the Sale Hearing.

### iv.    *Key Dates and Deadlines*

28.    Consistent with the Debtors' need to consummate a sale of the Assets as efficiently as practicable in accordance with the Stalking Horse Agreement and the DIP Loan Agreement, and to maximize value for the Debtors' estates, the Debtors propose the following key dates and deadlines for the sale process, certain of which dates and deadlines may be subject to extension in accordance with the Bidding Procedures:

| | |
|---|---|
| **June 25, 2026** | The deadline for the Debtors to file the Potential Assumption and Assignment Notice (the "**Potential Assumption Notice Deadline**") |
| **July 2, 2026** | Hearing to consider approval of the Bidding Procedures and for entry of the Bidding Procedures Order, subject to Court availability |
| **July 8, 2026 at 4:00 p.m.** | The deadline by which all binding Bids must be submitted to the Debtors by Potential Bidders (the "**Bid Deadline**") |
| **July 10, 2026 at 4:00 p.m.** | The deadline to object to this Motion and the sale of the Assets (including with respect to the identity of the Stalking Horse Bidder and adequate assurance of future performance by the Stalking Horse Bidder) (the "**Sale Objection Deadline**"), with the exception of objections solely related to the identity of the Successful Bidder and adequate assurance of future performance by the Successful Bidder (in each case, other than the Stalking Horse Bidder) |
| **July 10, 2026 at 4:00 p.m.** | The deadline for a Counterparty to object to its Proposed Cure Cost or the Potential Assumption and Assignment Notice (the "**Cure Objection Deadline**"), with the exception of objections solely related to the identity of the Successful Bidder and adequate assurance of future performance by the Successful Bidder (in each case, other than the Stalking Horse Bidder)[7] |
| **July 13, 2026 at 10:00 a.m.** | Auction (if any) to be held at the New York offices of Davis Polk (or such other location as the Debtors may designate in accordance with the Bidding Procedures) |

---

[7] The Cure Objection Deadline shall be 14 days after the Potential Assumption Notice Deadline.

| | |
|---|---|
| **July 13, 2026** | Target date for the Debtors to file the Notice of Auction Results and Proposed Assumption and Assignment Notice (the "**Post-Auction Notice Deadline**") |
| **July 14, 2026 at 4:00 p.m.** | The deadline for a Counterparty to object to the Proposed Assumption and Assignment Notice, if applicable (the "**Post-Auction Objection Deadline**") |
| **July 15, 2026** | Hearing to consider approval of the Sale Transaction and for entry of the Sale Order, subject to Court availability |
| **July 31, 2026** | Closing of the Sale Transaction (subject to obtaining required regulatory approvals) |

## C.   Noticing Procedures

29.   The Debtors propose the following "**Noticing Procedures**":

a. **Sale Notice and Publication**.  As soon as reasonably practicable after entry of the Bidding Procedures Order, the Debtors shall cause the Sale Notice to be served (by email if available or otherwise by first class mail) upon the following parties (or counsel thereto):  (i) the U.S. Trustee; (ii) counsel to the DIP Agent; (iii) counsel to the Stalking Horse Bidder; (iv) counsel to any statutory committee appointed in the Chapter 11 Cases; (v) Counterparties to Contracts and Leases; (vi) the Securities and Exchange Commission; (vii) the Internal Revenue Service; (viii) the United States Attorney's Office for the Southern District of New York; (ix) the state attorneys general for states in which the Debtors conduct business; (x) all other parties asserting a security interest in the assets of the Debtors to the extent reasonably known to the Debtors; (xi) all potential buyers previously identified or solicited by the Debtors or their advisors and any additional parties who have previously expressed an interest to the Debtors or their advisors in potentially acquiring the Assets; (xii) all other known parties with any interest in the Assets; and (xiii) any other party that is identified on Sleep Number's master service list,[8] is entitled to notice under rule 9013-1(c) of the Local Rule, or has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "**Sale Notice Parties**"); provided that the Debtors need not serve the Sale Notice on any party for whom the Debtors are unable to obtain, after reasonable diligence, either an email or physical address as of the entry of the Bidding Procedures Order; provided, further, that the Debtors shall not be obligated to provide supplemental service of the Sale Notice with respect to any Sale Notice that is returned as undeliverable so long as the Debtors have confirmed that any such Sale Notice was sent to the applicable email or physical address on file in the Debtors' books and records and no other email or physical

---

[8] Accessible by visiting https://restructuring.ra.kroll.com/Sleepnumber.

29

address could be obtained after reasonable diligence.  The Debtors will also cause the Sale Notice to be published once in the national edition of the *Wall Street Journal* or another publication with similar national circulation as soon as practicable following entry of the Bidding Procedures Order and will post the Sale Notice and the Bidding Procedures Order on the Debtors' case information website located at https://restructuring.ra.kroll.com/Sleepnumber (the "**Case Information Website**").

This publication of the Sale Notice will provide notice of the sale to any other interested parties whose identities are unknown to the Debtors.  The Sale Notice will include, among other things, (i) the date, time, and place of the Auction (if one is held); (ii) the Bidding Procedures and the dates and deadlines related thereto; (iii) the Sale Hearing; and (iv) instructions for promptly obtaining a copy of the Stalking Horse Agreement.

**Sale Objections**. All objections to the Sale Transaction other than objections related to the identity of the Successful Bidder and adequate assurance of future performance by the Successful Bidder (in each case, other than the Stalking Horse Bidder)) (a "**Sale Objection**") must (i) be in writing, (ii) comply with the Bankruptcy Code, Bankruptcy Rules, and the Local Rules, (iii) state, with specificity, the legal and factual bases thereof, and (iv) be filed with the Court and served on the following parties (the "**Objection Notice Parties**") so that it is actually received by such parties on or before the Sale Objection Deadline: (A) proposed counsel to the Debtors, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, NY 10017, Attn: Brian M. Resnick, Angela M. Libby, Richard J. Steinberg, and Mordechai Rivkin; (B) counsel to the DIP Agent, Faegre Drinker Biddle & Reath LLP, 2200 Wells Fargo Center, 90 S. 7th Street, Minneapolis, MN 55402, Attn: Michael R. Stewart and Adam C. Ballinger; (C) counsel to the Stalking Horse Bidder, Goodwin Procter LLP, The New York Times Building, 620 Eighth Avenue, New York, NY 10018, Attn: Kizzy Jarashow, Joshua Zachariah, Harrison Freeman, and Benjamin Loveland; (D) counsel to any statutory committee appointed in the Chapter 11 Cases; and (E) the U.S. Trustee.

b. **Notice of Determination of Qualified Bids**.  The Debtors will make a determination regarding which bids qualify as Qualified Bids.  Prior to the Auction, the Debtors will (i) notify each Qualified Bidder that has timely and properly submitted a Qualified Bid that its bid is a Qualified Bid and (ii) provide all Qualified Bidders (including the Stalking Horse Bidder) with (A) a list identifying all Qualified Bidders and their respective Qualified Bids, (B) copies of all Qualified Bids, (C) a copy of the Starting Bid and (D) an explanation of how the Debtors value the Starting Bid.

c. **Notice of Hearing if Auction Not Held**.  If no Qualified Bids other than the Stalking Horse Bid are submitted by the Bid Deadline, the Debtors will, within two (2) Business Days after the Bid Deadline, cancel the Auction and seek approval of the Sale Transaction contemplated in the Stalking Horse Bid at the

Sale Hearing. If no Auction is to be conducted, the Debtors will file with the Court, serve on the Sale Notice Parties, and cause to be published on the Case Information Website a notice (i) indicating that the Auction for the Assets has been canceled, (ii) indicating that the Stalking Horse Bid is the Successful Bid with respect to the Assets, and (iii) setting forth the date and time of the Sale Hearing.

d. **Notice of Auction Results**. Promptly following the selection of the Successful Bid and Back-Up Bid (if any), the Debtors shall file a notice describing the Successful Bid and Back-Up Bid (the "**Notice of Auction Results**") with the Court and cause the Notice of Auction Results to be published on the Case Information Website.

30. The Noticing Procedures are designed to provide adequate and reasonable notice of the key dates and deadlines for the sale process, including, among other things, the relevant deadlines and the times and locations of the Auction and Sale Hearing. The Debtors submit that notice of this Motion and the related hearing to consider entry of the Bidding Procedures Order, coupled with service of the Sale Notice, constitutes good and adequate notice of the Sale Transaction and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002. Accordingly, the Debtors request that the Court find that the Noticing Procedures are adequate and appropriate under the circumstances and comply with the requirements of Bankruptcy Rule 2002.

**D.     Assumption and Assignment Procedures**

31. In connection with the Sale Transaction, the Debtors anticipate that they will assume and assign to the Successful Bidder (or its designated assignee(s)) (or the Stalking Horse Bidder, as applicable) a substantial number of the Assumed Contracts and Assumed Leases pursuant to section 365(b) of the Bankruptcy Code. Accordingly, the Debtors hereby also seek approval of the proposed Assumption and Assignment Procedures set forth herein, which are designed to, among other things, (a) outline the process by which the Debtors will serve notice to all Counterparties regarding (i) such potential assumption and assignment, (ii) the related Cure

31

Costs, if any, and (iii) adequate assurance of future performance by the Successful Bidder (or the Stalking Horse Bidder, as applicable), and (b) establish (i) objection and other relevant deadlines and (ii) the manner for resolving disputes relating to assumption and assignment of the Assumed Contracts and Assumed Leases.  Specifically, the Assumption and Assignment Procedures are as follows:

a. **Potential Assumption and Assignment Notice**.  On the Potential Assumption Notice Deadline, the Debtors shall have filed the Potential Assumption and Assignment Notice with the Court (other than any Contracts or Leases that have been previously rejected or are subject to a pending motion to reject in the Chapter 11 Cases), which shall (i) include a list of the Potential Assumed Contracts, (ii) include a list of the Debtors' good faith calculation of the Cure Costs with respect to the Contracts identified on the Potential Assumption and Assignment Notice, which shall include (x) all prepetition arrears, *plus* (y) a good faith estimate of all unpaid post-petition amounts accrued under an Assumed Contract or Assumed Lease from the Petition Date through the anticipated date of assumption and assignment of such Assumed Contract or Assumed Lease (the "**Proposed Cure Costs**"), (iii) expressly state that assumption or assignment of an Assumed Contract or Assumed Lease is not guaranteed and is subject to Court approval, (iv) prominently display the deadline to file a Cure Objection (as defined below), and (v) prominently display the date, time, and location of the Sale Hearing.  The Debtors shall update the Potential Assumption and Assignment Notice from time to time, but no less frequently than once per month, in the event that they (i) identify additional Contracts that were not previously included in the initial Potential Assumption and Assignment Notice, or (ii) determine that a Proposed Cure Cost for any Potential Contract should be modified.

b. **Proposed Assumption and Assignment Notice**.  If the Successful Bidder is not the Stalking Horse Bidder, on the Post-Auction Notice Deadline, in conjunction with the filing of the Notice of Auction Results, the Debtors shall also file the Proposed Assumption and Assignment Notice, which shall (i) include a schedule of the Proposed Assumed Contracts (the "**Proposed Assumed Contracts Schedule**"), (ii) expressly state that assumption or assignment of an Assumed Contract or Assumed Lease is not guaranteed and is subject to Court approval, (iii) prominently display the deadline to file a Post-Auction Objection (as defined below), and (iv) prominently display the date, time, and location of the Sale Hearing.  If the Stalking Horse Bidder is the Successful Bidder, a Proposed Assumption and Assignment Notice will be filed in accordance with the Stalking Horse Agreement and the Sale Order.

c. **Designation Rights Period Assumption and Assignment/Rejection Notices**. During the period following the Closing Date until the earlier of (i) no less than fourteen (14) days prior to the date on which a hearing is held before the Court on

confirmation of a plan of reorganization or liquidation in the Chapter 11 Cases (the "**Confirmation Hearing**"), or (ii) the date that is sixty (60) days after the Closing Date (the "**Designation Rights Period**"), the Purchaser may, in its sole discretion, designate any Contract or Lease not otherwise assumed and assigned to the Purchaser at Closing pursuant to the Sale Order or previously rejected in the Chapter 11 Cases (each, a "**Designated Contract**") for either (x) assumption and assignment to the Purchaser, or (y) rejection, in each case, by providing written notice to the Debtors (a "**Purchaser Designation Notice**"); provided that, the Purchaser shall provide the Debtors with a Purchaser Designation Notice in respect of any Designated Contract at least seven (7) Business Days prior to the expiration of the Designation Rights Period. Each Purchaser Designation Notice for a Designated Contract that is to be assumed and assigned to the Purchaser shall include the Proposed Cure Cost associated with such Designated Contract. Within three (3) Business Days of the Debtors' receipt of a Purchaser Designation Notice, the Debtors are authorized to file with the Court (i) a supplemental assumption notice (each, a "**Designation Rights Period Assumption and Assignment Notice**"), which shall include the updated Proposed Assumed Contracts Schedule and associated Proposed Cure Costs and (ii) a rejection notice (the "**Designation Rights Rejection Notice**" and, together with the Potential Assumption and Assignment Notice, the Proposed Assumption and Assignment Notice and the Designation Rights Period Assumption and Assignment Notice(s), the "**Assumption/Rejection Notices**"), which shall include a schedule of the Designated Contracts to be rejected. Each notice shall prominently display the deadline to file a Designation Rights Period Notice Objection (as defined below). The expiration of the Designation Rights Period may be extended as to any Contract or Lease with the consent of the Debtors and the Successful Bidder (or the Stalking Horse Bidder, as applicable) and, to the extent that the deadline to assume or reject real property Leases under 11 U.S.C. § 365(d)(4) would expire during such extension period, with the consent of the Debtors, the Successful Bidder (or the Stalking Horse Bidder, as applicable) and the applicable Counterparty to such real property Lease. Purchaser shall be responsible for any and all liabilities of the Debtors under the Designated Contracts in each case that are incurred and come due and payable during the Designation Rights Period through the effective date of (i) any such Designated Contract's assumption and assignment to Purchaser, (ii) rejection by the Debtors, or (iii) deemed rejection, in each case, in accordance with the applicable definitive agreement. The Debtors shall cause each Assumption/Rejection Notice (as applicable) to be published on the Case Information Website and served on each applicable Counterparty by email or ECF where available, or otherwise by first class mail.

d. **Final Assumption and Assignment Notice**.  Upon expiration of the Designation Rights Period, the Debtors shall file a notice which shall include a final register of the Assumed Contracts and Assumed Leases and associated Cure Costs.

e. **Assumption/Rejection Objections**.

    i. Cure Objection Deadline. Any Counterparty may object to its Proposed Cure Cost or the Potential Assumption and Assignment Notice (any such objection, a "**Cure Objection**") by the Cure Objection Deadline, with the exception of objections solely related to the identity of the Successful Bidder and adequate assurance of future performance by the Successful Bidder (in each case, other than the Stalking Horse Bidder) which objections will be due by the Post-Auction Objection Deadline.

    ii. Post-Auction Objection Deadline. Any Counterparty may object to the Proposed Assumption and Assignment Notice solely as to the identity of the Successful Bidder or on the basis of adequate assurance of future performance by the Successful Bidder (in each case, other than the Stalking Horse Bidder) (any such objection, a "**Post-Auction Objection**") by the Post-Auction Objection Deadline; provided that, any Counterparty to a Proposed Assumed Contract for which the previously stated Proposed Cure Cost on the Potential Assumption and Assignment Notice has been modified shall have until the date that is fourteen (14) days after the filing of the Proposed Assumption and Assignment Notice to object solely as to the Proposed Cure Cost.[9]

    iii. Designation Rights Period Notice Objection. Any Counterparty to a Designated Contract may object to the filing of a Designation Rights Period Assumption and Assignment Notice or a Designation Rights Period Rejection Notice, as applicable, solely as to (i) the Proposed Cure Cost, if the previously stated Proposed Cure Cost on the Proposed Assumed Contracts Schedule or Potential Assumption and Assignment Notice, as applicable, has been modified or (ii) the rejection of the Contracts or Leases that have been added to a Designation Rights Rejection Notice. Each such Counterparty shall have until the date that is fourteen (14) days after the filing of the applicable notice (the "**Designation Rights Period Notice Objection Deadline**") to file the applicable objection (any such objection, a "**Designation Rights Period Notice Objection**" and, together with the Cure Objections and the Post-Auction Objection, the "**Assumption/Rejection Objections**"). [10] All Assumption/Rejection

---

[9] Notwithstanding anything herein to the contrary, any Counterparty to a Contract or Lease that (a) is included in the Proposed Assumption and Assignment Notice but (b) was not included on the Potential Assumption and Assignment Notice shall have until the date that is fourteen (14) days after the filing of the Proposed Assumption and Assignment Notice to object solely as to (i) the assumption and assignment of the Proposed Assumed Contracts or (ii) the Proposed Cure Cost, in each case, as contemplated by and set forth in the Proposed Assumption and Assignment Notice.

[10] Notwithstanding anything herein to the contrary, any Counterparty to a Designated Contract that (a) is included in the Designation Rights Period Assumption and Assignment Notice but (b) was not included on the Potential Assumption and Assignment Notice shall have until the date that is fourteen (14) days after the filing of the Designation Rights Period Assumption and Assignment Notice to object solely as to (i) the assumption and assignment of the Proposed Assumed Contracts, (ii) the Proposed Cure Cost, or (iii) the identity of the Successful Bidder and

Objections must (A) be in writing, (B) comply with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, (C) state, with specificity, the legal and factual bases thereof, including, if applicable, the Proposed Cure Cost the Counterparty believes is required to cure any alleged defaults under the relevant Assumed Contracts or Assumed Leases, (D) be filed no later than the applicable objection deadline, and (E) be served on the Objection Notice Parties so that it is received on or before the applicable objection deadline.

iv. <u>Resolution of Assumption/Rejection Objections</u>. If a Counterparty timely files an Assumption/Rejection Objection and such objection has not been consensually resolved, the Court shall make all necessary determinations relating to such Assumption/Rejection Objection at the applicable Contract Hearing (as defined below). A hearing with respect to Assumption/Rejection Objections timely and duly filed before the Sale Objection Deadline shall be held at the Sale Hearing or such later date that the Debtors, in their discretion, shall determine (subject to the Court's availability) (the "**Initial Contract Hearing**"). Hearings with respect to Assumption/Rejection Objections to Assumed Contracts or Assumed Leases for which the applicable objection deadlines are later than the Sale Objection Deadline may be scheduled by Debtors (at the request of the Successful Bidder (or Stalking Horse Bidder, if applicable)) on five (5) Business Days' notice (subject to the Court's availability) (each, an "**Additional Contract Hearing**," and, together with the Initial Contract Hearing, each, a "**Contract Hearing**"); <u>provided</u>, that, any Additional Contract Hearing shall occur no later than the Confirmation Hearing. Upon resolution of an Assumption/Rejection Objection and upon payment of the applicable cure amount, if any, by the Successful Bidder (or the Stalking Horse Bidder, as applicable), the Contract or Lease will be deemed assumed and assigned to the Successful Bidder (or the Stalking Horse Bidder, as applicable), as of the Closing Date. If an Assumption/Rejection Objection has not been resolved prior to the Closing Date (whether by an order of the Court or by agreement with the Counterparty), the Successful Bidder (or the Stalking Horse Bidder, as applicable) shall temporarily treat such Proposed Assumed Contract as a Designated Contract, proceed to the closing of the Sale Transaction with respect to all other Assets, and, during the Designation Rights Period, determine whether to assume and assign or reject the Designated Contract after resolution of such Counterparty's objection (whether by the Court's order or by agreement of the Counterparty, the Debtors, and the Successful Bidder (or the Stalking Horse Bidder, as applicable)). If any such Assumption/Rejection Objection is unresolved prior to the expiration of the Designation Rights Period, the

---

adequate assurance of future performance by the Successful Bidder (in each case, other than the Stalking Horse Bidder), in each case, as contemplated by and set forth in the Designation Rights Period Assumption and Assignment Notice.

Debtors may elect not to assume and assign the Designated Contract and designate such Designated Contract for rejection. If the Stalking Horse Bidder is the Successful Bidder, in no event shall the Debtors settle an objection to the assignment of an Assumed Contract or Assumed Lease listed on the Proposed Assumption and Assignment Notice or a Designated Contract, including as to Proposed Cure Costs, without the express prior written consent of the Successful Bidder (or the Stalking Horse Bidder, as applicable) (with an e-mail consent being sufficient).

v.   <u>Failure To File Timely Assumption/Rejection Objection</u>.  If a Counterparty fails to file with the Court and serve on the Objection Notice Parties a timely and proper Assumption/Rejection Objection, the Counterparty shall be forever barred from asserting any such objection with regard to the assumption or assignment of its Assumed Contract or Assumed Lease, as applicable.  Notwithstanding anything to the contrary in the Assumed Contract or Assumed Lease, as applicable, or any other document, the Proposed Cure Costs set forth in the Proposed Assumed Contracts Schedule shall be controlling and shall be the only amounts necessary to cure any alleged outstanding defaults under the applicable Assumed Contract or Assumed Lease under section 365(b) of the Bankruptcy Code arising out of or related to any events occurring prior to the Closing Date or other applicable date upon which such assumption and assignment would become effective, whether such defaults are known or unknown, due or to become due, accrued, absolute, contingent, or otherwise, and the Counterparty shall be forever barred from asserting any additional cure or other amounts with respect to such Assumed Contract or Assumed Lease against the Debtors, the Successful Bidder (or the Stalking Horse Bidder, as applicable), or the property of any of them.

f.   **Modification of Proposed Assumed Contracts Schedule**.

i.   If the Debtors or the Successful Bidder (or the Stalking Horse Bidder, as applicable) identify, prior to the expiration of the Designation Rights Period, any Contract or Lease that is not listed on the Proposed Assumed Contracts Schedule, and such contract or lease has not been rejected by the Debtors, such Successful Bidder (or the Stalking Horse Bidder, as applicable) may elect by written notice to the Debtors to treat such Contract or Lease as an Assumed Contract or Assumed Lease, as applicable, and the Debtors shall seek to assume and assign such Assumed Contract or Assumed Lease in accordance with the Assumption and Assignment Procedures, with all additional Proposed Cure Costs related to such Assumed Contracts or Assumed Leases to be paid by the Successful Bidder (or the Stalking Horse Bidder, as applicable), in accordance with the terms of the applicable definitive agreement (which, in the case of the Stalking Horse Bidder, is the Stalking Horse Agreement).

36

g. **Reservation of Rights**. The inclusion of an Assumed Contract, an Assumed Lease, or, in each case, Proposed Cure Costs with respect thereto on any Assumption/Rejection Notice shall not constitute, nor be deemed to be, a determination or admission by the Debtors, the Successful Bidder (or the Stalking Horse Bidder, as applicable), or any other party in interest that such Contract or Lease is an executory contract or unexpired lease within the meaning of the Bankruptcy Code. The Debtors reserve all rights, claims, and causes of action with respect to each Assumed Contract and Assumed Lease listed on any Assumption/Rejection Notice. The Debtors' inclusion of any Assumed Contract or Assumed Lease on any Assumption/Rejection Notice shall not be a guarantee that such Assumed Contract or Assumed Lease will ultimately be assumed or assumed and assigned.

## Basis for Relief

### A.    The Bidding Procedures are Fair and Appropriate and Should Be Approved

32.    The Bidding Procedures are specifically designed to promote what courts have deemed to be the paramount goal of any proposed sale of property of a debtor's estate: maximizing the value of sale proceeds received by the estate for the benefit of all stakeholders. *See Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the objective of bankruptcy rules and the [Debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate") (quoting *In re Atlanta Packaging Products, Inc.*, 99 B.R. 124, 130 (Bankr. N.D.Ga. 1988)). As this Court states in the Sale Guidelines, "[g]enerally, the Court will entertain a Motion for Approval . . . of proposed bidding procedures if such procedures are, as a matter of reasonable business judgment, likely to maximize the sale price." *See also In re Integrated Res., Inc.*, 147 B.R. at 659 (observing that sale procedures "encourage bidding and . . . maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 980 F.2d 165, 166 (2d Cir. 1992) (noting that a bankruptcy court must provide "for an orderly bidding Process" because "absent such a fixed and fair process bidders may decline to participate in the auction").

37

33.     The Bidding Procedures provide for an orderly, uniform, and appropriately competitive process through which interested parties may submit offers to purchase the Assets. Given the time constraints, the Debtors, with the assistance of their advisors, have structured the Bidding Procedures to promote active bidding by interested parties and to elicit the highest or otherwise best offer reasonably available for the Assets. Additionally, the Bidding Procedures will allow the Debtors to conduct the Auction in a fair and transparent manner that will encourage participation by financially capable bidders with demonstrated ability to consummate a timely Sale Transaction.

34.     Further, courts in this district routinely approve procedures similar to the proposed Bidding Procedures in connection with chapter 11 asset sales. *See, e.g.*, *In re Accorda Therapeutics, Inc.*, No. 24-22284 (DSJ) (Bankr. S.D.N.Y. Apr. 29, 2024) [ECF No. 109]; *In re Troika Media Group, Inc.*, No. 23-11969 (DSJ) (Bankr. S.D.N.Y. Jan. 3, 2024); *In re Voyager Aviation Holdings, LLC*, No. 23-11177 (JPM) (Bankr S.D.N.Y. Sept. 1, 2023); *In re Pareteum Corp.,* No. 2210615 (LGB) (Bankr. S.D.N.Y. May 31, 2022) [ECF No. 76]; *In re Greensill Capital Inc.*, No. 2110561 (MEW) (Bankr. S.D.N.Y. Apr. 6, 2021) [ECF No. 37]; *In re Garrett Motion, Inc.*, No. 20-12212 (MEW) (Bankr. S.D.N.Y. Oct. 24, 2020) [ECF No. 282]; *In re Hermitage Offshore Services Ltd.*, No. 20-11850 (MG) (Bankr. S.D.N.Y. Sept. 24, 2020) [ECF No. 71]; *In re LSC Communications, Inc.*, No. 20-10950 (SHL) (Bankr. S.D.N.Y. June 5, 2020) [ECF No. 322]; *In re Barneys New York, Inc.*, No. 1936300 (CGM) (Bankr. S.D.N.Y. Aug. 22, 2019) [ECF No. 156]; *In re Hollander Sleep Products, LLC*, No. 19-11608 (MEW) (Bankr. S.D.N.Y. July 3, 2019) [ECF No. 180]; *In re Sears Holdings Corp.*, No. 18-23538 (RDD) (Bankr. S.D.N.Y. Nov. 16, 2018) [ECF No. 775]; *In re Hooper Holmes, Inc.*, No. 1823302 (RDD) (Bankr. S.D.N.Y. Sept. 20,

2018) [ECF No. 119]; *In re Nine West Holdings, Inc.*, No. 18-10947 (SCC) (Bankr. S.D.N.Y. May 7, 2018) [ECF No. 223].

35.    As described above, the sale timeline and post-petition marketing period thereunder is reasonable. The sale timeline in the Bidding Procedures were heavily negotiated at arm's length with the Stalking Horse Bidder, and separately required under the DIP Loan Agreement, and failure to adhere to such timeline could jeopardize the process that has been agreed to and funded by the DIP Lenders, as well as the Debtors' ability to maximize value for the Debtors' estates. As noted above, the Debtors' Assets have been marketed extensively prior to the Petition Date. Through that process, parties that have expressed an interest in bidding are already familiar with the Assets for purposes of formulating and finalizing their bids.

36.    Further, the proposed timeline is consistent with timelines in bid procedures previously approved in this district and other districts. *See, e.g., In Re Vice Group Holdings Inc., et al.*, No. 23-10738 (JPM), (Bankr. S.D.N.Y. May 30, 2023) [ECF No. 80] (approving bid procedures containing a bid deadline 36 days after the Petition Date, an auction 38 days after the Petition Date, and a sale hearing 39 days after the Petition Date); *In re Pareteum Corporation*, No. 22-10615 (LGB) (Bankr. S.D.N.Y. May 31, 2022) [ECF No. 76] (approving bid procedures containing a bid deadline 29 days after the Petition Date, an auction 31 days after the Petition Date, and a sale hearing 37 days after the Petition Date); *In Re ABC Carpet Co., Inc, et al.*, No. 21-11591 (MSJ) (Bankr. S.D.N.Y. Oct. 1, 2021) [ECF No. 120] (approving bid procedures containing a bid deadline 41 days after the Petition Date, an auction 44 days after the Petition Date, and a sale hearing 49 days after the Petition Date); *In Re Things Remembered, Inc., et al.*, Case No. 19-10234 (KG) (Bankr. D. Del. Feb. 21, 2019) [ECF No. 150] (approving bid procedures containing a bid deadline 22 days after the Petition Date, an auction 26 days after the Petition Date, and a sale

hearing 28 days after the Petition Date); *In Re Wellpath Holdings, Inc., et al.*, No. 24-90533 (ARP) (Bankr. D. Del. Nov. 19, 2024) [ECF No. 111] (approving bid procedures containing a bid deadline 32 days after the Petition Date, an auction 35 days after the Petition Date, and a sale hearing 42 days after the Petition Date); *In re Orbital Infrastructure Grp., Inc.,* Case No. 23-90763 (DRJ) (Bankr. S.D. Tex. Sept. 20, 2023) [ECF No. 131] (approving bid procedures containing a bid deadline 41 days after the Petition Date, an auction 42 days after the Petition Date, and a sale hearing 43 days after the Petition Date); *In re AppHarvest Prods., LLC*, Case No. 23-90745 (DRJ) (Bankr. S.D. Tex. Aug. 25, 2023) [ECF No. 298] (approving bid procedures containing a bid deadline 35 days after the Petition Date, an auction 37 days after the Petition Date, and a sale hearing 44 days after the Petition Date); *In re Impel Pharmaceuticals Inc.*, Case No. 23- 80016 (SGJ) (Bankr. N.D. Tex. Jan. 11, 2024) [ECF No. 127] (approving bid procedures containing a bid deadline 35 days after the Petition Date, an auction 41 days after the Petition Date, and a sale hearing 44 days after the Petition Date); *In Re First Mode Holdings, Inc., et al.*, Case No. 24-12794 (KBO) (Bankr. D. Del. Jan. 17, 2025) [ECF No. 166] (approving bid procedures containing a bid deadline 42 days after the Petition Date, an auction 45 days after the Petition Date, and a sale hearing 52 days after the Petition Date).

37.     Accordingly, the Bidding Procedures should be approved because, under the circumstances, they are reasonable, appropriate, and in the best interests of the Debtors, their estates, and all parties in interest.

**B.     The Selection of the Stalking Horse Bidder and the Bid Protections Have Sound Business Purposes and Should Be Approved**

38.     As noted above, the Stalking Horse Agreement provides for a Break-Up Fee in an amount equal to 3% of the Purchase Price to be paid to the Stalking Horse Bidder upon certain termination events in accordance with the Stalking Horse Agreement. In addition, the Stalking

Horse Agreement provides for an Expense Reimbursement of up to $4,000,000 to be paid upon the occurrence of certain events typical and customary for transactions of this kind. The Debtors believe that the Bid Protections are necessary for the Stalking Horse Bidder to enter into the Stalking Horse Agreement. In addition, the Debtors believe that the presence of a stalking horse bidder is necessary, both to set a floor for the value of the Assets and to attract other potential buyers to bid for such assets, thereby providing certainty and maximizing the realizable value of the Assets for the benefit of the Debtors' estates, their creditors, and all other parties in interest.

39.     Approval of the Bid Protections is governed by standards for determining the appropriateness of bid protections in the bankruptcy context. The appropriateness of such purchaser protections is determined under a business judgment standard. *See In re Integrated Res. Inc.*, 147 B.R. at 656–57 (noting that bid protections, including break-up fee arrangements that have been negotiated by a debtor, are to be reviewed according to the "business judgment" standard, under which such procedures and arrangements are "presumptively valid"). Under this standard, a debtor's decision to provide for a break-up fee is proper so long as the following conditions are satisfied: (a) the relationship of the parties who negotiated any such fee is not tainted by self-dealing or manipulation; (b) the fee does not hamper bidding; and (c) the amount of the fee is not unreasonable relative to the proposed purchase price for the subject assets. *See In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 465 (Bankr. S.D.N.Y. 2014).

40.     Here, the Bid Protections squarely satisfy the *Genco* factors. First, as demonstrated by the Gottlieb Declaration, the Bid Protections are the product of good faith, arm's length negotiations between the Debtors and the Stalking Horse Bidder. *See* Gottlieb Decl. ¶ 14. Further, to the Debtors' knowledge, there was no collusive conduct between the Stalking Horse Bidder and any of the other parties who submitted proposals during the prepetition marketing process. *See id.*

41

41.     Second, the Debtors believe, based on their business judgment, that the Break-Up Fee and the Expense Reimbursement will allow them to maximize the realizable value of the Assets without chilling the bidding process. The Bid Protections were a material inducement for, and a condition of, the Stalking Horse Bidder's agreement to enter into the Stalking Horse Agreement. Indeed, the Debtors believe that their ability to offer the Bid Protections to the Stalking Horse Bidder is necessary to help ensure an adequate floor for the value of the Asset and to require competing bids to be materially higher or otherwise better than the Stalking Horse Bid, thereby providing the upside opportunity that the Debtors could potentially realize a higher or otherwise better offer at any auction for the Assets which, absent such a bid floor, might otherwise never have been realized—a clear benefit to the Debtors' estates. *See In re 310 Assocs*., 346 F.3d 31, 34 (2d Cir. 2003) (citation omitted) ("Break-up fees are sometimes authorized in the bankruptcy auction sale context because they provide an incentive for an initial bidder to serve as a so-called 'stalking horse,' whose initial research, due diligence, and subsequent bid may encourage later bidders."); *see also In re Integrated Res., Inc.*, 147 B.R. at 662 (declaring three proper functions for break-up fees: "(1) to attract or retain a potentially successful bid, (2) to establish a bid standard or minimum for other bidders to follow, or (3) to attract additional bidders.").  Without the Court authorizing the Debtors to offer the Bid Protections, the Debtors might lose the opportunity to obtain the highest or otherwise best offer for the Assets, and would certainly lose the downside protection that could be afforded by the existence of a Stalking Horse Bidder. Furthermore, without the benefit of the Stalking Horse Bidder, the bids received at the Auction for the Assets could be substantially lower than the one offered by the Stalking Horse Bidder.

42.     Third, and finally, the Break-Up Fee and Expense Reimbursement are reasonable and appropriate in light of the size, nature, and complexity of the transaction and the efforts that

42

will necessarily have been expended by the Stalking Horse Bidder. As set forth in the Gottlieb

Declaration, the Break-Up Fee represents only 3% of the Purchase Price to be paid by the Stalking

Horse Bidder. *See* Gottlieb Decl. ¶ 12. Additionally, both the Break-Up Fee and the Expense

Reimbursement were negotiated in good faith, and both were necessary to secure the Stalking

Horse Bidder's commitment under the Stalking Horse Agreement. In sum, the Debtors' ability to

offer the Bid Protections enables them to ensure the sale of the Assets at a price they believe to be

fair, while, at the same time, providing the Debtors with the potential of achieving an even greater

benefit to the Debtors' estates in the form of a higher or otherwise better offer for the Assets.

43.     Courts in this district have approved protections similar to the Bid Protections

proposed here as reasonable.  *See, e.g.*, *In re Acorda Therapeutics*, *Inc.*, No. 24-22284 (DSJ)

(Bankr. S.D.N.Y. Apr. 29, 2024) [ECF No. 109]; *In re Troika Media Group, Inc.*, No. 23-11969

(DSJ) (Bankr. S.D.N.Y. Jan. 3, 2024) [ECF No. 77]; *In re Voyager Aviation Holdings.*, *LLC*, No.

23-11177 (JPM) (Bankr. S.D.N.Y. Sept. 1, 2023) [ECF No. 148]; *In re Genesis Global Holdco,*

*LLC*, No. 23-10063 (SHL) (Bankr. S.D.N.Y. Mar. 31, 2023) [ECF No. 192].  Accordingly, the

Debtors submit that the Bid Protections reflect a sound business purpose, are fair and appropriate

under the circumstances, and should likewise be approved.

**C.     The Proposed Sale Transaction Satisfies the Requirements of Section 363 of the Bankruptcy Code**

44.     Ample authority exists for approval of the potential Sale Transaction contemplated

by this Motion.  Section 363(b)(1) of the Bankruptcy Code empowers a court to allow a debtor to

"use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C.

§ 363(b)(1).  To approve the use of estate property under section 363(b)(1) of the Bankruptcy

Code, courts in the Second Circuit require a debtor to demonstrate a "good business reason to grant

such an application" after considering "all salient factors."  *In re Lionel Corp. ("Lionel")*, 722

43

F.2d 1063, 1071 (2d Cir. 1983); *see also In re Motors Liquidation Co.*, 829 F.3d 135, 162 (2d Cir. 2016) (characterizing *Lionel*'s "good business reason" standard as "minimal"); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) ("Section 363(b) gives the court broad flexibility in tailoring its orders to meet a wide variety of circumstances.") (citing *Lionel*). Where a debtor establishes "a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *See In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted).  If there is a valid business justification for the use of estate property, there is a "strong presumption" that such usage is being done in good faith and for the best interests of the estate, such that an objecting party has the burden to rebut such presumption.  *In re MF Glob. Inc.*, 467 B.R. 726, 730 (Bankr. S.D.N.Y. 2012).

45.     Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was provided to interested parties; (c) whether the sale will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith.  *See In re MF Glob. Inc.*, 467 B.R. at 730 (citing *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991)).  Where a debtor demonstrates a valid business justification for a decision, it is presumed that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Res., Inc.*, 147 B.R. at 656.

46.     Moreover, section 105(a) of the Bankruptcy Code confers the Court with broad equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  Accordingly, the Court has expansive

44

equitable powers to fashion any order or decree that is in the interest of preserving or protecting the value of the Debtors' assets.  *See Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 375 (2007) (characterizing the bankruptcy court's power under section 105 of the Bankruptcy Code as "broad").

### i.   *The Debtors Have Demonstrated a Sound Business Justification for the Potential Sale Transaction*

47.     For the reasons set forth above and in the Gottlieb Declaration, a strong business justification exists for the sale of the Assets as described herein.  Exploring an orderly but expeditious sale of the Assets is critical to maximizing the value of the Debtors' estates and recoveries for the Debtors' stakeholders.  To that end, the Stalking Horse Agreement and the DIP Loan Agreement expressly require that the Debtors timely consummate any Sale Transaction by no later than July 31, 2026.

48.     The Bidding Procedures were carefully designed to facilitate a flexible, robust, and competitive bidding process.  The Debtors are poised to capitalize on the progress made during the prepetition marketing process to secure the Stalking Horse Bidder—including Guggenheim Securities' identification of and outreach to over 53 strategic and financial parties most likely to have interest in and financial wherewithal to consummate a Sale Transaction with the Debtors, the dissemination of confidential diligence information to 19 of those parties, and further negotiations with the various bidders to select the Stalking Horse Bidder—to maximize the value of the Assets sold at the Auction. *See* Gottlieb Decl. ¶ 8. The Bidding Procedures provide an appropriate framework for the Debtors to review, analyze, and compare all bids received to determine which bids are in the best interests of the Debtors' estates and their stakeholders.  A Sale Transaction governed by the Bidding Procedures undoubtedly would serve the important objectives of

45

26-11399-kyp  Doc 17  Filed 06/12/26  Entered 06/12/26 08:01:04  Main Document
Pg 46 of 229

obtaining a fair and reasonable purchase price for the Assets, which value would inure to the benefit of all parties in interest in the Chapter 11 Cases.

49.     Finally, nothing in the Bidding Procedures requires the Debtors' board of directors to take any action, or to refrain from taking any action, with respect to the Bidding Procedures, to the extent that the Debtors' board of directors determines that taking such action, or refraining from taking such action, is required to comply with applicable law or its fiduciary duties under applicable law, thereby allowing the Debtors to pivot to an alternative transaction if any such transaction would provide a greater recovery for the Debtors' stakeholders.

50.     For the foregoing reasons, the Debtors submit that a strong business justification exists for approving the Sale Transaction and related relief requested herein.

### ii.     *The Noticing Procedures Are Reasonable and Appropriate*

51.     A sale of assets outside of the ordinary course of business requires notice and a hearing and is subject to court approval.  11 U.S.C. § 363(b)(1); s*ee also In re Roman Cath. Diocese of Rockville Ctr.*, No. 20-12345 (MG), 2022 WL 17543589, at *3 (Bankr. S.D.N.Y. Dec. 9, 2022).  The Noticing Procedures described in this Motion are reasonably calculated to provide all of the Debtors' known relevant creditors and all other parties in interest with adequate, timely notice of, among other things, the proposed Sale Transaction, Bidding Procedures, Auction, and Sale Hearing.

### D.     The Successful Bidder Should Be Entitled to the Protections of Section 363(m) of the Bankruptcy Code

52.     Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from a debtor notwithstanding that such sale conducted under section 363(b) was later reversed or modified on appeal.  Specifically, section 363(m) of the Bankruptcy Code states the following:

> The reversal or modification on appeal of an authorization under [section 363(b) of the Bankruptcy Code] . . . does not affect the validity of a sale . . . to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

53.   Section 363(m) of the Bankruptcy Code "affords 'finality to judgments by protecting good faith purchasers, the innocent third parties who rely on the finality of bankruptcy judgments in making their offers and bids.'" *In re Chateaugay Corp.*, No. 92 Civ. 7054 (PKL), 1993 WL 159969, at *3 (S.D.N.Y. May 10, 1993) (quoting *In re Stadium Management Corp.*, 895 F.2d 845, 847 (1st Cir. 1990)).  *See also Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal.").

54.   Although the Bankruptcy Code does not define "good faith," most courts have adopted a traditional equitable definition, holding that a buyer who "purchases the assets for value, in good-faith and without notice of adverse claims" is a purchaser in good faith.  *Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 389 (2d Cir. 1997) (quoting *William v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985)).  Good faith of a purchaser is demonstrated by "the integrity of [its] conduct during the course of the sale proceedings." *Id*. at 390.  Courts in the Second Circuit have held that misconduct that would typically destroy a purchaser's good-faith status involves fraud, collusion, or an attempt to control the sale price or take unfair advantage of other bidders. *See Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269, 276 (2d Cir. 1997).

55.     The Debtors submit that the Successful Bidder would be a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code.  The Debtors and the Stalking Horse Bidder have entered into the Stalking Horse Agreement without collusion, in good faith, and after extensive arm's length negotiations. *See* Gottlieb Decl. ¶ 14. Indeed, the Stalking Horse Bidder and the Debtors have engaged independent, sophisticated counsel and other professional advisors to represent their respective interests in the negotiation of the Stalking Horse Agreement and with respect to the sale process and, to the best of the Debtors' knowledge, information, and belief, no party has engaged in any conduct during the bidding process that would cause or permit a Sale Transaction, including the Stalking Horse Agreement, to be set aside under section 363(m) of the Bankruptcy Code.

56.     Further, as set forth above, the Bidding Procedures are designed to produce a fair and transparent competitive bidding process.  Each Qualified Bidder participating in the Auction will be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale of any of the Assets.  *See* Bidding Procedures, §§ 2(b), 4.  Any definitive agreement the Debtors execute with a Successful Bidder would be negotiated at arm's length and in good faith. Accordingly, the Debtors seek a finding that any Successful Bidder so selected pursuant to the Bidding Procedures is a good faith purchaser and is entitled to the full protections afforded by section 363(m) of the Bankruptcy Code.

57.     Based on the foregoing, the Debtors submit that the Debtors' entrance into a Sale Transaction pursuant to the Bidding Procedures is a sound exercise of the Debtors' business judgment and should be approved as a good faith transaction.

48

**E.**     **The Assets Should Be Sold Free and Clear of Liens, Claims, Interests, and Encumbrances Under Section 363(f) of the Bankruptcy Code**

58.     In the interest of attracting the best offers, the Assets should be sold free and clear of any and all liens, claims, interests, and other encumbrances (including all DIP Liens and DIP Superpriority Claims in favor of the DIP Agent and the DIP Lenders (as each is defined in the Interim DIP Order)), in accordance with section 363(f) of the Bankruptcy Code, with any such liens, claims, interests, and encumbrances attaching to the proceeds of the applicable sale.  Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests, and encumbrances of an entity other than the estate if any one of the following conditions is satisfied:

    a.     applicable non-bankruptcy law permits the sale of such property free and clear of such interest;

    b.     such entity consents;

    c.     such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

    d.     such interest is in bona fide dispute; or

    e.     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see also In re Celsius Network LLC*, No. 22-10964 (MG), 2022 WL 14193879, at *7 (Bankr. S.D.N.Y. Oct. 24, 2022) ("section 363(f) is written in the disjunctive, authorizing a trustee or debtor-in-possession to sell property of the estate free and clear of all liens 'if any of the five conditions of § 363(f) are met . . . '") (quoting *Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988)); *In re Borders Group, Inc.*, 453 B.R. 477, 483 (Bankr. S.D.N.Y. 2011).

59.     Section 363(f) of the Bankruptcy Code is supplemented by section 105(a) of the Bankruptcy Code, which, as above, provides that "[t]he court may issue any order, process, or

judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."
11 U.S.C. § 105(a); *see also Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of claims] is within the court's equitable powers when necessary to carry out the provisions of [the Bankruptcy Code].").

60.     The Debtors submit that the sale of the Assets free and clear of liens, claims, interests, and encumbrances would satisfy one or more of the requirements under section 363(f) of the Bankruptcy Code.  For example, to the extent that a party objects to the Sale Transaction on the basis that it allegedly holds a prepetition lien or encumbrance on the Assets, the Debtors believe that any such party could be compelled to accept a monetary satisfaction of such claims, under section 363(f)(5) of the Bankruptcy Code, or that such lien is in bona fide dispute, under section 363(f)(4) of the Bankruptcy Code.  Moreover, the Debtors will send the Sale Notice to any purported prepetition lienholders.  If such lienholders do not object to the proposed Sale Transaction, then their consent should be presumed.  Accordingly, the Debtors request that, unless a party asserting a prepetition lien, claim, interest, or encumbrance on any of the Assets (other than those assumed or permitted, if any, in connection with a Sale Transaction) timely and properly objects to this Motion, such party shall be deemed to have consented to any Sale Transaction approved at the Sale Hearing.  *See Hargrave v. Twp. of Pemberton*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to a sale motion, a creditor is deemed to consent to the relief requested therein).

61.     The purpose of a sale order purporting to authorize the transfer of assets free and clear of all claims, liens, interests, and encumbrances would be defeated if claimants could, thereafter, use the transfer as a basis to assert claims against a purchaser arising from a seller's

pre-sale conduct. Moreover, without such assurances, potential bidders may choose not to participate in the Auction or the Stalking Horse Bidder would not have submitted the Stalking Horse Bid, to the detriment of the Debtors' stakeholders. Accordingly, the Debtors request that the Court authorize the sale of the Assets free and clear of any liens, claims, interests, and encumbrances in accordance with section 363(f) of the Bankruptcy Code, subject to such liens, claims, interests, and encumbrances (including all DIP Liens and DIP Superpriority Claims in favor of the DIP Agent and the DIP Lenders (as each is defined in the Interim DIP Order)) attaching to the proceeds thereof in the same order of relative priority and with the same validity, force, and effect as prior to such sale.

62. Specifically, the Debtors also submit that it is appropriate to sell the Assets free and clear of successor liability relating to the Debtors' business. This ensures that the Successful Bidder is protected from any claims or lawsuits premised on the theory that the Successful Bidder is a successor in interest to the Debtors. Courts have consistently held that a buyer of a Debtors' assets pursuant to a section 363 sale takes free and clear from successor liability relating to the Debtors' business. *In re Gen. Motors Corp.*, 407 B.R. 463, 505–06 (Bankr. S.D.N.Y. 2009) (holding that "[t]he law in this Circuit and District is clear; the Court will permit GM's assets to pass to the purchaser free and clear of successor liability claims, and in that connection, will issue the requested findings and associated injunction."); *In re Chrysler LLC*, 405 B.R. 84, 111 (Bankr. S.D.N.Y. 2009) ("[I]n personam claims, including any potential state successor or transferee liability claims against New Chrysler, as well as *in rem* interests, are encompassed by section 363(f) and are therefore extinguished by the Sale.").

**F.     The Assumption and Assignment of Executory Contracts and Unexpired Leases Should Be Authorized**

63.     Section 365(a) of the Bankruptcy Code provides that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Courts employ the business judgment standard in determining whether to approve a debtor's decision to assume or reject an executory contract or unexpired lease. *See, e.g.*, *Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.)*, 78 F.3d 18, 25 (2d Cir. 1996); *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993). The "business judgment" test in this context only requires that a debtor demonstrate that assumption or rejection of an executory contract or unexpired lease benefits the estate. *See In re Penn Traffic Co.*, 524 F.3d 373, 383 (2d Cir. 2008).

64.     Any assumption of the Proposed Assumed Contracts is an exercise of the Debtors' sound business judgment because the transfer of such Contracts and Leases is a fundamental component of the Stalking Horse Agreement and the Sale Transaction, as the Proposed Assumed Contracts are a critical element of the value of the Assets. Given that the ability to consummate a Sale Transaction is critical to the Debtors' efforts to monetize the Assets and maximize value for their estates and stakeholders, the Debtors' assumption of Proposed Assumed Contracts is an exercise of sound business judgment and, therefore, should be approved.

65.     The consummation of any Sale Transaction involving the assignment of a Proposed Assumed Contract would be contingent upon the Debtors' compliance with the applicable requirements of section 365 of the Bankruptcy Code. Section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Assumed Contracts and Leases be cured. The Debtors' assumption and assignment of Proposed Assumed Contracts would be contingent upon payment of the Proposed Cure Costs and effective only upon the Closing Date or any later

52

applicable effective date.  As set forth above, the Debtors propose to file with the Court and serve on each Counterparty a Potential Assumption and Assignment Notice, which will include the Debtors' good faith calculations of Cure Costs with respect to each Contract and Lease listed on the Potential Assumption and Assignment Notice.  As a result, Counterparties will have a meaningful opportunity to raise any objections to the proposed assumption of their respective Contracts and Leases in advance of the applicable Sale Hearing.

66.      Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign an executory contract if "adequate assurance of future performance by the assignee of such contract or lease is provided."  11 U.S.C. § 365(f)(2).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction."  *See Carlisle Homes, Inc. v. Azzari* (*In re Carlisle Homes, Inc.*), 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (citation omitted); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean an absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.,* 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) (finding that, "[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").  Among other things, adequate assurance may be provided by evidencing the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when the prospective assignee of a lease has financial resources, relevant experience, and has expressed willingness to devote sufficient funding to the business to give it a strong likelihood of succeeding).

67.     As set forth above and in the Bidding Procedures, for a bid to qualify as a Qualified Bid, a Potential Bidder must include with its bid information regarding its ability (and the ability of its designated assignee, if applicable) to perform under the applicable Potential Assumed Contracts.  Each affected Counterparty would have an opportunity to object to the ability of the Successful Bidder (or the Stalking Horse Bidder, as applicable) to provide adequate assurance as provided in the Bidding Procedures Order.  Further, the Debtors propose to file with the Court a Proposed Assumption and Assignment Notice, which would set forth a list of the Proposed Assumed Contracts, in advance of the Sale Hearing.  The Stalking Horse Bidder submits that it is able to provide adequate assurance of its ability to perform under the applicable Proposed Assumed Contracts. To the extent necessary, the Debtors would present facts at the Sale Hearing to demonstrate the financial wherewithal, willingness, and ability of the Successful Bidder (or the Stalking Horse Bidder, as applicable) to perform under the Proposed Assumed Contracts.

68.     In addition, to facilitate the assumption and assignment of the Proposed Assumed Contracts, the Debtors further request that the Court find that all anti-assignment provisions contained therein, whether such provisions expressly prohibit or have the effect of restricting or limiting the assignment of such Assumed Contract or Assumed Lease, are unenforceable and prohibited pursuant to section 365(f) of the Bankruptcy Code.[11]

---

[11] Section 365(f)(1) of the Bankruptcy Code provides in part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease . . . ." 11 U.S.C. § 365(f)(1).  Section 365(f)(3) of the Bankruptcy Code further provides that, "[n]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee."  11 U.S.C. § 365(f)(3).

**Waiver of Bankruptcy Rules 6004(a), 6004(h), and 6006(d)**

69.     To implement successfully the relief sought herein, the Debtors request that the Court find that notice of this Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances.  The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[u]nless the court orders otherwise, an order authorizing the use, sale, or lease of property (other than cash collateral) is stayed for 14 days after the order is entered."  Fed. R. Bankr. P. 6004(h).  The Debtors further request that the Court waive the stay imposed by Bankruptcy Rule 6006(d), which provides that "[u]nless the court orders otherwise, an order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is for 14 days after the order is entered."  Fed. R. Bankr. P. 6006(d).

70.     The Debtors request that the Bidding Procedures Order, the Sale Order, and any order authorizing the assumption and assignment of a Proposed Assumed Contract in connection with a Sale Transaction be effective immediately upon entry and that the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d) be waived.  Specifically, the Debtors submit that a waiver of the stay imposed by Bankruptcy Rule 6004(h) is necessary to effectuate the relief requested herein on the timeline imposed under the Debtors' case milestones and is therefore necessary for the Debtors to pursue one or more sale transactions while remaining in compliance with their obligations under the Stalking Horse Agreement and the DIP Loan Agreement.

**Notice**

71.     Notice of this Motion will be provided to the following parties (or their counsel) (collectively, the "**Notice Parties**"):  (a) the Office of the United States Trustee for the Southern District of New York; (b) those creditors holding the 30 largest unsecured claims against the Debtors' estates; (c) the Securities and Exchange Commission; (d) the Internal Revenue Service; (e) the United States Attorney's Office for the Southern District of New York; (f) the state

attorneys general for states in which the Debtors conduct business; (g) Faegre Drinker Biddle & Reath LLP, as counsel to the DIP Agent, (h) all other parties asserting a security interest in the assets of the Debtors to the extent reasonably known to the Debtors, all potential buyers previously identified or solicited by the Debtors or their advisors and any additional parties who have previously expressed an interest to the Debtors or their advisors in potentially acquiring the Debtors' assets, and all other known parties with any interest in the Assets; and (i) any other party that is identified on Sleep Number's master service list,[12] is entitled to notice under rule 9013-1(c) of the Local Rule, or has requested notice pursuant to Bankruptcy Rule 2002.  A copy of this Motion and any order entered in respect thereto will also be made available on the Debtors' case information website located at https://restructuring.ra.kroll.com/Sleepnumber.  Based on the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtors respectfully submit that no other or further notice is required.

*[Remainder of page intentionally left blank]*

---

[12] Accessible by visiting https://restructuring.ra.kroll.com/Sleepnumber.

WHEREFORE, the Debtors respectfully request that the Court enter the Bidding Procedures Order and, after the Sale Hearing, the Sale Order, granting the relief requested herein and such other and further relief as the Court deems just and proper.

Dated:   June 12, 2026
         New York, New York

DAVIS POLK & WARDWELL LLP

*/s/ Brian M. Resnick*
450 Lexington Avenue
New York, NY 10017
Tel.: (212) 450-4000
Brian M. Resnick
Angela M. Libby
Stephen D. Piraino
Richard J. Steinberg
Sihui (Sophy) Ma (*pro hac vice* pending)
Mordechai Rivkin

*Proposed Counsel to the Debtors and Debtors in Possession*

## EXHIBIT A

**Proposed Bidding Procedures Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **In re:** | **Chapter 11** |
| **SLEEP NUMBER CORPORATION,** *et al.,* | **Case No. 26-11399 ([●])** |
| **Debtors.**[1] | **[Jointly Administered]** |

**ORDER (I)(A) APPROVING BIDDING PROCEDURES FOR SALE OF THE DEBTORS' ASSETS, (B) APPROVING THE DESIGNATION OF SNBR INC., AN AFFILIATE OF SLEEP COUNTRY CANADA, INC., AS THE STALKING HORSE BIDDER FOR THE ASSETS, (C) AUTHORIZING AND APPROVING ENTRY INTO THE STALKING HORSE ASSET PURCHASE AGREEMENT, (D) APPROVING BID PROTECTIONS, (E) SCHEDULING AN AUCTION FOR, AND HEARING TO APPROVE, THE SALE OF THE DEBTORS' ASSETS, (F) APPROVING THE FORM AND MANNER OF NOTICES OF SALE, AUCTION, AND SALE HEARING, AND (G) APPROVING THE ASSUMPTION AND ASSIGNMENT PROCEDURES AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "**Motion**")[2] of Sleep Number Corporation and its direct and indirect subsidiaries (collectively, the "**Debtors**"), each of which is a debtor and debtor in possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), for entry of an order, pursuant to sections 105(a), 363, and 365 of title 11 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, and 9007, Local Rules 6004-1 and 6006-1, and the Court's Sale Guidelines, (a) approving Bidding Procedures for the sale of the Assets, (b) approving designation of SNBR Inc. as the Stalking Horse Bidder for the Assets, (c) authorizing and approving entry into the Stalking Horse Agreement, (d) approving the Bid Protections, (e) scheduling an Auction for, and a hearing to

---

[1] The Debtors' names and last four digits of their respective employer identification numbers are as follows: Sleep Number Corporation (7886); Select Comfort Retail Corporation (9757); Select Comfort Canada Holding Inc. (4273); Select Comfort SC LLC (5901); and Sleep Number Health Corporation (2499). The Debtors' mailing address is 1001 Third Avenue South, Minneapolis, MN 55404.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

approve, the sale of the Assets, (f) approving the form and manner of notices of sale, auction, and Sale Hearing, (g) approving the Assumption and Assignment Procedures, and (h) granting related relief; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference M-431*, dated January 31, 2012 (Preska, C.J.); and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157; and due and proper notice of the Motion having been provided to the Notice Parties, such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and the Court having reviewed and considered the Motion, the First Day Declaration, and the Gottlieb Declaration; and the Court having considered the relief requested in the Motion, including at any hearing thereon; and the Court having determined that the legal and factual bases set forth in the Motion, the First Day Declaration, and the Gottlieb Declaration establish just cause for the relief granted herein; and the Court having found that the relief requested in the Motion represents a sound exercise of the Debtors' business judgment and is in the best interests of the Debtors, their creditors, their estates, and all other parties in interest; and all objections and reservations of rights filed or asserted in respect of the Motion, if any, having been withdrawn, resolved, or overruled with prejudice; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor,

IT IS HEREBY FOUND AND DETERMINED THAT:

A.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact

2

constitute conclusions of law, and to the extent that any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.      The Debtors' proposed notice of the Motion (including any hearing thereon), the Bidding Procedures, and the proposed entry of the Bidding Procedures Order are (i) appropriate and reasonably calculated to provide all interested parties with timely and proper notice, (ii) in compliance with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and (iii) adequate and sufficient under the circumstances of the Chapter 11 Cases, and no other or further notice is required.  A reasonable opportunity to object or be heard regarding the relief requested in the Motion has been afforded to all interested persons and entities, including the Notice Parties.

C.      The Bidding Procedures in the form attached hereto as **Exhibit 1** are fair, reasonable, and appropriate, and are designed to maximize recoveries from a sale of the Assets.

D.      The Bidding Procedures were negotiated in good faith and at arm's length among the Debtors and the Stalking Horse Bidder, and the Stalking Horse Agreement was negotiated in good faith and at arm's length among the Debtors and the Stalking Horse Bidder. The Stalking Horse Agreement represents the highest or otherwise best offer that the Debtors have received to date to purchase the Assets. The process for selection of the Stalking Horse Bidder was fair and appropriate under the circumstances and in the best interests of the Debtors' estates and their stakeholders.

E.      The Debtors have demonstrated a compelling and sound business justification for the Court to enter this Bidding Procedures Order and, thereby, (i) approve the Bidding Procedures, (ii) approve the designation of the Stalking Horse Bidder, (iii) authorize and approve entry into the Stalking Horse Agreement, (iv) approve the Bid Protections under the terms and conditions set

forth in the Stalking Horse Agreement and the Bidding Procedures, (v) set the dates of the Bid Deadline, Auction (if needed), Sale Hearing, and other deadlines as set forth in the Bidding Procedures, (vi) approve the Noticing Procedures and the forms of notice, and (vii) approve the Assumption and Assignment Procedures and the forms of relevant notice.  Such compelling and sound business justification, which was set forth in the Motion and the Gottlieb Declaration and on the record at any hearing, are incorporated herein by reference and, among other things, forms the basis for the findings of fact and conclusions of law set forth herein.

F.      The Bid Protections, as approved by this Bidding Procedures Order, are fair and reasonable and provide a benefit to the Debtors' estates and stakeholders and represent a prudent exercise of the Debtors' sound business judgment.

G.      If triggered in accordance with the terms of the Stalking Horse Agreement, the payment of the Bid Protections, under this Bidding Procedures Order and upon the terms and conditions set forth in the Stalking Horse Agreement and the Bidding Procedures, is (i) an actual and necessary cost of preserving the Debtors' estates, within the meaning of section 503(b) of the Bankruptcy Code and shall constitute an allowed administrative expense claim against the Debtors, on a joint and several basis, and (ii) reasonably tailored to facilitate, rather than hinder, bidding for the Assets by providing a baseline of value, increasing the likelihood of competitive bidding at the Auction, and encouraging the participation of other bidders in the sale process, thereby increasing the likelihood that the Debtors would receive the highest and best possible price for the Assets. The Bid Protections are, accordingly, (a) of substantial benefit to the Debtors' estates, their stakeholders, and all parties in interest, (b) reasonable and appropriate, (c) a material inducement for, and condition necessary to, ensure that the Stalking Horse Bidder will continue to pursue its proposed agreement to purchase the Assets, and (d) reasonable in relation to the Stalking Horse

Bidder's efforts, the magnitude and complexity of the Sale Transaction, and the Stalking Horse Bidder's lost opportunities resulting from the time spent pursuing a Sale Transaction. Without the Bid Protections, the Stalking Horse Bidder is unwilling to be bound under the Stalking Horse Agreement (including the obligation to maintain its committed offer while such offer is subject to higher or better offers, as contemplated by the Bidding Procedures and the Stalking Horse Agreement).

H.     The Stalking Horse Bidder is a third-party purchaser and is unrelated to any of the Debtors. Neither the Stalking Horse Bidder, nor any of its affiliates, subsidiaries, officers, directors, members, partners, or principals, nor any of their respective representatives, successors, or assigns is an "insider" of any of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.

I.     The legal and factual bases set forth in the Motion establish just cause for the relief granted herein. Entry of this Bidding Procedures Order is in the best interests of the Debtors and their estates, creditors, interest holders, and all other parties in interest herein.

J.     The form and manner of notice to be delivered pursuant to the Noticing Procedures and the Assumption and Assignment Procedures (including the Sale Notice attached hereto as **Exhibit 2**, the Potential Assumption and Assignment Notice attached hereto as **Exhibit 3** and the Proposed Assumption and Assignment Notice attached hereto as **Exhibit 4**) are reasonably calculated to provide (i) all interested parties with timely and proper notice of the sale of the Assets and  the Successful Bid(s) and (ii) each Counterparty to the Potential Assumed Contracts and the Proposed Assumed Contracts with proper notice of (A) the potential assumption and assignment of such Potential Assumed Contracts and Proposed Assumed Contracts to the Successful Bidder (or the Stalking Horse Bidder, as applicable) or any of their known proposed assignees (if different

5

from the Successful Bidder) and (B) the requirement that each such Counterparty assert any objection to the notices by the applicable deadlines or otherwise, in each case, be barred from asserting claims arising from events occurring prior to the effective date of the assumption and assignment of such Proposed Assumed Contracts or any later applicable effective date following assumption and assignment of such Proposed Assumed Contracts.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

1. Any objections to or reservations of rights regarding the Motion or the relief requested therein that have not been adjourned, withdrawn, or resolved are overruled in all respects on the merits with prejudice.

2. The Bidding Procedures, in substantially the form attached hereto as **Exhibit 1**, are approved and fully incorporated into this Bidding Procedures Order and the Debtors are authorized to act in accordance therewith. The failure to specifically include a reference to any particular provision of the Bidding Procedures in the Motion or this Bidding Procedures Order shall not diminish or impair the effectiveness of such provision.

3. The Stalking Horse Bidder is deemed a Qualified Bidder for all purposes, and the Stalking Horse Bid as set forth in the Stalking Horse Agreement is deemed a Qualified Bid. In the event that no other Qualified Bids are submitted, the Debtors shall deem the Stalking Horse Bidder to be the Successful Bidder, in accordance with the terms and conditions of this Order (including the Bidding Procedures) and the Stalking Horse Agreement.

4. The Debtors are hereby authorized to enter into the Stalking Horse Agreement, and the Stalking Horse Agreement, and all other ancillary documents and all terms and conditions thereof, are hereby approved, subject to the terms and conditions of this Bidding Procedures Order (including the Bidding Procedures) and the entry of the Sale Order.

5.      Nothing herein shall prejudice the rights of the Debtors to seek, by separate motion, in the exercise of their sound business judgment and fiduciary duties, the authority to sell assets of the Debtors' estates pursuant to section 363 of the Bankruptcy Code subject to the terms of the Stalking Horse Agreement.

6.      Bid Deadline.  As further described in the Bidding Procedures and in accordance therewith, the Bid Deadline shall be at **July 8, 2026 at 4:00 p.m.**[3]

7.      Auction.  In the event that the Debtors receive, on or before the Bid Deadline, one or more Qualified Bids in addition to the Stalking Horse Bid, an Auction shall be conducted at the offices of Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, NY 10017 on **July 13, 2026 at 10:00 a.m.** or such later time on such day, such other day, or such other place (including remotely via teleconference) as the Debtors shall notify all Participating Parties.  The Debtors are authorized to conduct the Auction in accordance with the Bidding Procedures.

8.      If no Qualified Bids other than the Stalking Horse Bid are submitted by the Bid Deadline, the Debtors shall, within two (2) business days after the Bid Deadline, cancel the Auction and seek approval of the Sale Transaction contemplated in the Stalking Horse Bid at the Sale Hearing.

9.      Absent irregularities in the conduct of the Auction or reasonable and material confusion during the bidding, each as determined by the Court, the Debtors will not consider bids after the Auction has closed.

10.      The form of Sale Notice attached hereto as **<u>Exhibit 2</u>** is hereby approved.

11.      As soon as reasonably practicable after entry of the Bidding Procedures Order, the Debtors shall cause the Sale Notice to be served (by email if available or otherwise by first class

---

[3] All times herein are expressed in prevailing Eastern Time.

7

mail) upon the following parties (or counsel thereto):  (i) the U.S. Trustee; (ii) counsel to the DIP Agent; (iii) counsel to the Stalking Horse Bidder; (iv) counsel to any statutory committee appointed in the Chapter 11 Cases; (v) Counterparties to Contracts and Leases; (vi) the Securities and Exchange Commission; (vii) the Internal Revenue Service; (viii) the United States Attorney's Office for the Southern District of New York; (ix) the state attorneys general for states in which the Debtors conduct business; (x) all other parties asserting a security interest in the assets of the Debtors to the extent reasonably known to the Debtors; (xi) all potential buyers previously identified or solicited by the Debtors or their advisors and any additional parties who have previously expressed an interest to the Debtors or their advisors in potentially acquiring the Assets; (xii) all other known parties with any interest in the Assets; and (xiii) any other party that is identified on Sleep Number's master service list,[4] is entitled to notice under rule 9013-1(c) of the Local Rule, or has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "**Sale Notice Parties**"); provided that the Debtors need not serve the Sale Notice on any party for whom the Debtors are unable to obtain, after reasonable diligence, either an email or physical address as of the entry of the Bidding Procedures Order; provided, further, that the Debtors shall not be obligated to provide supplemental service of the Sale Notice with respect to any Sale Notice that is returned as undeliverable so long as the Debtors have confirmed that any such Sale Notice was sent to the applicable email or physical address on file in the Debtors' books and records and no other email or physical address could be obtained after reasonable diligence.  The Debtors will also cause the Sale Notice to be published once in the national edition of the *Wall Street Journal* or another publication with similar national circulation as soon as practicable following entry of the Bidding Procedures Order and will post the Sale Notice and the Bidding Procedures Order on

---

[4] Accessible by visiting https://restructuring.ra.kroll.com/Sleepnumber.

the Debtors' case information website located at https://restructuring.ra.kroll.com/Sleepnumber

(the "**Case Information Website**").

12.     Service of the Sale Notice on the Sale Notice Parties in the manner described in this

Bidding Procedures Order constitutes good and sufficient notice of the Auction, the Sale Hearing,

and the Sale Objection Deadline.  No other or further notice is required.

13.     Promptly after the conclusion of the Auction (if any) and the selection of the

Successful Bid and Alternate Bid (if any), the Debtors shall file with the Court and post on the

Case Information Website a notice identifying such Successful Bid and Alternate Bid.

14.     <u>Sale Objections</u>.  Objections to the Sale Transaction other than objections related

to the identity of the Successful Bidder and adequate assurance of future performance by the

Successful Bidder (in each case, other than the Stalking Horse Bidder)) must (a) be in writing,

(b) comply with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, (c) state, with

specificity, the legal and factual bases thereof, (d) be filed with the Court no later than **July 10,**

**2026 at 4:00 p.m.** (the "**Sale Objection Deadline**"), and (e) be served on the following parties so

that they are received by such parties by the Sale Objection Deadline: (i) proposed counsel to the

Debtors, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, NY 10017, Attn:

Brian M. Resnick, Angela M. Libby, Richard J. Steinberg, and Mordechai Rivkin; (ii) counsel to

the DIP Agent, Faegre Drinker Biddle & Reath LLP, 2200 Wells Fargo Center, 90 S. 7th Street,

Minneapolis, MN 55402, Attn: Michael R. Stewart and Adam C. Ballinger; (iii) counsel to the

Stalking Horse Bidder, Goodwin Procter LLP, The New York Times Building, 620 Eighth

Avenue, New York, NY 10018, Attn: Kizzy Jarashow, Joshua Zachariah, Harrison Freeman, and

Benjamin Loveland; (iv) counsel to any statutory committee appointed in the Chapter 11 Cases;

and (v) the U.S. Trustee (collectively, the "**Objection Notice Parties**").

15.     <u>Post-Auction Objections</u>. Objections related to the identity of the Successful Bidder or on the basis of adequate assurance of future performance by the Successful Bidder (in each case, other than the Stalking Horse Bidder) must (a) be in writing, (b) comply with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, (c) state, with specificity, the legal and factual bases thereof, (d) be filed with the Court no later than **July 14, 2026 at 4:00 p.m.** (the "**Post-Auction Objection Deadline**"), and (e) be served on the Objection Notice Parties and the Successful Bidder so that they are received by such parties by the Post-Auction Objection Deadline.

16.     <u>Sale Hearing</u>.  The Sale Hearing shall be held in the United States Bankruptcy Court for the Southern District of New York, [●], New York, NY 10014, on **July 15, 2026 at [●].m.** (the "**Sale Hearing**"), subject to Court availability, or such other date and time that the Court may later direct; <u>provided</u> that the Sale Hearing may be adjourned by the announcement at a hearing before the Court or by filing a notice on the Court's docket.

17.     As soon as reasonably practicable after the completion of the Auction or following the cancellation of the Auction if there are no Qualified Bids other than the Stalking Horse Bid submitted by the Bid Deadline, the Debtors shall file a final form of proposed Sale Order as agreed upon between the Debtors and the Successful Bidder.

18.     <u>Bid Protections</u>.  Pursuant to sections 105, 363 and 503 of the Bankruptcy Code, the Debtors are hereby authorized and directed to pay the Break-Up Fee and Expense Reimbursement to the Stalking Horse Bidder in accordance with the terms and conditions set forth in the Bidding Procedures and the Stalking Horse Agreement without further order of this Court. The dollar amounts of the Break-Up Fee and Expense Reimbursement are hereby approved. The Stalking Horse Bidder shall be entitled to receive the Bid Protections in accordance with the terms and conditions of the Stalking Horse Agreement and the Bidding Procedures without further action

10

or order of the Court. Upon entry of this Bidding Procedures Order, the Break-Up Fee and Expense Reimbursement shall each constitute an allowed administrative expense claim against the Debtors, on a joint and several basis, pursuant to section 503(b) of the Bankruptcy Code. Any Qualified Bid shall, at a minimum, include a cash component sufficient to satisfy the Bid Protections.

19. The Debtors' obligation to pay the Break-Up Fee and Expense Reimbursement shall survive termination of the Stalking Horse Agreement, dismissal or conversion of these Chapter 11 Cases, and confirmation of any plan of reorganization or liquidation.

20. The Stalking Horse Bidder shall be entitled, but not obligated, to credit bid the full amount of the Bid Protections as part of any subsequent bid at the Auction, which credit bid amount shall be deemed the equivalent of cash consideration for all purposes of bid evaluation.

21. <u>Assumption and Assignment Procedures</u>.   The assumption and assignment procedures set forth in the Motion (the "**Assumption and Assignment Procedures**") are hereby approved.

22. <u>Potential Assumption and Assignment Notice</u>.  On the Potential Assumption Notice Deadline, the Debtors shall have filed the Potential Assumption and Assignment Notice with the Court (other than any Contracts or Leases that have been previously rejected or are subject to a pending motion to reject in the Chapter 11 Cases), which shall (i) include a list of the Potential Assumed Contracts, (ii) include a list of the Debtors' good faith calculation of the Cure Costs with respect to the Contracts identified on the Potential Assumption and Assignment Notice, which shall include (x) all prepetition arrears, *plus* (y) a good faith estimate of all unpaid post-petition amounts accrued under an Assumed Contract or Assumed Lease from the Petition Date through the anticipated date of assumption and assignment of such Assumed Contract or Assumed Lease (the "**Proposed Cure Costs**"), (iii) expressly state that assumption or assignment of an Assumed

11

Contract or Assumed Lease is not guaranteed and is subject to Court approval, (iv) prominently display the deadline to file a Cure Objection (as defined below), and (v) prominently display the date, time, and location of the Sale Hearing. The Debtors shall update the Potential Assumption and Assignment Notice from time to time, but no less frequently than once per month, in the event that they (i) identify additional Contracts that were not previously included in the initial Potential Assumption and Assignment Notice, or (ii) determine that a Proposed Cure Cost for any Potential Contract should be modified.

23.     Proposed Assumption and Assignment Notice.  If the Successful Bidder is not the Stalking Horse Bidder, on the Post-Auction Notice Deadline, in conjunction with the filing of the Notice of Auction Results, the Debtors shall also file the Proposed Assumption and Assignment Notice, which shall (i) include a schedule of the Proposed Assumed Contracts (the "**Proposed Assumed Contracts Schedule**"), (ii) expressly state that assumption or assignment of an Assumed Contract or Assumed Lease is not guaranteed and is subject to Court approval, (iii) prominently display the deadline to file a Post-Auction Objection (as defined below), and (iv) prominently display the date, time, and location of the Sale Hearing.  If the Stalking Horse Bidder is the Successful Bidder, a Proposed Assumption and Assignment Notice will be filed in accordance with the Stalking Horse Agreement and the Sale Order.

24.     Designation Rights Period Assumption and Assignment/Rejection Notices. During the period following the Closing Date until the earlier of (i) no less than fourteen (14) days prior to the date on which a hearing is held before the Court on confirmation of a plan of reorganization or liquidation in the Chapter 11 Cases (the "**Confirmation Hearing**"), or (ii) the date that is sixty (60) days after the Closing Date (the "**Designation Rights Period**"), the Purchaser may, in its sole discretion, designate any Contract or Lease not otherwise assumed and assigned to the Purchaser

12

at Closing pursuant to the Sale Order or previously rejected in the Chapter 11 Cases (each, a "**Designated Contract**") for either (x) assumption and assignment to the Purchaser, or (y) rejection, in each case, by providing written notice to the Debtors (a "**Purchaser Designation Notice**"); provided that, the Purchaser shall provide the Debtors with a Purchaser Designation Notice in respect of any Designated Contract at least seven (7) Business Days prior to the expiration of the Designation Rights Period. Each Purchaser Designation Notice for a Designated Contract that is to be assumed and assigned to the Purchaser shall include the Proposed Cure Cost associated with such Designated Contract. Within three (3) Business Days of the Debtors' receipt of a Purchaser Designation Notice, the Debtors are authorized to file with the Court (i) a supplemental assumption notice (each, a "**Designation Rights Period Assumption and Assignment Notice**"), which shall include the updated Proposed Assumed Contracts Schedule and associated Proposed Cure Costs and (ii) a rejection notice (the "**Designation Rights Rejection Notice**" and, together with the Potential Assumption and Assignment Notice, the Proposed Assumption and Assignment Notice and the Designation Rights Period Assumption and Assignment Notice(s), the "**Assumption/Rejection Notices**"), which shall include a schedule of the Designated Contracts to be rejected. Each notice shall prominently display the deadline to file a Designation Rights Period Notice Objection (as defined below). The expiration of the Designation Rights Period may be extended as to any Contract or Lease with the consent of the Debtors and the Successful Bidder (or the Stalking Horse Bidder, as applicable) and, to the extent that the deadline to assume or reject real property Leases under 11 U.S.C. § 365(d)(4) would expire during such extension period, with the consent of the Debtors, the Successful Bidder (or the Stalking Horse Bidder, as applicable) and the applicable Counterparty to such real property Lease. Purchaser shall be responsible for any and all liabilities of the Debtors under the Designated

13

Contracts in each case that are incurred and come due and payable during the Designation Rights Period through the effective date of (i) any such Designated Contract's assumption and assignment to Purchaser, (ii) rejection by the Debtors, or (iii) deemed rejection, in each case, in accordance with the applicable definitive agreement. The Debtors shall cause each Assumption/Rejection Notice (as applicable) to be published on the Case Information Website and served on each applicable Counterparty by email or ECF where available, or otherwise by first class mail.

25. <u>Final Assumption and Assignment Notice</u>. Upon expiration of the Designation Rights Period, the Debtors shall file a notice which shall include a final register of the Assumed Contracts and Assumed Leases and associated Cure Costs.

26. **<u>Assumption/Rejection Objections</u>**.

i. <u>Cure Objection Deadline</u>. Any Counterparty may object to its Proposed Cure Cost or the Potential Assumption and Assignment Notice (any such objection, a "**Cure Objection**") by the Cure Objection Deadline, with the exception of objections solely related to the identity of the Successful Bidder and adequate assurance of future performance by the Successful Bidder (in each case, other than the Stalking Horse Bidder) which objections will be due by the Post-Auction Objection Deadline.

ii. <u>Post-Auction Objection Deadline</u>. Any Counterparty may object to the Proposed Assumption and Assignment Notice solely as to the identity of the Successful Bidder or on the basis of adequate assurance of future performance by the Successful Bidder (in each case, other than the Stalking Horse Bidder) (any such objection, a "**Post-Auction Objection**") by the Post-Auction Objection Deadline; <u>provided</u> that, any Counterparty to a Proposed Assumed Contract for which the previously stated Proposed Cure Cost on the Potential Assumption and Assignment

Notice has been modified shall have until the date that is fourteen (14) days after the filing of the Proposed Assumption and Assignment Notice to object solely as to the Proposed Cure Cost.[5]

iii.      Designation Rights Period Notice Objection. Any Counterparty to a Designated Contract may object to the filing of a Designation Rights Period Assumption and Assignment Notice or a Designation Rights Period Rejection Notice, as applicable, solely as to (i) the Proposed Cure Cost, if the previously stated Proposed Cure Cost on the Proposed Assumed Contracts Schedule or Potential Assumption and Assignment Notice, as applicable, has been modified or (ii) the rejection of the Contracts or Leases that have been added to a Designation Rights Rejection Notice. Each such Counterparty shall have until the date that is fourteen (14) days after the filing of the applicable notice (the "**Designation Rights Period Notice Objection Deadline**") to file the applicable objection (any such objection, a "**Designation Rights Period Notice Objection**" and, together with the Cure Objections and the Post-Auction Objection, the "**Assumption/Rejection Objections**").[6] All Assumption/Rejection Objections must (A) be in writing, (B) comply with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, (C) state, with specificity, the legal and factual bases thereof, including, if applicable, the Proposed Cure Cost the Counterparty believes is required to cure any alleged defaults under the relevant Assumed Contracts or Assumed

---

[5] Notwithstanding anything herein to the contrary, any Counterparty to a Contract or Lease that (a) is included in the Proposed Assumption and Assignment Notice but (b) was not included on the Potential Assumption and Assignment Notice shall have until the date that is fourteen (14) days after the filing of the Proposed Assumption and Assignment Notice to object solely as to (i) the assumption and assignment of the Proposed Assumed Contracts or (ii) the Proposed Cure Cost, in each case, as contemplated by and set forth in the Proposed Assumption and Assignment Notice.

[6] Notwithstanding anything herein to the contrary, any Counterparty to a Designated Contract that (a) is included in the Designation Rights Period Assumption and Assignment Notice but (b) was not included on the Potential Assumption and Assignment Notice shall have until the date that is fourteen (14) days after the filing of the Designation Rights Period Assumption and Assignment Notice to object solely as to (i) the assumption and assignment of the Proposed Assumed Contracts, (ii) the Proposed Cure Cost, or (iii) the identity of the Successful Bidder and adequate assurance of future performance by the Successful Bidder (in each case, other than the Stalking Horse Bidder), in each case, as contemplated by and set forth in the Designation Rights Period Assumption and Assignment Notice.

15

Leases, (D) be filed no later than the applicable objection deadline, and (E) be served on the Objection Notice Parties so that it is received on or before the applicable objection deadline.

27.      Resolution of Assumption/Rejection Objections.   If a Counterparty timely files an Assumption/Rejection Objection and such objection has not been consensually resolved, the Court shall make all necessary determinations relating to such Assumption/Rejection Objection at the applicable Contract Hearing (as defined below). A hearing with respect to Assumption/Rejection Objections timely and duly filed before the Sale Objection Deadline shall be held at the Sale Hearing or such later date that the Debtors, in their discretion, shall determine (subject to the Court's availability) (the "**Initial Contract Hearing**"). Hearings with respect to Assumption/Rejection Objections to Assumed Contracts or Assumed Leases for which the applicable objection deadlines are later than the Sale Objection Deadline may be scheduled by Debtors (at the request of the Successful Bidder (or Stalking Horse Bidder, if applicable)) on five (5) Business Days' notice (subject to the Court's availability) (each, an "**Additional Contract Hearing**," and, together with the Initial Contract Hearing, each, a "**Contract Hearing**"); provided that, any Additional Contract Hearing shall occur no later than the Confirmation Hearing. Upon resolution of an Assumption/Rejection Objection and upon payment of the applicable cure amount, if any, by the Successful Bidder (or the Stalking Horse Bidder, as applicable), the Contract or Lease will be deemed assumed and assigned to the Successful Bidder (or the Stalking Horse Bidder, as applicable), as of the Closing Date. If an Assumption/Rejection Objection has not been resolved prior to the Closing Date (whether by an order of the Court or by agreement with the Counterparty), the Successful Bidder (or the Stalking Horse Bidder, as applicable) shall temporarily treat such Proposed Assumed Contract as a Designated Contract, proceed to the closing of the Sale Transaction with respect to all other Assets, and, during the Designation Rights

16

Period, determine whether to assume and assign or reject the Designated Contract after resolution

of such Counterparty's objection (whether by the Court's order or by agreement of the

Counterparty, the Debtors, and the Successful Bidder (or the Stalking Horse Bidder, as

applicable)). If any such Assumption/Rejection Objection is unresolved prior to the expiration of

the Designation Rights Period, the Debtors may elect not to assume and assign the Designated

Contract and designate such Designated Contract for rejection. If the Stalking Horse Bidder is the

Successful Bidder, in no event shall the Debtors settle an objection to the assignment of an

Assumed Contract or Assumed Lease listed on the Proposed Assumption and Assignment Notice

or a Designated Contract, including as to Proposed Cure Costs, without the express prior written

consent of the Successful Bidder (or the Stalking Horse Bidder, as applicable) (with an e-mail

consent being sufficient).

28.    Failure To File Timely Assumption/Rejection Objection.  If a Counterparty fails to

file with the Court and serve on the Objection Notice Parties a timely and proper

Assumption/Rejection Objection, the Counterparty shall be forever barred from asserting any such

objection with regard to the assumption or assignment of its Assumed Contract or Assumed Lease,

as applicable.  Notwithstanding anything to the contrary in the Assumed Contract or Assumed

Lease, as applicable, or any other document, the Proposed Cure Costs set forth in the Proposed

Assumed Contracts Schedule shall be controlling and shall be the only amounts necessary to cure

any alleged outstanding defaults under the applicable Assumed Contract or Assumed Lease under

section 365(b) of the Bankruptcy Code arising out of or related to any events occurring prior to

the Closing Date or other applicable date upon which such assumption and assignment would

become effective, whether such defaults are known or unknown, due or to become due, accrued,

absolute, contingent, or otherwise, and the Counterparty shall be forever barred from asserting any

17

additional cure or other amounts with respect to such Assumed Contract or Assumed Lease against the Debtors, the Successful Bidder (or the Stalking Horse Bidder, as applicable), or the property of any of them.

29. <u>Modification of Proposed Assumed Contracts Schedule</u>. If the Debtors or the Successful Bidder (or the Stalking Horse Bidder, as applicable) identify, prior to the expiration of the Designation Rights Period, any Contract or Lease that is not listed on the Proposed Assumed Contracts Schedule, and such contract or lease has not been rejected by the Debtors, such Successful Bidder (or the Stalking Horse Bidder, as applicable) may elect by written notice to the Debtors to treat such Contract or Lease as an Assumed Contract or Assumed Lease, as applicable, and the Debtors shall seek to assume and assign such Assumed Contract or Assumed Lease in accordance with the Assumption and Assignment Procedures, with all additional Proposed Cure Costs related to such Assumed Contracts or Assumed Leases to be paid by the Successful Bidder (or the Stalking Horse Bidder, as applicable), in accordance with the terms of the applicable definitive agreement (which, in the case of the Stalking Horse Bidder, is the Stalking Horse Agreement).

30. <u>Reservation of Rights</u>. The inclusion of an Assumed Contract, an Assumed Lease, or, in each case, Proposed Cure Costs with respect thereto on any Assumption/Rejection Notice shall not constitute, nor be deemed to be, a determination or admission by the Debtors, the Successful Bidder (or the Stalking Horse Bidder, as applicable), or any other party in interest that such Contract or Lease is an executory contract or unexpired lease within the meaning of the Bankruptcy Code. The Debtors reserve all rights, claims, and causes of action with respect to each Assumed Contract and Assumed Lease listed on any Assumption/Rejection Notice. The Debtors' inclusion of any Assumed Contract or Assumed Lease on any Assumption/Rejection Notice shall

18

not be a guarantee that such Assumed Contract or Assumed Lease will ultimately be assumed or assumed and assigned.

31.     For the avoidance of doubt and notwithstanding anything herein to the contrary, nothing in this Bidding Procedures Order, the Bidding Procedures, or the Motion shall be construed to, in any way amend, impair, prejudice, alter, or otherwise modify the terms of the Stalking Horse Agreement or the Stalking Horse Bidder's rights thereunder. The Stalking Horse Bidder shall have standing to appear and be heard on all issues related to the Auction, the sale of the Assets and related matters, including the right to object to the sale of the Assets or any portion thereof (including the conduct of the Auction and interpretation of the Bidding Procedures).

32.     The Debtors are authorized to take all such actions as are necessary or appropriate to implement the terms of this Bidding Procedures Order.

33.     This Bidding Procedures Order shall be binding on the Debtors, including any chapter 7 or chapter 11 trustee or other fiduciary appointed for the estates of the Debtors.

34.     Any Bankruptcy Rule (including Bankruptcy Rules 6004(a), 6004(h), 6006(d), and 9014) or Local Rule that might otherwise delay the effectiveness of this Bidding Procedures Order is hereby waived, and the terms and conditions of this Bidding Procedures Order shall be effective and enforceable immediately upon its entry.

35.     All time periods set forth in this Bidding Procedures Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

36.     The automatic stay pursuant to section 362 of the Bankruptcy Code is hereby modified with respect to the Debtors to the extent necessary, without further order of the Court, to allow the Stalking Horse Bidder to take any and all actions permitted under the Stalking Horse Agreement in accordance with the terms and conditions thereof.

19

37.     To the extent any provisions of this Bidding Procedures Order shall be inconsistent with the Motion, the terms of this Bidding Procedures Order shall control.

38.     The Court shall retain exclusive jurisdiction to hear and determine all matters arising from or relating to the implementation, interpretation, or enforcement of this Bidding Procedures Order.

Dated:     _____, 2026
       New York, New York

 

_____
THE HONORABLE [●]
UNITED STATES BANKRUPTCY JUDGE

20

**Exhibit 1**

**Proposed Bidding Procedures**

## BIDDING PROCEDURES

The bidding procedures set forth below (these "**Bidding Procedures**") detail the process by which Sleep Number Corporation ("**Sleep Number**") and certain of its affiliates (collectively, the "**Debtors**") are authorized by the United States Bankruptcy Court for the Southern District of New York (the "**Court**") to conduct a sale (such sale, the "**Sale Transaction**") of all or substantially all of the Debtors' assets (collectively, the "**Assets**").[1]  A party may participate in the bidding process by submitting a bid for the Assets in accordance with these Bidding Procedures.

**Any interested bidder should contact Guggenheim Securities, LLC (in its capacity as the Debtors' proposed investment banker), in the manner and for the purposes described herein, as soon as practicable:**

Guggenheim Securities, LLC[2]
330 Madison Avenue
New York, NY 10017
Attn: Michael Gottlieb (Michael.Gottlieb@guggenheimpartners.com) and Stuart Erickson
(stuart.erickson@guggenheimpartners.com)

These Bidding Procedures describe, among other things, (a) the Assets offered for sale, (b) the manner in which bidders and bids may become Qualified Bidders and Qualified Bids (each as defined below), respectively, (c) the conduct of the Auction (as defined below), if necessary, (d) the selection of the Successful Bidder (as defined below), and (e) the approval by the Court of the sale of the Assets to the Successful Bidder.

The Debtors shall not consult with or provide copies of bids regarding any Assets to any insider or affiliate of the Debtors pursuant to the terms of these Bidding Procedures if such party has a bid for the Assets pending or has otherwise expressed any interest (written or verbal) in bidding for any of the Assets; provided that, if such insider or affiliate of the Debtors chooses not to submit a bid, and so informs the Debtors in writing on or before the Bid Deadline (as defined below), then such party may receive copies of all bids following expiration of the latest possible Bid Deadline (as may be extended hereunder).

---

[1] These bidding procedures were approved by the Court on [●], 2026 [ECF No. [●]] (the "**Bidding Procedures Order**").  Unless indicated otherwise, capitalized terms used but not defined herein shall have the meanings ascribed to such terms in (a) the *Motion of Debtors for Entry of Orders (I)(A) Approving Bidding Procedures for Sale of the Debtors' Assets, (B) Approving the Designation of SNBR Inc., an affiliate of Sleep Country Canada, Inc., as the Stalking Horse Bidder for the Assets, (C) Authorizing and Approving Entry into the Stalking Horse Asset Purchase Agreement, (D) Approving Bid Protections, (E) Scheduling an Auction for, and Hearing to Approve, the Sale of the Debtors' Assets, (F) Approving the Form and Manner of Notices of Sale, Auction, and Sale Hearing, and (G) Approving the Assumption and Assignment Procedures, (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances and (B) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [ECF No. [●]] (together with any supplemental and/or final order(s) entered in connection therewith, the "**DIP Motion**"), as applicable.

[2] Guggenheim Securities, LLC, in its capacity as the Debtors' proposed investment banker, is referred to herein as "**Guggenheim Securities**."

1

The Debtors selected the bid (the "**Stalking Horse Bid**") submitted by SNBR Inc., an affiliate of Sleep Country Canada, Inc. (the "**Stalking Horse Bidder**") as the highest or otherwise best offer for the sale of the Assets to date following a comprehensive bidding process completed before the filing of these Bidding Procedures. The Stalking Horse Bidder has executed that certain Asset Purchase Agreement, dated June 12, 2026, entered into by and between Sleep Number, as seller, and SNBR Inc., an affiliate of Sleep Country Canada, Inc., as purchaser (as may be amended, supplemented or otherwise modified by the parties thereto in accordance with the terms thereof, and including the disclosure schedules and exhibits attached thereto, the "**Stalking Horse Agreement**"), pursuant to which the Stalking Horse Bidder has agreed to purchase the Assets, subject to the terms and conditions set forth therein.  Having announced the Stalking Horse Bid, the Debtors will now conduct a subsequent round of open bidding during these Chapter 11 Cases intended to obtain the highest or otherwise best offer for the Assets. The Stalking Horse Bid is subject to higher or otherwise better offers in accordance with the terms and conditions of these Bidding Procedures and the Bidding Procedures Order.

## 1.      PARTICIPATION REQUIREMENTS

### (a)      Interested Parties

Unless otherwise ordered by the Court for cause shown, to participate in the bidding process described herein (the "**Bidding Process**"), each interested person or entity (other than the Stalking Horse Bidder, which shall be deemed a Potential Bidder and a Qualified Bidder and is deemed to have satisfied each of the below requirements) (each, an "**Interested Party**") must deliver the following items (unless previously delivered) to Guggenheim Securities (at the email addresses set forth on the first page of these Bidding Procedures):

  i. an executed confidentiality agreement in form and substance satisfactory to the Debtors; <u>provided</u> that Interested Parties that executed a confidentiality agreement with the Debtors concerning a Sale Transaction within 12 months of the Petition Date and which confidentiality agreement remains in full force and effect will not be required to execute an additional confidentiality agreement to participate in the Bidding Process;

  ii. a statement and other factual support demonstrating, to the Debtors' satisfaction, that the Interested Party has a *bona fide* interest in purchasing the Assets;

  iii. a description of the nature and extent of any due diligence the Interested Party wishes to conduct and the date in advance of the Bid Deadline (as defined below) by which such due diligence will be completed; and

  iv. sufficient information, to the Debtors' satisfaction, to allow the Debtors to determine that the Interested Party has the financial wherewithal and any required internal corporate, legal, or other authorizations to close the Sale Transaction pursuant to these

2

Bidding Procedures, which may include current audited financial statements of the Interested Party (or such other form of financial disclosure acceptable to the Debtors) or, if the Interested Party is an entity formed for the purpose of acquiring the Assets, (A) current audited financial statements of the equity holder(s) (the "**Sponsor(s)**") of the Interested Party (or such other form of financial disclosure acceptable to the Debtors), (B) a written commitment acceptable to the Debtors that the Sponsor(s) are responsible for the Interested Party's obligations in connection with the Bidding Process, and (C) copies of any documents evidencing any financing commitments necessary to consummate the Sale Transaction.

If the Debtors determine, after receipt of the items identified in Section 1(a)(i)-(iv) above and after consultation with the DIP Agent, that an Interested Party has a *bona fide* interest in purchasing the Assets, such Interested Party will be deemed a "**Potential Bidder**" and the Debtors will provide such Potential Bidder with (a) an electronic copy of the Stalking Horse Agreement and (b) access to the Debtors' confidential electronic data room concerning the Assets (the "**Data Room**"), which shall include a form of Sale Order (as defined below).

**(b)**     **Due Diligence**

Until the Bid Deadline, in addition to granting access to the Data Room, the Debtors will provide Potential Bidders with due diligence access and additional information as may be requested by a Potential Bidder, to the extent that the Debtors determine that such requests are reasonable and appropriate under the circumstances. All due diligence requests for the Debtors shall be directed to Guggenheim Securities. The Debtors, with the assistance of Guggenheim Securities and/or their other advisors, will coordinate all reasonable requests for additional information and due diligence access from Potential Bidders.

The Debtors reserve the right to withhold any diligence materials from any Potential Bidder that the Debtors determine are commercially sensitive or otherwise not appropriate for disclosure to such Potential Bidder, or to require that the Potential Bidder enter into a "clean team" or similar arrangement acceptable to the Debtors in order to receive such diligence materials.

Unless otherwise determined by the Debtors, the availability of due diligence to a Potential Bidder will cease if (a) the Potential Bidder does not become a Qualified Bidder or (b) the Bidding Process is terminated in accordance with its terms.

**2.**     **QUALIFIED BIDS**

Each offer, solicitation, or proposal by a Potential Bidder (other than the Stalking Horse Bidder) must satisfy each of the following conditions in order for such offer, solicitation, or proposal to be deemed a "**Qualified Bid**" and for such Potential Bidder to be deemed a "**Qualified Bidder**," unless any such conditions that are not satisfied are waived by the Debtors:

**(a)      Bid Deadline**

A Potential Bidder who desires to be deemed a Qualified Bidder must deliver to Guggenheim Securities, with copies to Davis Polk & Wardwell LLP ("**Davis Polk**") (Attn: Brian M. Resnick (brian.resnick@davispolk.com), Angela M. Libby (angela.libby@davispolk.com), Brian Wolfe (brian.wolfe@davispolk.com); Lee Parnes (lee.parnes@davispolk.com); and Richard J. Steinberg (richard.steinberg@davispolk.com)), the Required Bid Documents (as defined below), so as to be received no later than **4:00 p.m.**[3] **on July 8, 2026** (the "**Bid Deadline**").  The Debtors will subsequently deliver copies of the Required Bid Documents to the DIP Agent.[4]  The Debtors, with the consent of the DIP Agent (not to be unreasonably withheld) and without the need for further Court approval, may extend the Bid Deadline by a reasonable period of time if the Debtors believe that such extension would further the goal of attaining the highest or otherwise best offer for the Assets.  If the Debtors extend the Bid Deadline, the Debtors will notify all Potential Bidders of such extension.

**(b)      Bid Requirements**

All bids (other than the Stalking Horse Bid, which has satisfied or is deemed to have satisfied each of the below requirements, and with respect to which the deposit requirements will be governed by the Stalking Horse Agreement), must include the following items (collectively, the "**Required Bid Documents**"):

- a letter stating that the bidder's offer is irrevocable until consummation of the Sale Transaction;

- a duly authorized and executed (a) purchase agreement satisfactory to the Debtors, based on the form of the Stalking Horse Agreement, and a redline marked to show any revisions to the form Stalking Horse Agreement, or (b) an equity investment agreement (as applicable), in each case, which shall include the purchase price for the Assets.  For the avoidance of doubt, a "conceptual" or "issues list"-style markup of the form asset purchase agreement would not satisfy this requirement;

- written evidence acceptable to the Debtors, demonstrating a firm commitment for financing to consummate the Sale Transaction (or evidence of an ability to consummate the Sale Transaction without financing), operational ability, and corporate authorization to consummate the Sale Transaction,

---

[3] All times herein are expressed in prevailing Eastern Time.

[4] Subject to Section 13 hereof in all respects, by submitting its Required Bid Documents, each Potential Bidder affirms its consent to the disclosure of the information contained therein (and in any Subsequent Bid submitted by such Potential Bidder) to the DIP Agent as set forth herein (notwithstanding any provisions to the contrary in any confidentiality agreements between the Debtors and such Potential Bidder).

including the payment of any contingent or deferred consideration; and

- a written acknowledgment that the Potential Bidder (a) has had an opportunity to conduct any and all due diligence regarding the Assets and the Sale Transaction, (b) has relied solely upon its own independent review, investigation, and/or inspection of any documents and any other information in making the bid, (c) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, by the Debtors or any of their advisors (including Guggenheim Securities, AlixPartners, and Davis Polk) or other representatives regarding the bid, the Assets or the Sale Transaction, or the completeness or accuracy of any information provided in connection therewith or with the Auction, except solely with respect to the Debtors, as expressly stated by them in these Bidding Procedures, and (d) did not engage in any collusive conduct and acted in good faith in submitting its bid.

A bid will be considered only if the bid:

- identifies the legal name of the purchaser (including any Sponsor(s), if the purchaser is an entity formed for the purpose of consummating the Sale Transaction);

- identifies the Assets to be acquired and the Contracts, Leases, and liabilities (if any) to be assumed;

- includes a statement of the Potential Bidder's intentions with respect to the relevant members of the Debtors' current management team and other employees;

- sets forth the consideration, including the form thereof, for the Assets to be purchased and the Contracts and Leases to be assumed (the "**Bid Consideration**"); provided that the consideration must be at least equal to the following: (a) the Stalking Horse Purchase Price; *plus* (b) a cash component equal to $4,000,000 *plus* 3% of the Purchase Price (which consists of an amount equal to the Bid Protections (as defined below); *plus* (c) cash or non-cash consideration in the amount of $10,000,000 (the "**Minimum Overbid Amount**");

- clearly indicates which portion of the Bid Consideration will be paid at Closing and which portion (if any) will be deferred

5

or contingent (and, in the event that a portion is deferred or contingent, clearly indicates when such amount would be due and payable) and any conditions or prerequisites to payment of such deferred or contingent consideration;

- is not conditioned on (a) obtaining financing or (b) the outcome of unperformed due diligence;

- includes a description of all governmental, licensing, regulatory, or other approvals or consents that are required to consummate the Sale Transaction (including any antitrust approval related to the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended or any other Antitrust Law (as defined in the Stalking Horse Agreement), together with evidence satisfactory to the Debtors of the ability to obtain such approvals or consents as soon as reasonably practicable, as well as a description of any material contingencies or other conditions that will be imposed upon, or that will otherwise apply to, the obtainment or effectiveness of any such approvals or consents;

- expressly states that the Potential Bidder agrees to serve as a Back-Up Bidder (as defined below) if such Potential Bidder's Qualified Bid is selected as the next highest or next best bid after the Successful Bid (as defined below) with respect to the Assets;

- is accompanied by a cash deposit by wire transfer to an escrow agent selected by the Debtors (the "**Deposit Agent**") in an amount equal to ten (10) percent of the consideration set forth in connection with such bid (any such deposit, a "**Good Faith Deposit**"); provided that a Credit Bid (as defined below) need not be accompanied by a Good Faith Deposit;

- sets forth the representatives that are authorized to appear and act on behalf of the Potential Bidder in connection with the Sale Transaction;

- indicates that the Potential Bidder will not seek any transaction or break-up fee, expense reimbursement, or similar type of payment, and that it waives any substantial contribution administrative expense claims under section 503(b) of the Bankruptcy Code;

- includes evidence of the Potential Bidder's ability to comply

6

with section 365 of the Bankruptcy Code (to the extent applicable), including providing adequate assurance of such Potential Bidder's ability to perform in the future the Contracts and Leases proposed in its bid to be assumed by the Debtors and assigned to the Potential Bidder, in a form that will permit the Debtors to disseminate immediately such evidence to the non-Debtor counterparties to such Contracts and Leases, which such adequate assurance information may include: (a) the specific name of the proposed assignee, the proposed name under which the proposed assignee intends to operate the leased premises if not the current trade-name of the Debtors, (b) a corporate organizational chart or similar disclosure identifying corporate ownership and control, (c) audited or unaudited financial statements, tax returns, bank account statements or annual reports; (d) the proposed assignee's intended use of the leased premises and a description of the proposed business to be conducted at the premises; (e) a contact person for the proposed assignee; and/or (f) any other documentation that the Debtors may further request;

- confirms that the Potential Bidder will assume all Cure Costs associated with any Contracts and Leases it intends to assume;

- includes a description of the Potential Bidder's proposed treatment of the Debtors' outstanding gift cards and gift certificates following the closing of the Sale Transaction;

- states or otherwise estimates the types of transition services, if any, the Potential Bidder would require of and/or provide to the Debtors, including an estimate of the time any such transition services would be required of and/or provided to the Debtors, if the Potential Bidder's bid were selected as the Successful Bid for the applicable Assets;

- (i) indicates whether the Potential Bidder intends to hire all or some of the employees who are primarily employed in connection with the Assets to be included in the proposed Sale Transaction and (ii) confirms whether the Potential Bidder will assume any severance, state or federal WARN Act, or similar obligations of the Debtors arising prior to the Closing; and

- is received on or before the Bid Deadline (as such deadline may be extended in accordance with these Bidding Procedures).

7

A bid received from a Potential Bidder will constitute a Qualified Bid only if it includes all Required Bid Documents and meets each of the above requirements as determined by the Debtors, in consultation with the DIP Agent.  The Debtors shall have the right, in consultation with the DIP Agent, to deem a bid a Qualified Bid even if such bid does not conform to one or more of the requirements above or does not include one or more Required Bid Documents, provided that such bid (i) must include a cash component sufficient to satisfy the Bid Protections and (ii) must satisfy the Minimum Overbid Amount.  The Debtors will be authorized to approve joint bids in their reasonable discretion on a case-by-case basis, in consultation with the DIP Agent.

If the Debtors receive a bid prior to the Bid Deadline that is not a Qualified Bid, the Debtors may provide the Potential Bidder with the opportunity to remedy any deficiencies up to one (1) business day prior to the Auction.  If any bid is determined by the Debtors not to be a Qualified Bid, and the applicable Potential Bidder fails to remedy such bid in accordance with these Bidding Procedures, the Debtors, to the extent applicable, shall promptly instruct the Deposit Agent to return such Potential Bidder's Good Faith Deposit.  For the avoidance of doubt, the Stalking Horse Bidder shall be deemed a Qualified Bidder and the Stalking Horse Agreement shall be deemed a Qualified Bid for all purposes in connection with these Bidding Procedures, and the Stalking Horse Bidder shall, without any further action, be entitled to participate in any Auction.

Notwithstanding any other provision of these Bidding Procedures, the Debtors may, in their discretion and in consultation with the DIP Agent, evaluate bids on any grounds, including, (a) the consideration and form of consideration, set forth in the bid, (b) the value to be provided to the Debtors under the bid, including the net economic effect upon the Debtors' estates, (c) any benefit to the Debtors' estates from any assumption of liabilities or waiver of liabilities, including the release or replacement of letters of credit, (d) the transaction structure and execution risk, including conditions to and certainty of closing, termination provisions, finality of documentation, availability of financing and financial wherewithal to meet all commitments, and required governmental or other approvals, (e) the anticipated timing to closing and whether such timing is consistent with the Debtors' case milestones and/or adherence to any relevant budget, (f) the impact on employees and employee claims against the Debtors, (g) the presence of any governmental, licensing, regulatory, or other approvals or consents in a bid, and the anticipated timing or likelihood of obtaining such approvals or consents, (h) the impact on trade and other creditors, (i) the tax consequences of any such bid; (j) whether the bid contemplates a Sale Transaction that would be consummated through a plan or a sale pursuant to section 363 of the Bankruptcy Code; (k) the certainty of a Qualified Bid leading to a confirmed plan; and (l) any other factors the Debtors may reasonably deem relevant consistent with their fiduciary duties and applicable bankruptcy law.  For the avoidance of doubt, the presence of any governmental, licensing, regulatory, or other approvals or consents in a bid, and the anticipated timing or likelihood of obtaining such approvals or consents, among other considerations, may be grounds for the Debtors, in their discretion and in consultation with the DIP Agent, to determine that such bid (y) is not a Qualified Bid or (z) is not higher or otherwise better than any other Qualified Bid.

By submission of its bid, each Qualified Bidder shall be deemed to acknowledge and represent that it (a) has reviewed, understands, and accepts these Bidding Procedures, (b) has consented to the jurisdiction of the Court, (c) intends to consummate its Qualified Bid if it is selected as the Successful Bidder, (d) has had an opportunity to conduct any and all due diligence regarding the Assets that are the subject of the Auction prior to making any such bid, (e) has relied

8

solely upon its own independent review, investigation, and/or inspection of any documents and/or the assets in making its bid, and (f) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith, except as expressly stated in these Bidding Procedures or, as to the Stalking Horse Bidder, the Stalking Horse Agreement, or, as to any other Successful Bidder, the Asset Purchase Agreement with such Successful Bidder.   Without the written consent of the Debtors, in consultation with the DIP Agent, a Qualified Bidder may not amend, modify, or withdraw its Qualified Bid, except for proposed amendments to increase the amount or otherwise improve the terms of its Qualified Bid in the Debtors' favor, during the period that such Qualified Bid is required to remain irrevocable (which, as it pertains to the Stalking Horse Bidder, shall be governed by the Stalking Horse Agreement in the event of any inconsistencies with these Bidding Procedures).

### 3.    BID PROTECTIONS

Recognizing the Stalking Horse Bidder's expenditure of time, energy and resources in connection with the proposed transaction set forth in the Stalking Horse Agreement, and the benefit that those efforts provided to all Interested Parties, the Debtors' estates, their creditors, and other parties in interest, the Debtors have agreed that, among other circumstances set forth in the Stalking Horse Agreement, if the Stalking Horse Bidder is not the Successful Bidder or the Back-Up Bidder until the Back-Up Termination Date (as defined in the Stalking Horse Agreement), the Debtors will pay to the Stalking Horse Bidder the Break-Up Fee and the Expense Reimbursement (collectively, the "**Bid Protections**"). The payment of the Break-Up Fee, which is $3% of the Purchase Price, and Expense Reimbursement, which shall not exceed $4,000,000, will be governed by the provisions of the Stalking Horse Agreement and the Bidding Procedures Order.

Other than any Bid Protections provided to the Stalking Horse Bidder pursuant to the terms of the Stalking Horse Agreement, no bidder or other party shall be entitled to any termination or "break-up" fee, expense reimbursement, or any other bidding protection in connection with the submission of a bid for the Assets.

### 4.    AUCTION

In the event that the Debtors timely receive more than one Qualified Bid, the Debtors shall conduct an auction (the "**Auction**") for the applicable Assets.  The Auction shall be conducted in accordance with these Bidding Procedures and upon notice to all Qualified Bidders that have submitted Qualified Bids.   The Auction shall be conducted at the offices of Davis Polk, 450 Lexington Avenue, New York, NY 10017 on **July 13, 2026 at 10:00 a.m.**, or such later time on such day, such other day, or such other place (including remotely via videoconference) as the Debtors shall notify all Participating Parties (as defined below).  If no Qualified Bids other than the Stalking Horse Bid are submitted by the Bid Deadline, the Debtors shall, within two (2) business days after the Bid Deadline, cancel the Auction and seek approval of the Sale Transaction contemplated in the Stalking Horse Bid at the Sale Hearing.

Only representatives or agents of the Debtors, the DIP Agent, and the Qualified Bidders, and the legal, financial and investment banking advisors to each of the foregoing (collectively,

9

the "**Participating Parties**"), will be entitled to attend the Auction, and only Qualified Bidders will be entitled to make any Subsequent Bids (as defined below) at the Auction. The Debtors may, in consultation with the DIP Agent, establish a reasonable limit on the number of representatives and professional advisors that may appear on behalf of or accompany each Qualified Bidder at the Auction; provided that the Stalking Horse Bidder shall not be subject to such limitation.

At least one (1) day prior to the Auction, the Debtors (either directly or through or their advisors) will (a) notify each Qualified Bidder that has timely submitted a Qualified Bid that its bid is a Qualified Bid and (b) provide all Qualified Bidders (including the Stalking Horse Bidder) with (i) a list identifying all Qualified Bidders and their respective Qualified Bids, (ii) copies of all Qualified Bids (including any redline marked to show any revisions to the form Stalking Horse Agreement); (iii) a statement that identifies which Qualified Bid it deems the highest or otherwise best bid at the outset of the Auction (the **"Starting Bid"**) and (iv) an explanation of how the Debtors value the Starting Bid (including, to the extent that the Debtors ascribe value to non-cash components, an explanation of the valuation of each such component).

The Debtors may, in consultation with the DIP Agent, employ and announce at the Auction additional procedural rules for conducting the Auction (*e.g.*, governing the amount of time allotted to submit Subsequent Bids); provided that such rules shall (a) not be inconsistent with the Bankruptcy Code, the Bidding Procedures Order, or any other order of the Court entered in connection herewith, (b) be disclosed to all Qualified Bidders, and (c) apply equally to each Qualified Bidder in a round and shall not be changed within any given round of bidding.

Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding in the presence of all parties at the Auction, so long as during each round at least one subsequent bid (a "**Subsequent Bid**") is submitted by a Qualified Bidder that (a) provides for a higher or otherwise better offer than such Qualified Bidder's immediately prior Qualified Bid and (b) the Debtors, in their discretion, determine that such Subsequent Bid is (i) with respect to the first round, a higher or otherwise better offer than the Starting Bid and (ii) with respect to subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined below); provided that, the Debtors, in their discretion, may determine appropriate minimum bid increments or requirements for each round of bidding. For the avoidance of doubt, in any round of bidding, the Stalking Horse Bidder will be entitled to a "credit" in the amount of the Bid Protections to be counted toward its bid in such round.

After the first round of bidding and between each subsequent round of bidding, as applicable, the Debtors, in their discretion, will determine and announce the bid or bids that they believe to be the highest or otherwise best offer (the "**Leading Bid**"). Additional consideration in excess of the amount set forth in the Starting Bid may include cash and/or non-cash consideration; provided that the value for such non-cash consideration shall be determined by the Debtors, in their discretion and in consultation with the DIP Agent. In connection with each such determination, the Debtors shall provide all Qualified Bidders with an explanation of how the Debtors are valuing the bids submitted in such round.

A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge and written confirmation of the Leading Bid and after receiving an explanation from the Debtors regarding how they valued the

10

Leading Bid (email being sufficient).  For the purpose of evaluating Subsequent Bids, the Debtors may require a Qualified Bidder (other than the Stalking Horse Bidder) submitting a Subsequent Bid to submit, as part of its Subsequent Bid, additional evidence (in the form of financial disclosure or credit-quality support information or enhancement), acceptable to the Debtors in their discretion, after consultation with the DIP Agent, demonstrating such Qualified Bidder's ability to close the Sale Transaction and pay the full consideration (including, any deferred or contingent consideration).

The Debtors shall maintain a transcript of all bids made and announced at the Auction, including the Starting Bid, all Subsequent Bid(s), the Leading Bid(s), the Back-Up Bid (as defined below) and the Successful Bid.  At the outset of the Auction, each Qualified Bidder will be asked to confirm that it has not engaged in any collusive conduct with respect to its participation in the Bidding Process and that it will not engage in any collusion with respect to any Subsequent Bid.

If a Qualified Bidder (other than the Stalking Horse Bidder) increases its bid at the Auction and is the Successful Bidder or Back-Up Bidder, such Qualified Bidder must increase its Good Faith Deposit to an amount equal to ten (10) percent of the proposed purchase price submitted at the Auction within two business days after the Auction.

## 5.      SELECTION OF THE SUCCESSFUL BID AND THE BACK-UP BID

Prior to the conclusion of the Auction, the Debtors shall in their discretion and in consultation with the DIP Agent (i) review and evaluate each bid made at the Auction on the basis of financial and contractual terms and other factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Sale Transaction, (ii) determine and identify the highest or otherwise best offer (the **"Successful Bid"**), (iii) determine and identify the next highest or otherwise best offer (the **"Back-Up Bid"**), and (iv) notify all Qualified Bidders participating in the Auction, prior to its adjournment, of (a) the identity of the party that submitted the Successful Bid, which may be the Stalking Horse Bidder (the "**Successful Bidder**"), (b) the amount and other material terms of the Successful Bid, (c) the identity of the party that submitted the Back-Up Bid (the **"Back-Up Bidder"**), and (d) the amount and other material terms of the Back-Up Bid.  Each Qualified Bidder shall agree and be deemed to agree to be the Back-Up Bidder if so designated in accordance with terms of the applicable definitive agreement.

Absent irregularities in the conduct of the Auction or reasonable and material confusion during the bidding, each as determined by the Court, the Debtors will not consider bids after the Auction has closed.

As soon as reasonably practicable after the completion of the Auction, the Successful Bidder and the applicable Debtors shall complete and execute all agreements, instruments, and other documents necessary to consummate the applicable sale or other transaction contemplated by the Successful Bid.  Promptly following the selection of the Successful Bid and Back-Up Bid, the Debtors shall file a notice of the Successful Bid and Back-Up Bid on the Court's docket, together with a revised proposed order approving the Sale Transaction (the **"Sale Order"**).

11

**6.      THE SALE HEARING**

The hearing to consider the proposed Sale Order (the "**Sale Hearing**") will be held on **July 15, 2026 at [●].m.**, subject to Court availability, before the Honorable Judge [●], in the United States Bankruptcy Court for the Southern District of New York, [●], or by such other virtual or electronic means as may be determined by the Court.  The Sale Hearing may be adjourned by the Debtors by an announcement at a hearing before the Court or by filing a notice on the Court's docket.  At the Sale Hearing, the Debtors will seek the Court's approval of the Successful Bid and the Back-Up Bid in the event that the Successful Bidder fails to consummate the transaction contemplated by its Successful Bid.

The Debtors' presentation to the Court of the Successful Bid and Back-Up Bid will not constitute the Debtors' acceptance of such bids, which acceptance will only occur upon approval of such bids by the Court.  Following the Court's entry of the Sale Order, the Debtors and the Successful Bidder shall proceed to consummate the Sale Transaction contemplated by the Successful Bid in accordance with the terms of the applicable definitive agreement.  If the Debtors and the Successful Bidder fail to consummate the proposed transaction in accordance with the terms of the applicable definitive agreement, then the Debtors shall file a notice with the Court advising of such failure.  Upon the filing of such notice with the Court, the Back-Up Bid will be deemed to be the Successful Bid and the Debtors will be authorized, but not directed, to effectuate the Sale Transaction with the Back-Up Bidder, subject to the terms of the Back-Up Bid and in accordance with the terms of the applicable definitive agreement, without further order of the Court.  If the failure to consummate the transactions contemplated by either the Successful Bid or the Back-Up Bid is the result of a breach by the Successful Bidder or Back-Up Bidder, as applicable (the **"Breaching Bidder"**), of its definitive agreement, the Debtors reserve the right to seek all available remedies from such Breaching Bidder, subject to the terms of the applicable definitive agreement (which shall include, as applicable to the Stalking Horse Bidder, the terms of the Stalking Horse Agreement).

**7.      RETURN OF GOOD FAITH DEPOSIT**

The Good Faith Deposits of all Qualified Bidders will be held in escrow by the Deposit Agent and will not become property of the Debtors' bankruptcy estates unless released to the Debtors from escrow pursuant to the terms of the applicable escrow agreement or pursuant to further order of the Court.  The Deposit Agent will retain the Good Faith Deposits of the Successful Bidder and the Back-Up Bidder until the consummation of the transaction contemplated by the Successful Bid or the Back-Up Bid, as applicable, in accordance with Section 6 above, except as otherwise ordered by the Court.  The Good Faith Deposits (and all interest accrued thereon) of the other Qualified Bidders will be returned within two (2) business days after the entry of an order approving the Sale Transaction (which may be the Sale Order), or as soon as reasonably practicable thereafter.  At the closing of the Sale Transaction contemplated by the Successful Bid, the Successful Bidder will receive a credit in the amount of its Good Faith Deposit (plus all interest accrued thereon) and the remaining Good Faith Deposit of the Back-Up Bidder (and all interest accrued thereon) held by the Deposit Agent will be released by the Deposit Agent three (3) business days after the consummation of the Sale Transaction contemplated by the Successful Bid, or as soon as reasonably practicable thereafter; provided that the Deposit Agent will retain the

Good Faith Deposit of a Breaching Bidder pending a ruling by the Court as to the amount of damages owed, if any, by such Breaching Bidder to the Debtors.

Notwithstanding anything herein to the contrary, the terms under which the Stalking Horse Bidder provided the Deposit Amount (as defined in the Stalking Horse Agreement) and the terms of its use, release, and return to the Stalking Horse Bidder will be governed by the Stalking Horse Agreement.

8. **AS IS, WHERE IS**

The sale of the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their agents, or their estates, except as specifically accepted or agreed to by the Debtors in the applicable definitive agreement, as approved by the Court.

9. **FREE AND CLEAR OF ANY AND ALL ENCUMBRANCES**

Except as otherwise provided for in the Stalking Horse Agreement or another Successful Bidder's definitive agreement, as applicable, all of the Debtors' right, title, and interest in and to the Assets shall be sold free and clear of any pledges, liens, security interests, encumbrances, claims, charges, options, judgments, decrees, rights of setoff or recoupment, successor liability claims (whether legal or equitable), and interests thereon (collectively, the **"Encumbrances"**) to the maximum extent permitted by the Bankruptcy Code, with such Encumbrances to attach to the net proceeds of the sale of the Assets with the same validity and priority as such Encumbrances applied against the Assets.

10. **RESERVATION OF RIGHTS**

Except as otherwise provided in these Bidding Procedures or the Bidding Procedures Order, the Debtors reserve the right, in their discretion and in consultation with the DIP Agent, consistent with applicable bankruptcy law and all other orders entered in these Chapter 11 Cases, to:

- determine which Interested Parties are Potential Bidders;

- determine which Potential Bidders are Qualified Bidders;

- determine which bids are Qualified Bids;

- determine which Qualified Bid is the Starting Bid;

- determine which Qualified Bid is the highest or otherwise best offer for the Assets and which is the next highest or otherwise best offer;

- reject any bid that the Debtors deem to be (a) inadequate or insufficient, (b) not in conformity with the requirements of these Bidding Procedures or the requirements of the

13

> Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules, or (c) contrary to the best interests of the Debtors and their estates;

- impose additional terms and conditions with respect to all Potential Bidders;

- cancel the Auction;

- waive the terms and conditions set forth herein with respect to Potential Bidders;

- extend the deadlines set forth herein; and

- modify these Bidding Procedures and implement additional procedural rules that the Debtors determine, in their discretion and in consultation with the DIP Agent, will better promote the goals of the Bidding Process and discharge the Debtors' fiduciary duties; provided, however, that nothing herein shall permit the Debtors to modify the Bidding Procedures to reduce the time provided for a party in interest to file an objection.

Notwithstanding anything to the contrary herein, the Debtors may, in consultation with the DIP Agent, elect to consummate the Sale Transaction pursuant to a chapter 11 plan of reorganization or a sale pursuant to section 363 of the Bankruptcy Code.

Nothing in these Bidding Procedures shall require the Debtors' board of directors to take any action, or to refrain from taking any action, with respect to these Bidding Procedures, to the extent that the Debtors' board of directors determines, based on the advice of counsel, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or its fiduciary duties under applicable law. Accordingly, at any time prior to the Court's entry of a Sale Order, the Debtors may, in consultation with the DIP Agent, terminate the Bidding Process and pursue an alternative transaction, including a plan of reorganization. Notwithstanding anything in this Section 10 to the contrary, nothing herein shall limit, impair, or otherwise affect the Stalking Horse Bidder's right to enforce the terms of the Stalking Horse Agreement or the Stalking Horse Bidder's entitlement to the Bid Protections pursuant to the Stalking Horse Agreement and the Bidding Procedures Order; provided that any DIP Secured Party or Prepetition Secured Party intending to submit a Credit Bid shall notify the Debtors and other Qualified Bidders of such intention no later than two (2) business days prior to the Auction.

## 11.   DIP ORDERS

Notwithstanding anything to the contrary contained in these Bidding Procedures or otherwise, (a) any and all rights of the DIP Agent to consent to the sale of any portion of the DIP Collateral as set forth in the DIP Loan Agreement are hereby expressly reserved and not modified, waived, or impaired in any way by these Bidding Procedures, (b) all cash proceeds generated from

the sale of any DIP Collateral shall be applied in accordance with the terms and conditions of the DIP Order, the DIP Loan Documents, and any other order of the Court, as applicable, and (c) nothing in these Bidding Procedures shall amend, modify, or impair any provision of the DIP Order or the rights of the Debtors, the DIP Agent, or the DIP Lenders thereunder or under any of the DIP Loan Documents, including with respect to allocation of the sale proceeds of any DIP Collateral.  Further, nothing in these Bidding Procedures shall limit the right of the DIP Secured Parties or the Prepetition Secured Parties, as applicable, to submit a credit bid (a "**Credit Bid**") pursuant to section 363(k) of the Bankruptcy Code for the Assets (or any portion thereof) at any time.

## 12.    RELEVANT DATES

| | |
|---|---|
| **June 25, 2026** | The deadline for the Debtors to file the Potential Assumption and Assignment Notice (the "**Potential Assumption Notice Deadline**") |
| **July 2, 2026** | Hearing to consider approval of the Bidding Procedures and for entry of the Bidding Procedures Order, subject to Court availability |
| **July 8, 2026 at 4:00 p.m.** | The deadline by which all binding Bids must be submitted to the Debtors by Potential Bidders (the "**Bid Deadline**") |
| **July 10, 2026 at 4:00 p.m.** | The deadline to object to the Motion and the sale of the Assets (including with respect to the identity of the Stalking Horse Bidder and adequate assurance of future performance by the Stalking Horse Bidder) (the "**Sale Objection Deadline**"), with the exception of objections solely related to the identity of the Successful Bidder and adequate assurance of future performance by the Successful Bidder (in each case, other than the Stalking Horse Bidder) |
| **July 10, 2026 at 4:00 p.m.** | The deadline for a Counterparty to object to its Proposed Cure Cost or the Potential Assumption and Assignment Notice (the "**Cure Objection Deadline**"), with the exception of objections solely related to the identity of the Successful Bidder and adequate assurance of future performance by the Successful Bidder (in each case, other than the Stalking Horse Bidder)[5] |
| **July 13, 2026 at 10:00 a.m.** | Auction (if any) to be held at the New York offices of Davis Polk (or such other location as the Debtors may designate in accordance with the Bidding Procedures) |

---

[5] The Cure Objection Deadline shall be 14 days after the Potential Assumption Notice Deadline.

| July 13, 2026 | Target date for the Debtors to file the Notice of Auction Results and Proposed Assumption and Assignment Notice (the "**Post-Auction Notice Deadline**") |
|---|---|
| July 14, 2026 at 4:00 p.m. | The deadline for a Counterparty to object to the Proposed Assumption and Assignment Notice, if applicable (the "**Post-Auction Objection Deadline**") |
| July 15, 2026 | Hearing to consider approval of the Sale Transaction and for entry of the Sale Order, subject to Court availability |
| July 31, 2026 | Closing of the Sale Transaction (subject to obtaining required regulatory approvals) |

13.     **<u>CONSULTATION BY THE DEBTORS</u>**

The Debtors will consult with the DIP Agent as set forth herein and in the Bidding Procedures Order, and to the extent not explicitly required herein or in the Bidding Procedures Order, before making any material decision with respect to the Auction or the Sale Transaction. If the DIP Agent or the Prepetition Loan Agent, as applicable, elects to participate in the Auction as a bidder, such party shall forfeit its right to consult with the Debtors as set forth in these Bidding Procedures.

**Exhibit 2**

**Form of Sale Notice**

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Tel.: (212) 450-4000
Brian M. Resnick
Angela M. Libby
Stephen D. Piraino
Richard J. Steinberg
Sihui (Sophy) Ma (*pro hac vice* pending)
Mordechai Rivkin

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **SLEEP NUMBER CORPORATION,** *et al.*, | **Case No. 26-11399 ([●])** |
| **Debtors.**[1] | **[Joint Administration Requested]** |

**NOTICE OF SALE OF SUBSTANTIALLY ALL OF THE
DEBTORS' ASSETS FREE AND CLEAR OF ANY AND ALL
LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES**

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York (the "**Court**") on June 12, 2026.

**PLEASE TAKE FURTHER NOTICE** that, on June 12, 2026, in connection with the proposed sale (the "**Sale Transaction**") of substantially all of the assets of the Debtors (the "**Assets**") to SNBR Inc. (the "**Stalking Horse Bidder**") or any other successful bidder (a "**Successful Bidder**") subject to an auction process (the "**Auction**"), if any, for the Assets, the Debtors filed a motion (the "**Motion**") with the Court seeking entry of an order, among other things, approving (a) procedures for (i) the solicitation of bids in connection with the Sale Transaction and the Auction, free and clear of any and all liens, claims, interests, and encumbrances, and (ii) holding the Auction if applicable in connection therewith (the "**Bidding**

---

[1] The Debtors' names and last four digits of their respective employer identification numbers are as follows: Sleep Number Corporation (7886); Select Comfort Retail Corporation (9757); Select Comfort Canada Holding Inc. (4273); Select Comfort SC LLC (5901); and Sleep Number Health Corporation (2499). The Debtors' mailing address is 1001 Third Avenue South, Minneapolis, MN 55404.

**Procedures**"),[2] (b) payment of the Bid Protections to the Stalking Horse Bidder in accordance with the terms and conditions set forth in the Stalking Horse Agreement, (c) the form and manner of notice related to the Sale Transaction, and (d) procedures for the assumption and assignment of contracts and leases in connection with the Sale Transaction.

**PLEASE TAKE FURTHER NOTICE** that, on [●], 2026, the Court entered an order (the "**Bidding Procedures Order**") approving, among other things, the Bidding Procedures, which establish the key dates and times related to the Sale Transaction and the Auction, the Debtors' entry into the Stalking Horse Agreement, and the Assumption and Assignment Procedures. All parties interested in bidding should carefully read the Bidding Procedures Order and the Bidding Procedures in their entirety.[3]

## Contact Persons for Parties Interested in Submitting a Bid

The Bidding Procedures set forth the requirements for submitting a Qualified Bid, and any person interested in making an offer to purchase the Assets must comply strictly with the Bidding Procedures. Only Qualified Bids will be considered by the Debtors, in accordance with the Bidding Procedures.

**Any interested bidder should contact, as soon as practicable:**

**Guggenheim Securities, LLC**[4]
330 Madison Avenue
New York, NY 10017
Attn: Michael Gottlieb (Michael.Gottlieb@guggenheimpartners.com) and Stuart Erickson
(stuart.erickson@guggenheimpartners.com)

## Obtaining Additional Information

Copies of the Motion and the Bidding Procedures Order, as well as all related exhibits (including the Stalking Horse Agreement and the Bidding Procedures) and all other documents filed with the Court, are available free of charge on the Debtors' case information website located at https://restructuring.ra.kroll.com/Sleepnumber or can be requested by email at SleepNumberInfo@ra.kroll.com.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or the Bidding Procedures, as applicable.

[3] To the extent of any inconsistencies between the Bidding Procedures and the summary descriptions of the Bidding Procedures in this notice, the terms of the Bidding Procedures shall control in all respects.

[4] Guggenheim Securities, LLC, in its capacity as the Debtors' proposed investment banker, is referred to herein as "**Guggenheim Securities**."

**Important Dates and Deadlines**[5]

1. **Bid Deadline**. The deadline to submit a Qualified Bid and Required Bid Documents is **July 8, 2026 at 4:00 p.m.**[6]

2. **Sale Objection Deadline**. The deadline to file an objection with the Court to the Sale Order or the Sale Transaction (including objections relating to the Stalking Horse Bidder) (the "**Sale Objection**") is **July 10, 2026 at 4:00 p.m.** (the "**Sale Objection Deadline**").

3. **Auction**. In the event that the Debtors timely receive more than one Qualified Bid for the Assets in addition to the Stalking Horse Bid, and subject to the satisfaction of any further conditions set forth in the Bidding Procedures, the Debtors intend to conduct an Auction for the Assets. The Auction, if one is held, will commence on **July 13, 2026 at 10:00 a.m.** at the offices of Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, NY 10017. If the Debtors hold the Auction, the Debtors will, as soon as reasonably practicable after selecting the Successful Bid and Back-Up Bid (if any), file (but not serve) and publish on the Case Website a notice of the results of the Auction (such notice, the "**Notice of Auction Results**"). If a Successful Bidder at the Auction is not the Stalking Horse Bidder, objections solely related to the identity of such Successful Bidder and adequate assurance of future performance by the Successful Bidder (the "**Post-Auction Objection**") must be filed with the Court and served on the Objection Notice Parties so as to be received by 4:00 p.m. on the date that is one calendar day after the date that the Debtors file the Notice of Auction Results (the "**Post-Auction Objection Deadline**"). The Notice of Auction Results will set forth the specific deadline and procedures for filing any such objections in response to the Notice of Auction Results.

4. **Sale Hearing**. A hearing to consider the proposed Sale Transaction will be held before the Court on **July 15, 2026 at [●].m.**, or such other date as determined by the Court.

**Filing Objections**

A Sale Objection or Post-Auction Objection, if any, must (a) be in writing, (b) state, with specificity, the legal and factual bases thereof, (c) comply with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, (d) be filed with the Court no later than the applicable deadline, and (e) be served on the following parties so that it is received no later than the applicable deadline: (i) proposed counsel to the Debtors, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, NY 10017, Attn: Brian M. Resnick, Angela M. Libby, Richard J. Steinberg, and Mordechai Rivkin; (ii) counsel to the DIP Agent, Faegre Drinker Biddle & Reath LLP, 2200 Wells Fargo Center, 90 S. 7th Street, Minneapolis, MN 55402, Attn: Michael R. Stewart and Adam C. Ballinger; (iii) counsel to the Stalking Horse Bidder, Goodwin Procter LLP, The New York Times Building, 620 Eighth Avenue, New York, NY 10018, Attn: Kizzy Jarashow, Joshua Zachariah, Harrison Freeman, and Benjamin Loveland; (iv) counsel to any statutory committee appointed in the Chapter 11 Cases; and (v) the U.S. Trustee (the "**Objection Notice Parties**").

---

[5] The following dates and deadlines may be extended by the Debtors or the Court pursuant to the terms of the Bidding Procedures and the Bidding Procedures Order.

[6] All times herein are expressed in prevailing Eastern Time.

3

## CONSEQUENCES OF FAILING TO TIMELY ASSERT AN OBJECTION

*Any party or entity who fails to timely and properly raise a Sale Objection or Post-Auction Objection on or before the applicable deadline in accordance with the Bidding Procedures Order and this notice shall be forever barred from asserting any objection to the Sale Transaction, including with respect to the transfer of the assets free and clear of all liens, claims, encumbrances, and other interests.*

## NO SUCCESSOR LIABILITY

*The assets sold in the Sale Transaction will be sold free and clear of, among other things, any claim arising from any conduct of the Debtors prior to the closing of the Sale Transaction, whether known or unknown, whether due or to become due, whether accrued, absolute, contingent, or otherwise, so long as such claim arises out of or relates to events occurring prior to the closing of the Sale Transaction. Accordingly, as a result of the Sale Transaction, the Successful Bidder will not be a successor to any of the Debtors by reason of any theory of law or equity, and the Successful Bidder will have no liability, except as expressly provided in a definitive agreement reached between the Debtors and the Successful Bidder, for any liens, claims, encumbrances, and other interests against or in any of the Debtors under any theory of law, including successor liability theories.*

*[Remainder of page intentionally left blank]*

4

Dated:   [●], 2026
         New York, New York

                                        DAVIS POLK & WARDWELL LLP

                                        */s/ DRAFT*
                                        450 Lexington Avenue
                                        New York, NY 10017
                                        Tel.: (212) 450-4000
                                        Brian M. Resnick
                                        Angela M. Libby
                                        Stephen D. Piraino
                                        Richard J. Steinberg
                                        Sihui (Sophy) Ma (*pro hac vice* pending)
                                        Mordechai Rivkin

                                        *Proposed Counsel to the Debtors*
                                        *and Debtors in Possession*

5

## Exhibit 3

### Form of Potential Assumption and Assignment Notice

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Tel.: (212) 450-4000
Brian M. Resnick
Angela M. Libby
Stephen D. Piraino
Richard J. Steinberg
Sihui (Sophy) Ma (*pro hac vice* pending)
Mordechai Rivkin

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | **Chapter 11** |
| **SLEEP NUMBER CORPORATION, *et al.*,** | **Case No. 26-11399 ([●])** |
| Debtors.[1] | **[Joint Administration Requested]** |

### NOTICE OF POTENTIAL ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS OR UNEXPIRED LEASES AND CURE AMOUNT

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York (the "**Court**") on June 12, 2026.

**PLEASE TAKE FURTHER NOTICE** that, on June 12, 2026, in connection with the proposed sale (the "**Sale Transaction**") of substantially all of the assets of the Debtors (the "**Assets**") to SNBR Inc. (the "**Stalking Horse Bidder**") or any other successful bidder (a "**Successful Bidder**") subject to an auction process (the "**Auction**"), if any, for the Assets, the Debtors filed a motion (the "**Motion**") with the Court seeking entry of an order, among other things, approving (a) procedures for (i) the solicitation of bids in connection with the Sale Transaction and the Auction, free and clear of any and all liens, claims, interests, and encumbrances, and (ii) holding the Auction if applicable in connection therewith (the "**Bidding**

---

[1]   The Debtors' names and last four digits of their respective employer identification numbers are as follows: Sleep Number Corporation (7886); Select Comfort Retail Corporation (9757); Select Comfort Canada Holding Inc. (4273); Select Comfort SC LLC (5901); and Sleep Number Health Corporation (2499).  The Debtors' mailing address is 1001 Third Avenue South, Minneapolis, MN 55404.

**Procedures**"),[2] (b) payment of the Bid Protections to the Stalking Horse Bidder in accordance with the terms and conditions set forth in the Stalking Horse Agreement, (c) the form and manner of notice related to the Sale Transaction, and (d) procedures for the assumption and assignment of contracts and leases in connection with the Sale Transaction (the "**Assumption and Assignment Procedures**").

PLEASE TAKE FURTHER NOTICE that, on [●], 2026, the Court entered an order (the "**Bidding Procedures Order**") approving, among other things, the Bidding Procedures, which establish the key dates and times related to the Sale Transaction and the Auction, and the Debtors' entry into the Stalking Horse Agreement, and the Assumption and Assignment Procedures. All parties interested in bidding should carefully read the Bidding Procedures Order and the Bidding Procedures in their entirety.[3]

PLEASE TAKE FURTHER NOTICE that, upon the closing of the Sale Transaction, the Debtors intend to assume and assign the Potential Assumed Contracts to the Successful Bidder. A schedule listing the Potential Assumed Contracts (the "**Potential Assumed Contracts Schedule**") is attached hereto and may also be accessed free of charge on the Debtors' case information website located at https://restructuring.ra.kroll.com/Sleepnumber or can be requested by email at SleepNumberInfo@ra.kroll.com. In addition, the "**Proposed Cure Costs**," if any, necessary for the assumption and assignment of the Potential Assumed Contracts are set forth on the Potential Assumed Contracts Schedule. *Each Proposed Cure Cost listed on the Potential Assumed Contracts Schedule represents all liabilities of any nature of the Debtors arising under an Assumed Contract or Assumed Lease prior to the closing of the Sale Transaction, or other applicable date upon which such assumption and assignment will become effective, whether known or unknown, whether due or to become due, whether accrued, absolute, contingent, or otherwise, so long as such liabilities arise out of or relate to events occurring prior to the closing of the Sale Transaction or other applicable date upon which such assumption and assignment will become effective.*

YOU ARE RECEIVING THIS NOTICE BECAUSE YOU HAVE BEEN IDENTIFIED AS A COUNTERPARTY TO A POTENTIAL ASSUMED CONTRACT. Under the terms of the Assumption and Assignment Procedures, (a) at or prior to the closing of the Sale Transaction, the Successful Bidder may elect, in its sole and absolute discretion, (i) to exclude any contract or lease on the Potential Assumed Contracts Schedule as an Assumed Contract or Assumed Lease, as applicable (in which case it shall become a Designated Contract), or (ii) to include on the Proposed Assumed Contracts Schedule any contract or lease listed on the Potential Assumed Contracts Schedule, as applicable, by providing to the Debtors written notice of its election to exclude or include such contract or lease, (b) if the Debtors or any Successful Bidder identify during the pendency of the Chapter 11 Cases (before or after the closing of the Sale Transaction) any contract or lease that is not listed on the Proposed Assumed Contracts Schedule, and such contract or lease has not been rejected by the Debtors, the Successful Bidder

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or the Bidding Procedures, as applicable.

[3] To the extent of any inconsistencies between the Bidding Procedures and the summary descriptions of the Bidding Procedures in this notice, the terms of the Bidding Procedures shall control in all respects.

may in its sole and absolute discretion elect by written notice to the Debtors to treat such contract or lease as an Assumed Contract or Assumed Lease, as applicable, and the Debtors shall seek to assume and assign such Assumed Contract or Assumed Lease in accordance with the Assumption and Assignment Procedures, and (c) following the Auction, the Debtors may, in accordance with the applicable purchase agreement, or as otherwise agreed by the Debtors and the Successful Bidder, at any time before the closing of the Sale Transaction, modify the previously stated Proposed Cure Costs associated with any Proposed Assumed Contract in accordance with the Assumption and Assignment Procedures.  The Assumption and Assignment Procedures further provide that any Counterparty whose previously-stated Proposed Cure Cost is modified will receive notice of such modification and an opportunity to file an objection in accordance with the Assumption and Assignment Procedures.   **The assumption and assignment of the Contracts and Leases on the Potential Assumed Contracts Schedule is not guaranteed and is subject to approval by the Court and the Debtors' or Successful Bidder's right to remove an Assumed Contract or Assumed Lease from the Potential Assumed Contracts Schedule and Proposed Assumed Contracts Schedule.**

## Obtaining Additional Information

Copies of the Bidding Procedures Motion and the Bidding Procedures Order, as well as all related exhibits (including the Stalking Horse Agreement and the Bidding Procedures) and all other documents filed with the Court, are available free of charge on the Debtors' case information website, located at https://restructuring.ra.kroll.com/Sleepnumber or can be requested by email at SleepNumberInfo@ra.kroll.com.

## Filing Assumption and Assignment Objections

Pursuant to the Assumption and Assignment Procedures, objections to the potential assumption and assignment of an Assumed Contract or Assumed Lease, the Debtors' Proposed Cure Costs, if any, or the ability of the Stalking Horse Bidder to provide adequate assurance of future performance (any such objection, an "**Assumption and Assignment Objection**") must (a) be in writing, (b) comply with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, (c) state, with specificity, the legal and factual bases thereof, including, if applicable, the Cure Cost that the Counterparty believes is required to cure any alleged defaults under the relevant Assumed Contract or Assumed Lease, (d) **be filed no later than July 10, 2026 at 4:00 p.m.[4] (the "Cure Objection Deadline")**, and (e) be served on the following parties so that it is received no later than the Cure Objection Deadline: (i) proposed counsel to the Debtors, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, NY 10017, Attn: Brian M. Resnick, Angela M. Libby, Richard J. Steinberg, and Mordechai Rivkin; (ii) counsel to the DIP Agent, Faegre Drinker Biddle & Reath LLP, 2200 Wells Fargo Center, 90 S. 7th Street, Minneapolis, MN 55402, Attn: Michael R. Stewart and Adam C. Ballinger; (iii) counsel to the Stalking Horse Bidder, Goodwin Procter LLP, The New York Times Building, 620 Eighth Avenue, New York, NY 10018, Attn: Kizzy Jarashow, Joshua Zachariah, Harrison Freeman, and Benjamin Loveland; (iv) counsel to any

---

[4] All times herein are expressed in prevailing Eastern Time.

statutory committee appointed in the Chapter 11 Cases; and (v) the U.S. Trustee (the "**Objection Notice Parties**").

### CONSEQUENCES OF FAILING TO TIMELY ASSERT AN OBJECTION

*Any Counterparty to a contract or lease who fails to timely make an Assumption and Assignment Objection or Post-Auction Objection before the applicable Deadline in accordance with the Assumption and Assignment Procedures, the Bidding Procedures Order, and this notice shall be deemed to have consented to the assumption and assignment of such contract or lease, including the Proposed Cure Costs (if any), set forth on a Potential Assumed Contracts Schedule, and shall be forever barred from asserting any objection or claims against the Debtors, the Successful Bidder, or the property of any such parties relating to the assumption and assignment of such contract or lease, including asserting additional Cure Costs with respect to such contract or lease.  Notwithstanding anything to the contrary in such contract or lease, or any other document, the Proposed Cure Costs set forth on a Potential Assumed Contracts Schedule shall be controlling and will be the only amount necessary to cure outstanding defaults under the applicable Assumed Contract or Assumed Lease under section 365(b) of the Bankruptcy Code arising out of or related to any events occurring prior to the closing of the Sale Transaction or other applicable date upon which such assumption and assignment will become effective, whether known or unknown, whether due or to become due, whether accrued, absolute, contingent, or otherwise, so long as such liabilities arise out of or relate to events occurring prior to the closing of the Sale Transaction or other applicable date upon which such assumption and assignment will become effective.*

### Other Important Dates and Deadlines[5]

In addition to the dates and deadlines described above with respect to filing Assumption and Assignment Objections or the Post-Auction Objections, note the following important dates and deadlines:

1. **Sale Objection Deadline**.  The deadline to file an objection with the Court to the Sale Order or the Sale Transaction (including objections relating to the Stalking Horse Bidder) (the "**Sale Objection**") is **July 10, 2026 at 4:00 p.m.** (the "**Sale Objection Deadline**").

2. **Auction**.  In the event that the Debtors timely receive more than one Qualified Bid for the Assets in addition to the Stalking Horse Bid, and subject to the satisfaction of any further conditions set forth in the Bidding Procedures, the Debtors intend to conduct an Auction therefor.  The Auction, if one is held, will commence on **July 13, 2026 at 10:00 a.m.** at the offices of Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, NY 10017. If the Debtors hold the Auction, the Debtors will, as soon as reasonably practicable after selecting the Successful Bid(s), file (but not serve) and publish on the Case Website a notice of the results of the Auction (such notice, the "**Notice of Auction Results**"). If a Successful Bidder at the Auction is not the Stalking Horse Bidder, objections solely related to the identity of such Successful Bidder(s) and adequate assurance of future performance by the

---

[5] The following dates and deadlines may be extended by the Debtors or the Court pursuant to the terms of the Bidding Procedures and the Bidding Procedures Order.

Successful Bidder (the "**Post-Auction Objection**") must be filed with the Court and served on the Objection Notice Parties so as to be received by 4:00 p.m. on the date that is one calendar day after the date that the Debtors file the Notice of Auction Results (the "**Post-Auction Objection Deadline**"). The Notice of Auction Results will set forth the specific deadline and procedures for filing any such objections in response to the Notice of Auction Results.

3. **Sale Hearing**. A hearing to consider the proposed Sale Transaction will be held before the Court on **July 15, 2026 at [●].m.**, or such other date as determined by the Court.

[*Remainder of page intentionally left blank*]

Dated:    [●], 2026
      New York, New York

                                      DAVIS POLK & WARDWELL LLP

                                      */s/ DRAFT*
                                      450 Lexington Avenue
                                      New York, NY 10017
                                      Tel.: (212) 450-4000
                                      Brian M. Resnick
                                      Angela M. Libby
                                      Stephen D. Piraino
                                      Richard J. Steinberg
                                      Sihui (Sophy) Ma (*pro hac vice* pending)
                                      Mordechai Rivkin

                                      *Proposed Counsel to the Debtors*
                                      *and Debtors in Possession*

6

**Exhibit 4**

**Form of Proposed Assumption and Assignment Notice**

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Tel.: (212) 450-4000
Brian M. Resnick
Angela M. Libby
Stephen D. Piraino
Richard J. Steinberg
Sihui (Sophy) Ma (*pro hac vice* pending)
Mordechai Rivkin

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **SLEEP NUMBER CORPORATION,** *et al.*, | **Case No. 26-11399 ([●])** |
| **Debtors.**[1] | **[Joint Administration Requested]** |

**NOTICE OF PROPOSED ASSUMPTION AND ASSIGNMENT OF EXECUTORY**
**CONTRACTS OR UNEXPIRED LEASES AND CURE AMOUNT**

 **PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York (the "**Court**") on June 12, 2026.

 **PLEASE TAKE FURTHER NOTICE** that, on June 12, 2026, in connection with the proposed sale (the "**Sale Transaction**") of substantially all of the assets of the Debtors (the "**Assets**") to SNBR Inc. (the "**Stalking Horse Bidder**") or any other successful bidder (a "**Successful Bidder**") subject to an auction process (the "**Auction**"), if any, for the Assets, the Debtors filed a motion (the "**Motion**") with the Court seeking entry of an order, among other things, approving (a) procedures for (i) the solicitation of bids in connection with the Sale Transaction and the Auction, free and clear of any and all liens, claims, interests, and encumbrances, and (ii) holding the Auction if applicable in connection therewith (the "**Bidding**

---

 [1] The Debtors' names and last four digits of their respective employer identification numbers are as follows: Sleep Number Corporation (7886); Select Comfort Retail Corporation (9757); Select Comfort Canada Holding Inc. (4273); Select Comfort SC LLC (5901); and Sleep Number Health Corporation (2499). The Debtors' mailing address is 1001 Third Avenue South, Minneapolis, MN 55404.

**Procedures**"),[2] (b) payment of the Bid Protections to the Stalking Horse Bidder in accordance with the terms and conditions set forth in the Stalking Horse Agreement, (c) the form and manner of notice related to the Sale Transaction, and (d) procedures for the assumption and assignment of contracts and leases in connection with the Sale Transaction (the "**Assumption and Assignment Procedures**").

PLEASE TAKE FURTHER NOTICE that, on [●], 2026, the Court entered an order (the "**Bidding Procedures Order**") approving, among other things, the Bidding Procedures, which establish the key dates and times related to the Sale Transaction and the Auction, and the Debtors' entry into the Stalking Horse Agreement, and the Assumption and Assignment Procedures. All parties interested in bidding should carefully read the Bidding Procedures Order and the Bidding Procedures in their entirety.[3]

PLEASE TAKE FURTHER NOTICE that, on July 13, 2026 at 10:00 a.m., the Debtors held an Auction at the offices of Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, NY 10017.

PLEASE TAKE FURTHER NOTICE that, upon the closing of the Sale Transaction, the Debtors intend to assume and assign the Proposed Assumed Contracts to the Successful Bidder. A schedule listing the Proposed Assumed Contracts (the "**Proposed Assumed Contracts Schedule**") is attached hereto and may also be accessed free of charge on the Debtors' case information website located at https://restructuring.ra.kroll.com/Sleepnumber or can be requested by email at SleepNumberInfo@ra.kroll.com. In addition, the "**Proposed Cure Costs**," if any, necessary for the assumption and assignment of the Proposed Assumed Contracts are set forth on the Proposed Assumed Contracts Schedule. *Each Proposed Cure Cost listed on the Proposed Assumed Contracts Schedule represents all liabilities of any nature of the Debtors arising under an Assumed Contract or Assumed Lease prior to the closing of the Sale Transaction, or other applicable date upon which such assumption and assignment will become effective, whether known or unknown, whether due or to become due, whether accrued, absolute, contingent, or otherwise, so long as such liabilities arise out of or relate to events occurring prior to the closing of the Sale Transaction or other applicable date upon which such assumption and assignment will become effective.*

YOU ARE RECEIVING THIS NOTICE BECAUSE YOU HAVE BEEN IDENTIFIED AS A COUNTERPARTY TO A PROPOSED ASSUMED CONTRACT. Under the terms of the Assumption and Assignment Procedures, (a) at or prior to the closing of the Sale Transaction, the Successful Bidder may elect, in its sole and absolute discretion, (i) to exclude any contract or lease on the Proposed Assumed Contracts Schedule as an Assumed Contract or Assumed Lease, as applicable (in which case it shall become a Designated Contract), or (ii) to include on the Proposed Assumed Contracts Schedule any contract or lease listed on the Potential Assumption and Assignment Notice, by providing to the Debtors written notice of its

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or the Bidding Procedures, as applicable.

[3] To the extent of any inconsistencies between the Bidding Procedures and the summary descriptions of the Bidding Procedures in this notice, the terms of the Bidding Procedures shall control in all respects.

election to exclude or include such contract or lease, as applicable, (b) if the Debtors or any Successful Bidder identify during the pendency of the Chapter 11 Cases (before or after the closing of the Sale Transaction) any contract or lease that is not listed on the Proposed Assumed Contracts Schedule, and such contract or lease has not been rejected by the Debtors, the Successful Bidder may in its sole and absolute discretion elect by written notice to the Debtors to treat such contract or lease as an Assumed Contract or Assumed Lease, as applicable, and the Debtors shall seek to assume and assign such Assumed Contract or Assumed Lease in accordance with the Assumption and Assignment Procedures, and (c) following the Auction, the Debtors may, in accordance with the applicable purchase agreement, or as otherwise agreed by the Debtors and the Successful Bidder, at any time before the closing of the Sale Transaction, modify the previously stated Proposed Cure Costs associated with any Proposed Assumed Contract in accordance with the Assumption and Assignment Procedures.  The Assumption and Assignment Procedures further provide that any Counterparty whose previously-stated Proposed Cure Cost is modified will receive notice of such modification and an opportunity to file an objection in accordance with the Assumption and Assignment Procedures.   **The assumption and assignment of the Contracts and Leases on the Proposed Assumed Contracts Schedule is not guaranteed and is subject to approval by the Court and the Debtors' or Successful Bidder's right to remove an Assumed Contract or Assumed Lease from the Proposed Assumed Contracts Schedule.**

### Obtaining Additional Information

Copies of the Bidding Procedures Motion and the Bidding Procedures Order, as well as all related exhibits (including the Stalking Horse Agreement and the Bidding Procedures) and all other documents filed with the Court, are available free of charge on the Debtors' case information website, located at https://restructuring.ra.kroll.com/Sleepnumber or can be requested by email at SleepNumberInfo@ra.kroll.com.

### Filing Assumption and Assignment Objections

Pursuant to the Assumption and Assignment Procedures, objections to the Debtors' Proposed Cure Costs, if any, or as to the identity of the Successful Bidder or on the basis of adequate assurance of future performance by the Successful Bidder (in each case, other than the Stalking Horse Bidder) (any such objection, an "**Assumption and Assignment Objection**") must (a) be in writing, (b) comply with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, (c) state, with specificity, the legal and factual bases thereof, including, if applicable, the Cure Costs that the Counterparty believes is required to cure any alleged defaults under the relevant Assumed Contract or Assumed Lease, (d) **(1) for objections relating to the identity of the Successful Bidder or on the basis of adequate assurance of future performance by the Successful Bidder (in each case, other than the Stalking Horse Bidder), be filed no later than 4:00 p.m. on the date that is one calendar day after the date that the Debtors file the Notice of Auction Results (the "Post-Auction Objection Deadline") and (2) for objections relating to Proposed Cure Costs, by no later than 14 calendar days from the date of service of the Proposed Assumption and Assignment Notice,** and (e) be served on the following parties so that it is received no later than the applicable deadline: (i) proposed counsel to the Debtors, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, NY 10017, Attn: Brian M. Resnick, Angela M. Libby, Richard J. Steinberg, and Mordechai Rivkin; (ii) counsel to the DIP Agent, Faegre Drinker Biddle & Reath LLP, 2200 Wells Fargo Center, 90 S. 7th Street, Minneapolis, MN 55402,

3

Attn: Michael R. Stewart and Adam C. Ballinger; (iii) counsel to the Stalking Horse Bidder, Goodwin Procter LLP, The New York Times Building, 620 Eighth Avenue, New York, NY 10018, Attn: Kizzy Jarashow, Joshua Zachariah, Harrison Freeman, and Benjamin Loveland; (iv) counsel to any statutory committee appointed in the Chapter 11 Cases; and (v) the U.S. Trustee (the "**Objection Notice Parties**").

Pursuant to the Assumption and Assignment Procedures, any Counterparty to a Contract or Lease that (a) is included in the Proposed Assumption and Assignment Notice but (b) was not included on the Potential Assumption and Assignment Notice shall have until the date that is 14 calendar days after the filing of the Proposed Assumption and Assignment Notice to object solely as to (i) the assumption and assignment of the Proposed Assumed Contracts or (ii) the Proposed Cure Cost, in each case, as contemplated by and set forth in the Assumption and Assignment Procedures.

## CONSEQUENCES OF FAILING TO TIMELY ASSERT AN OBJECTION

*Any Counterparty to a contract or lease who fails to timely make an Assumption and Assignment Objection before the applicable deadline in accordance with the Assumption and Assignment Procedures, the Bidding Procedures Order, and this notice shall be deemed to have consented to the assumption and assignment of such contract or lease, including the Proposed Cure Costs (if any), set forth on a Proposed Assumed Contracts Schedule, and shall be forever barred from asserting any objection or claims against the Debtors, the Successful Bidder, or the property of any such parties relating to the assumption and assignment of such contract or lease, including asserting additional Cure Costs with respect to such contract or lease.  Notwithstanding anything to the contrary in such contract or lease, or any other document, the Proposed Cure Costs set forth on a Proposed Assumed Contracts Schedule shall be controlling and will be the only amount necessary to cure outstanding defaults under the applicable Assumed Contract or Assumed Lease under section 365(b) of the Bankruptcy Code arising out of or related to any events occurring prior to the closing of the Sale Transaction or other applicable date upon which such assumption and assignment will become effective, whether known or unknown, whether due or to become due, whether accrued, absolute, contingent, or otherwise, so long as such liabilities arise out of or relate to events occurring prior to the closing of the Sale Transaction or other applicable date upon which such assumption and assignment will become effective.*

## Other Important Dates and Deadlines[4]

In addition to the dates and deadlines described above with respect to filing Assumption and Assignment Objections, note the following important dates and deadlines:

---

[4] The following dates and deadlines may be extended by the Debtors or the Court pursuant to the terms of the Bidding Procedures and the Bidding Procedures Order.

1. **Sale Hearing**.  A hearing to consider the proposed Sale Transaction will be held before the Court on **July 15, 2026 at [●].m.**, or such other date as determined by the Court.

[*Remainder of page intentionally left blank*]

Dated: [●], 2026
      New York, New York

DAVIS POLK & WARDWELL LLP

_/s/ DRAFT_
450 Lexington Avenue
New York, NY 10017
Tel.: (212) 450-4000
Brian M. Resnick
Angela M. Libby
Stephen D. Piraino
Richard J. Steinberg
Sihui (Sophy) Ma (_pro hac vice_ pending)
Mordechai Rivkin

_Proposed Counsel to the Debtors_
_and Debtors in Possession_

## EXHIBIT B

**Stalking Horse Agreement**

**ASSET PURCHASE AGREEMENT**

**by and between**

**SNBR Inc., as Purchaser,**

**Sleep Number Corporation, as Seller,**

**and**

**Sleep Country Canada Inc.**

**(for purpose of Section 10.21 only)**

**Dated as of June 12, 2026**

## TABLE OF CONTENTS

Page

ARTICLE 1 DEFINED TERMS ................................................................................................ 2

**1.1 Defined Terms** ............................................................................................... **2**
**1.2 Other Definitional and Interpretive Matters** ........................................... **22**
ARTICLE 2 THE PURCHASE AND SALE; CLOSING ........................................................ 25

**2.1 Purchase and Sale** ......................................................................................... **25**
**2.2 Excluded Assets** ............................................................................................. **26**
**2.3 Assumption of Liabilities** ............................................................................ **28**
**2.4 Assumption/Rejection of Certain Contracts (including Real Property Leases) and Designation Rights** ......................................................................................... **29**
**2.5 Excluded Liabilities** ...................................................................................... **33**
**2.6 Excluded Contracts** ....................................................................................... **35**
**2.7 Nontransferable Assets and Liabilities** ...................................................... **35**
**2.8 Closing** ............................................................................................................. **36**
**2.9 Closing Deliveries of the Parties** ................................................................. **36**
**2.10 Purchase Price; Assumed Liabilities** .......................................................... **37**
**2.11 Transfer Taxes** .............................................................................................. **41**
**2.12 Allocation of Purchase Price** ....................................................................... **41**
**2.13 Withholding** ................................................................................................... **42**
**2.14 Good Faith Deposit** ....................................................................................... **42**
ARTICLE 3 REPRESENTATIONS AND WARRANTIES OF THE SELLER GROUP ........... 43

**3.1 Organization, Good Standing and Other Matters** .................................... **43**
**3.2 Authority and Enforceability** ...................................................................... **44**
**3.3 No Conflict; Required Filings and Consents** .............................................. **44**
**3.4 Sufficiency of Transferred Assets** ............................................................... **44**
**3.5 Compliance With Laws; Permits** ................................................................. **45**
**3.6 Litigation** ........................................................................................................ **45**
**3.7 Real Property** ................................................................................................. **45**
**3.8 Assigned Contracts**……………………………………………………………..**46**
**3.9 Tax** ................................................................................................................... **46**
**3.10 Affiliate Transactions** ................................................................................... **47**
**3.11 Labor Matters** ............................................................................................... **47**
**3.12 Employee Benefits** ......................................................................................... **47**
**3.13 Insurance** ........................................................................................................ **48**
**3.14 Intellectual Property** ..................................................................................... **48**
**3.15 Inventory** ........................................................................................................ **51**
**3.16 Product Liability.** ........................................................................................... **51**
**3.17 Absence of Changes** ....................................................................................... **51**
**3.18 Financial Statements; Undisclosed Liabilities** .......................................... **51**
**3.19 Brokers and Finders** ..................................................................................... **52**

3.20    **Information Technology and Privacy** .................................................................. 52

3.21    **Environmental Matters** .................................................................................... 53

3.22    **Anti-Bribery, Anti-Corruption, and Anti-Money Laundering** ......................... 54

3.23    **Sanctions, Import, and Export Controls** .......................................................... 54

3.24    **Data Security Program** ..................................................................................... 55

3.25    **No TID US Business** ......................................................................................... 55

3.26    **No Other Representations or Warranties** ......................................................... 55

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF PURCHASER ......................... 55

4.1    **Organization, Good Standing and Other Matters** ............................................ 56

4.2    **Authority and Enforceability** ........................................................................... 56

4.3    **No Conflict: Required Filings and Consents** .................................................... 56

4.4    **Equity Financing** .............................................................................................. 56

4.5    **Solvency** ........................................................................................................... 57

4.6    **Litigation** .......................................................................................................... 57

4.7    **Brokers and Finders** ......................................................................................... 58

4.8    **Investigation and Agreement by Purchaser; Non-Reliance of Purchaser; No Other Representations and Warranties** ............................................................ 58

4.9    **No Other Representations or Warranties** ......................................................... 58

ARTICLE 5 BANKRUPTCY COURT MATTERS ............................................................... 59

5.1    **Debtors-in-Possession** ...................................................................................... 59

5.2    **Post-Petition Payments** .................................................................................... 59

5.3    **Bid Procedures Motion: Bidding Procedures Order** ........................................ 59

5.4    **Sale Order** ......................................................................................................... 59

5.5    **Approval of Bid Protections; Minimum Overbid** ............................................ 60

5.6    **Cooperation with Respect to Bankruptcy Court Approvals** .............................. 60

5.7    **Back-Up Bid** .................................................................................................... 61

5.8    **Bankruptcy Court Pleadings** ............................................................................ 61

5.9    **Bankruptcy Court Milestones** .......................................................................... 61

5.10    **Competing Transaction** .................................................................................... 62

ARTICLE 6 PRE-CLOSING COVENANTS ....................................................................... 62

6.1    **Conduct of Business** ......................................................................................... 62

6.2    **Access to Information; Confidentiality** ............................................................ 66

6.3    **Efforts to Consummate** .................................................................................... 67

6.4    **Notices and Consents** ....................................................................................... 67

6.5    **Regulatory Matters and Approvals** .................................................................. 67

6.6    **Public Announcements** ..................................................................................... 69

6.7    **Transferred Employees; Employee Benefits** .................................................... 70

6.8    **Financing** .......................................................................................................... 72

6.9    **Financing Cooperation** .................................................................................... 73

6.10    **No Successor Liability** ...................................................................................... 77

6.11    **Reporting and Information Rights.** ................................................................... 77

6.12    **Transition Services Agreement.** ....................................................................... 77

6.13    **A&G Realty Partners Cooperation.** ................................................................. 78

6.14    **Marketing Expenditures** ................................................................................. 78

ii

**6.15**   **Critical Vendor Payments** ................................................................ 79
**6.16**   **Employee Compensation.** ................................................................ 79
ARTICLE 7 POST-CLOSING COVENANTS ............................................................ 79

**7.1**   **Access to Information; Books and Records** .................................... 79
**7.2**   **Post-Closing Receipt and Possession of Assets and Liabilities** ........... 80
**7.3**   **Tax Matters** .................................................................................. 80
ARTICLE 8 CONDITIONS PRECEDENT ............................................................ 81

**8.1**   **Conditions to Each Party's Obligation** ............................................ 81
**8.2**   **Conditions to Obligation of Purchaser** ............................................ 82
**8.3**   **Conditions to Obligations of the Seller** ............................................ 83
**8.4**   **Waiver of Condition; Frustration of Conditions** ............................ 83
ARTICLE 9 TERMINATION ............................................................................ 84

**9.1**   **Events of Termination** .................................................................... 84
**9.2**   **Effect of Termination** .................................................................... 85
ARTICLE 10 GENERAL PROVISIONS ............................................................ 87

**10.1**   **Survival of Representations, Warranties and Covenants** ................ 87
**10.2**   **Entire Agreement** .......................................................................... 87
**10.3**   **Amendment; No Waiver** ................................................................ 87
**10.4**   **Severability; Specific Versus General Provisions** ............................ 88
**10.5**   **Expenses and Obligations** .............................................................. 88
**10.6**   **Notices** .......................................................................................... 88
**10.7**   **Counterparts** ................................................................................ 89
**10.8**   **Governing Law** .............................................................................. 89
**10.9**   **Submission to Jurisdiction; Consent to Service of Process** ............ 90
**10.10**  **Waiver of Jury Trial** .................................................................... 90
**10.11**  **Rights Cumulative** ........................................................................ 90
**10.12**  **Assignment** .................................................................................. 90
**10.13**  **Specific Enforcement; Remedies** .................................................... 91
**10.14**  **Third-Party Beneficiaries** ............................................................ 91
**10.15**  **No Personal Liability of Directors, Officers and Owners** ................ 92
**10.16**  **General Release** ............................................................................ 92
**10.17**  **Legal Representation** .................................................................... 93
**10.18**  **Bulk Sales Laws** .......................................................................... 94
**10.19**  **Fiduciary Obligations** .................................................................... 94
**10.20**  **Debt Financing Sources** ................................................................ 94
**10.21**  **Sleep Country Guarantee.** ............................................................ 96

iii

**ASSET PURCHASE AGREEMENT**

THIS ASSET PURCHASE AGREEMENT (this "**Agreement**"), dated as of June 12, 2026, is entered into by and between SNBR Inc., a Delaware corporation (the "**Purchaser**"), Sleep Number Corporation, a Minnesota corporation ("**Seller**"), and Sleep Country Canada Inc., a corporation formed under the federal laws of Canada ("**Sleep Country**") (for purposes of Section 10.21 only).

**RECITALS**

WHEREAS, Seller owns, directly or indirectly, 100% of the interests of each of (i) Select Comfort Retail Corporation, a Minnesota corporation, (ii) Select Comfort SC LLC, a Minnesota limited liability company, (iii) Sleep Number Health Corporation, a Minnesota corporation, and (iv) Select Comfort Canada Holding Inc., a Minnesota corporation (collectively, the "**Subsidiaries**" and each individually, a "**Subsidiary**");

WHEREAS, on June 12, 2026 (the "**Petition Date**"), Seller and certain of its Subsidiaries (collectively, the "**Debtors**") filed voluntary petitions (collectively, the "**Bankruptcy Cases**") for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**");

WHEREAS, as of the date hereof, the Debtors remain in possession of their property and continue to operate and manage their business as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, the Seller, through itself and the Subsidiaries (collectively, the "**Seller Group**"), is engaged in the Business and owns, directly or indirectly, all of the Transferred Assets;

WHEREAS, the Seller desires to sell (or cause to be sold) to Purchaser, and Purchaser desires to purchase from the Seller or its applicable Subsidiaries, all of the Transferred Assets Free and Clear, and the Seller desires Purchaser to assume, and Purchaser desires to assume from the Seller or its applicable Subsidiaries, all of the Assumed Liabilities, in each case upon the terms and subject to the conditions hereof, and (as applicable) pursuant to the Bid Procedures Order and the Sale Order and Sections 105(a) and 363 of the Bankruptcy Code and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure;

WHEREAS, the Debtors will seek entry by the Bankruptcy Court of the Bid Procedures Order approving the Bid Procedures and Bid Protections;

WHEREAS, Purchaser and Seller are contemplating that following the execution of this Agreement and upon approval by the Bankruptcy Court of, among other things, the Bid Protections, Purchaser will act as "stalking horse bidder" pursuant to the Bid Procedures for the Transferred Assets. Accordingly, in the absence of Seller's acceptance of a superior bid made in accordance with the Bid Procedures, Purchaser will purchase Seller Group's right, title and interest in and to the Transferred Assets and assume the Assumed Liabilities on the terms and subject to the conditions set forth in this Agreement in accordance with the Bid Procedures and subject to entry of the Bid Procedures Order and the Sale Order by the Bankruptcy Court;

**WHEREAS**, the parties desire to consummate the Transactions as promptly as practicable following the satisfaction of the conditions precedent set out herein, including the entry of the Bid Procedures Order and the Sale Order by the Bankruptcy Court; and

**WHEREAS**, the Transactions contemplated by this Agreement are subject to approval by the Bankruptcy Court and will be consummated pursuant to the Bid Procedures Order and the Sale Order to be entered in the Bankruptcy Cases.

**NOW**, **THEREFORE**, in consideration of the premises and the mutual representations, warranties, covenants, agreements and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE 1
## DEFINED TERMS

**1.1**    **Defined Terms**.  The following terms shall have the following meanings in this Agreement:

"**Accounting Expert**" has the meaning set forth in Section 2.10(e).

"**Accounting Principles**" means U.S. GAAP applied consistently with the Seller's historical accounting policies as disclosed in Seller's most recently filed Annual Report on Form 10-K, as modified by the specific inclusions and exclusions set forth in this Agreement, which shall control in any conflict.

"**Accounts Payable**" means only trade accounts payable, including all accrued Liabilities of the Business as of the Measurement Time that are Assumed Liabilities hereunder and arose as post-petition obligations of the Seller after the Petition Date for the purchase of inventory only. The Accounts Payable balance excludes (i) rent or occupancy obligations for August 2026 or any subsequent period; (ii) pre-petition accounts payable; (iii) §365(b)(1) cure payments; (iv) §503(b)(9) or other administrative expense claims; and (v) intercompany payables.

"**Accounts Receivable**" means all trade accounts receivable of the Business as of the Measurement Time that are Transferred Assets hereunder, recorded net of an allowance for expected credit losses consistent with the Seller's historical practice. Per the Seller's Form 10-K, accounts receivable consists primarily of receivables from third-party financiers for customer credit purchases; the allowance is determined based on delinquencies, aging trends, industry risk trends, and historical experience.

"**Acquired Claims**" has the meaning set forth in Section 2.1(f).

"**Action**" means any judicial, administrative, or arbitral action, claim, suit, hearing, investigation, inquiry, audit, proceeding, arbitration, litigation or similar dispute (whether public or private and whether civil, criminal or administrative) commenced, brought, conducted or heard by or before, or otherwise involving any Governmental Authority or arbitrator.

2

"**Additional Inventory**" means an amount equal to forty percent (40%) of the Customer Deposit Balance. This amount is required to satisfy the Undelivered Customer Orders and is in addition to the Inventory balance on the Closing Date.

"**Additional Inventory Shortfall**" means an amount equal to the excess, if any, of (a) forty percent (40%) of the Customer Deposit Balance over (b) the Additional Inventory balance as of the Closing Date. For the avoidance of doubt, the Additional Inventory Shortfall shall operate solely as a one-way downward adjustment to the Purchase Price in favor of Purchaser.

"**Adjustment Escrow Account**" means the account established and maintained by the Adjustment Escrow Agent under the terms of the Adjustment Escrow Agreement.

"**Adjustment Escrow Agent**" means Acquiom Clearinghouse LLC.

"**Adjustment Escrow Agreement**" means that certain escrow agreement to be entered into prior to the Closing Date, by and between the Adjustment Escrow Agent, the Seller, and the Purchaser, in form and substance mutually satisfactory to the Seller and Purchaser.

"**Adjustment Escrow Amount**" means an amount equal to $25,000,000.

"**Affiliate**" means, with respect to any Person, any other Person that directly or indirectly (through one or more intermediaries) controls, is controlled by or is under common control with such specified Person.  For the purposes of this definition, "control" (including, with correlative meaning, the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"**Aggregate Marketing Expenditure Target**" means $30,000,000, representing the aggregate amount of Marketing Expenditures that Seller is required to make during the Interim Period pursuant to Section 6.14.

"**Agreement**" has the meaning set forth in the Preamble.

"**Allocation Schedule**" has the meaning set forth in Section 2.13(a).

"**Alternate Transaction**" has the meaning set forth in Section 9.1(b).

"**Antitrust Laws**" means the HSR Act, the Sherman Antitrust Act, as amended, the Clayton Act, as amended, the Federal Trade Commission Act, as amended, and any other United States federal or state or foreign statutes, rules, regulations, Orders, decrees, administrative or judicial doctrines or other Laws designed to prohibit, restrict or regulate actions for the purpose or effect of monopolization or restraint of trade or relating to foreign direct investment.

"**Approved Budget**" shall have the meaning set forth in the DIP Interim Order and shall be in form and substance reasonably acceptable to Purchaser, including any amendments thereto, with respect to the post-petition payments described in Section 5.2 and Section 6.1.

"**Assigned Contracts**" has the meaning set forth in Section 2.1(b).

3

"**Assumed Liabilities**" has the meaning set forth in Section 2.3.

"**Assumption/Rejection Notices**" means, collectively, the Potential Assumption and Assignment Notice (and any related supplements thereto), the Proposed Assumption and Assignment Notice, the Designation Rights Period Assumption and Assignment Notice(s), the Designation Rights Period Rejection Notice(s), and the Final Assumption and Assignment Notice.

"**Attorney-Client Information**" has the meaning set forth in Section 10.17.

"**Auction**" has the meaning set forth in Section 5.7.

"**Avoidance Actions**" means all claims or causes of action to avoid a transfer of property or an obligation incurred by the Seller Group pursuant to any applicable section of the Bankruptcy Code, including sections 502, 510, 542, 544, 545, 547 through 553, and 724(a), or any similar actions under any other applicable Law.

"**Back-Up Bid**" means the second highest or otherwise best bid if the successful bidder fails to consummate its bid in accordance with the Bid Procedures.

"**Back-Up Termination Date**" means the first to occur of (a) the date that is thirty (30) days after entry of the Sale Order, (b) consummation of the Transactions with the winning bidder at the Auction, and (c) Purchaser's receipt of written notice from the Seller of the release by the Seller of Purchaser's obligations under Section 5.7.

"**Bankruptcy Cases**" has the meaning set forth in the Recitals.

"**Bankruptcy Code**" has the meaning set forth in the Recitals.

"**Bankruptcy Court**" has the meaning set forth in the Recitals.

"**Bankruptcy Court Milestones**" has the meaning set forth in Section 5.9.

"**Base Purchase Price**" means $415,000,000.

"**Bid Procedures**" means those certain bidding procedures for the sale of the Seller's assets approved by the Bankruptcy Court pursuant to the Bid Procedures Order (which shall, among other things, approve and authorize the Bid Protections), which shall be in form and substance reasonably acceptable to the Purchaser and Seller.

"**Bid Procedures Motion**" means the motion of the Seller seeking entry of the Bidding Procedures Order and Sale Order, which shall be in form and substance reasonably acceptable to the Purchaser and Seller.

"**Bid Procedures Order**" means an Order of the Bankruptcy Court, (A) Approving Bidding Procedures for Sale of the Debtors' Assets, (B) Approving the Designation of Purchaser as the Stalking Horse Bidder for the Assets, (C) Authorizing and Approving Entry into the Stalking Horse Asset Purchase Agreement, (D) Approving Bid Protections, (E) Scheduling an Auction for, and Hearing to Approve, the Sale of the Debtors' Assets, (F) Approving the Form and Manner of

4

Notices of Sale, Auction, and Sale Hearing, (G) Approving the Assumption and Assignment Procedures, and (H) Granting Related Relief, which shall be in form and substance reasonably acceptable to the Purchaser and Seller.

"**Bid Protections**" means the Break-Up Fee and Expense Reimbursement.

"**Bid Protections Aggregate Amount**" means the sum of the Break-Up Fee and the Expense Reimbursement.

"**Bill of Sale and Assignment and Assumption Agreement**" means the bill of sale and assignment and assumption agreement, dated as of the Closing Date, by and between the Seller and Purchaser, in form and substance reasonably acceptable to the parties hereto.

"**Break-Up Fee**" means a fee payable as set forth in this Agreement in an amount equal to 3.0% of the Base Purchase Price, which, upon entry of the Bid Procedures Order, will constitute an allowed administrative expense claim against the Seller Group, on a joint and several basis, pursuant to section 503(b) of the Bankruptcy Code. In the event of an Alternate Transaction, the Break-Up Fee shall be payable from the proceeds of such Alternate Transaction.

"**Burdensome Condition**" has the meaning set forth in Section 6.5(b).

"**Business**" means the business carried on by the Seller Group as of the Closing Date, including, but not limited to, developing, selling, delivering, providing, and servicing personalized sleep wellness solutions, including (a) smart beds and mattresses, (b) adjustable bed frames, bases and furniture, (c) pillows, bedding and accessories, and (d) digital solutions and applications for sleep tracking and smart bed control.

"**Business Day**" means any day excluding Saturday, Sunday or federal holiday or any day which is a legal holiday under the Laws of Toronto, Canada, the State of New York or the State of Minnesota or is a day on which banking institutions located in such state are authorized or required by Law or other governmental action to close.

"**Business Employees**" means all of the employees and contractors of the Seller or any of its Subsidiaries.

"**Claim**" shall have the meaning set forth in Section 101(5) of the Bankruptcy Code.

"**Closing**" has the meaning set forth in Section 2.8.

"**Closing Date**" has the meaning set forth in Section 2.8.

"**Closing Inventory Value**" means the aggregate value of all Inventory included in the Transferred Assets at Closing, as determined by the Inventory Count and calculated in accordance with the Accounting Principles.

"**Closing Marketing Expenditure Amount**" means Seller's good faith estimate of the aggregate Marketing Expenditures made by the Seller Group during the period from the date of this Agreement through the Closing Date.

5

"**Closing Marketing Expenditure Deduction**" means the amount, if any, by which the Aggregate Marketing Expenditure Target exceeds the Closing Marketing Expenditure Amount as set forth in the Estimated Closing Statement or the Closing Statement (as applicable), which amount shall be applied as a dollar-for-dollar reduction to the Purchase Price at Closing pursuant to Section 2.10(a).

"**Closing Statement**" has the meaning set forth in Section 2.11(a).

"**Closing Statement Deadline**" has the meaning set forth in Section 2.11(a).

"**Closing Stores**" has the meaning set forth in Section 6.1(b)(xv).

"**Closing Working Capital**" means the Net Working Capital as of the Measurement Time, an illustrative calculation of which is set forth on Exhibit B hereto.

"**Closing Working Capital Adjustment**" means, whether positive or negative, (a) the amount by which Closing Working Capital is greater than the Target Closing Working Capital or (b) the product of (i) the amount by which Closing Working Capital is less than the Target Closing Working Capital *multiplied* by (ii) negative 1 (-1).

"**Collective Bargaining Agreement**" means any written or oral agreement, memorandum of understanding or other contractual obligation between any member of the Seller Group and any labor organization or other authorized employee representative representing employees or other service providers.

"**Competing Bid**" has the meaning set forth in Section 5.10.

"**Confidentiality Agreement**" means that certain Mutual Confidentiality and Non-Disclosure Agreement, dated as of March 9, 2026, by and between the Seller and Sleep Country Canada Inc.

"**Consent**" means any consent, approval, authorization, waiver or license, or an Order of the Bankruptcy Court that deems or renders unnecessary the same.

"**Contaminant**" has the meaning set forth in Section 3.14(j).

"**Contract**" means any written agreement, mortgage, license, sublicense, purchase order, sales order, statement of work, guarantee, instrument, indenture, lease (whether for a Real Property Lease or a lease for personal property), contract, subcontract or any binding commitment to enter into any of the foregoing to which the Seller or any of its Subsidiaries is a party.

"**Contracting Parties**" has the meaning set forth in Section 10.15.

"**Critical Vendor(s)**" means, collectively, all of the entities defined as either Critical Vendors, Foreign Vendors, and/or Lien Claimants in the Critical Vendor Motion.

"**Critical Vendor Motion**" means the *Motion of the Debtors for entry of interim and final Orders (I) Authorizing the Debtors to Satisfy Prepetition Claims of (A) Critical Vendors, (B)*

6

*Foreign Claimants, (C) Lien Claimants, and (D) 503(b)(9) Claimants, (II) Confirming Administrative Status of Outstanding Orders, (III) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers, and (IV) Granting Related Relief*, filed by the Debtors in the Bankruptcy Cases on (or one day following) the Petition Date.

"**Critical Vendor Order**" means the applicable interim and Final Order approving the *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Satisfy Prepetition Claims of (A) Critical Vendors, (B) Foreign Claimants, (C) Lien Claimants, and (D) 503(b)(9) Claimants, (II) Confirming Administrative Status of Outstanding Orders, (III) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers, and (IV) Granting Related Relief*, which each such order shall be in form and substance reasonably acceptable to the Purchaser and Seller.

"**Critical Vendor Payments**" means payments to Critical Vendors pursuant to the Critical Vendor Order and in accordance with the Approved Budget.

"**Cure Cap**" means $8,000,000.

"**Cure Costs**" means amounts that must be paid and obligations that otherwise must be satisfied, pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code in order to effectuate the assumption and assignment to Purchaser of any of the Assigned Contracts, as determined by Final Order of the Bankruptcy Court or as otherwise agreed by the Purchaser and the applicable counterparty to an Assigned Contract.

"**Cure Costs Deduction**" means an amount equal to (a) the amount by which pre-petition Cure Costs with respect to Assigned Contracts other than Designated Contracts exceeds the Cure Cap, plus (b) the amount of Post-Petition Cure Costs.

"**Customer Deposit Balance**" means, as of the Closing Date, the aggregate amount of customer deposits paid to any member of the Seller Group in respect of customer orders not yet delivered or fulfilled.

"**Debt Financing**" means any debt financing obtained to fund the Transactions (including, for the avoidance of doubt, any customary bridge facilities or one or more offerings of customary "high yield" debt securities).

"**Debt Financing Sources**" means the financial institutions, agents, arrangers, and institutional investors that have at any time committed to provide or arrange or otherwise have entered into agreements in connection with the Debt Financing or any alternative debt financing, including the parties to any debt commitment letter and/or any joinder agreements, any underwriting agreements and or purchase or agency agreements, credit agreements or indentures (or other definitive financing documents) related thereto, together with the Debt Financing Sources Related Parties in each case, excluding Purchaser and its Affiliates; provided that, "Debt Financing Sources" shall not include any Affiliate of the Purchaser.

"**Debt Financing Sources Related Parties**" means the Debt Financing Sources their respective Affiliates, and such Persons' and such Persons' respective Affiliates' current and future equity holders, managers, members, officers, directors, employees, partners, controlling persons,

7

agents and representatives and their respective successors and assigns; provided that, "Debt Financing Sources Related Parties" shall not include any Affiliate of the Purchaser.

"**Deficit Amount**" has the meaning set forth in Section 2.10(e).

"**Deposit Amount**" has the meaning set forth in Section 2.15.

"**Deposit Escrow Agent**" means Kroll Restructuring Administration, LLC.

"**Deposit Escrow Agreement**" means that certain escrow agreement, dated as of the date hereof, by and among Purchaser, Seller and the Deposit Escrow Agent.

"**Designated Contracts**" means all executory Contracts (i) not assumed and assigned to the Purchaser at Closing pursuant to the Sale Order, and (ii) not designated for rejection by the Purchaser in the Chapter 11 Cases.

"**Designation Rights Period**" means, with respect to any Designated Contracts (including Real Property Leases) to be assumed and assigned or rejected pursuant to Sections 2.4(c) and 2.4(d), the period from Closing and ending on the earlier of (i) no less than fourteen (14) calendar days prior to the date on which a hearing is held before the Bankruptcy Court on confirmation of a plan of reorganization or liquidation in the Bankruptcy Cases, or (ii) the date that is sixty (60) days after the Closing Date; provided that the expiration of the Designation Rights Period may be extended as to any Contract with the consent of the Purchaser and Seller and, to the extent that the deadline to assume or reject Real Property Leases under 11 U.S.C. § 365(d)(4) would expire during such extension period, with the consent of Purchaser, Seller and the applicable counterparty to Real Property Lease subject thereto.

"**Designation Rights Period Assumption and Assignment Notice**" has the meaning set forth in Section 2.4(c).

"**Designation Rights Period Rejection Notice**" has the meaning set forth in Section 2.4(f).

"**DIP Financing Agreement**" means the debtor in possession financing approved by the Bankruptcy Court in these Chapter 11 Cases, in each case as ratified, amended, supplemented and otherwise modified from time to time on or after the date of the DIP Interim Order.

"**DIP Interim Order**" means that certain interim order (I) Authorizing the Debtors to (A) Obtain Senior Secured Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief.

"**Discussion Period**" has the meaning set forth in Section 2.10(e).

"**Disputed Amounts**" has the meaning set forth in Section 2.10(e).

"**DIP Order**" means the DIP Interim Order and such further order of the Bankruptcy Court granting similar relief on a final basis, which shall be in form and substance reasonably acceptable to the Purchaser and Seller.

"**DOJ**" has the meaning set forth in Section 6.5(a).

"**DPA**" has the meaning set forth in Section 3.25.

"**DSP**" has the meaning set forth in Section 3.24.

"**Enforceability Exceptions**" means applicable bankruptcy, insolvency, reorganization, moratorium, receivership and Laws affecting the enforcement of creditors' rights generally and general equitable principles.

"**Equity Commitment Letter**" has the meaning set forth in Section 4.4(a).

"**Equity Financing**" has the meaning set forth in Section 4.4(a).

"**Equity Financing Commitments**" has the meaning set forth in Section 4.4(a).

"**ERISA**" has the meaning set forth in Section 3.12(a).

"**ERISA Affiliate**" means, with respect to any Person, any trade or business, whether or not incorporated, that together with such Person, would be treated as a single employer within the meaning of Section 414(b), (c), (m) or (o) of the IRC.

"**Estimated Closing Statement**" has the meaning set forth in Section 2.10(d).

"**Estimated Purchase Price**" has the meaning set forth in Section 2.10(d).

"**Excess Amount**" has the meaning set forth in Section 2.10(e).

"**Excluded Assets**" has the meaning set forth in Section 2.2.

"**Excluded Books and Records**" means books and records, correspondence, or communications (in whatever form maintained) of the Seller Group: (a) all corporate minute books (and other similar corporate records) and stock records of the Seller Group, (b) any books and records materially related to the Excluded Assets or Excluded Liabilities, (c) any books and records with respect to Taxes paid or payable by the Seller Group, including Tax Returns of any member of the Seller Group for income or franchise Taxes, (d) any books and records that any member of the Seller Group is required by Law to retain, (e) any books and records or relating to this Agreement, any Related Document or the execution, negotiation or consummation of the transactions contemplated hereunder or thereunder (and including any attorney-client privilege associated with any of the items described in the preceding clauses (a), (b), (c) or (d)).

"**Excluded Contracts**" has the meaning set forth in Section 2.6.

"**Excluded Liabilities**" has the meaning set forth in Section 2.5.

9

"**Excluded Tax**" means (i) any Tax of Seller Group or for which the Seller Group or any of its Affiliates is otherwise liable, for any Tax period, including (a) all Taxes of any member of the Seller Group (or any predecessor thereof) that are imposed as a result of being or having been a member of an affiliated, consolidated, combined or unitary group on or prior to the Closing Date, including pursuant to Section 1.1502-6 of the Treasury Regulations or any analogous or similar state, local or non-U.S. Law or regulation, and (b) any liability as a transferee or successor, pursuant to an express or implied obligation to indemnify any other Person, by contract or pursuant to any Law or otherwise entered into before the Closing (in each case, other than arrangements entered into in the ordinary course of business that are not primarily related to Taxes); (ii) all Taxes arising out of the Excluded Assets or Excluded Liabilities for any taxable period; (iii) any Tax liability relating to the Business or the Transferred Assets for any taxable period ending on or prior to the Closing Date and, with respect to any Straddle Period for the portion of such taxable period ending on the Closing; and (iv) subject to Section 2.13, all withholding Taxes (including all Transfer Taxes) that Purchaser is subject to as a result of its obligations to deliver consideration to Seller hereunder.

"**Existing Expense Reimbursement Agreement**" means that certain Expense Payment Agreement, dated June 1, 2026, by and among Seller and Sleep Country Canada Inc.

"**Expense Reimbursement**" means an amount equal to the reasonable, documented, out-of-pocket costs and expenses of Purchaser (including the reasonable, documented expenses of outside counsel, investment bankers, accountants and other outside advisors, which shall be redacted to preserve privileged or confidential information) in connection with or related to preparing, negotiating, documenting, this Agreement, the Related Documents, and the other documents necessary to effect the transactions and agreements contemplated hereby and thereby, evaluating, analyzing, and investigating the Seller Group and the Transferred Assets, and executing and performing on this Agreement, including in the Bankruptcy Cases and any other judicial and regulatory proceedings related to this Agreement, which shall be treated in accordance with and paid up to the Expense Reimbursement Cap and, in the instance of an Alternate Transaction, shall be payable from proceeds from such Alternate Transaction.

"**Expense Reimbursement Cap**" means a maximum aggregate amount equal to $4,000,000, which amount, upon entry of the Bid Procedures Order, will constitute an allowed administrative expense claim against the Seller Group, on a joint and several basis, pursuant to section 503(b) of the Bankruptcy Code.

"**Filed SEC Documents**" means the forms, reports, schedules, statements, exhibits and other documents filed with the SEC by Seller to the extent publicly available on the SEC's EDGAR database.

"**Final Assumption and Assignment Notice**" has the meaning set forth in Section 2.4(d).

"**Final Marketing Expenditure Amount**" means the aggregate Marketing Expenditures actually made by the Seller Group during the period from the date of this Agreement through the Closing Date, as finally determined pursuant to Section 2.10(e).

10

"**Final Marketing Expenditure Shortfall**" means the amount, if any, by which the Aggregate Marketing Expenditure Target of $30,000,000 exceeds the Final Marketing Expenditure Amount, as finally determined pursuant to Section 2.10(e).

"**Final Order**" means an Order of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Bankruptcy Cases (or the docket of such other court), which is in full force and effect, which has not been modified, amended, reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari*, or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for *certiorari* or motion for new trial, stay, reargument or rehearing is then pending or (b) if an appeal, writ of *certiorari* new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court or other court of competent jurisdiction has been affirmed by the highest court to which such order was appealed, or *certiorari* has been denied, or a new trial, stay, reargument or rehearing has been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument or rehearing has expired, as a result of which such order has become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, will not cause such order not to be a Final Order.

"**Final Purchase Price**" has the meaning set forth in Section 2.10(e).

"**Financial Statements**" means the audited consolidated balance sheet of the Seller Group and related consolidated statements of operations and cash flows of the Seller Group as of January 3, 2026.

"**Fraud**" means knowing and intentional fraud under Delaware law committed by any Person in the making of the representations and warranties in Article III or Article IV, as applicable, with the actual knowledge of such Person that such representations or warranties were inaccurate (or breached) when made.

"**Free and Clear**" means free and clear of all Liens and Liabilities, other than the Permitted Liens and the Assumed Liabilities, in accordance with Sections 363(f) of the Bankruptcy Code.

"**FTC**" has the meaning set forth in Section 6.5(a).

"**GAAP**" means generally accepted accounting principles in the United States.

"**Generative AI Tools**" means generative artificial intelligence technology or similar tools capable of automatically producing various types of content (such as source code, text, images, audio, and synthetic data) based on user-supplied prompts.

"**Governmental Authority**" means any domestic or foreign national, provincial, state, multi-state, county, or municipal or other local government, any subdivision, agency, department, council, bureau, commission or authority thereof, any court (including the Bankruptcy Court), arbiter or tribunal or any quasi-governmental or private body exercising any regulatory or taxing authority thereunder (including the IRS), in each case with competent jurisdiction.

11

"**Government Official**" means any officer or employee of a Governmental Authority or any department, agency, or instrumentality thereof, including any political subdivision thereof or any corporation or other Person owned or controlled in whole or in part by any Governmental Authority or any sovereign wealth fund, or of a public international organization, or any Person acting in any official capacity for or on behalf of any such government or department, agency, or instrumentality, or for or on behalf of any such public international organization, or any political party, party official, or candidate thereof.

"**Guaranteed Obligation**" has the meaning set forth in Section 10.21(a).

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"**Information Privacy and Security Laws**" means all applicable Laws relating to privacy, security, data breach notification, and the collection, storage, use, disclosure, retention, transfer or other Processing of Personal Information, including, to the extent applicable, (i) Section 5 of the Federal Trade Commission Act; (ii) the Electronic Communications Privacy Act of 1986 and the Video Privacy Protection Act of 1988; (iii) the California Invasion of Privacy Act ("CIPA") and all other state Laws regulating wiretapping and/or interception or recording of communications; (iv) the Stored Communications Act; (v) the California Consumer Privacy Act; (vi) the Health Insurance Portability and Accountability Act and Washington's My Health My Data Act; (vii) the Illinois Biometric Information Privacy Act; and (vii) the CAN-SPAM Act, the Telephone Consumer Protection Act.

"**Information Security Reviews**" has the meaning set forth in Section 3.20(d).

"**Intellectual Property**" means any and all intellectual property rights arising from the following anywhere in the world, whether registered or unregistered, including such rights in and to any of the following: (a) patents and patent applications together with all reissues, reexaminations, substitutions, divisionals, renewals, continuations and continuations-in-part issuing therefrom or claiming priority thereto, any provisionals or other applications to which any of the foregoing claim priority, and any foreign counterparts claiming priority to any of the foregoing; (b) trademarks, service marks, trade dress, service names, trade names, brand names, logos, taglines, business names, corporate names and other source or business identifiers, all registrations and applications for registration thereof, and, in each case, together with all of the goodwill associated therewith; (c) works of authorship (including without limitation computer software and firmware (including data files, source code, object code and software-related specifications), manuals and other documentation, compilations, databases, and all derivatives, translations, adaptations and combinations of the above), copyrights in both published and unpublished works, mask work rights, and all registrations and applications for registration thereof and other rights in works of authorship; (d) trade secrets, and other proprietary or confidential information (including know-how, ideas, inventions and invention disclosures (whether or not patented or patentable and whether or not reduced to practice), research in progress, processes, process technology, software development methodologies, algorithms, technical information, business information (including customer and supplier lists, customer and supplier information and records, pricing and cost information, and business, financial, and sales and marketing plans), reports, drawings, data, databases, data collections, designs, formulae, schematics, blueprints, flow

12

charts, models, strategies, prototypes, techniques, source code, source code documentation, testing procedures, and testing results), and rights under applicable trade secret Law in the foregoing (collectively, "**Trade Secrets**"); (e) internet domain names and rights to social media accounts; (f) any and all other intellectual property rights and/or proprietary rights; and (g) goodwill associated with any and all of the foregoing.

"**Inventory**" means all finished goods, work-in-process, raw materials, and supplies of the Seller Group that are related to the Business as of the Measurement Time; provided, that, Inventory shall not include, and the following are hereby expressly excluded from the definition of Inventory: (a) Inventory that is damaged, defective, obsolete, unsaleable, recalled or otherwise not in a condition suitable for sale to customers in the ordinary course of business, (b) Inventory that is subject to a supplier's right of reclamation that has not been resolved or waived as of the Closing Date, (c) any mattress SKU that is not included in the Seller Group's current product offerings or new product offerings as of the Measurement Time, including any mattress SKU that has been (i) discontinued, phased out, or removed from the Seller Group's active product catalogue, (i) superseded by a current or new mattress model or product line, (iii) designated as end-of-life, clearance, or legacy inventory in the Seller Group's product management or inventory systems, or (iv) otherwise not actively offered for sale to retail customers by the Seller Group as part of its current or new mattress product assortment as of the Measurement Time. Inventory (including materials, labor, and overhead) is stated at the lower of cost or net realizable value, with cost determined by the first-in, first-out (FIFO) method; reserves for obsolescence are recorded based on historical selling prices, current market conditions, and forecasted product demand. Inventory balances at period end exclude goods for which customer payment (including by credit card) has been received but delivery or installation has not occurred as of the Measurement Time ("**Undelivered Customer Orders**").

"**Inventory Count**" means the physical count of all Inventory included in the Transferred Assets as conducted by the Seller or the Purchaser (or their respective Representatives), as applicable, in its good faith in accordance with this Agreement.

"**Inventory Statements**" has the meaning set forth in Section 2.10(c)(ii).

"**Inventory Valuation Methodology**" means Inventory which includes materials, labor and overhead and are stated at the lower of cost or net realizable value. Cost is determined by the first-in, first-out method. The Seller reviews inventory quantities on hand and records reserves for obsolescence based on historical selling prices, current market conditions and forecasted product demand, to reduce inventory to net realizable value.

"**IP Assignment Agreement**" means, collectively, the patent, trademark, and other intellectual property assignment agreements, dated as of the Closing Date, by and between the applicable member of the Seller Group and Purchaser, in form and substance reasonably acceptable to the parties hereto.

"**IRC**" means the Internal Revenue Code of 1986, as amended.

"**IRS**" means the United States Internal Revenue Service.

"**Knowledge**" means with regard to the Seller, the actual knowledge, after a reasonable inquiry of their direct reports and records of the Seller Group, of Linda Findley, Amy O'Keefe, Sam Hellfeld, Dennis Hansen, Amber Minson, Tanya Skogerboe, Melissa Barra or Christopher Krusmark.

"**Law**" means any federal, provincial, state, local law, ordinance, principle of common law, code, regulation or statute.

"**Leased Real Property**" has the meaning set forth in Section 3.7.

"**Liabilities**" means debts, liabilities, Taxes, duties, penalties, fines, assessments, claims, causes of action, or other losses, fees, costs, expenses, obligations or commitments of any nature whatsoever, whether direct or indirect, asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured or otherwise, whenever or however arising.

"**Lien**" means, with respect to any asset, any mortgage, lien (statutory or otherwise), deed of trust, hypothecation, pledge, charge, security interest, claim, encroachment, option, easement, negative pledge, right of first refusal or first offer, conditional sale or other title retention agreement or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable Law (including any conditional sale or other title retention agreement and any lien arising under the Bankruptcy Code, including within the meaning of Section 101(37) of the Bankruptcy Code), whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, known or unknown.

"**Marketing Expenditures**" means all bona fide, third-party out-of-pocket expenditures made or committed to be made by or on behalf of the Seller Group in connection with the promotion, advertising, and marketing of the Business that are consistent with the Seller Group's marketing practices prior to the Petition Date.

"**Material Adverse Effect**" means any event, occurrence, change, condition, circumstance, development or effect which has had or would reasonably be expected to have, individually or in the aggregate, a material adverse effect on (A) the business, financial condition, or results of operations of the Business or (B) the ability of Seller to timely consummate the Closing; provided, however, that none of the following shall be deemed (either alone or in combination) to constitute, and none of the following shall be taken into account in determining whether there has been or may be, a Material Adverse Effect solely to the previous clause (A): (a) any change in, or effects arising from or relating to, general business or economic conditions affecting the industry in which the Business operates; (b) any change in, or effects arising from or relating to, the United States or foreign economies, or securities, banking or financial markets in general, or other general business, banking, financial or economic conditions (including (i) any disruption in any of the foregoing markets, (ii) debt defaults or other restructuring events of any country with respect to which bondholders take a discount to the debt of any country or any increases in the interest rates for any country's debt, (iii) any change in currency exchange rates, (iv) any decline or rise in the price of any security, commodity, contract or index and (v) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for

14

the Transactions); (c) any change from, or effects arising from or relating to, the occurrence, escalation or material worsening of any act of God or other calamity, natural disaster, epidemic, pandemic or disease, outbreak, hostility, act of war, sabotage, cyber-attack or terrorism or military action; (d) any action taken to the extent required by this Agreement, or any action taken or failed to be taken, by the Seller at the written request of, or with the written Consent of, Purchaser or otherwise relating to Purchaser's failure to Consent to any action restricted by Section 6.1; (e) any change in, or effects arising from or relating to changes in, Laws or accounting rules (including GAAP) or any interpretation thereof; (f) the failure of the Business to meet any of its projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Purchaser or its Affiliates or Representatives); provided that, the underlying causes thereof, to the extent not otherwise excluded by this definition, may be deemed to contribute to a Material Adverse Effect; (g) national or international political, labor or social conditions; (h) the public announcement of, entry into or pendency of, this Agreement and the Transactions or the identity of Purchaser, including any termination of, reduction in or similar adverse impact on relationships, contractual or otherwise, with any customers, suppliers, financing sources, licensors, licensees, distributors, partners, employees or others having relationships with the Business (i) any effect arising or resulting from the filing, or the pendency, of the Bankruptcy Cases; or (j) any action required to be taken under any Law or Order by which any member of the Seller Group's (or any of their properties) are bound; provided, however, such effects set forth in the foregoing clauses (a) through (c), clause (e) and clause (g) shall be taken into account in determining whether any Material Adverse Effect has occurred to the extent that any such effect has, or would reasonably be expected to have, a materially disproportionate effect on the Business relative to other participants in the industry in which the Seller Group operates.

"**Measurement Time**" means 12:01 a.m. Eastern Time on the Closing Date.

"**Net Working Capital**" means an amount equal to the Accounts Receivable *plus* the Inventory *minus* the Accounts Payable (which shall not exceed the Inventory Accounts Payable Cap), in each case determined in accordance with the Accounting Principles.

"**Non-Transferred Asset**" has the meaning set forth in Section 2.7(a).

"**Non-Transferred Asset Term**" has the meaning set forth in Section 2.7(b).

"**Nonparty Affiliates**" has the meaning set forth in Section 10.15.

"**Notice of Disagreement**" has the meaning set forth in Section 2.11(c).

"**Objection Notice**" has the meaning set forth in Section 2.10(e).

"**Open Source Software**" means all software (in source or object code form) or documentation that is subject to (a) a license or other agreement commonly referred to as an open source, free software, copyleft or community source code license (including but not limited to any code or library licensed under the GNU Affero General Public License, GNU General Public License, GNU Lesser General Public License, BSD License, Apache Software License, or any other public source code license arrangement) or (b) any other license or other agreement that requires, as a condition of the use, modification or distribution of software subject to such license

15

or agreement, that such software or other software linked with, called by, combined or distributed with such software be (i) disclosed, distributed, made available, offered, licensed or delivered in source code form, (ii) licensed for the purpose of making derivative works, (iii) licensed under terms that allow reverse engineering, reverse assembly, or disassembly of any kind, or (iv) redistributable at no charge, including without limitation any license defined as an open source license by the Open Source Initiative as set forth on www.opensource.org.

"**Order**" means any award, order, decree, writ, determination, directive, consent, binding decision, injunction, judgment, ruling or verdict entered, issued, made or rendered by any Governmental Authority or arbitrator.

"**Organizational Documents**" mean (a) the articles or certificates of incorporation and the by-laws of a corporation, (b) the partnership agreement and any statement of partnership of a general partnership, (c) the limited partnership agreement and the certificate of limited partnership of a limited partnership, (d) the operating or limited liability company agreement and the certificate of formation of a limited liability company, (e) any charter, joint venture agreement or similar document adopted or filed in connection with the creation, formation or organization of a Person not described in clauses (a) through (d), and (f) any amendment or supplement to or equivalent of any of the foregoing.

"**Outside Date**" means the date that is one hundred fifty (150) days following the date of this Agreement.

"**Owned Intellectual Property**" means the Intellectual Property owned or purported to be owned by any of member of the Seller Group that is related to the Business.

"**Payment Processor**" means any payment processor, acquiring bank, credit card network, merchant services provider, or other third-party payment intermediary with which the Business has a merchant processing relationship, including, without limitation Synchrony.

"**PCI DSS**" has the meaning set forth in Section 3.20(a).

"**Permit**" means any license, franchise, permit, consent, clearance, approval, right, registration, qualification, accreditation, privilege, immunity, certificate, or similar authorization issued by, or otherwise granted by Governmental Authority.

"**Permitted Liens**" means, solely to the extent expressly permitted by the Sale Order to remain attached to the Transferred Assets following the Closing: (a) Liens for Taxes, assessments or other governmental charges not yet due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings and for which adequate reserves have been accrued; (b) outstanding valid and timely-filed warehousemen's, mechanics', materialmen's, repairmen's or other carriers', workers', repairers' and other similar Liens arising or incurred in the ordinary course of business for obligations that are not yet due and payable or being contested in good faith by appropriate proceedings and for which adequate reserves have been accrued; (c) zoning, entitlement and building regulations and land use restrictions that do not adversely affect the value of such real property in any material respect and do not materially interfere with the use or occupancy thereof as presently used in the ordinary course of business; (d) covenants, conditions, restrictions, easements and other similar matters affecting the Leased Real Property

16

that do not adversely affect the value of such real property in any material respect and do not materially interfere with the use or occupancy thereof as presently used in the ordinary course of business; (e) purchase money Liens and Liens securing rental payments under capital lease arrangements; (f) Liens on Leased Real Property arising from the provisions of the applicable leases that are not violated in any material respect by the current use or occupancy of such Leased Real Property of the operation of the Business conducted thereon; (g) nonexclusive licenses of Intellectual Property granted in the ordinary course of business; (h) Liens arising under or created by this Agreement or any of the Related Documents; and (i) only for purposes of <u>Article 3</u> and <u>Section 6.1</u> (and not for purposes of the definition of "Free and Clear"), Liens arising in the ordinary course of business which do not and would not, individually or in the aggregate, reasonably be expected to interfere in any material respect with the operation or use of any Transferred Asset or conduct of the Business as currently operated or conducted and Liens set forth on <u>Schedule 1.1(b)</u>.

"**Person**" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, estate, trust, association, organization, labor union or any other entity or Governmental Authority.

"**Personal Information**" means any information in the possession or control of the Seller Group about an identifiable individual and any and all other information that relates to, or could reasonably be linked (directly or indirectly) or combined with other information to contact, locate, or identify a natural person, household or device or that otherwise constitutes "personal information," "personal data" or any similar term provided by applicable Law.

"**Petition Date**" has the meaning set forth in the Recitals.

"**Post-Auction Notice Deadline**" has the meaning set forth in <u>Section 5.10</u>.

"**Post-Closing Tax Period**" means any taxable period beginning after the Closing Date and, with respect to a Straddle Period, the portion of such Straddle Period beginning after the Closing Date.

"**Post-Petition Cure Costs**" means all unpaid post-petition amounts accrued under an Assigned Contract from the Petition Date through the anticipated date of assumption and assignment of such Assigned Contract.

"**Potential Assumption and Assignment Notice**" has the meaning set forth in <u>Section 2.4(a)</u>.

"**Potential Assumption Notice Deadline**" has the meaning set forth in <u>Section 2.4(a)</u>.

"**Pre-Closing Tax Period**" means any taxable period ending on or before the Closing Date and, with respect to a Straddle Period, the portion of such Straddle Period ending on and including the Closing Date.

"**Prepaid Rent**" means all amounts actually paid in cash by the Seller prior to the Measurement Time to landlords or lessors under leases that are Assigned Contracts for occupancy periods commencing on or after the Closing Date, determined on a cash basis without giving effect

17

to any straight-line rent or other non-cash adjustments under ASC Topic 842, which are embedded in the Seller's operating lease right-of-use assets and expressly excluded herefrom. Prepaid Rent shall exclude: (i) amounts under leases not designated as Assumed Leases; (ii) security deposits and tenant improvement allowances; and (iii) §365(b)(1) cure amounts.

"**Privacy Requirements**" has the meaning set forth in Section 3.20(a).

"**Processing**" means, with respect to Personal Information, any operation or set of operations such as collection, recording, organization, structuring, storage, adaptation, enhancement, enrichment or alteration, retrieval, consultation, analysis, use, disclosure by transmission, dissemination or otherwise making available, alignment or combination, restriction, erasure or destruction.

"**Processor Reserve Deposit**" means any and all cash, funds, or amounts that Purchaser is required to deposit, fund, post, or maintain with any Payment Processor on or after the Closing Date in order to establish, activate, or maintain a merchant processing relationship with such Payment Processor in connection with the operation of the Business following the Closing, including: (i) any initial reserve deposit, rolling reserve, or security deposit required by any Payment Processor as a condition to entering into or continuing a merchant services agreement or payment processing arrangement with Purchaser following the Closing; (ii) any reserve top-up, reserve replenishment, or incremental reserve funding required by any Payment Processor in connection with the Business following the Closing; (iii) any holdback, delayed settlement, or retention of settlement funds imposed by any Payment Processor on Purchaser in connection with payment card transactions processed in connection with the Business on or after the Closing Date; and (iv) any other amount required to be deposited, posted, or maintained by Purchaser with any Payment Processor as a condition to the uninterrupted processing of payment card transactions in connection with the Business following the Closing, in each case regardless of whether such Processor Reserve Deposit arises under an existing merchant services agreement assumed by Purchaser at Closing or a new merchant services agreement entered into by Purchaser following the Closing, and regardless of whether the applicable Payment Processor is the same Payment Processor that held any existing processor reserve balances prior to the Closing.

"**Property Taxes**" means any *ad valorem* (such as real and personal property) Taxes and any similar Taxes imposed or measured based on the ownership of the Transferred Assets, but, for the avoidance of doubt, other than (a) Taxes based on net or gross income and (b) Transfer Taxes.

"**Proposed Cure Cost**" has the meaning set forth in Section 2.4(a).

"**Protected Leaves**" has the meaning set forth in Section 6.7(b).

"**Purchase Price**" has the meaning set forth in Section 2.10(a).

"**Purchaser**" has the meaning set forth in the Preamble.

"**Purchaser Designation Notice**" has the meaning set forth in Section 2.4(c).

"**Purchaser Group Members**" has the meaning set forth in Section 10.17.

"**Purchaser Plans**" has the meaning set forth in Section 6.7(d).

"**Purchaser Related Party**" has the meaning set forth in Section 9.2(c).

"**Purchaser Releasing Party**" has the meaning set forth in Section 10.16(b).

"**Purchaser Welfare Plans**" has the meaning set forth in Section 6.7(d).

"**Real Property Lease**" has the meaning set forth in Section 3.7.

"**Reconciliation Statement**" has the meaning set forth in Section 2.10(e).

"**Related Claims**" means all claims or causes of action (whether in contract or tort, in law or in equity, or granted by statute or otherwise) that may be based upon, arise out of or relate to this Agreement, the Related Documents and any other document or instrument delivered pursuant to this Agreement or the Related Documents, or the negotiation, execution, termination, validity, interpretation, construction, enforcement, performance or nonperformance of this Agreement or the Related Documents or otherwise arising from the Transactions or the relationship between the parties (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with, or as an inducement to enter into, this Agreement or the Related Documents).

"**Related Documents**" means the Bill of Sale and Assignment and Assumption Agreement, the IP Assignment Agreement, and any other document, agreement, certificate or instrument entered into in connection with this Agreement.

"**Remedial Action**" has the meaning set forth in Section 6.5(b).

"**Representative**" means, with respect to a particular Person, any director, officer, member, manager, partner, employee, agent, consultant, advisor, investor, shareholder, contractor, subcontractor or other representative of such Person, including legal counsel, accountants and financial advisors.

"**Required Employee Acceptance Threshold**" means that at least eighty-five percent (85%) of the Business Employees (other than the Required Executives) to whom Purchaser (or its Affiliate) extends an offer of employment pursuant to Section 6.7(a) shall have accepted such offer of employment in writing and not revoked such acceptance prior to the date that is three (3) Business Days prior to the Closing Date.

"**Required Executives**" means each Business Employee of the Company with title of Senior Vice President or higher to whom Purchaser (or its Affiliate) extends an offer of employment pursuant to Section 6.7(a).

"**Required Information**" means (a) (1) the audited consolidated balance sheet of the Seller Group and the related consolidated statements of operations and cash flows for the two (2) most recently completed fiscal years of the Seller Group ended at least ninety (90) days prior to the Closing Date, together with all related notes and schedules thereto, and in each case accompanied by the audit reports thereon of Deloitte & Touche LLP, and (2) the unaudited consolidated balance

19

sheet of the Seller Group and related consolidated statements of operations, stockholders' equity and cash flows for any subsequent fiscal quarter ended at least forty-five (45) days prior to the Closing Date and the portion of the fiscal year through the end of such quarter (other than in each case the fourth (4th) quarter of any fiscal year) and, in each case, for the comparable period of the prior fiscal year, together with all related notes and schedules thereto, in the case of each of clauses (1) and (2) above, prepared in accordance with GAAP and in compliance with Regulation S-X (other than Rules 3-09, 3-10,3-16, 13-01 or 13-02 of Regulation S-X) and which, with respect to clause (2), shall have been reviewed by the independent auditors of the Seller Group as provided in AU 722; (b) financial statements and all other financial information derived from the historical books and records of the Seller Group reasonably requested by the Purchaser to the extent reasonably necessary to allow Purchaser to prepare pro forma financial statements (limited to data regarding the Seller Group) (including for the most recent four (4) fiscal quarter period ended at least forty-five (45) days prior to the Closing Date (or, if the end of the most recently completed four (4) fiscal quarter period is the end of a fiscal year, ended at least ninety (90) days prior to the Closing Date)) that give effect to the Transactions as if the Transactions had occurred as of such date (in the case of such balance sheet) or at the beginning of such period (in the case of such statement of operations) and which are prepared in accordance with GAAP, but which need not be prepared in compliance with Regulation S-X or include adjustments the extent not customary in private placements pursuant to Rule 144A promulgated under the Securities Act and any portion of the disclosure in relation to any Debt Financing that relates to the Transactions; (c) financial data, audit reports, business and other information (and customary due diligence materials with respect to the Seller Group) derived from the historical books and records of the Seller Group regarding the Seller Group that is of the type and form customarily included in, and subject to other exceptions that are customary for, an offering memorandum for private placements of high-yield bonds under Rule 144A promulgated under the Securities Act, or otherwise necessary to receive from the independent auditors of the Seller Group (and any other auditor to the extent financial statements audited or reviewed by such auditor are or would be included in such offering memorandum) customary audit consents and customary "comfort" letters (including "negative assurance" comfort and change period comfort) with respect to the financial information of the Seller Group to be included in such offering memorandum; (d) the consents of auditors for use of their unqualified audit reports in any offering memorandum for any high-yield bonds being issued as part of or in lieu of all or a portion of the Debt Financing; (e) any replacements or restatements of and supplements to the information specified in items (a) through (d) above if any such information would contain a material misstatement or omission; (f) the authorization letters referred to in Section 9.6(a)(v); *provided* that the Required Information shall exclude (1) a description of the anticipated Debt Financing or any component thereof, including amounts, interest rates, dividends, fees and expenses related thereto, or other information customarily provided by the Debt Financing Sources or their counsel, (2) risk factors relating solely to (x) the anticipated Debt Financing or any component thereof and (y) the Transactions and any component thereof, (3) any post-Closing or pro forma assumed cost savings, synergies or similar adjustments (and the assumptions relating thereto) or capitalization, ownership information, (4) segment reporting, consolidating financial statements, separate subsidiary financial statements and other financial statements, data and analysis that would be required by Sections 3-09, 3-10, 3-16, 13-01 or 13-02 of Regulation S-X or Item 302 of Regulation S-K, (5) information required by Item 402 or Item 404 of Regulation S-K, (6) any pro forma financial statements, projections or other prospective information and (7) other information customarily exclude from an offering

20

memorandum with respect to an offering of non-convertible high yield debt securities pursuant to Rule 144A promulgated under the Securities Act. Notwithstanding the foregoing, no information or financial statements shall be "Required Information" if it is not of the type customarily provided in connection with the type of Debt Financing actually (and actively) being pursued by the Purchaser.

"**Response Period**" has the meaning set forth in Section 2.10(e).

"**Sale Hearing**" means the hearing seeking entry of the Sale Order.

"**Sale Order**" means an Order of the Bankruptcy Court (A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances and (B) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Related Relief, which otherwise shall be in form and substance reasonably acceptable to the Purchaser and Seller.

"**SEC**" means the United States Securities and Exchange Commission.

"**Seller**" has the meaning set forth in the Preamble.

"**Seller Access Contact**" has the meaning set forth in Section 6.2(a).

"**Seller Group**" has the meaning set forth in the Recitals.

"**Seller Group Members**" has the meaning set forth in Section 10.17.

"**Seller Permits**" has the meaning set forth in Section 3.5(b).

"**Seller Plan**" has the meaning set forth in Section 3.12(a).

"**Seller Releasing Party**" has the meaning set forth in Section 10.16(a).

"**Seller Schedules**" has the meaning set forth in Article 3.

"**Seller Software**" means any software (in source and object code form) included in the Owned Intellectual Property.

"**Solvent**" when used with respect to any Person, means that such Person and its subsidiaries, on a consolidated basis, (a) have property with fair value greater than the total amount of their debts and liabilities, contingent, subordinated or otherwise (it being understood that the amount of contingent liabilities at any time shall be computed as the amount that, in light of all the facts and circumstances existing at such time, can reasonably be expected to become an actual or matured liability), (b) have assets with present fair salable value (on a going concern basis) not less than the amount that will be required to pay their liability on their debts as they become absolute and matured, (c) will be able to pay their debts and liabilities, subordinated, contingent or otherwise, as they become absolute and matured and (d) are not engaged in business or a transaction, and are not about to engage in business or a transaction, for which they have unreasonably small capital.

21

"**Sponsor**" has the meaning set forth in Section 4.4(a).

"**Straddle Period**" means any taxable period that begins on or before the Closing Date and ends after the Closing Date.

"**Subsidiary**" has the meaning set forth in the Recitals.

"**Successful Bidder**" has the meaning set forth in the Bid Procedures Order.

"**Target Closing Working Capital**" means an amount equal to $101,363,147.

"**Tax**" means any and all U.S. federal, state, local and non-U.S. tax (including any income tax, franchise tax, branch profits tax, capital gains tax, value-added tax, sales tax, use tax, property tax, transfer tax, payroll tax, social security tax, withholding tax, alternative or add-on minimum tax or estimated tax), assessments, levies, duties, tariffs, imposts and other similar charges and fees and any related fine, penalty, interest, or additional amounts with respect thereto, imposed, assessed or collected by or under the authority of any Governmental Authority.

"**Tax Return**" means any return (including any information return), report, statement, schedule, notice, form, claim for refund, estimated Tax filing, or other document or information (whether in tangible, electronic or other form), including any amendments, schedules attachments, supplements, appendices and exhibits thereto, filed with or submitted to, or required to be filed with or submitted to, any Governmental Authority in connection with the determination, assessment, collection, or payment, of any Tax.

"**Transactions**" means the transactions contemplated by this Agreement and the Related Documents.

"**Transfer Taxes**" has the meaning set forth in Section 2.12.

"**Transferred Assets**" has the meaning set forth in Section 2.1.

"**Transferred Employees**" has the meaning set forth in Section 6.7(a).

"**Transitions Services Agreement**" has the meaning set forth in Section 6.12.

"**Treasury Regulations**" means the U.S. Department of Treasury regulations promulgated under the IRC.

"**WARN Act**" means the United States Worker Adjustment and Retraining Notification Act of 1988 and any similar foreign, state or local law.

"**Willful Breach**" means a material breach of a covenant or agreement contained in this Agreement that is a consequence of an act undertaken or a failure to act by the breaching Party with the actual knowledge by the breaching Party that the taking of such act or such failure to act would constitute or result in a breach of this Agreement.

**1.2** **Other Definitional and Interpretive Matters**.

22

(a)     Unless otherwise expressly provided, for purposes of this Agreement and the Related Documents, the following rules of interpretation shall apply:

(i)     <u>Calculation of Time Period</u>.  All references to a day or days shall be deemed to refer to a calendar day or days, as applicable, unless otherwise specifically provided. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(ii)     <u>Dollars</u>.  Any reference to $ shall mean U.S. dollars, which is the currency used for all purposes in this Agreement and the Related Documents.  The specification of any dollar amount in the representations and warranties or otherwise in this Agreement, the Related Documents or the Schedules is not intended and shall not be deemed to be an admission or acknowledgement of the materiality of such amounts or items, nor shall the same be used in any dispute or controversy between the parties hereto to determine whether any obligation, item or matter (whether or not described herein or included in any schedule) is or is not material for purposes of this Agreement, the Related Documents or the Schedules.

(iii)     <u>Exhibits/Schedules</u>.  The Exhibits and Schedules to this Agreement are an integral part of this Agreement.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any matter or item disclosed on one Schedule shall be deemed to have been disclosed on each other Schedule to the extent the relevance of such matter or item to such other Schedule is readily apparent from the face of such disclosure (without reference to any underlying document).  Disclosure of any item on any Schedule shall not constitute an admission or indication that any such item is required to be disclosed, or that such item or matter is material or has resulted in or will result in a Material Adverse Effect or that the included items or actions are not in the ordinary course of business.  No disclosure on a Schedule relating to a possible breach or violation of any Contract, Law or Order shall be construed as an admission or indication that a breach or violation exists or has actually occurred.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iv)     <u>Gender and Number</u>.  Any reference to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(v)     <u>Headings</u>.  The provision of a table of contents, the division of this Agreement or Related Documents into articles, sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement or Related Document, as applicable. Unless otherwise specified, all references in this Agreement to any "Section" or other subdivision are to the corresponding section or subdivision of this Agreement, and all

23

references in a Related Document to any "Section" or other subdivision are to the corresponding section or subdivision of such Related Document.

(vi)   Herein.   The words such as "herein," "hereinafter," "hereof" and "hereunder" that are used in this Agreement refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. Uses of such words in the Related Documents shall refer to such Related Document as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(vii)   Or.   The word "or" shall be construed in the inclusive sense of "and/or" unless otherwise specified or indicated by, for example, the use of "either".

(viii)   Including.   The word "including" or any variation thereof means (unless the context of its usage otherwise requires) "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(ix)   Successors.   A reference to any party to this Agreement, any Related Document or any other agreement or document shall include such party's successors and permitted assigns.

(x)   Legislation.   A reference to any legislation or to any provision of any legislation shall include any amendment thereto, and any modification or re-enactment thereof, any legislative provision substituted therefor and all regulations and statutory instruments issued thereunder or pursuant thereto.

(xi)   Reflected On or Set Forth In.   An item arising with respect to a specific representation or warranty shall be deemed to be "reflected on" or "set forth in" a balance sheet or financial statement, to the extent any such phrase appears in such representation or warranty, if (A) there is a reserve, accrual or other similar item underlying a number on such balance sheet or financial statement that corresponds to the subject matter of such representation, (B) such item is otherwise specifically set forth on the balance sheet or financial statement or (C) such item is set forth in the notes to the balance sheet or financial statement.

(xii)   Made Available.   Any reference in this Agreement to "made available" means a document or other item of information that was made available to Purchaser or its Representatives by being posted to (and properly indexed within) the "Atlas" electronic data room hosted by DataSite in connection with the transactions contemplated by this Agreement prior to the execution of this Agreement.

(xiii)   Ordinary Course of Business.   Any reference in this Agreement to "ordinary course of business" means the ordinary and usual course of normal day-to-day operations of the Business as conducted by the Seller Group through the date hereof, taking into

24

account and in all respects consistent with the Approved Budget and/or approved by the Bankruptcy Court in the Bankruptcy Cases, except for compliance with legal requirements in connection with the Bankruptcy Cases (including conduct of the Auction).

(b)     The parties hereto have participated jointly in the negotiation and drafting of this Agreement and the Related Documents and, in the event an ambiguity or question of intent or interpretation arises, this Agreement and the Related Documents shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement and the Related Documents. The parties hereto agree that changes from earlier drafts to the final version of this Agreement do not necessarily imply that the party agreeing to such change is agreeing to a change in meaning (as the party agreeing to such change may believe the change is stylistic and non-substantive); consequently, no presumption should exist by virtue of a change from a prior draft.

## ARTICLE 2
## THE PURCHASE AND SALE; CLOSING

**2.1**    **Purchase and Sale**. Upon the terms and subject to the conditions set forth in this Agreement, including for the avoidance of doubt Section 2.2, and the Sale Order, at the Closing, in exchange for an aggregate payment from Purchaser to the Seller, Purchaser shall purchase, assume and accept from the Seller and its Subsidiaries, and Seller shall, and shall cause the other members of the Seller Group to, sell, transfer, assign, convey and deliver (or shall cause the sale, transfer, assignment, conveyance and delivery) to Purchaser, Free and Clear, as applicable, all of the rights, title and interests in, to and under the assets and interests of the Seller Group that are used, held for use or useful in connection with the Business (other than the Excluded Assets) as the same shall exist on the Closing Date (collectively, the "**Transferred Assets**"), including, but not limited to the Seller Group's right, title and interest in, to and under the following:

(a)     to the extent transferable, the Permits held by the Seller Group used in the Business or used in connection with the Transferred Assets;

(b)     all Contracts to which a member of the Seller Group is a party that Purchaser elects to assume pursuant to Section 2.4 but excluding any Seller Plan and Contracts that expire or are terminated prior to the Closing or during the Designation Rights Period, as applicable (each, an "**Assigned Contract**," and collectively, the "**Assigned Contracts**");

(c)     all books and records, documents, files, data and information of the Seller Group, other than the Excluded Books and Records;

(d)     the Owned Intellectual Property, together with all (i) royalties, fees, income, payments, and other proceeds now or hereafter due or payable to Seller with respect to such Owned Intellectual Property; (ii) claims and causes of action with respect to such Owned Intellectual Property, including all past, present and future rights to and claims for damages, restitution, and injunctive and other legal or equitable relief for infringement, misappropriation, or other violation

25

thereof; and (iii) all tangible embodiments of the Owned Intellectual Property, including software, works of authorship, data, documentation, websites, website content and technology;

(e)     all personal property and interests therein, including machinery, equipment, furniture, office equipment, communications equipment, information technology systems, computer systems, hardware, vehicles, spare and replacement parts, fuel, and other tangible personal property used in the Business and owned by the Seller Group;

(f)     all of the Seller Group's rights, claims or causes of action (including, for the avoidance of doubt, any Avoidance Actions or any Action against any officer, director, manager, stockholder, agent, Affiliate, advisor, Representative or employee of the Seller Group) against third parties or any Transferred Employees relating to the assets, properties, business or operations of the Seller Group that are related to the Business, the Transferred Assets or the Assumed Liabilities, except for such rights, claims and causes of action solely related to the Excluded Assets or Excluded Liabilities (the "**Acquired Claims**");

(g)     all Inventory;

(h)     all Accounts Receivable;

(i)     all marketing, advertising, and promotional materials and product samples and designs used in the Business and owned by the Seller Group;

(j)     all prepaid expenses of the Seller Group, including deposits, security deposits, merchant deposits, prepaid rent, escrow monies, and prepaid expenses previously paid by the Seller Group to fulfill the Seller Group's obligations under any Transferred Assets;

(k)     the right to receive and retain mail and other communications of the Seller Group and the right to bill and receive payment for services performed or transactions processed that are unbilled or unpaid as of the Closing, in each case, to the extent related to the Transferred Assets or the Assumed Liabilities;

(l)     all third-party warranties, guarantees, refunds, rights of recovery, rights of set-off or counter-claim and rights of recoupment of every kind and nature for the benefit of, or enforceable by, any member of the Seller Group, in each case that are related to the Business, the Transferred Assets or the Assumed Liabilities; and

(m)     all goodwill, customer and referral relationships, and other intangible assets related to the Business or the Transferred Assets.

**2.2**    **Excluded Assets**. Notwithstanding the provisions of Section 2.1 or anything to the contrary herein, any and all assets, rights and properties of the Seller Group that are not described in Section 2.1 as Transferred Assets, including the following (each, an "**Excluded Asset**," and collectively, the "**Excluded Assets**"), shall be retained by the Seller Group, and Purchaser and its

26

designees shall acquire no right, title or interest in the Excluded Assets in connection with the Transaction:

(a)     all (i) cash and cash equivalents (including the Customer Deposit Balance), wherever located, including bank balances and bank accounts or safe deposit boxes, monies in the possession of any banks, savings and loans or trust companies and similar cash items, (ii) except to the extent related to an Assigned Contract, escrow monies and deposits in the possession of landlords and utility companies, and (iii) investment securities and other short- and medium-term investments;

(b)     all rights of the Seller Group under this Agreement or the Related Documents, including, without limitation, the right to receive the Purchase Price and to enforce the Seller Group's rights and remedies thereunder;

(c)     all Excluded Contracts, other than the Assigned Contracts, to which any member of the Seller Group or any of their respective Affiliates is a party;

(d)     (i) any attorney-client privilege and attorney work-product protection of any member of the Seller Group or associated with the Business as a result of legal counsel representing any member of the Seller Group or the Business, including in connection with the Transactions; (ii) all documents subject to the attorney-client privilege and work-product protection described in the foregoing clause (i); (iii) all documents maintained by any member of the Seller Group relating to the drafting, negotiation, execution, delivery and performance of this Agreement, any Related Document or any agreements with any other bidder in connection with any sale process previously conducted by or in which any member of the Seller Group was previously involved, including the sale process leading to the entry into this Agreement; and (iv) claims (and resulting proceeds) under any director and officer, errors and omissions, fiduciary, commercial crime insurance and other insurance policies;

(e)     any rights of the Seller Group to Tax refunds (including any rights to refunds, credits or other rebates arising from or relating to tariffs, duties or similar charges) or credits for overpayment of Taxes in lieu of a refund, in each case attributable to (i) Taxes that the Seller Group paid prior to the Closing, (ii) Taxes that are Excluded Liabilities or (iii) Property Taxes for which the Seller Group is liable pursuant to Section 7.3;

(f)     the Excluded Books and Records;

(g)     any capital stock, shares, warrants, stock options, membership interests, partnership interests, units, or other equity or equity-linked securities of any member of the Seller Group or of any other Person;

(h)     all Seller Plans and all assets, trusts, accounts, insurance policies and other rights and interests relating thereto;

(i)     any assets not otherwise designated as Transferred Assets;

27

(j)      all rights and interests of the Seller Group to the assets, claims and other matters listed on Schedule 2.2(j);

(k)      except for Acquired Claims, all of the Seller Group's rights, claims or causes of action against third parties relating to the assets, properties, business or operations of the Seller Group (including all guaranties, warranties, indemnities and similar rights in favor of the Seller Group or any of their Affiliates) to the extent arising under the Bankruptcy Code or relating to any of the Excluded Assets or Excluded Liabilities, in each case, whether arising by way of counterclaim or otherwise, and whether arising out of transactions occurring prior to, on or after the Closing Date; and

(l)      all prepaid expenses, claims, deposits, prepayments, refunds, causes of action, demands, Actions, suits, rights of recovery, rights under guarantees, warranties, indemnities and all similar rights against third parties, rights of setoff and rights of recoupment, in each case, to the extent related to or used in or held for use for the Excluded Assets listed in clauses (a) through (k) above.

**2.3      Assumption of Liabilities**.  On the terms and subject to the conditions set forth in this Agreement, subject to Section 2.5, Purchaser shall, effective as of the Closing, assume and agree to pay, discharge and perform in accordance with their terms the following Liabilities of the Seller Group as the same shall exist on the Closing Date or arise after the Closing Date (each, an "**Assumed Liability**," and collectively, the "**Assumed Liabilities**"):

(a)      all Liabilities (other than Taxes) arising under the Assigned Contracts, that first are incurred or arise after the Closing Date and to the extent they are not the result of a breach of any Assigned Contract prior to the Closing;

(b)      all Liabilities (other than Taxes) arising from the Transferred Assets, that first are incurred or arise after the Closing Date;

(c)      all Liabilities outstanding as of or arising after the Closing for returns of merchandise previously sold to customers, to the extent such returns are in compliance with the applicable return policy in effect as of the time of such sale;

(d)      all Liabilities for gift cards or gift certificates validly issued by the Seller Group in the ordinary course of business and outstanding as of the Closing, including any outstanding customer loyalty, rewards or similar program obligations to the extent such rewards are redeemable for gift cards, gift certificates or other merchandise;

(e)      all Liabilities for orders placed by the Seller Group's customers for Inventory that has not been shipped to such customer prior to the Closing and all orders for goods, materials or services placed by the Seller Group in good faith and in the ordinary course of business and that are reasonably necessary to fulfill such orders placed by the Seller Group's customers in respect of such Inventory;

(f)      all Liabilities arising from any warranties relating to or arising out of any Transferred Asset that are first incurred or arise after the Closing;

(g)      (i) all Liabilities for Taxes imposed with respect to or arising out of the Transferred Assets for any Post-Closing Tax Period, (ii) Property Taxes for which Purchaser is liable pursuant to Section 7.3;

(h)      solely to the extent such Liabilities relate to periods following the Closing (i) all accounts payable of the Seller Group to the extent related to the Business, arising out of or related to the purchase of goods, materials or services in the ordinary course of business by or on behalf of the Seller Group and (ii) all other trade payables of the Seller Group incurred in the ordinary course of business, to the extent related to the Business or the Transferred Assets;

(i)      all Liabilities arising out of or relating to any of the Transferred Employees solely to the extent such Liabilities are first incurred or arise after the Closing;

(j)      all Liabilities related to or arising out of the ownership and operation of the Transferred Assets or the Business from and after the Closing;

(k)      all Cure Costs (subject to the Cure Costs Deductions as set forth in Section 2.10(a));

(l)      Liabilities equal to $10,278,441 in Accounts Payable in respect of Inventory (the "**Inventory Accounts Payable Cap**"); and

(m)      all Liabilities for which the Purchaser is responsible pursuant to Section 2.4(j) of this Agreement during the Designation Rights Period.

**2.4      Assumption/Rejection of Certain Contracts (including Real Property Leases) and Designation Rights**.

(a)      No later than fourteen (14) days following the Petition Date (the "**Potential Assumption Notice Deadline**"), the Seller shall file a notice (the "**Potential Assumption and Assignment Notice**") with the Bankruptcy Court (and properly serve it on all relevant counterparties), which shall include (i) a true and complete list of all Contracts to which any member of the Seller Group is a party (other than any Contracts that have been previously rejected or are subject to a pending motion to reject in the Chapter 11 Cases) and (ii) to the Seller's Knowledge, a good faith calculation of the Cure Costs with respect to the Contracts identified on the Potential Assumption and Assignment Notice, which shall include (x) all prepetition arrears, plus (y) a good faith estimate of Post-Petition Cure Costs (the "**Proposed Cure Costs**"). The Debtors shall update the Potential Assumption and Assignment Notice from time to time, but no less frequently than once per month, in the event that they (i) identify new contracts that were not previously included in the initial Potential Assumption and Assignment Notice, or (ii) determine that a Proposed Cure Cost for any Contract should be modified.

29

(b)      Prior to the Closing Date, the Seller shall file a notice (the "**Proposed Assumption and Assignment Notice**") with the Bankruptcy Court (and properly serve it on all relevant counterparties), which shall include a schedule of the Contracts that were designated as of such date by the Purchaser, in its sole discretion, as Assigned Contracts.  The assumption and assignment to Purchaser of any Contract designated as an Assigned Contract in the Proposed Assumption and Assignment Notice shall be deemed effective upon Closing pursuant to the Sale Order.

(c)      During the Designation Rights Period, Purchaser may, in its sole discretion, designate any Designated Contract for either (x) assumption and assignment to Purchaser, or (y) rejection, in each case by providing written notice to the Seller Group (a "**Purchaser Designation Notice**"); provided that Purchaser shall provide the Seller Group with a Designation Notice in respect of any such Contract at least seven (7) Business Days prior to the expiration of the Designation Rights Period. Each Purchaser Designation Notice for a Designated Contract that is to be assumed and assigned to Purchaser shall include the Proposed Cure Cost associated with such Designated Contract.  Within three (3) Business Days of the Seller Group's receipt of a Purchaser Designation Notice, the Seller Group shall file a notice (the "**Designation Rights Period Assumption and Assignment Notice**") with the Bankruptcy Court, and properly serve it on all relevant counterparties, which notice shall, if applicable, include the Proposed Cure Cost and relevant objection deadline(s), if any, for each Designated Contract included therein.  In the event that the Proposed Cure Cost for a Designated Contract in any Designation Rights Period Assumption and Assignment Notice is consistent with the Proposed Cure Cost in the Potential Assumption and Assignment Notice, or the relevant counterparty has consented to any deviation therefrom, the assumption and assignment of such Designated Contract shall be deemed effective upon the filing of such notice.  If the Proposed Cure Cost has changed from the Potential Assumption and Assignment Notice and has not been agreed to by the relevant counterparty, or the counterparty to the Designated Contract has not previously received notice of the potential assumption and assignment of their Contract, the counterparty to such Designated Contract shall have fourteen (14) days from the date of the Designation Rights Period Assumption and Assignment Notice to object to the Proposed Cure Cost and, if no timely objection is filed, the assumption and assignment of such Designated Contract shall be deemed effective upon the expiration of that fourteen (14) day period.

(d)      Upon the expiration of the Designation Rights Period, the Seller shall file a final notice (the "**Final Assumption and Assignment Notice**"), which shall include a final schedule of the Assigned Contracts that were designated by the Purchaser (including all Contracts (i) assumed by the Purchaser at Closing and (ii) designated for assumption and assignment pursuant to a Purchaser Designation Notice).

(e)      The Sale Order shall provide that the assumption and assignment of (i) a Contract included on the Proposed Assumption and Assignment Notice for which (1) no objection was timely made or (2) an objection was timely made but resolved prior to entry of the Sale Order shall, in each case, be effective upon entry of the Sale Order and (ii) a Designated Contract shall be effective without further order of the Bankruptcy Court (x) immediately, upon the filing of the

30

Designation Rights Period Assumption and Assignment Notice, or (y) upon expiration of the applicable objection deadline set forth in the Designation Rights Period Assumption and Assignment Notice or the Final Assumption and Assignment Notice (as applicable) unless the counterparty to such Designated Contract timely serves an objection upon Purchaser and the Seller that relates to adequate assurance of future performance or a cure cost issue that could not have been raised in an objection to any Assumption/Rejection Notice prior to the Sale Hearing. If Purchaser, the Seller and the applicable counterparty are unable to resolve an objection timely served, the Seller shall resolve the matter pursuant to Section 2.4(q).

(f)      Within three (3) Business Days of the Seller Group's receipt of a Purchaser Designation Notice, the Seller Group shall, with respect to any Contract designated in a Purchaser Designation Notice to be rejected, file a notice (a "**Designation Rights Period Rejection Notice**") with the Bankruptcy Court (and properly serve it on all relevant counterparties).  The Sale Order shall provide that the rejection of any Designated Contract shall be effective without further order of the Bankruptcy Court.

(g)      Any Contract that is not designated for assumption and assignment or rejection before the expiration of the Designation Rights Period shall be deemed rejected, effective upon the expiration of the Designation Rights Period, without the need for any further order of the Bankruptcy Court.

(h)      For the avoidance of doubt, all Contracts designated for assumption and assignment to Purchaser pursuant to a Purchaser Designation Notice during the Designation Rights Period and assumed and assigned to Purchaser shall be deemed Assigned Contracts for all purposes hereunder.

(i)      Notwithstanding Section 2.4(c), the Sale Order shall provide that, during the Designation Rights Period, Purchaser may deliver a written notice to the Seller Group of Purchaser's entry into an agreement with the counterparty to any Contract listed on a Potential Assumption and Assignment Notice pursuant to which such counterparty consents to the assumption and assignment to Purchaser or its designee of such Contract on the terms set forth in such agreement. The assumption and assignment of any such Contract pursuant to this Section 2.4(i) shall be effective on the date set forth in the written notice provided to the Seller Group without further order of the Bankruptcy Court. For the avoidance of doubt, Purchaser may negotiate such assumption and assignment directly with the Contract counterparty.

(j)      Purchaser shall be responsible for any and all Liabilities of the Seller Group under Designated Contracts in each case that are incurred and come due and payable during the Designation Rights Period through the effective date of (i) any such Designated Contract's assumption and assignment to Purchaser, (ii) rejection by any member of the Seller Group, or (iii) deemed rejection, in each case, in accordance with this Agreement. For the avoidance of doubt, Purchaser shall pay all such Liabilities on a current basis as and when they come due and payable.

(k)      The Seller Group shall take all actions reasonably required to assume and assign the Assigned Contracts to Purchaser, including taking all actions reasonably necessary, at

31

Purchaser's expense following the Closing Date, to facilitate any negotiations with the counterparties to such Contracts and, if necessary, to obtain an order of the Bankruptcy Court containing a finding that the proposed assumption and assignment of the Contracts to Purchaser satisfies all applicable requirements of section 365 of the Bankruptcy Code.

(l)     Purchaser shall take all actions reasonably required for the Seller Group to assume and assign the Assigned Contracts to Purchaser, including taking all actions reasonably necessary to facilitate any negotiations with counterparties to such Contracts and, if necessary, to obtain an order of the Bankruptcy Court containing a finding that the proposed assumption and assignment of the Contracts to Purchaser satisfies all applicable requirements of section 365 of the Bankruptcy Code.

(m)     Notwithstanding any provision in this Agreement to the contrary, a Contract shall not be an Assigned Contract hereunder and shall not be assigned to, or assumed by, Purchaser to the extent that such Contract is (i) deemed rejected under Section 365 of the Bankruptcy Code (ii) the subject of an objection to assignment or assumption or requires the Consent of any Governmental Authority or other third party in order to permit the assumption and assignment by the applicable Seller to Purchaser of such Contract pursuant to Section 365 of the Bankruptcy Code, and such objection has not been resolved pursuant to Section 2.4(q) of this Agreement or such Consent has not been obtained by the Closing Date or the expiration of the Designation Rights Period, as applicable, or (iii) is validly terminated by any party thereto other than Seller, or terminates or expires by its terms, on or prior to such time as it is to be assumed by Purchaser as an Assigned Contract hereunder and is not continued or otherwise extended upon assumption.

(n)     During the Designation Rights Period, the Seller Group shall use commercially reasonable efforts to provide unrestricted access to all properties governed by any Designated Contract that is a Real Property Lease to allow the Purchaser to operate the Business during the period from and after the Closing Date through the effective date of the applicable assumption and assignment of the Real Property Lease to the Purchaser or rejection in accordance with this Agreement.

(o)     Purchaser shall as promptly as reasonably practicable, but in any event upon assumption and assignment of any Assigned Contract hereunder, pay all Cure Costs (if any) in connection with any such assumption and assignment.

(p)     During the Designation Rights Period, the Seller Group shall not reject, terminate, amend, supplement, modify, waive any rights under, or create any adverse interest with respect to any Designated Contract, or take any affirmative action not required thereby, without the prior written consent of Purchaser unless (i) Purchaser has provided written notice to the Seller Group designating such Contract for rejection pursuant to this Section 2.4, or (ii) in the case of any Contract as to which Purchaser has breached its obligations with respect to the payment of Liabilities associated with such Contract to the extent required by the terms hereof if Purchaser has failed to cure such breach within five (5) Business Days after receiving written notice of such breach from Seller.

32

(q)      In no event shall Seller settle an objection to the assignment of an Assigned Contract listed on the Proposed Assumption and Assignment Notice or a Designated Contract, including as to Cure Costs, without the express prior written consent of Purchaser (with an e-mail consent being sufficient).

(i)      In the event any such objection is unresolved prior to the expiration of the Designation Rights Period, the Seller may elect not to assume and assign the potentially Assigned Contract and designate such Contract for rejection.

(ii)      With regard to any Designated Contract that is the subject of a timely-filed objection, the parties will cooperate in good faith to resolve such objections. If Purchaser, Seller and the applicable counterparty to such Designated Contract are unable to resolve such objection prior to the expiration of the Designation Rights Period, Seller shall schedule the matter for hearing on no less than five (5) Business Days' notice; *provided*, that, any such hearing shall occur no later than the date on which the hearing is held before the Bankruptcy Court on confirmation of a plan of reorganization or liquidation in the Bankruptcy Cases.  Upon entry of an Order of the Bankruptcy Court determining any Cure Costs and authorizing the assumption and assignment to Purchaser of any Designated Contract, which order shall be in a form and substance reasonably acceptable to Purchaser, Purchaser shall have the option to either (i) designate such Designated Contract for assumption and assignment to Purchaser, or (ii) designate such Designated Contract for rejection.

(r)      The objection deadlines and notice requirements for each of the Assumption/Rejection Notices shall be as provided in the Bidding Procedures Order.

**2.5      Excluded Liabilities**.  Purchaser is assuming only the Assumed Liabilities of the Seller Group and shall not assume, be obligated to pay, perform or otherwise discharge, or in any other manner be liable or responsible for any other Liabilities of, or Action against, the Seller Group or relating to the Transferred Assets or the Business, of any kind or nature whatsoever, whether absolute, accrued, contingent, or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing or arising thereafter as a result of any act, omission, or circumstance taking place prior to the Closing. Notwithstanding anything in this Agreement to the contrary, the Assumed Liabilities shall not include any Liabilities or obligations for any Excluded Taxes, and the Seller Group shall retain and shall be responsible for, all Liabilities that are not Assumed Liabilities (all such Liabilities not being assumed herein referred to as the "**Excluded Liabilities**"). Without limiting the foregoing, Purchaser shall not be obligated to assume, and does not assume, and hereby disclaims all the Excluded Liabilities, including the following Liabilities of any member of the Seller Group or of any predecessor of any member of the Seller Group, whether incurred or accrued before or after the Closing:

(a)      any Liabilities to the extent not relating to or arising out of the Business or the Transferred Assets, including any Liabilities to the extent relating to or primarily arising out of the Excluded Assets;

33

(b)      any Liabilities in respect of any Contracts that are not Assigned Contracts or Designated Contracts (and in the case of Designated Contracts, only to the extent provided in Section 2.4(j) and for so long as such Designated Contracts remain Designated Contracts), including any Liabilities arising out of the rejection of any such Contracts pursuant to Section 365 of the Bankruptcy Code;

(c)      any administrative expenses or priority claims (other than claims or expenses that are included in the Cure Costs);

(d)      all Liabilities for fees, costs and expenses that have been incurred or that are incurred or owed by the Seller Group in connection with this Agreement or the administration of the Bankruptcy Cases (including all fees and expenses of professionals engaged by the Seller Group) and administrative expenses and priority claims accrued through the Closing Date and specified post-Closing administrative wind-down expenses of the Seller Group's bankruptcy estates pursuant to the Bankruptcy Code (which such amounts shall be paid by the Seller Group from the proceeds collected in connection with the Excluded Assets) and all costs and expenses incurred in connection with (i) the negotiation, execution and consummation of the Transactions and each of the Related Documents, (ii) the negotiation, execution and consummation of any debtor-in-possession financing agreement, and (iii) the consummation of the Transactions, including any retention bonuses, "success" fees, change of control payments and any other payment obligations of the Seller Group payable as a result of the consummation of the Transactions and the Related Documents;

(e)      all Liabilities of the Seller Group arising out of or relating to any pending or threatened Action;

(f)      all Liabilities of the Seller Group under this Agreement or any Related Document and the transactions contemplated hereby and thereby;

(g)      Excluded Taxes;

(h)      all Liabilities arising under Environmental Laws, other than to the extent arising solely out of events, facts or circumstance that first occur on or after the Closing with respect to the Transferred Assets;

(i)      all Liabilities of the Seller Group or any of their predecessors to their respective direct or indirect equityholders, including any dividends, distributions in liquidation, redemption of interests, option payments or otherwise;

(j)      all Liabilities arising out of or relating to any business or property formerly owned or operated by any member of the Seller Group, any Affiliate or predecessor thereof, but not presently owned or operated by any member of the Seller Group;

34

(k)      all Liabilities of the Seller Group associated with any and all indebtedness, including any guarantees of third party obligations and reimbursement obligations to guarantors of the Seller Group; or

(l)      (i) any severance, retention, change-in-control, bonuses, commissions, deferred compensation, state or federal WARN, or similar payments or obligations of Seller arising prior to the Closing, whether or not triggered by the Transactions and (ii) all Liabilities and obligations arising out of, relating to or in connection with (a) any Business Employee, who is not a Transferred Employee, arising at any time, or (b) any Transferred Employee that are first incurred or arise on or prior to the Closing Date, in each case including those related to payment, claims, indemnification, paid time off, the WARN Act or any other Law, or benefits under workers' compensation or any other Laws.

**2.6      Excluded Contracts**.  Any Contract that Purchaser elects not to be an Assigned Contract pursuant to Section 2.4 of this Agreement shall be considered an excluded contract ("**Excluded Contract**") (and shall constitute an Excluded Asset and not be included in the Transferred Assets) for all purposes of this Agreement and Purchaser shall not have any obligation to satisfy or pay any Cure Costs or other Liabilities with respect to such Excluded Contract, subject only to Section 2.4(e), if applicable.

**2.7      Nontransferable Assets and Liabilities**.

(a)      Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer any Transferred Asset or any claim, right or benefit arising thereunder or resulting therefrom if an attempted assignment or transfer thereof, without the Consent of a third party (including any Governmental Authority) (after giving effect to the Sale Order or any other applicable order of the Bankruptcy Court that effects such transfer without any required Consents), would constitute a breach or other contravention thereof or a violation of Law (each, a "**Non-Transferred Asset**").

(b)      If, on the Closing Date, any third-party Consent is not obtained for a Non Transferred Asset, or if an attempted transfer or assignment thereof would be ineffective or a violation of Law, then, until the earlier of (i) forty (40) days following the Closing Date and (ii) the date on which any such requisite Consent is obtained therefor and the same is transferred and assigned to Purchaser or its designee (such time period, the "**Non-Transferred Asset Term**"), (A) such Non-Transferred Asset shall be held in trust by the Seller as agent for the Purchaser, and the Seller shall, to the extent permitted by Law, provide to Purchaser the benefits and Purchaser shall assume the obligations and bear the economic burdens associated with such Non-Transferred Asset and (B) the Seller and Purchaser shall use commercially reasonable efforts to enter into a mutually agreeable arrangement, to the extent feasible and without the need for any such Consent by which for the duration of the Non-Transferred Asset Term, (1) the Seller shall, at Purchaser's sole expense, provide Purchaser with the economic and operational equivalent of obtaining the requisite third-party Consent and assigning the applicable Non-Transferred Asset to Purchaser and (2) Purchaser shall perform, at its sole expense, the obligations and assume the economic burdens of the Seller or its Affiliates to be performed after the Closing with respect to such Non-Transferred

35

Asset; provided that no member of the Seller Group will be obligated to pay any consideration or grant any accommodation therefor to any Person from whom Consent or approval is requested or to initiate any Actions to obtain any such Consent or approval.  Purchaser shall promptly, upon receipt of a written request therefor, which request shall also include evidence of such payments and any other supporting documentation reasonably requested by Purchaser, from the Seller, reimburse the Seller for all monies paid by the Seller on Purchaser's behalf in connection with any Assumed Liability not assigned or transferred to Purchaser pursuant to this Section 2.7.

**2.8**     **Closing**.  The closing of the Transactions (the "**Closing**") will take place remotely by electronic exchange of documents on the date (the "**Closing Date**") that is the third (3rd) Business Day after the date on which all of the conditions set forth in Article 8 (excluding conditions that, by their terms, are to be satisfied at the Closing, but subject to the satisfaction or waiver of all such conditions at the Closing), have been satisfied or waived by the party hereto entitled to the benefit of the same, unless another time or date is agreed to in writing by the parties hereto *provided* that in no event shall the Closing occur prior to the date that is forty-five (45) days after the date hereof without the prior written consent of the Purchaser.  Any actions required to take place in person will take place at Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017 at 10:00 a.m. (Eastern Time).  Except as otherwise set forth herein, all proceedings to be taken and all documents to be executed and delivered by all parties hereto at the Closing will be deemed to have been taken and executed simultaneously and no proceedings will be deemed to have been taken nor documents executed or delivered until all have been taken, executed and delivered.

**2.9**     **Closing Deliveries of the Parties**.  At or prior to the Closing:

(a)     Purchaser and the Seller (or the applicable member of Seller Group) shall execute and deliver the Bill of Sale and Assignment and Assumption Agreement;

(b)     Purchaser shall deliver, or cause to be delivered, to the Seller or the applicable Person each of the following:

(i)     a certificate, dated as of the Closing Date, executed by or on behalf of Purchaser as to the satisfaction of the conditions set forth in Section 8.3(a) and Section 8.3(b);

(ii)     the Purchase Price, by cash, by wire transfer of immediately available funds to an account or accounts designated by Seller, or a combination of such methods;

(iii)     the Adjustment Escrow Amount to the Adjustment Escrow Account;

(iv)     the amount of the Assumed Liabilities described in Section 2.3, by assuming such Assumed Liabilities pursuant to the Bill of Sale and Assignment and Assumption Agreement;

(v)     the Transition Services Agreement; and

(vi)     the IP Assignment Agreement.

(c)     the Seller (or the applicable member of Seller Group) shall deliver, or cause to be delivered, to Purchaser each of the following:

(i)     a certificate, dated as of the Closing Date, executed by or on behalf of the Seller as to the satisfaction of the conditions set forth in Section 8.2(a) and Section 8.2(b);

(ii)     a properly completed IRS Form W-9 for the Seller, duly completed and executed;

(iii)     an irrevocable power of attorney for the Owned Intellectual Property, duly executed by the applicable member of the Seller Group;

(iv)     the Transition Services Agreement;

(v)     the IP Assignment Agreement; and

(vi)     a copy of the Sale Order as entered by the Bankruptcy Court.

**2.10    Purchase Price; Assumed Liabilities; Inventory Count; Closing Statement**.

(a)     At the Closing, upon the terms and subject to the conditions set forth herein, in full consideration for the sale, transfer, conveyance, assignment and delivery of the Transferred Assets to Purchaser, Purchaser shall (i) pay to the Seller (A) the Base Purchase Price, *plus* (B) Prepaid Rent, *plus or minus* (C) the Closing Working Capital Adjustment, if any, *minus* (D) the Adjustment Escrow Amount, *minus* (E) any Cure Costs Deductions, if any, *minus* (F) the Processor Reserve Deposit, *minus* (G) the Additional Inventory Shortfall, if any, *minus* (H) the Closing Marketing Expenditure Deduction, if any (the "**Purchase Price**") and (ii) assume the Assumed Liabilities.

(b)     Purchaser agrees to pay, perform, honor, and discharge, or cause to be paid, performed, honored and discharged, all Assumed Liabilities in a timely manner in accordance with the terms hereof, including paying or causing to be paid by the Closing all Cure Costs in accordance with the Sale Order; provided that any Cure Costs related to a Designated Contract designated to be assumed by the Purchaser pursuant to a Designation Notice during the Designation Rights Period shall be paid as soon as reasonably practicable following the effective date of such Designated Contract's assumption and assignment to Purchaser.

(c)     **Inventory Count**.

(i)     The Seller shall commence the Inventory Count no later than six (6) Business Days prior to the Closing Date and shall complete the Inventory Count no later than four (4) Business Days prior to the Closing Date. The Inventory Count shall be conducted in accordance with the Inventory Valuation Methodology.

37

(ii)    At the end of the Inventory Count, as promptly as reasonably practicable (but, for the avoidance of doubt, prior to the delivery of the Closing Statement), Seller shall deliver a certificate, executed by an authorized officer of Seller, setting forth in reasonable detail the results of the Inventory Count, together with reasonable supporting documentation used in applying the Accounting Principles (the "**Inventory Statements**").

(d)    **Closing Statement**. No later than four (4) Business Days prior to the Closing Date, Seller shall deliver to Purchaser a written statement (the "**Closing Statement**") setting forth Seller's good faith estimates of (i) the Prepaid Rent, Closing Working Capital (including Closing Inventory Value) and the Closing Working Capital Adjustment, (ii), the Processor Reserve Deposit, (iii) the Additional Inventory Shortfall, if any, (iv) the Closing Marketing Expenditure Deduction, if any and (v) using the amounts referred to in the preceding clauses (i) through (iv), the resulting Purchase Price, together with copies of such documents and information used by Seller in its calculation of such amounts as are reasonably necessary for Purchaser to review and verify such amounts. Notwithstanding anything to the contrary in this Agreement, for purposes of calculating Closing Working Capital and the Closing Working Capital Adjustment, the value of Inventory included in such calculation shall not exceed $105,459,944 (the "**Inventory Cap**"). To the extent the Closing Inventory Value exceeds the Inventory Cap, (i) such excess Inventory shall nonetheless constitute Transferred Assets and shall be transferred to Purchaser at the Closing Free and Clear, and (ii) such excess amount shall be disregarded and excluded from the calculation of Closing Working Capital and the Closing Working Capital Adjustment, and shall not result in any increase to the Purchase Price. For the avoidance of doubt, all Inventory, regardless of whether its value is above or below the Inventory Cap, shall be included in the Transferred Assets and transferred to Purchaser at the Closing. Seller shall afford the Purchaser and its Representatives with a reasonable and timely opportunity to access and review the books and records of the Seller Group and the Business and shall cause the personnel and Representatives of the Seller Group to reasonably cooperate with Purchaser and its Representatives for the purpose of enabling Purchaser to review the Closing Statement and each component thereof; *provided*, that notwithstanding anything to the contrary in this Agreement, no member of the Seller Group shall be required to provide access to any information or documents to the extent that Seller reasonably believes, based on the advice of its legal counsel, such access would (x) violate any attorney-client or other legal privilege or (y) contravene any applicable Law, fiduciary duty or Contract to which any member of the Seller Group or any of its Affiliates is a party. Purchaser shall have a reasonable opportunity to review and comment on the Closing Statement and Seller shall consider in good faith any reasonable comments from Purchaser thereto and the parties shall work in good faith to resolve any such disagreement; provided that Seller's calculation of the Purchase Price and each component thereof (including Prepaid Rent, Closing Working Capital Adjustment and Additional Inventory Shortfall) shall prevail in case of disagreement as between Seller and Purchaser which is not resolved prior to the Closing. Nothing in this Section 2.10(d) is a waiver of the Purchaser's rights under this Section 2.10.

(e)    **Post-Closing Reconciliation by the Purchaser**.

38

(i)      No later than ninety (90) days after the Closing Date, the Purchaser shall deliver to the Seller a written statement (the "**Reconciliation Statement**") stating the Purchaser's good faith determination of (i) Prepaid Rent, Closing Working Capital (including Closing Inventory Value) and the Closing Working Capital Adjustment, (ii) the Processor Reserve Deposit, (iii) the Additional Inventory Shortfall, if any, (iv) the Closing Marketing Expenditure Deduction, if any, and (v) using the amounts referred to in the preceding clauses (i) through (iv), the resulting final Purchase Price (the "**Final Purchase Price**"), together with copies of such documents and information used by Purchaser in its calculation of such amounts as are reasonably necessary for Seller to review and verify such amounts.

(ii)      During the thirty (30) days after the Seller's receipt of the Reconciliation Statement (such 30-day period, the "**Response Period**"), the Purchaser shall, and shall cause the Business and its Representatives to provide Seller and its Representatives (A) access to reasonably requested books and records of the Purchaser and other information of the Business pertaining to the Reconciliation Statement and (B) the opportunity to discuss such books, records and other information with those Persons responsible for the preparation of (or knowledgeable about the information contained in) the Reconciliation Statement. Before the expiration of the Response Period, the Seller may deliver a written objection to any of the amounts stated on the Reconciliation Statement, accompanied by the specific adjustments the Seller proposes to be made to the Reconciliation Statement along with reasonable detail showing support for the Seller's position (such objection notice and supporting detail, the "**Objection Notice**"). If the Seller does not provide an Objection Notice to the Purchaser before the expiration of the Response Period, then the Seller will be deemed to have waived its right to object to any amount stated on the Reconciliation Statement and such amounts will be conclusive and binding on the Seller. If the Seller delivers an Objection Notice to the Purchaser within the Response Period, then the Seller and the Purchaser will have fifteen (15) days after delivery of the Objection Notice (such 15-day period, the "**Discussion Period**") to discuss each other's position and to attempt to resolve their disagreements. All discussions related thereto will be treated as compromise negotiations governed by Rule 408 of the Federal Rules of Evidence, which will apply to any matter submitted to the Accounting Expert and the Accounting Expert's decision itself.

(iii)      If the Purchaser and the Seller are unable to agree on any amounts stated on the Reconciliation Statement (such amounts, the "**Disputed Amounts**") by the expiration of the Discussion Period, then either of them may submit the Disputed Amounts to be resolved by a nationally-recognized or regionally-recognized independent accounting or financial consulting firm as mutually agreed to by the Purchaser and the Seller (the "**Accounting Expert**"), acting as an expert and not an arbitrator. Regardless of which party submits the matter to the Accounting Expert for resolution, both the Purchaser and the Seller shall enter into the Accounting Expert's standard engagement letter and both shall instruct the Accounting Expert to resolve each of the Disputed Amounts (but no other

39

items) as soon as practicable but in any event within 60 days of being engaged. Promptly after engaging the Accounting Expert, the Purchaser and the Seller shall each deliver to the Accounting Expert and each other party written statements on the Disputed Amounts, along with any applicable supporting documentation, attaching the Reconciliation Statement delivered by the Purchaser and the Objection Notice delivered by the Seller. The Purchaser and the Seller shall cooperate with the Accounting Expert in all reasonable respects, but neither party will have meetings, teleconferences or other correspondence with the Accounting Expert without the other party. In resolving each of the Disputed Amounts, the Accounting Expert shall not be authorized to choose a value greater than or less than the greatest and the least values, respectively, assigned to each component of the Reconciliation Statement by the Purchaser in the Reconciliation Statement or by the Seller Representative in the Objection Notice, but the Accounting Expert may resolve the Disputed Amounts on an item-by-item basis so that it may choose the Purchaser's position on some items and the Seller Representative's position on other items. The Purchaser and the Seller will pay their own expenses in connection with resolving the Disputed Amounts; *provided*, that the fees and expenses of the Accounting Expert will be paid by the Purchaser and the Seller based on the percentage which the portion of the Disputed Amounts not awarded to each such party bears to the amount actually contested by such party, as determined by the Accounting Expert. For example, if the Reconciliation Statement states Closing Working Capital is $1,000 less than the amount stated on the Closing Statement, the Seller contests only $500 of such amount, and the Accounting Expert ultimately resolves the dispute by awarding the Purchaser $300 of the $500 contested, then the fees and expenses of the Accounting Expert will be allocated 60% (i.e., $300 ÷ $500) to the Seller and 40% (i.e., $200 ÷ $500) to the Purchaser.

(iv)     If the determination of the Final Purchase Price under this Section 2.10, differs from the Closing Statement, then a true-up payment shall be made as follows:

(A)     If the Final Purchase Price exceeds the Purchase Price (such amount, the "**Excess Amount**"), then (1) the Purchaser shall pay, or cause to be paid, the lesser of (y) an amount equal to the Adjustment Escrow Amount or (B) the Excess Amount, to the Seller by wire transfer of immediately available funds to the account or accounts designated in writing by Seller to the Purchaser and (2) the Purchaser and the Seller shall sign and deliver joint written instructions to the Adjustment Escrow Agent instructing the Adjustment Escrow Agent to release an amount equal to the Adjustment Escrow Amount from the Adjustment Escrow Account to the Seller. Purchaser shall not have any liability for any amounts due pursuant to Section 2.10 in excess of an amount equal to the Adjustment Escrow Amount.

(B)     If the Purchase Price exceeds the Final Purchase Price (such amount, the "**Deficit Amount**"), then (1) the Purchaser and the Seller shall sign and deliver joint written instructions to the Adjustment Escrow Agent

40

instructing the Adjustment Escrow Agent to release an amount equal to the Deficit Amount from the Adjustment Escrow Account to the Purchaser, and (2) if the Deficit Amount is less than the Adjustment Escrow Amount, then the Purchaser and the Seller shall sign and deliver joint written instructions to the Adjustment Escrow Agent instructing the Adjustment Escrow Agent to release the then remaining Adjustment Escrow Amount to the Seller. The Seller shall have no liability for any amounts due pursuant to this Section 2.10 in excess of the Adjustment Escrow Amount, and Purchaser's sole source of recourse and recovery for such amounts due shall be the funds available in the Adjustment Escrow Account.

**2.11   Transfer Taxes**.   It is the intention of the Purchaser and the Seller that the Transactions be exempt from all transfer, documentary, sales, use, excise, stock transfer, value-added, stamp, recording, registration and other similar taxes, levies and fees (including any penalties, fines and interest), together with any conveyance fees, recording charges and other similar fees and charges, incurred in connection with this Agreement and the Transactions (collectively, "**Transfer Taxes**") pursuant to Section 1146(a) of the Bankruptcy Code, to the extent applicable.   Purchaser and the Seller shall cooperate in good faith to minimize, to the extent permissible under applicable Law, the amount of any Transfer Taxes due with respect to the Transactions.   To the extent not exempt in accordance with Section 1146(a) of the Bankruptcy Code (to the extent applicable) or any available exemption under state or local Law, all Transfer Taxes shall be borne one hundred percent (100%) by the Seller. The Seller shall timely prepare, with the Purchaser's reasonable cooperation, and file any and all Tax Returns required by applicable Law with respect to Transfer Taxes. The Seller shall pay to the relevant Governmental Authority any Transfer Taxes shown as due on such Tax Returns.   If required by applicable Law, Seller and Purchaser shall, and shall cause their respective Affiliates to, cooperate in preparing and filing and join in the execution of any such Tax Returns.   Purchaser and Seller each agree to use commercially reasonable efforts to cooperate to establish any available exemption from (or otherwise reduce) any such Transfer Taxes.

**2.12   Allocation of Purchase Price**.

(a)   Within 30 days following the Closing, Seller shall deliver to the Purchaser a schedule allocating the Purchase Price, the Assumed Liabilities, and all other amounts treated as consideration for U.S. federal income tax purposes among the Transferred Assets (the "**Allocation Schedule**").   The Allocation Schedule shall be prepared in accordance with Section 1060 of the IRC and the applicable regulations promulgated thereunder as well as any similar provisions of state, local or non-U.S. Laws, as appropriate.   In the event the Purchaser notifies Seller that it disagrees with the Allocation Schedule delivered by Seller within 30 days of delivery of the Allocation Schedule by Seller, Purchaser and the Seller shall negotiate in good faith to resolve such disputed items as promptly as practicable; provided that, if the Purchaser does not deliver a notice of disagreement to Seller within 30 days of delivery of the Allocation Schedule by Seller, the Allocation Schedule delivered by Seller shall be final.   If Purchaser and the Seller are unable to reach agreement with respect to the Allocation Schedule within 60 days after the delivery of the Allocation Schedule by Seller to the Purchaser, the parties shall submit the dispute to the

41

Bankruptcy Court for final resolution.  The Seller and the Purchaser shall submit the relevant information, books and records, as applicable, and all other data necessary for, or requested by, the Bankruptcy Court to make its determination.  The determination of the Bankruptcy Court solely in respect of the specifically disputed items shall be final and binding upon the parties, and the Allocation Schedule shall be revised solely to reflect such determinations, and thereafter such revised Allocation Schedule shall be deemed agreed to by the parties.

(b)     Purchaser and the Seller shall (i) timely file all Tax Returns (including IRS Form 8594) required to be filed in connection with the agreed (or deemed agreed) Allocation Schedule (as adjusted pursuant to Section 2.12(a)) (taking into account all available extensions), (ii) prepare and file all Tax Returns and determine all Taxes in a manner consistent with the Allocation Schedule, and (iii) not, and shall not allow their respective Affiliates to, take any actions inconsistent with the Allocation Schedule, except in each case as may be required by a change in applicable Law or pursuant to the good faith resolution of a tax dispute as mutually agreed between Purchaser and Seller or as otherwise required pursuant to a "determination" described under Section 1313(a) of the IRC.  Purchaser, on the one hand, and the Seller, on the other hand, shall notify the other if it receives notice that any Governmental Authority proposes any allocation different from the Allocation Schedule.

**2.13   Withholding**.  Each of Purchaser and Seller shall be entitled to withhold from any amount otherwise payable pursuant to this Agreement, any withholding Taxes required by applicable Law to be withheld from the amounts so payable.  Any amount so withheld and paid over to the appropriate Governmental Authority shall be deemed to have been paid over to the applicable Person for all purposes of this Agreement.  In the event Purchaser determines that Purchaser is required to withhold any Taxes from any amount otherwise payable to Seller or any Subsidiary under this Agreement, Purchaser shall use commercially reasonable efforts to notify the Seller or Subsidiary of such requirement and the basis for such requirement prior to the Closing as soon as reasonably practicable.  The parties shall cooperate in determining whether any such withholding is required and to take reasonable steps with any reasonable out-of-pocket costs borne by Seller to reduce or eliminate any such withholding to the extent permitted under applicable Law.  As of the date of this Agreement and based on the information known by the parties, the parties are not aware that any such withholding will be required under applicable Law.

**2.14   Good Faith Deposit**.  Pursuant to the terms of the Deposit Escrow Agreement, Purchaser has deposited with the Deposit Escrow Agent $41,500,000 (the "**Deposit Amount**") in cash on the date hereof, which will be released by the Deposit Escrow Agent and delivered to either Purchaser or Seller in accordance with the provisions of the Deposit Escrow Agreement and the Bid Procedures.  Pursuant to the Deposit Escrow Agreement, the Deposit Amount will be distributed as follows (and Purchaser and Seller will deliver joint written instructions to the Deposit Escrow Agent to effect such distributions as and when required hereunder):

(a)     if the Closing occurs, the Deposit Amount together with all accrued investment income thereon, if any, will be delivered to Seller and applied towards the Purchase Price payable by Purchaser pursuant to Section 2.10;

(b)      if this Agreement is terminated pursuant to Section 9.1(g) (after giving effect to the applicable cure period set forth therein), the Deposit Amount, together with all accrued investment income thereon, if any, will be delivered to Seller within two (2) Business Days after such termination by wire transfer of immediately available funds to the accounts designated in writing by Seller. Except in the case of Fraud or Willful Breach of this Agreement, in no event shall Purchaser's Liability under this Agreement after the termination of this Agreement pursuant to Section 9.1(g) exceed an amount equal to the Deposit Amount, which shall be the sole and exclusive remedy of the Seller Group against Purchaser and its Affiliates and Representatives in connection with such termination; and

(c)      if this Agreement is terminated for any reason other than pursuant to Section 9.1(g) (after giving effect to the applicable cure period set forth therein), the Deposit Amount, together with all accrued investment income thereon, if any, shall be delivered to Purchaser as soon as reasonably practicable, but in no instance later than two (2) Business Days after such termination, by wire transfer of immediately available funds to the accounts designated in writing by the Purchaser.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF THE SELLER GROUP

Except as disclosed in (i) the Filed SEC Documents (to the extent such exception is reasonably apparent from such disclosure), (ii) any forms, statements or other documents filed with the Bankruptcy Court, or (iii) the document herewith delivered by the Seller to Purchaser (the "**Seller Schedules**"), the Seller hereby makes the representations and warranties contained in this Article 3 to Purchaser.

**3.1      Organization, Good Standing and Other Matters**.

(a)      The Seller is duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization and has, subject to the necessary authority of the Bankruptcy Court, the requisite corporate or limited liability company power and authority to own and lease its properties and to carry on the Business as now being conducted in all material respects.

(b)      Each member of the Seller Group (other than Seller) is duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization and has, subject to the necessary authority of the Bankruptcy Court, the requisite corporate or limited liability company power, as applicable, and authority to own and lease its respective properties and to carry on the Business as now being conducted in all material respects.

(c)      Each member of the Seller Group is duly qualified as a corporation or limited liability company, as applicable, in each jurisdiction in which the nature of the Business as currently conducted by it or the property owned or leased by it makes such qualification necessary, except where the failure to be so qualified would not, individually or in the aggregate, have a Material Adverse Effect.

**3.2**     **Authority and Enforceability**.   Subject to Bankruptcy Court approval, each member of the Seller Group has all requisite power and authority to execute and deliver this Agreement and each of the Related Documents to which they are (or at Closing, will be) a party and to perform their respective obligations hereunder and thereunder and to consummate the Transactions.  The execution, delivery and performance of this Agreement and each of the Related Documents to which each member of the Seller Group is (or at Closing, will be) a party thereto, and the consummation by the Seller Group of the Transactions, has been duly authorized and approved by all necessary corporate action on the part of each member of the Seller Group and are subject to the approval of the Bankruptcy Court.   This Agreement has been, and each Related Document will be, at or prior to the Closing, duly executed and delivered by the applicable member of the Seller Group and, assuming the due execution and delivery by the other parties hereto or thereto, and subject to the approval of the Bankruptcy Court, constitutes a valid and binding obligation of the Seller Group, enforceable against it in accordance with its respective terms, except to the extent that such enforceability may be subject to, and limited by, the Enforceability Exceptions.

**3.3**     **No Conflict; Required Filings and Consents**.   Except (a) as required by the HSR Act, (b) such filings as may be required in connection with the Transfer Taxes described in Section 2.11 and (c) to the extent excused by or unenforceable against the Seller Group or Purchaser as a result of the filing of the Bankruptcy Cases and following the entry and effectiveness of the Bid Procedures Order and the Sale Order, the execution and delivery of this Agreement by the Seller does not and the execution and delivery of the Related Documents by any member of the Seller Group will not, and the consummation of the Transactions hereby and thereby will not (i) violate the provisions of the Organizational Documents of any member of the Seller Group, (ii) subject to the entry of the Sale Order, violate any Law or Order to which any member of the Seller Group is subject or by which its properties or assets are bound, (iii) require any member of the Seller Group to obtain any Consent, or give any notice to, or make any filing with, any Governmental Authority on or prior to the Closing Date (except as required by the Bankruptcy Code or the Sale Order), (iv) subject to the entry of the Sale Order, result in a breach of or constitute a default (with or without due notice or lapse of time or both), give rise to any right of termination, cancellation, modification or acceleration under, or require the Consent of any third party to, any Assigned Contract or (v) subject to the entry of the Sale Order, result in the imposition or creation of any Lien upon or with respect to any of the assets or properties of the Seller Group; excluding from the foregoing clauses (i) through (v) any Consents, approvals, notices and filings the absence of which, would not, individually or in the aggregate, be material to the Business.

**3.4**     **Sufficiency of Transferred Assets**.   Assuming receipt of all required Consents and except for the Excluded Assets or the Non-Transferred Assets, the Transferred Assets, together with and taking into account all Related Documents, constitute all of the assets, properties, and rights used or held for use by the Seller Group that are necessary as of immediately following the Closing to operate the Business in all material respects as presently conducted as of the Closing Date. Except as would not reasonably be expected to be material to the Business, all tangible assets of the Business are (i) in good working order and condition, ordinary wear and tear excepted, (ii) have been reasonably maintained in the ordinary course of business and (iii) are suitable for the uses for which they are being utilized in the Business as conducted by the Seller Group as of the Closing Date.

44

**3.5** **Compliance With Laws; Permits**.

(a) The Seller Group is, and for the past four (4) years has been, conducting the Business in compliance in all material respects with all Laws applicable to the Business and the products manufactured or sold, or held in inventory, by or on behalf of the Seller Group in connection with the Business are, and during such period have been, in compliance in all material respects with all applicable Laws. No member of the Seller Group has received any written notice, nor to the Seller's Knowledge, oral notice, during the past four (4) years of any material violations of any Law applicable to their conduct of the Business. To the Seller's Knowledge, during the past four (4) years, no event has occurred or circumstance exists that (with or without notice, passage of time, or both) would constitute or result in a failure by any member of the Seller Group to comply, in any material respect, with any applicable Law. During the past four (4) years, no investigation, review or Action by any Governmental Authority in relation to any actual or alleged violation of Law in any material respect by any member of the Seller Group is pending or, to the Seller's Knowledge, threatened, nor has any member of the Seller Group received during the past four (4) years any written notice from any Governmental Authority indicating an intention to conduct the same.

(b) The Seller Group possess all material Permits necessary for the lawful operation of the Business as currently conducted (the "**Seller Permits**"). No member of the Seller Group has received any written, or to the Seller's Knowledge, oral, notice of any termination, cancellation, suspension, revocation, invalidation or non-renewal of any Seller Permit. Each member of the Seller Group is in compliance in all material respects with the terms and conditions of such Seller Permits and all such Seller Permits are valid and in full force and effect in all material respects. To the Seller's Knowledge, no event has occurred with respect to any such Seller Permit that permits, or after notice or lapse of time (or both) would permit, revocation or termination of such Seller Permit. No Action is pending, or to the Seller's Knowledge, threatened to terminate, revoke, limit, cancel, suspend or modify any Seller Permit that is material to the Business.

**3.6** **Litigation**. There are no Actions pending or, to the Seller's Knowledge, threatened, against any member of the Seller Group that would reasonably be expected to be, individually or in the aggregate, material to the Business or Transferred Assets.

**3.7** **Real Property**. Schedule 3.7(a) sets forth a true and complete list of all leases and subleases as of the date hereof that are used for, or held for use in, the Business (the "**Real Property Leases**," and the leasehold interest, "**Leased Real Property**"), and the Seller Group has provided to the Purchaser true and complete copies of the Real Property Leases related thereto. The Seller Group has a valid, binding and enforceable leasehold interest under each of the Leased Real Properties, Free and Clear of all Liens (other than Permitted Liens). Except as a result of, or arising in connection with, the filing of the Bankruptcy Cases, the Seller Group has not received any written notice of any default or event that (with due notice or lapse of time or both) would constitute a default by the Seller Group under any Real Property Lease, other than defaults that have been cured or waived in writing or that would not reasonably be expected to have a Material Adverse Effect. The Seller Group has not received notice of any pending or threatened condemnation proceedings relating to any Leased Real Property that would have a Material

Adverse Effect. The Transferred Assets do not include any owned real property. There are no material defects in the physical condition of any improvements constituting a part of the Leased Real Property, including structural elements, mechanical systems, HVAC systems, roofs or parking and loading areas, and all of such improvements are in good operating condition and repair and have been generally well maintained.

**3.8     Assigned Contracts**.

(a)     True and complete copies of all material Contracts required to be set forth on the Potential Assumption and Assignment Notice (including all modifications, amendments, supplements and waivers thereto) have been made available to Purchaser.

(b)     Each material Contract required to be set forth on the Potential Assumption and Assignment Notice is a legal, valid and binding obligation of the applicable member of the Seller Group and, to the Seller's Knowledge, each other party thereto, and is in full force and effect (except to the extent subject to, and limited by, the Enforceability Exceptions). To the Seller's Knowledge, no other party to any material Contract is (with or without the lapse of time or the giving of notice, or both) in breach of or in default under any material Contract.

**3.9     Tax**.

(a)     Seller Group has timely filed all income and other material Tax Returns with respect to the Business and the Transferred Assets required to be filed by it (taking into account any applicable extensions) and all such Tax Returns are true, complete and correct in all material respects. Seller Group has timely paid all material Taxes with respect to the Transferred Assets (whether or not shown as due and owing by it on any Tax Returns) other than to the extent of the nonpayment of which is permitted or required under the Bankruptcy Code.

(b)     Seller Group has not been, and as of the date of this Agreement, Seller Group is not currently, the subject of an audit or other examination relating to the payment of or failure to pay a material amount of Taxes with respect to the Business or the Transferred Assets, and, to the Seller's Knowledge, the Seller Group (in relation to the Business or the Transferred Assets) has not received written notice from any Governmental Authority that such an audit or examination will be initiated in the future.

(c)     Seller Group has not entered into an agreement or waiver extending any statute of limitations relating to the payment or collection of any material Taxes with respect to the Business or the Transferred Assets that will be in effect after the Closing.

(d)     There are no Liens (other than Liens for Taxes not yet delinquent) with respect to Taxes on any of the Transferred Assets.

(e)     All material amounts of Taxes with respect to the Business or the Transferred Assets that Seller Group was required to withhold or to collect for payment have been duly withheld and collected and paid to the proper governmental entity or third party.

46

**3.10** **Affiliate Transactions**.  There have been no transactions, or series of related transactions, agreements, arrangements or understandings in effect that would be required to be disclosed under Item 404(a) of Regulation S-K that have not been otherwise disclosed in the Filed SEC Documents.

**3.11** **Labor Matters**.  As of the date hereof:

(a)     no member of the Seller Group (solely as related to the Business) is a party to any (i) Collective Bargaining Agreement or (ii) other Contract with a labor union or labor organization, and no employee of any member of the Seller Group is represented by any labor organization with respect to such employee's employment with the applicable member of the Seller Group;

(b)     there is no strike or work stoppage involving the Seller Group (solely as related to the Business) pending or, to Seller's Knowledge, threatened;

(c)     no Action brought by or on behalf of any employee, former employee, labor organization or other representative of the employees of any member of the Seller Group (solely as related to the Business) is pending or, to Seller's Knowledge, threatened against the Seller Group (solely as related to the Business) (other than ordinary workers' compensation claims) that would be material to the Business;

(d)     to Seller's Knowledge, no union organization campaign is in progress with respect to any employee or group of employees of the Seller Group;

(e)     there has been no "mass layoff" or "plant closing" (as defined by the WARN Act) with respect to any member of the Seller Group within the six (6) months prior to the date hereof; and

(f)     except as would not have a Material Adverse Effect, to Seller's Knowledge:

(i)     all individuals classified as independent contractors have been properly classified under applicable Law;

(ii)     all individuals classified as exempt employees have been properly classified under applicable Law; and

(iii)     Seller has complied with all applicable wage and hour Laws with respect to all Business Employees over the past three (3) years, and it has received no notice of any wage and hour investigations or audits.

**3.12** **Employee Benefits**.

(a)     Schedule 3.12(a) contains a list of each material Seller Plan.  For purposes of this Agreement, "**Seller Plan**" (and collectively, "**Seller Plans**") means each "employee benefit plan" (within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**")), whether or not subject to ERISA, and each other employee benefit and

47

employee compensation plan, program or arrangement, including any stock purchase, stock option, employment, severance, change-in-control, bonus, incentive compensation, deferred compensation, pension, welfare benefit or vacation plan that is sponsored, maintained or contributed to by Seller or an ERISA Affiliate of Seller in respect of current or former employees who provide (previously provided) services to the Business, including, for the avoidance of doubt, the Seller Plans set forth on Schedule 3.12(a).  With respect to each material Seller Plan, Seller has provided or made available to Purchaser a copy of such Seller Plan or a summary of the material terms and conditions thereof, to the extent such a document exists.

(b)     Except as would not reasonably be expected to have a Material Adverse Effect, each Seller Plan has been established and administered in accordance with its terms and in compliance with applicable Law.  Each Seller Plan that is intended to be qualified within the meaning of Section 401(a) of the IRC has received an IRS determination letter or is based on a form that is the subject of an IRS opinion or advisory letter and, to Seller's Knowledge, nothing has occurred that would reasonably be expected to result in any such Seller Plan not being so qualified.

(c)     No Seller Plan is subject to Title IV of ERISA, and neither Seller nor any of its ERISA Affiliates has (or in the past six (6) years has had) any Liability, contingent or otherwise, under Title IV of ERISA.  Neither Seller nor any of its ERISA Affiliates participates in, contributes to, has any obligation to contribute to, or has any Liability with respect to, any "multiemployer plan" (as defined in Section 3(37) of ERISA).

(d)     Neither the execution and delivery of this Agreement nor the approval or consummation of the Transactions, either alone or in combination with any other event, could (i) result in any material compensation becoming due to any current or former employee or director of Seller who provides services in support of the Business, (ii) materially increase any payments or benefits payable under any Seller Plan, (iii) result in the acceleration of the time of payment, funding or vesting of any payments or benefits under any Seller Plan, (iv) result in any "parachute payment" as defined in Section 280G(b)(2) of the IRC, or (v) result in a requirement to pay any tax "gross-up" payments to any current or former employees of the Business.

**3.13    Insurance**.  As of the date of this Agreement, each insurance policy maintained by Seller and material to the Business is in full force and effect, all premiums due and payable thereon have been paid in full and no member of Seller Group has (a) received a written notice of cancellation or non-renewal with respect thereto or (b) taken any action or failed to take any action which would constitute a default, or permit the termination or modification, of any such insurance policy.

**3.14    Intellectual Property**.

(a)     Schedule 3.14(a) sets forth a list of all (i) registrations and applications for registration of Owned Intellectual Property, including, for each item listed, the record owner, jurisdiction and issuance, registration or application number and date, as applicable, of such item and, in the case of domain names and social media accounts, the domain registrar and social media

48

handles, (ii) licenses, sublicenses or other agreements under which Seller is granted rights by others in or under Intellectual Property, other than (A) non-exclusive retail shrink-wrap or click-wrap licenses for off-the-shelf software that is generally available on a commercial basis that is made available for a total cost of less than $75,000, (B) licenses for Open Source Software, (C) agreements where any license of any Intellectual Property is incidental to such agreement, such as licenses to use feedback and suggestions and licenses authorizing the use of brand materials for marketing purposes, (D) employee, contractor, and consulting agreements entered into in the ordinary course of business, substantially in the form of Seller's forms of employee confidentiality and invention assignment agreement and contractor agreement, copies of which have been provided to Purchaser, and (E) nondisclosure agreements entered into in the ordinary course of business, and (iii) licenses, sublicenses or other agreements under which Seller has granted rights to others in or under the Owned Intellectual Property, other than non-exclusive licenses, sublicenses or other non-exclusive rights granted in (A) customer agreements and employee, contractors, and consulting agreements entered into in the ordinary course of business, (B) agreements where any license of any Intellectual Property is incidental to such agreement, such as licenses to use feedback and suggestions and licenses authorizing the use of brand materials for marketing purposes, (C) nondisclosure agreements entered into in the ordinary course of business, and (D) non-exclusive licenses granted to service providers in the ordinary course of business for the purpose of providing services to Seller.  All registrations set forth on Schedule 3.14(a) are valid and in force, and all applications set forth on Schedule 3.14(a) are pending and in good standing.

(b)      Except as set forth on Schedule 3.14(b), Seller exclusively owns all Owned Intellectual Property, Free and Clear (other than Permitted Liens), and has a valid right to use all other Intellectual Property used in the conduct of the Business in the manner currently conducted.

(c)      Except as would not be material to the Transferred Assets (taken as a whole), all Owned Intellectual Property that have been the subject of an application filed with, are issued by, or registered with, as applicable, the U.S. Patent and Trademark Office, the U.S. Copyright Office or any similar office or agency anywhere in the world are (i) registered in the name of the Seller; and (ii) have been duly maintained (including the payment of maintenance fees) in a manner necessary to maintain the good standing of such Owned Intellectual Property.

(d)      There are no pending claims, and during the six (6) year period prior to the date of this Agreement, Seller has not received any written notice from any Person (i) alleging that the conduct of the Business as currently conducted infringes, constitutes a misappropriation of or violates any Intellectual Property of any Person or (ii) challenging the ownership by Seller of or the validity or enforceability of any Owned Intellectual Property, in each case, that would reasonably be expected to be material to the Transferred Assets (taken as a whole).  The Seller Group has not, in the operation of the Business, infringed, misappropriated, or otherwise violated any Intellectual Property of any Person in the past six (6) years in any material respect, except that the representation and warranty in this sentence is made to Seller's Knowledge with respect to the patents of any Person.

(e)      All former and current employees, consultants and contractors of Seller who have created or developed material Intellectual Property that (i) relates to the Business, and (ii) was developed in the performance of the services for Seller, have executed written and enforceable agreements with Seller that assign to Seller all rights, title and interest (including all Intellectual Property rights) in and to all of the foregoing.

(f)      The Seller Group has taken commercially reasonable steps to protect and maintain the secrecy and confidentiality of all Trade Secrets included in the Owned Intellectual Property.

(g)      To Seller's Knowledge, there has been no unauthorized use, disclosure, infringement, violation, or misappropriation of any of the Owned Intellectual Property.

(h)      To the extent required by applicable Law, all products made, used or sold under patents included in the Owned Intellectual Property have been marked with the proper patent notice.

(i)      Seller has not (i) granted any current or contingent rights, licenses or interests in or to any source code of any Seller Software, or (ii) provided or disclosed any such source code to any third-party other than pursuant to a written agreement obligating the recipient to maintain the confidentiality of such source code and not use such source code for any purpose other than providing services to Seller.

(j)      To Seller's Knowledge, none of the Seller Software contains any material viruses, worms, time-bombs, key-locks, or any other items that could disrupt or interfere with the operation of such software or equipment upon which such software operates, or the safety, security or integrity of the data, information or signals such software produces or processes ("**Contaminants**").   Seller uses commercially reasonable methods to detect and prevent Contaminants and subsequently correct or remove such Contaminants.   Except to the extent permitted by applicable Law, none of the Seller Software includes or installs undocumented or unauthorized portals, key-logs, codes, commands or other access (including backdoors) or any spyware, adware, or other similar software designed by or on behalf of Seller that monitors the use of Seller Software or the data, information or signals such software produces or processes, or that contacts any remote computer without the knowledge and express consent of the user(s) of such software and remote computer, as applicable.

(k)      Except as would not be material to the Transferred Assets (taken as a whole), none of Seller Software contains, incorporates, links to or are called by, are distributed with, or otherwise uses any Open Source Software in a manner that obligates Seller to disclose, make available, offer or deliver to any third party any portion of the source code of the Seller Software or component thereof other than the applicable Open Source Software. Seller is in compliance with all licenses for Open Source Software that it uses.

(l)      Except as would not be material to the Transferred Assets (taken as a whole), (i) Seller uses all Generative AI Tools in compliance with the applicable license terms, consents,

50

agreements and Laws and (ii) Seller has not used Generative AI Tools to develop any Intellectual Property that Seller intended to maintain as proprietary in a manner that it believes would materially affect Seller's ownership or rights therein.

(m)     Except as would not be material to the Transferred Assets (taken as a whole), no funding, facilities or personnel of any Governmental Authority, university, college, other educational institution or research center was used directly or indirectly in connection with the development of any Owned Intellectual Property in such a manner as to give any of the foregoing any claim or right, current or contingent, in or to any Owned Intellectual Property.

(n)     Except as would not be material to the Transferred Assets (taken as a whole), the consummation of the transactions contemplated hereunder will not result in the loss or impairment of or payment of any additional amounts with respect to, nor require the consent of any other Person in respect of, Purchaser's right to own, use or hold for use any Owned Intellectual Property as owned, used or held for use in the conduct of the Business as currently conducted.

**3.15    Inventory**. All Inventory consists of a quality and quantity usable and salable in the ordinary course of business, except for obsolete, damaged, or defective items that have been written-off or written-down to fair market value for which adequate reserves have been established, in each case, except as would not be material to the Business, individually or in the aggregate. All Inventory is owned, collectively, by the Seller Group free and clear of all Liens (other than Permitted Liens), and no Inventory is held on a consignment basis, in each case, except as would not be material to the Business, individually or in the aggregate.

**3.16    Product Liability**. Except as would not have a Material Adverse Effect, there is no product liability, warranty or similar claims outstanding or, to the Seller's Knowledge, threatened by any Person against a member of the Seller Group (whether based on contract or tort and whether relating to personal injury, including death, property damage or economic loss).

**3.17    Absence of Changes**. From April 4, 2026 until the date hereof, Seller has conducted the Business in the ordinary course of business, and there have not been any events, circumstances, or developments that, individually or in the aggregate would, or would reasonably be expected to have, a Material Adverse Effect, in each case, except for (a) the preparation and filing of the Bankruptcy Cases and (b) the solicitation of, discussions and negotiations with, presentations and provision of other diligence to and similar engagement with other potential bidders for the Business or the Transferred Assets and the negotiation and execution of this Agreement and any Related Documents.

**3.18    Financial Statements; Undisclosed Liabilities**.

(a)     The consolidated financial statements of the Seller Group (including all related notes or schedules) included in the Filed SEC Documents complied at the time it was filed as to form in all material respects with applicable accounting requirements and the published rules and regulations of the SEC with respect thereto in effect at the time of filing or furnishing the applicable report, was prepared in accordance with GAAP (except in the case of unaudited financial statements, as permitted by Form 10-Q of the SEC) applied on a consistent basis during the periods

51

involved and fairly presented in all material respects the consolidated financial position of the Seller Group as of the dates thereof and the consolidated results of their operations, changes in shareholders' equity (deficit) and cash flows as of the dates thereof and for the periods shown.

(b)     The Seller Group maintains a system of internal control over financial reporting reasonably designed to provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP consistently applied.

(c)     No member of the Seller Group has any Liabilities relating to the Business or the Transferred Assets required by GAAP to be reflected in a consolidated balance sheet of Seller except (i) for those current Liabilities incurred since April 4, 2026, (ii) those Liabilities disclosed, reflected, accrued or reserved in the Filed SEC Documents or (iii) those Liabilities permitted by this Agreement or incurred pursuant to the transactions contemplated by this Agreement.

**3.19     Brokers and Finders**.  No member of the Seller Group has, directly or indirectly, entered into any agreement with any Person that would entitle such Person to receive any commission, brokerage fee, "finder's fee" or other similar fee in connection with the Transactions from any member of the Seller Group.

**3.20     Information Technology and Privacy**.

(a)     Seller complies, and has at all times in the past three (3) years complied, in all material respects with all: (i) Contracts relating to privacy, information security, or the Processing of Personal Information; (ii) all Information Privacy and Security Laws; (iii) all applicable binding industry standards, including, to the extent applicable, the Payment Card Industry Data Security Standard ("**PCI DSS**") and all binding codes of conduct and industry standards applicable to the Seller's advertising and marketing activities; and (iv) all written policies and statements made by the Seller relating to privacy, information security, or the Processing of Personal Information, including any applicable privacy policies adopted by Seller or otherwise utilized in the Business (collectively, the "**Privacy Requirements**"). Seller displays a privacy policy on each website and mobile application owned, controlled or operated by the Seller, and each such privacy policy incorporates all disclosures to data subjects required by the Privacy Requirements. None of the disclosures made or contained in any such privacy policy has been inaccurate, misleading or deceptive, or in violation of the Privacy Requirements (including by omission) in any material respect.  The Seller has maintained, currently maintains and has complied with and is in compliance with, a comprehensive privacy compliance program commensurate with the volume, nature, and sensitivity of Personal Information Processed in connection with the Business, including written policies and procedures addressing data minimization, purpose limitation, retention, destruction, and subject rights.

(b)     The Seller has obtained all necessary, valid, and current consents, authorizations, and permissions from data subjects for the collection, use, and disclosure of Personal Information in connection with the operation of the Business, including for the purposes for which such Personal Information is and has been used. There has been no withdrawal of consent or objection by any data subject that has not been honored in all material respects.

52

(c)     The Seller has not sold, rented, disclosed, transferred, or otherwise made available Personal Information to any third party in a manner that would violate Privacy Requirements.

(d)     Seller has: (i) regularly conducted and regularly conducts vulnerability testing, risk assessments, and external audits of, and tracks security incidents related to, Seller's systems and products (collectively, "**Information Security Reviews**"); and (ii) timely corrected any material exceptions or vulnerabilities identified in such Information Security Reviews.

(e)     The Seller has entered into written agreements with each third party data processor engaged to Process Personal Information on behalf the Seller (each a "Data Processor") that (i) include all terms required by Information Privacy and Security Laws; (ii) require the Data Processor to implement and maintain appropriate technical and organizational security measures; (iii) restrict the Data Processor's use of Personal Information to the specific purposes authorized by the Seller; (iv) require the Data Processor to return or destroy Personal Information upon termination; and (v) grant the Seller (and, as applicable, its successors and assigns) audit rights with respect to the Data Processor's data protection and security practices. True, correct, and complete copies of all Data Processor Agreements have been provided to the Purchaser. To the Knowledge of the Seller, no Data Processor has breached or is in violation of any Data Processor Agreement or any Information Privacy and Security Laws in connection with the Processing of Personal Information on behalf of the Seller.

(f)     Seller has not experienced any: (i) data security incidents, data breaches, ransomware incidents, or other adverse events or incidents related to any Personal Information or other data in the custody or control of Seller, or any service provider acting on behalf of the Seller; or (ii) breaches or violations of the security of any information technology, nor have any such breaches or violations been threatened, in each case of (i) and (ii) solely to the extent such event would have required the Seller to notify any Person or Governmental Authority.

(g)     There have not been any allegations, claims or proceedings related to any data security incidents, ransomware incidents, or any violations of any Privacy Requirements that have resulted in any material liability or Actions, and to the Knowledge of the Seller, there are no facts or circumstances which could reasonably serve as the basis for any such allegations, claims or Actions.

(h)     The execution and performance of this Agreement will not violate any Privacy Requirements in any material respect. Seller is not subject to any contractual requirement or other legal obligation that, following the Closing, would prohibit Purchaser from Processing any Personal Information in the manner in which Seller Processed such Personal Information immediately prior to the Closing in any material respect. Any transfer of Personal Information in connection with the transactions contemplated by this Agreement will not violate any Privacy Requirements in any material respect.

**3.21    Environmental Matters**. The Seller Group is, and for the past six (6) years has been, conducting the Business in compliance with all applicable Environmental Laws in all

material respects, which compliance has included obtaining, maintaining, and complying with all material Permits required under any Environmental Law for its operations. The Seller Group has not received, at any time during the last six (6) years, any written notice, claim or information request from any Governmental Authority or other Person alleging that any member of the Seller Group or the Business is in material violation of, or has material liability under, any Environmental Law.  There has been no release or disposal of, no contamination involving, and no exposure of any Person to, any substance, material or waste that has given or would give rise to any material liability (contingent or otherwise) to any member of the Seller Group or the Business under any Environmental Law.  "Environmental Law" means any Law or Order concerning pollution, human or worker health or safety, or protection of the environment.

**3.22** **Anti-Bribery, Anti-Corruption, and Anti-Money Laundering**.  Except as would not be material to the Business, no member of the Seller Group or any of their respective, officers or directors, or, to Seller's knowledge, employees or agents or any other Person acting for or on behalf of the Seller Group has in violation of Law, directly or indirectly, (a) corruptly made, offered, or promised to make or offer any payment, loan, or transfer of anything of value, including any reward, advantage, or benefit of any kind, to or for the benefit of any Government Official, candidate for public office, political party, or political campaign, for the purpose of (i) influencing any act or decision of such Government Official, candidate, party or campaign, (ii) inducing such Government Official, candidate, party or campaign to do or omit to do any act in violation of a lawful duty, (iii) obtaining or retaining business for or with any Person, (iv) expediting or securing the performance of official acts of a routine nature, or (v) otherwise securing any improper advantage; (b) paid, offered, or promised to pay or offer any bribe, payoff, influence payment, kickback, unlawful rebate, or other similar unlawful payment of any nature; (c) made, offered or promised to make or offer any unlawful contributions, gifts, entertainment, or other unlawful expenditures; (d) established or maintained any unlawful fund of corporate monies or other properties; (e) created or caused the creation of any false or inaccurate books and records of any member of the Seller Group; or (f) otherwise violated any provision of the Foreign Corrupt Practices Act of 1977, 15 U.S.C. §§ 78dd-1, et seq., the Money Laundering Control Act, the Currency and Foreign Transactions Reporting Act, The United and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, or any other Laws relating to corruption, bribery, or money laundering.  Except as would not be material to the Business, within the past five years, no member of the Seller Group has made any voluntary disclosure to any Governmental Authority relating to corruption, bribery, or money laundering Laws; been the subject of any allegation, investigation, inquiry, or prosecution regarding compliance with such Laws; or been subject to any enforcement action or otherwise assessed any fine or penalty under such Laws.

**3.23** **Sanctions, Import, and Export Controls**.  Except as would not be material to the Business, no member of the Seller Group, or any of their respective officers or directors, or, to Seller's Knowledge, employees or agents or any other Person acting for or on behalf of the Seller Group (a) is a Person with whom transactions are prohibited or limited under any economic sanctions or export controls Laws, rules, or regulations, including those administered by the U.S. government (including, without limitation, the Department of Treasury's Office of Foreign Assets Control, the Department of State, of the Department of Commerce), the United Nations Security Council, the European Union, or His Majesty's Treasury, or (b) has violated any Laws relating to economic sanctions, export controls, import, customs, personal data security, or antiboycott

54

Laws.  Except as would not be material to the Business, each member of the Seller Group is in possession of and in compliance with any and all licenses, registrations, and permits that may be required for its lawful conduct under economic sanctions, import, and export control Laws, including without limitation the Export Administration Regulations and the International Traffic in Arms Regulations.  Except as would not be material to the Business, within the past six (6) years, no member of the Seller Group has made any voluntary disclosure or other report to any Governmental Authority relating to economic sanctions, import, customs, export control, or antiboycott Laws; been the subject of any allegation, investigation, inquiry, or prosecution regarding compliance with such Laws; or been subject to any enforcement action or otherwise assessed any fine or penalty under such Laws.

**3.24**   **Data Security Program**.  The Seller Group is not a "covered person" as defined in Executive Order 14117 and rules and regulations issued thereunder, including 28 C.F.R. Part 202, as implemented or amended from time to time (the "**DSP**").  Since April 8, 2025, neither the Seller Group nor the Business has knowingly engaged in or directed any "covered data transaction" as that term is defined in the DSP, except in compliance with the DSP.

**3.25**   **No TID US Business**. None of the Business or the Transferred Assets (a) produces, designs, tests, manufactures, fabricates or develops one or more "critical technologies" within the meaning of the Defense Production Act of 1950 (the "**DPA**"), other than critical technology for which a "U.S. regulatory authorization" (within the meaning of the DPA) would not be required for the export, reexport, transfer (in-country), or retransfer of such critical technology to a non-government end user in Canada or (b) performs the functions as set forth in column 2 of appendix A to 31 C.F.R. Part 800 with respect to "covered investment critical infrastructure" within the meaning of the DPA.

**3.26**   **No Other Representations or Warranties**.  Except for the representations and warranties contained in this Article 3 (including the related portions of the Disclosure Schedules), the Seller does not, nor do any other Persons on behalf of the Seller, make any other express or implied representation or warranty with respect to itself, the Business, the Transferred Assets or the Assumed Liabilities, or with respect to any other information provided to Purchaser or its Representatives, and the Seller disclaims any other representations or warranties, whether made by or on behalf of the Seller or any other Person.  The Seller will not, and no other Persons will, have or be subject to any Liability to Purchaser or any other Person resulting from the distribution to Purchaser, or Purchaser's use of, any such information, including any information, documents, projections, forecasts or other material made available to Purchaser or its Representatives in any "data rooms," "virtual data rooms," management presentations or in any other form in expectation of, or in connection with, the Transactions, or in respect of any other matter or thing whatsoever (electronic or otherwise) or otherwise in expectation of the Transactions.

### ARTICLE 4
### REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby makes the representations and warranties contained in this Article 4 to the Seller.

**4.1** **Organization, Good Standing and Other Matters**. Purchaser is duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization and has all requisite corporate power or other entity power and authority to own its properties and to carry on its business as now being conducted. Purchaser is duly qualified or licensed to conduct its business as currently conducted and is in good standing in each jurisdiction in which the location of the property owned, leased or operated by it or the nature of its business makes such qualification necessary, except where the failure to be so qualified or licensed would not reasonably be expected to prevent, hinder or delay the consummation of the Transactions or the ability of Purchaser to perform its obligations under this Agreement.

**4.2** **Authority and Enforceability**. Purchaser has all requisite corporate power and authority to execute and deliver this Agreement and each of the Related Documents to which it is (or at Closing, will be) a party and to perform its obligations hereunder and thereunder and to consummate the Transactions. The execution, delivery and performance of this Agreement and each of the Related Documents to which it is (or at Closing, will be) a party, and the consummation of the Transactions, have been duly authorized and approved by its board of directors (or equivalent governing body) and no other action on the part of Purchaser or its stockholders is necessary to authorize the execution, delivery and performance of this Agreement and the Related Documents by Purchaser and the consummation of the Transactions. This Agreement has been, and each Related Document will be at or prior to Closing, duly executed and delivered by Purchaser and, assuming the due execution and delivery by the other parties hereto or thereto, constitutes a valid and binding obligation of Purchaser enforceable against it in accordance with its respective terms, except to the extent that such enforceability may be subject to, and limited by, the Enforceability Exceptions.

**4.3** **No Conflict:  Required Filings and Consents**. Except (a) as required by the HSR Act, (b) such filings as may be required in connection with the Transfer Taxes described in Section 2.11 and (c) as set forth on Schedule 4.3, the execution and delivery of this Agreement and of the Related Documents and the consummation of the Transactions by Purchaser will not (i) violate the provisions of its Organizational Documents, (ii) violate any Law or Order to which it is subject or by which any of its properties or assets are bound, (iii) require it to obtain any Consent, or give any notice to, or make any filing with, any Governmental Authority on or prior to the Closing Date, (iv) result in a material breach of or constitute a default (with or without due notice or lapse of time or both), give rise to any right of termination, cancellation or acceleration under, or require the Consent of any third party to, any material Contract to which it is a party or (v) result in the imposition or creation of any Lien upon or with respect to any of its assets or properties; excluding from the foregoing clauses (ii) through (v) Consents, approvals, notices and filings the absence of which, and violations, breaches, defaults, rights of acceleration, cancellation or termination, and Liens, the existence of which would not reasonably be expected to prevent, hinder or delay the consummation of the Transactions or the ability of Purchaser to perform its obligations under this Agreement.

**4.4** **Equity Financing**.

(a) Concurrently with the execution of this Agreement, the Purchaser has delivered to the Seller a correct and complete copy of a signed equity commitment letter (the "**Equity Commitment Letter**", and the commitments set forth in the Equity Commitment Letter,

collectively, the "**Equity Financing Commitments**"), between the Purchaser and Fairfax Financial Holdings Limited (the "**Sponsor**"), under which the Sponsor has committed, subject to the terms set forth therein, to provide (directly or indirectly) equity or debt financing in the amount stated in the Equity Commitment Letter for the purposes stated therein (the "**Equity Financing**"). The Equity Commitment Letter provides that the Seller is an express third-party beneficiary of the terms thereof.

(b) The Equity Commitment Letter is in full force and effect and has not been amended, modified, terminated, withdrawn or rescinded in any respect. The Equity Commitment Letter is a legal, valid and binding obligation of the Purchaser and the other parties party thereto, enforceable against the Purchaser and the other parties party thereto in accordance with their terms, except to the extent such enforceability (1) may be limited by applicable insolvency, bankruptcy reorganization, a moratorium or other similar Laws affecting creditors' rights generally, and (2) is subject to general equitable principles (whether considered in a proceeding at law or in equity). As of the date of this Agreement, there are no other Contracts to which the Purchaser or any of its Affiliates is party relating to the Equity Financing Commitments. As of the date of this Agreement, no event has occurred which, with or without notice, lapse of time or both, would reasonably be expected to (i) constitute a default or breach on the part of the Purchaser under any term or condition of the Equity Commitment Letter (ii) result in the failure of any condition to the Equity Financing; or (iii) otherwise result in any portion of the Equity Financing to be unavailable or materially delayed on the Closing Date. Assuming satisfaction of the conditions set forth in Section 8.1 and Section 8.3 and the funding of the Equity Financing in accordance with the Equity Financing Commitment, the Purchaser will have immediately available funds from the Equity Financing Commitment and excess balance sheet cash in an aggregate amount sufficient to pay in cash all amounts payable by the Purchaser pursuant to this Agreement, including Section 2.10, and the Related Documents (the "**Financing Amounts**"). Other than as expressly set forth in the Equity Commitment Letter, there are no conditions precedent relating to the obligations of the Sponsor to provide the Equity Financing contemplated by the Equity Commitment Letter or other contingencies that would permit the Sponsor to reduce the aggregate amount of the Equity Financing to an amount that is less than the Financing Amounts. Purchaser has no reason to believe that it will be unable to satisfy on a timely basis any term or condition of the Equity Financing.

**4.5** **Solvency**. Purchaser is not entering into this Agreement with the intent to hinder, delay or defraud either present or future creditors.  Immediately after giving effect to the Closing (and any of the Transactions related thereto or incurred in connection therewith), any repayment or refinancing of debt contemplated in this Agreement and the payment of all related fees and expenses, and assuming the truth and accuracy in all material respects of the representations and warranties in Article 3 and subject to the satisfaction (or waiver) of the Purchaser conditions set forth in Sections 8.1 and 8.2, Purchaser will be Solvent.

**4.6** **Litigation**. There is no Action pending or, to Purchaser's Knowledge, threatened against Purchaser or involving any of its properties or assets that would reasonably be expected to prevent, hinder or delay the consummation of the Transactions or the ability of Purchaser to perform its obligations under this Agreement.

**4.7**     **Brokers and Finders**.  Except as set forth on Schedule 4.7, none of Purchaser or its Affiliates have, directly or indirectly, entered into any agreement with any Person that would obligate the Seller to pay any commission, brokerage fee or "finder's fee" in connection with the Transactions.

**4.8**     **Investigation and Agreement by Purchaser; Non-Reliance of Purchaser; No Other Representations and Warranties**.

(a)     Purchaser acknowledges that it and its Representatives have received access to the books and records, facilities, equipment, contracts and other assets of the Business and the Transferred Assets.  Purchaser acknowledges and agrees for the benefit of the Seller Group (and their Representatives) that it has made its own inquiry and investigation into, and, based thereon, has formed an independent judgment concerning the Seller Group, the Business, the Transferred Assets and the Assumed Liabilities.

(b)     Except for the representations and warranties expressly made by the Seller Group in Article 3 (including the related portions of the Disclosure Schedules), Purchaser acknowledges and agrees that (i) the Seller is not making and has not made any representation or warranty, expressed or implied, at law or in equity, in respect of the Business, the Transferred Assets, the Assumed Liabilities, or any of its operations, prospects or condition (financial or otherwise), including with respect to merchantability or fitness for any particular purpose of any assets, the nature or extent of any Liabilities, the prospects of the Business, the effectiveness or the success of any operations, or the accuracy or completeness of any confidential information memoranda, documents, projections, material or other information (financial or otherwise) regarding the Business furnished to Purchaser or its Representatives or made available to Purchaser and its Representatives in any "**data rooms**," "**virtual data rooms**," management presentations or in any other form in expectation of, or in connection with, the Transactions, or in respect of any other matter or thing whatsoever, and (ii) no officer, director, manager, stockholder, agent, Affiliate, advisor, Representative or employee of the Seller Group has any authority, express or implied, to make any representations, warranties or agreements not specifically set forth in Article 3 (including the related portions of the Disclosure Schedules) and subject to the limited remedies herein provided.

(c)     Other than the representations and warranties made by the Seller expressly set forth in Article 3 (including the related portions of the Disclosure Schedules), Purchaser specifically disclaims for the benefit of the Seller Group (and their Representatives) that it is relying upon or has relied upon any such other representations or warranties that may have been made by any Person (including without limitation any Representative of the Seller Group), and acknowledges and agrees that the Seller and the Seller's Affiliates have specifically disclaimed and do hereby specifically disclaim, and shall not have or be subject to any Liability for reliance on any such other representation or warranty made by any Person.

**4.9**     **No Other Representations or Warranties**.  Except for the representations and warranties contained in this Article 4 (including the related portions of the Disclosure Schedules) neither Purchaser nor any other Person on behalf of Purchaser makes any other express or implied

representation or warranty with respect to Purchaser or with respect to any other information provided to the Seller or its Representatives, and Purchaser disclaims any other representations or warranties, whether made by Purchaser or any of its Affiliates, officers, directors, employees, agents or Representatives.

## ARTICLE 5
## BANKRUPTCY COURT MATTERS

**5.1** **Debtors-in-Possession**.  From the Petition Date through the Closing, the Seller Group shall operate the Business in accordance with the Approved Budget as debtors-in-possession pursuant to the Bankruptcy Code.

**5.2** **Post-Petition Payments**.  From the Petition Date through the Closing, Seller shall timely make all post-petition payments to customers (including for refunds and deposits) and vendors, including the Critical Vendor Payments, as and to the extent set forth in the Approved Budget in accordance with the DIP Order. Seller shall provide Purchaser with reasonable advance notice of any proposed Critical Vendor designation or Critical Vendor Payment, including the proposed recipient, amount, timing, and applicable trade terms, and shall consult with Purchaser regarding the foregoing. Seller shall provide Purchaser with weekly written reports summarizing all Critical Vendor designations made and Critical Vendor Payments paid or proposed, and the status of any related trade term negotiations during the preceding week.  Seller shall use commercially reasonable efforts to promptly, but in no event more than three (3) Business Days after receipt of notice thereof, notify Purchaser if any Critical Vendor refuses to do business with the Sellers postpetition or otherwise threatens to terminate the relationship or materially modify trade terms.

**5.3** **Bid Procedures Motion: Bidding Procedures Order**. Seller shall file the Bid Procedures Motion with the Bankruptcy Court, pursuant to which, among other things, it will seek approval of this Agreement, the designation of Purchaser as the "Stalking Horse Bidder", and the approval of the Bid Procedures and the Bid Protections.  Seller shall cause the Bid Procedures Order to be entered by the Bankruptcy Court in a manner reasonably acceptable to Purchaser.

**5.4** **Sale Order**. The Sale Order shall conform in all material respects to this Agreement and otherwise be in form and substance reasonably acceptable to Purchaser, and shall, among other things, (a) approve, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by Seller of this Agreement, (ii) the sale of the Transferred Assets to Purchaser on the terms set forth herein, and (iii) the performance by Seller of its obligations under this Agreement, (b) authorize and empower Seller to assume and assign to Purchaser the Assigned Contracts, (c) find that Purchaser has provided adequate assurance of future performance (as that term is used in Section 365 of the Bankruptcy Code) in connection with the assumption and assignment of the Assigned Contracts, (d) find that Purchaser is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code, (e) find that Purchaser shall not be deemed to be a successor to any member of the Seller Group or otherwise inherit any liability of any member of the Seller Group by reason of any theory of law or equity, including successor liability, de facto merger, mere continuation or product line theories, (f) find that the Purchaser shall not be deemed to assume, be liable for, or otherwise become responsible for any Liability that is not an Assumed Liability, (g) find that Purchaser did not engage in any conduct

59

that would allow this Agreement to be set aside pursuant to Section 363(n) of the Bankruptcy Code, and (h) include a finding that the Transferred Assets are being transferred Free and Clear.

**5.5** **Approval of Bid Protections; Minimum Overbid**.

(a)     The parties acknowledge and agree that (i) the parties have expressly negotiated the provisions of this Section 5.5 and the payment of the Bid Protections are integral parts of this Agreement and (ii) in the absence of the Seller's obligations to make these payments, Purchaser would not have entered into this Agreement.

(b)     Each member of the Seller Group acknowledges and agrees that it shall be jointly and severally liable for the entire Break-Up Fee and the Expense Reimbursement if payable by the Seller pursuant to this Agreement.

(c)     The obligations of the Seller to pay the Bid Protections shall survive the termination of this Agreement.  The Bid Protections shall be deemed earned upon entry of the Bid Procedures Order.

(d)     The Bid Procedures Order will provide that the minimum initial overbid for a bidder to qualify as a "Qualified Bidder" and participate at any Auction shall be (i) an amount, in cash, no less than the Bid Protections Aggregate Amount plus (ii) cash or non-cash consideration in the amount of $10,000,000, in each case, subject to and in accordance with the Bid Procedures.

(e)     Upon execution of this Agreement, the Existing Expense Reimbursement Agreement shall be terminated.

**5.6** **Cooperation with Respect to Bankruptcy Court Approvals**.  Subject to pursuing a Competing Bid in accordance with the Bid Procedures Order, the Seller shall diligently pursue the entry by the Bankruptcy Court of the Sale Order, which Sale Order shall provide for the transfer of the Transferred Assets and the Assumed Liabilities to Purchaser Free and Clear.  The Seller shall comply (or obtain an Order from the Bankruptcy Court waiving compliance) with all requirements under the applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Bankruptcy Court and the Bid Procedures Order in obtaining the entry of the Bid Procedures Order and Sale Order.  The Seller further covenants and agrees that, after entry by the Bankruptcy Court of the Sale Order, and provided, that the Sale Order becomes a Final Order, the terms of any other proposed order submitted by the Seller to the Bankruptcy Court shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the Transactions other than as is permitted under the Bid Procedures.  Purchaser agrees that it will promptly take such actions as are reasonably requested by the Seller to assist in obtaining entry of the Bid Procedures Order and the Sale Order, including by furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.  In the event the entry of the Bid Procedures Order or the Sale Order shall be appealed, the Seller shall use reasonable best efforts to defend such appeal.

**5.7**     **Back-Up Bid**. If an auction is conducted pursuant to the Bid Procedures Order (the "**Auction**") and Purchaser is not the Successful Bidder, Purchaser shall, in accordance with and subject to the Bid Procedures Order, be required to serve as the Back-Up Bid if Purchaser is the next highest or otherwise best bidder for the Transferred Assets at Auction.  If Purchaser serves as the Back-Up Bid, Purchaser will be required to keep its bid to consummate the Transactions on the terms and conditions set forth in this Agreement (as may be amended with Seller's written Consent prior to or at the Auction) open and irrevocable until the Back-Up Termination Date.  If (i) Purchaser serves as the Back-Up Bid and (ii) the agreement with the Successful Bidder (other than Purchaser) is terminated prior to closing under such agreement, Purchaser will be deemed to be the Successful Bidder and Purchaser will forthwith consummate the Transactions on the terms and conditions set forth in this Agreement (as the same may be amended with Seller's written Consent prior to or at the Auction), subject to the right of Purchaser to elect to not serve as the Back-Up Bid at any time after the Back-Up Termination Date.

**5.8**     **Bankruptcy Court Pleadings**.  To the extent practicable, the Seller shall provide Purchaser with draft copies of all applications, pleadings, declarations, notices, proposed Orders and other documents filed in the Bankruptcy Cases that relate to the Transactions or the Acquired Assets, including any applications, pleadings, and orders relating to financing or cash collateral, three calendar days prior to such filing, but in no respects later than one (1) Business Day in advance of the proposed filing date so as to permit Purchaser sufficient time to review and comment on such drafts.  The Sale Order and any other motions, pleadings, declarations, notices, orders or other documents filed by the Seller relating to the Transactions shall be in form and substance reasonably acceptable to Purchaser.  The Seller shall use commercially reasonable efforts to give Purchaser reasonable advance notice of any hearings regarding the motions required to obtain the issuance of the Bid Procedures Order and the Sale Order.  Nothing in this Agreement shall require Seller or its Affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

**5.9**     **Bankruptcy Court Milestones.** The Seller shall comply with the following timeline (the "**Bankruptcy Court Milestones**"):

(a)     On the Petition Date, the Seller shall file with the Bankruptcy Court the Bid Procedures Motion, together with a substantially final form of this Agreement;

(b)     No later than three (3) business days after the Petition Date, Seller shall obtain entry of the DIP Interim Order;

(c)     No later than twenty-one (21) days after the Petition Date, the Seller shall obtain entry of the Bid Procedures Order;

(d)     No later than thirty (30) days after the Petition Date, Seller shall obtain entry of the DIP Order on a final basis;

(e)     No later than forty-five (45) days after the Petition Date, the Auction (if necessary) shall have been held pursuant to the Bid Procedures Order;

(f)      No later than fifty (50) days after the Petition Date, the Bankruptcy Court shall have held the Sale Hearing to consider entry of the Sale Order;

(g)      No later than one (1) Business Day after the Sale Hearing, the Seller shall obtain entry by the Bankruptcy Court of the Sale Order, and such Sale Order shall be in full force and effect and not reversed, modified or stayed; and

(h)      No later than sixty (60) days after the Petition Date the Closing Date shall have occurred.

**5.10**    **Competing Transaction**. This Agreement is subject to approval by the Bankruptcy Court and the consideration by the Seller of higher or better competing bids in respect of all or any part of the Transferred Assets (whether in combination with other assets of the Seller Group or otherwise) in accordance with the terms of the Bid Procedures Order (each, a "**Competing Bid**"). Subject to Section 5.5(e), from the date hereof (and any prior time) and until the Seller files a notice with the Bankruptcy Court announcing the Successful Bid and Back-Up Bid (the "**Post-Auction Notice Deadline**"), the Seller is permitted to, and to cause its Representatives to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchaser and its Affiliates and Representatives) in connection with any sale or other disposition of the Transferred Assets in accordance with the Bid Procedures.  In addition, during such period the Seller and its Representatives shall have the authority to respond to any inquiries or offers to purchase all or any part of the Transferred Assets (whether in combination with other assets of the Seller Group or otherwise) and perform any and all other acts related thereto which are required under the Bankruptcy Code, the Bid Procedures Order or other applicable Law, including supplying information relating to the Business and the assets of the Seller Group to prospective purchasers.  Following the Post-Auction Notice Deadline and until the Closing, the Seller shall not, and shall cause its Representatives not to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by any Person in connection with any sale or other disposition of the Transferred Assets; *provided*, *however*, that the Seller and its Representatives may respond to any unsolicited inquiries or offers and take such other actions with respect to a Competing Bid as may be required by the Seller's fiduciary duties under applicable Law, the Bankruptcy Code or the Bid Procedures Order.

## ARTICLE 6
## PRE-CLOSING COVENANTS

**6.1**    **Conduct of Business**.  Except (i) as set forth on Schedule 6.1, (ii) as may be expressly approved by Purchaser in writing (which approval will not be unreasonably withheld, delayed or conditioned), or (iii) as is otherwise expressly permitted, contemplated or required by this Agreement, any Assigned Contract, by applicable Laws or by order of the Bankruptcy Court, from the date hereof through the earlier of the Closing Date or the termination of this Agreement pursuant to Article 9:

(a)      the Seller shall use commercially reasonable efforts to (i) conduct the Business in all material respects in the ordinary course of business, (ii) preserve intact their business organizations in all material respects in the ordinary course of business, (iii) timely pay all of its

post-petition obligations in all material respects in the ordinary course of business, including all post-petition obligations owed to licensors, licensees, suppliers, contractors, distributors, consultants, vendors, landlords, customers (including with respect to any returns or refunds), counterparties to Contracts, and others having business relationships with the Seller Group in connection with the operation of the Business, (iv) receive inventory and merchandise in accordance with purchase orders in all material respects in the ordinary course of business, (v) manage and sell merchandise in all material respects in the ordinary course of business, (vi) maintain, service, repair, and preserve all tangible assets, equipment, machinery, fixtures, and facilities included in the Transferred Assets in good working order and condition and compliant with all material safety standards, reasonable wear and tear excepted and (vii) maintain reasonably satisfactory relationships with employees of the Seller Group, subject to Purchaser's satisfaction of its obligations in Section 6.7 (provided that, in the case of the foregoing clauses (i) through (vii), no action with respect to the matters addressed by any subclause of the following clause (b) that is expressly permitted by such subclause (nor any action not taken in order to comply therewith) shall constitute a breach of clauses (i) through (vii)); and

(b)     the Seller shall not, and shall cause its Subsidiaries not to:

(i)     sell, lease, license, mortgage, pledge, transfer abandon or otherwise dispose of, in a single transaction or series of related transactions, any Transferred Assets other than, in each case, in the ordinary course of business or for the purpose of disposing of obsolete or worthless assets that are no longer used or useful in the conduct of the Business;

(ii)     (A) issue, sell, encumber or grant any shares of the capital stock or other equity or voting interests of the Seller Group, or any securities or rights convertible into, exchangeable or exercisable for, or evidencing the right to subscribe for any shares of such capital stock or other equity or voting interests, or any rights, warrants or options to purchase any shares of such capital stock or other equity or voting interests; (B) establish a record date for, declare, set aside for payment or pay any dividend on, or make any other distribution in respect of, any equity or voting interests of the Seller Group; (C) amend or modify any Organizational Documents of the Seller Group (other than amendments or modifications to any Organizational Documents of the Subsidiaries in the ordinary course of business, none of which shall negatively impact or effect the Transferred Assets, individually or in the aggregate, in any material respect); or (D) split, combine, subdivide or reclassify any shares of the capital stock or other equity or voting interests of the Seller Group.

(iii)     acquire by merging or consolidating with, or by purchasing a substantial portion of the assets of any business or any corporation, partnership or other business organization or otherwise acquire any material assets (except Inventory), that as of the Closing would constitute Transferred Assets, except for the acquisition of assets in the ordinary course of business;

(iv) transfer or dispose of, abandon, lapse, allow to lapse, sell, assign, grant any right or license to, any material Owned Intellectual Property (except non-exclusive licenses granted in the conduct of the Business consistent with past practice);

(v) other than indebtedness authorized by the DIP Order, by the Bankruptcy Court in the Bankruptcy Cases or in the ordinary course of business under any existing revolving credit facility, incur, create, assume, guarantee or become liable for any indebtedness for borrowed money;

(vi) make or authorize any capital expenditures related to any Transferred Assets other than for amounts not in excess of 110% of the amounts set forth in Seller's business plan made available to Purchaser;

(vii) terminate, permit to expire, amend or fail to renew any material Seller Permit;

(viii) except in the ordinary course of business, directly or indirectly, mark down, discount, or reduce the selling price of any product included in, or reasonably expected to be included in, the Inventory below its full retail selling price as of the date of this Agreement or offer or advertise, other than continuing any current promotional activity in effect since the launch of any new product in the ordinary course of business, any promotional discount, coupon, rebate, bundle pricing, financing promotion, clearance event, going-out-of-business sale, liquidation sale, or any other mechanism that has the effect of reducing the net realized selling price of any product below its full retail selling price as of the date of this Agreement; provided that, for the avoidance of doubt, the foregoing prohibition applies to all forms of price reduction regardless of mechanism, duration, channel, or magnitude;

(ix) use "liquidation", "going out of business", "out of business", "going out of business sale", "we quit", "quitting business", "everything must go", "liquidation/liquidating" or other similar language with respect to the Business or the Transferred Assets;

(x) change its present accounting methods, principles or practices in any material respect, except as required by a change in GAAP or applicable Law;

(xi) invalidate or cause the cancellation of any current material insurance coverage (without replacement thereof) or fail to maintain current material insurance coverage or suitable renewals thereof providing coverage substantially the same as any expiring policy;

(xii) except as required by applicable Law or Seller Plan: (A) grant any severance, retention or termination pay to, or enter into or materially amend any severance, retention, termination, employment, consulting, bonus, change in control or severance agreement with, any Business Employee; (B) materially increase the compensation or

64

benefits provided to any Business Employee; (C) grant any incentive awards to, or discretionarily accelerate the vesting or payment of any such awards held by, any employee; or (D) establish, adopt, enter into or materially amend any Seller Plan or Collective Bargaining Agreement, except, in each case, as would not result in any increase in Liability or cost to Purchaser;

(xiii)   issue gift cards with a value, in the aggregate, in excess of $100,000, other than to replace lost or stolen gift cards consistent with the applicable policies of the Seller Group in place as of the date of this Agreement;

(xiv)   enter into any new lease, sublease, license or other agreement granting occupancy or use rights with respect to real property with an annual rent in excess of $50,000, or amend, modify, extend, renew or terminate any Real Property Lease with an annual rent in excess of $50,000 (or waive any material right of the Seller Group thereunder);

(xv)   close any store, other than the stores set forth in Schedule 6.1(b)(xv) (the "**Closing Stores**");

(xvi)   except in the ordinary course of business, amend, modify, supplement, reject, terminate, or waive, or consent or agree to any of the foregoing, any provisions under, any Assigned Contract; provided, that the Seller Group shall be permitted to exercise any right to extend the term of any Assigned Contract in accordance with its terms for which the deadline for such exercise of extension occurs between the date of this Agreement and the Closing Date (other than any Contract designated for rejection by the Purchaser hereunder);

(xvii)   make, revoke or change any material Tax election or any method of Tax accounting, settle or compromise or enter into any contractual arrangement in respect of any material Tax Liability, file an amended material Tax return, enter into any closing agreement relating to any Tax, enter into any voluntary disclosure or similar program with respect to any Tax, agree to any extension of a statute of limitations with respect to any Tax or income or other material Tax Return (other than an extension to the due date for filing a Tax Return), or surrender any right to claim a Tax refund, in each case, to the extent such action would reasonably be excepted to materially adversely affect either (A) any Transferred Asset or Assumed Liability or (B) the Purchaser's (or any of its Affiliate's) ownership or assumption of the Transferred Assets or Assumed Liabilities, in each case, after the Closing; or

(xviii)   agree, authorize or commit, in writing or otherwise, to take any of the foregoing actions.

(c)   Notwithstanding anything to the contrary, nothing contained in this Agreement shall give Purchaser or any of its Affiliates, directly or indirectly, any right to control or direct the

65

Business, assets and operations prior to the Closing.  Prior to the Closing, the Seller shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its Business, assets and operations.

      **6.2**      **Access to Information; Confidentiality**.

(a)      From the date hereof until the earlier of the Closing Date and the termination of this Agreement, the Seller shall grant Purchaser and its Representatives (at Purchaser's sole cost and expense) reasonable access, during normal business hours and upon reasonable notice (and in the event of any facility visit request, at least 48 hours' prior notice) to the personnel, facilities, books and records of the Seller Group related to the Business or the Transferred Assets, that are in the possession or under the control of the Seller Group, in each case, solely for the purpose of consummating the transactions contemplated hereunder; provided, however, that (i) all requests for access shall be directed to such person(s) as the Seller may designate in writing from time to time (the "**Seller Access Contact**"), (ii) such activities do not unreasonably interfere with the ongoing business or operations of the Seller Group, (iii) the Seller shall have the right to have one or more of its Representatives present at all times during any visits, examinations, discussions or contacts contemplated by this Section 6.2(a), (iv) such access or related activities would not cause a violation of any agreement to which any member of the Seller Group is a party, (v) no Personal Information shall be disclosed or used other than in compliance with applicable privacy Law and (vi) nothing herein shall require any member of the Seller Group or their Representatives to furnish to Purchaser or provide Purchaser with access to information that (A) is subject to an attorney-client or an attorney work-product privilege, or that is otherwise subject to any obligation of confidentiality, (B) may give rise to antitrust or competition Law issues or violate a protective Order or otherwise may not be disclosed pursuant to applicable Law or (C) would cause significant competitive harm to the Seller Group if the Transactions are not consummated.

(b)      Notwithstanding anything to the contrary contained in this Agreement, from the date of this Agreement until the Closing Date, Purchaser shall not, and shall cause its Affiliates and its and their respective Representatives not to, have any contact or discussions concerning any member of the Seller Group, the Business or the Transaction with any Person known (or should be known) by Purchaser to be a lender, borrower, creditor, guarantor, business partner, bank, landlord, tenant, supplier, customer, employee, manager, franchisee, distributer, noteholder, independent contractor or consultant to the Business, in each case, without the prior written Consent of the Seller.

(c)      Any information provided to or obtained by Purchaser or its Affiliates and its and their respective Representatives, including pursuant to this Section 6.2 is confidential information and subject to the terms of, and the restrictions contained in, the Confidentiality Agreement. Purchaser agrees to be bound by and comply with the provisions set forth in the Confidentiality Agreement as if such provisions were set forth herein, and such provisions are hereby incorporated herein by reference.  Effective upon (and only upon) the Closing, the Confidentiality Agreement shall automatically terminate and none of the parties thereto shall have any further Liability or obligation thereunder except with respect to any confidential information provided to or obtained

by Purchaser or its Representatives concerning the Seller Group, which information shall remain subject to the terms and conditions of the Confidentiality Agreement after the Closing Date.  If this Agreement is terminated prior to Closing for any reason, the duration of the confidentiality of the Confidentiality Agreement shall be deemed extended, without any further action by the parties, for a period of time equal to the period of time elapsed between the date such Confidentiality Agreement was initially signed and the date of termination of this Agreement.  Notwithstanding any other provision of this Agreement to the contrary, to the extent necessary to comply with Treasury Regulations Section 1.6011-4(b)(3), each of the parties hereto (and any employee, representative, or other agent of such party) may disclose to any Governmental Authority the U.S. federal tax treatment and tax structure of any transactions contemplated by this Agreement.

(d)      Notwithstanding anything to the contrary contained herein, nothing in this Section 6.2 shall limit the ability of the parties or any of their respective Affiliates to make any disclosure to their respective tax advisors or any taxing authority.

**6.3      Efforts to Consummate**. Subject to Section 6.5 and except as otherwise provided in this Agreement, each of the parties hereto agrees to use its commercially reasonable efforts (unless, with respect to any action, another standard of performance is expressly provided for herein) to cause the Closing to occur as soon as possible after the date hereof, including satisfying the conditions precedent set forth in Article 8 applicable to such party; provided, however, that, for purposes of "commercially reasonable efforts" standard as required by this Section 6.3 or Section 6.4, neither the Seller nor its Affiliates or Representatives shall be required to offer or grant any accommodation or concession (financial or otherwise) to any third party or to otherwise expend any money or suffer any detriment, to expend any money to remedy any breach of any representation or warranty hereunder, to commence any Action, to waive or surrender any right, to modify any Contract (including any Assigned Contract) or to provide financing to Purchaser for the consummation of the Transactions.

**6.4      Notices and Consents**.  Reasonably promptly following the execution of this Agreement, the Seller will give, or cause to be given, applicable notices to third parties and thereafter will use commercially reasonable efforts (as limited by Section 6.3) to obtain any third-party Consents set forth on Schedule 6.4; provided, however, that no representation, warranty, covenant or agreement of the Seller shall be breached or deemed breached, and no condition shall be deemed not satisfied, as a result of (a) the failure to obtain any such third-party Consent, (b) any termination of a Contract as a result of the failure to obtain such third-party Consent or (c) any Action commenced or threatened by or on behalf of any Person arising out of or relating to the failure to obtain any such Consent or any such termination.

**6.5      Regulatory Matters and Approvals**.

(a)      Each of Purchaser and the Seller will cooperate with each other and use, and shall cause their respective Subsidiaries to use, their respective reasonable best efforts to take or cause to be taken all actions, and do or cause to be done all things necessary, proper or advisable on its part under this Agreement and applicable Antitrust Laws to consummate and make effective the Transactions, including by providing any notices to and making any filings with any Governmental Authority that are necessary to consummate the Transactions.  Without limiting the generality of

67

the foregoing, the Seller and Purchaser shall, no later than ten (10) Business Days after the date hereof, prepare and file with the United States Federal Trade Commission (the "**FTC**") and the United States Department of Justice (the "**DOJ**") the notification and report form required under the HSR Act for the Transactions. Each of Purchaser and the Seller shall submit as soon as practicable any supplemental or additional information which may reasonably be requested by the FTC and the DOJ or by any other Governmental Authority in connection with such filings and shall comply in all material respects with all applicable Laws relating thereto.

(b)      In furtherance and not in limitation of the foregoing, if and to the extent necessary to obtain clearance of the Transactions pursuant to the HSR Act or any other Antitrust Laws with respect to the Transactions, (1) the Purchaser and its Affiliates shall (and shall direct the Seller and its Subsidiaries to) and (2) the Seller and its Subsidiaries shall, solely to the extent directed by Purchaser and contingent on the Closing, (a) propose, negotiate, offer to commit and effect (and if such offer is accepted, commit to and effect), by Order, consent decree, hold separate order, trust, or otherwise, the sale, divestiture, license, disposition or holding separate of such assets or businesses of the Purchaser or the Seller or their respective Affiliates, or otherwise offering to take or offering to commit to take any action (including any action that limits its freedom of action, ownership or control with respect to, or its ability to retain or hold, any of the businesses, assets, product lines, properties or services of Purchaser or the Seller or their respective Affiliates) to the extent legally permissible, and if the offer is accepted, taking or committing to take such action; (b) terminate, relinquish, modify or waive existing relationships, ventures, contractual rights, obligations or other arrangements of Purchaser or the Seller or their respective Affiliates; (c)create any relationships, ventures, contractual rights, obligations or other arrangements of Purchaser or the Seller or their respective Affiliates; and (d) enter or offer to enter into agreements and stipulate to the entry of an Order or decree or filing appropriate applications with any Governmental Authority in connection with any of the actions contemplated by the foregoing clauses (a) through (d) (provided that the Seller and its Subsidiaries shall not be obligated to take any such action unless the taking of such action is conditioned upon the consummation of the Transactions), in each case, as may be necessary, required or advisable in order to satisfy the requirements of any applicable Antitrust Law, to avoid the entry of, or to effect the dissolution of or to vacate or lift, any decree or Order (whether temporary, preliminary or permanent) that would otherwise have the effect of restraining, preventing or delaying the consummation of the Transactions, or to avoid the commencement of any Action that seeks to prohibit the Transactions (each action listed in the foregoing clauses (a) through (d), a "**Remedial Action**"). Notwithstanding anything to the contrary in the foregoing, Purchaser and its Affiliates shall not be required to agree to any Remedial Action that would, or would reasonably be expected to, individually or in the aggregate, be material and adverse on Purchaser and its Affiliates (including the Seller Group), taken as a whole, after giving effect to the Transactions (a "**Burdensome Condition**"). For the avoidance of doubt, the parties acknowledge and agree that Purchaser's obligation to use reasonable best efforts pursuant to Section 6.5(b) shall not require Purchaser or its Affiliates to take or agree to take any action, or accept any condition or restriction, that constitutes or would constitute a Burdensome Condition.

(c)     Each of Purchaser and the Seller will promptly notify the other parties hereto of any written communication made to or received by either Purchaser and/or the Seller, as the case may be, from any Governmental Authority regarding the Transactions, and, subject to applicable Law, if practicable, (i) permit the other parties hereto to review in advance any written communication to any such Governmental Authority and incorporate the other parties' reasonable comments, (ii) not agree to participate in any substantive meeting or discussion with any such Governmental Authority in respect of any filing, investigation or inquiry concerning this Agreement or the Transactions unless, to the extent reasonably practicable, it consults with the other parties hereto in advance and (iii) to the extent permitted by such Governmental Authority, give the other parties hereto the opportunity to attend, and furnish the other parties with copies of all correspondence, filings and written communications between them and their Affiliates and their respective Representatives on one hand and any such Governmental Authority or its staff on the other hand, with respect to this Agreement and the Transactions; provided, however, that this Agreement shall not obligate any party to disclose to any other party such portions of any proposed or final correspondence, filing or other written communication with a Governmental Authority or its staff as the party to such correspondence, filing or communication may reasonably deem competitively-sensitive, privileged or confidential vis-à-vis the other party, except that it shall disclose matters to the external counsel of the other party to the extent reasonably necessary in order to enable the party to fulfill its cooperation obligations in this Section 6.5(c).

(d)     Purchaser shall not, and shall not permit any of its Affiliates to, acquire or agree to acquire by way of arrangement, amalgamation, merger or consolidation with, or by purchasing a substantial portion of the assets of or equity in, or by any other manner, any Person or portion thereof, or otherwise acquire or agree to acquire any assets, if the entering into a definitive agreement relating to or the consummation of such acquisition, arrangement, amalgamation, merger or consolidation would reasonably be expected to (i) impose any material delay in the obtaining of, or significantly increase the risk of not obtaining, any authorizations, Consents, orders, declarations or approvals of any Governmental Authority necessary to consummate the Transactions or the expiration or termination of any applicable waiting period, (ii) significantly increase the risk of any Governmental Authority entering an order prohibiting the consummation of the Transactions or (iii) materially delay the consummation of the Transactions.

(e)     Purchaser shall have the sole discretion and authority, in good faith and in consultation with the Seller, to determine and implement the strategy for obtaining any applicable clearance, consent, approval or waiver under the Antitrust Laws with respect to the Transactions.

**6.6     Public Announcements**.  Between the date of this Agreement and the Closing Date, except to the extent required by any applicable Law or Action (including the Bankruptcy Cases), neither Purchaser nor the Seller shall, and Purchaser and the Seller shall cause their respective Affiliates and Representatives not to, directly or indirectly, issue any press release or public announcement of any kind without the prior written consent of Purchaser and the Seller (as applicable); provided, however, that the Seller and its Affiliates may make announcements from time to time to their respective employees, customers, suppliers and other business relations and otherwise as the Seller may reasonably determine in consultation with Purchaser, to the extent it

69

is necessary to comply with applicable Law or the requirements of this Agreement or any other agreement to which Seller or any such Affiliate is a party or any securities exchange on which the securities of Seller or any such Affiliate are listed; provided, further, that, prior to making any such release, announcement or disclosure the Seller shall allow Purchaser reasonable time to review and comment on such release, announcement or disclosure in advance.  Purchaser and the Seller shall cooperate in good faith to prepare a joint press release to be issued on the Closing Date, the terms of which shall be mutually agreed upon by the parties. Notwithstanding the foregoing, nothing contained in this Agreement shall prohibit Purchaser or any Debt Financing Sources from making customary announcements and communications in connection with the arrangement and consummation of the Debt Financing.

### 6.7    Transferred Employees; Employee Benefits.

(a)    Prior to the Closing, the Purchaser shall offer employment to the Business Employees determined by the chief executive officer of Seller, which must be approved by the Purchaser (not to be unreasonably withheld), on such terms and conditions as set forth in Section 6.7(c) below.  In no event shall the Purchaser be obligated to hire or engage any Business Employees for any period following the Closing. The Purchaser shall have no obligation to continue or assume any employee plan of the Seller Group or to offer any employee plan to service providers, other than as set forth in Section 6.7(c). Subject to Section 6.7(b) below, those Business Employees to whom offers of employment are made, who accept such offer of employment within the time period set forth in the offer, and who commence employment as of the Closing Date shall be collectively referred to as the "**Transferred Employees**."  Prior to the Closing, Seller shall take all actions reasonably necessary to (i) reflect on its payroll, benefits, administrative and other systems the termination of the Transferred Employees' employment with Seller and its Affiliates and (ii) process the voluntary resignations of the Transferred Employees' employment with Seller and its Affiliates, in each case no later than upon their voluntary resignation from Seller. Nothing herein shall obligate Purchaser to maintain any compensation, incentive compensation, severance, or benefits at any particular level following the Closing, other than as set forth in Section 6.7(c) below. Seller will not enforce any non-compete or customer non-solicits against Purchaser with respect to any Transferred Employees arising from Purchaser's act of hiring or engaging the Transferred Employees. Prior to the Closing Date, the Seller shall use its reasonable best efforts in assisting Purchaser to secure signed offer letters from each employee of the Seller Group to whom Purchaser decides to extend an offer of employment, including by providing Purchaser necessary information relating to any such individual's employment with the Seller or any of its Subsidiaries.

(b)    Notwithstanding anything to the contrary in Section 6.7(a), in the case of any Business Employee to whom an offer is made and who is on inactive status due to a legally-protected leave of absence or leave of absence provided under a written policy of Seller (the "**Protected Leaves**"), such offer shall be binding on Purchaser who will allow the Business Employee to remain on the Protected Leave until the conclusion of the Protected Leave as set forth by applicable Law or Seller's written policy, and such Business Employee shall report to Purchaser for active work upon the conclusion of the Protected Leaves.  Such individual who has fulfilled the requirements of this Section 6.7(b) shall be deemed to commence employment with Purchaser

70

or an Affiliate thereof as of the date he or she commences active work with Purchaser and shall become a Transferred Employee as of such date.

(c)      Purchaser shall provide, or shall cause to be provided, to each Transferred Employee for a period of at least one year following the Closing Date (or, if earlier, until the applicable Transferred Employee's termination of employment with Purchaser or its Affiliate) with: (i) base salary, wages, commissions and target short- and long-term incentive commission opportunities that are in each case equal to or better than such base salary, wages, commissions and target short- and long-term incentive compensation opportunities in effect for such Transferred Employees as of immediately prior to the Closing and (ii) other health and welfare benefits that are substantially comparable in the aggregate to such health and welfare benefits as in effect for such Transferred Employees as of immediately prior to the Closing; *provided* that such compensation and benefits shall not include defined benefit pension plans, retiree medical benefits, nonqualified deferred compensation, equity or equity based awards and change in control, transaction, retention or similar payments. Notwithstanding the foregoing, nothing herein prohibits Purchaser from making changes to base salary or wages or other aggregate health and welfare benefits (A) as required to comply with applicable Law or decrease litigation or audit risk (as determined by Purchaser in its sole discretion), and/or (B) as otherwise consented to by the applicable Transferred Employee. For the avoidance of doubt, nothing in this section or this Agreement (i) requires Purchaser to keep any Transferred Employee employed for any specific period of time; (ii) prevents Purchaser from terminating the employment of any Transferred Employee before the one-year anniversary of the Closing Date; or (iii) prevents Purchaser from increasing base salary or wages.

(d)      For purposes of eligibility, vesting and benefit accrual (other than accruals under a defined benefit pension plan or retiree medical plan) under the employee benefit plans of Purchaser providing benefits to Transferred Employees (the "**Purchaser Plans**"), Purchaser shall use commercially reasonable efforts to credit each Transferred Employee with his or her years of service with the Seller Group and any predecessor entities, to the same extent as such Transferred Employee was entitled immediately prior to the Closing to credit for such service under any similar Seller Plan.  Purchaser shall take commercially reasonable efforts to (i) waive any preexisting condition, actively-at-work requirement and similar waiting periods or restrictions under any Purchaser Plans that provide health and welfare benefits ("**Purchaser Welfare Plans**") to the same extent that such conditions and waiting periods were waived or previously satisfied under the comparable Seller Plan immediately prior to the Closing Date, and (ii) cause such Purchaser Welfare Plans to honor any expenses incurred by such Transferred Employees and their eligible dependents under Seller Plans during the portion of the calendar year in which they become Transferred Employees for purposes of satisfying applicable deductible, co-insurance, maximum out-of-pocket, and similar expenses, to the same extent that such expenses were recognized under the comparable Seller Plan.

(e)      Purchaser shall be responsible for and pay all medical, life insurance, disability and other welfare plan expenses and benefits for each Transferred Employee with respect to claims incurred by such Transferred Employees or their covered dependents after the Closing Date.

71

(f)    Where required by applicable Law or policy of Seller, Seller will pay out any accrued but unused paid time off to Business Employees upon termination of the Business Employees' employment with Seller.

(g)    Nothing herein expressed or implied is intended to confer on any Person other than the parties hereto or their respective successors and assigns any rights, remedies, obligations or liabilities under or by reason of this Section 6.7, and no individual shall be deemed to be a third-party beneficiary with respect to this Section 6.7.   Nothing contained in this Section 6.7 or elsewhere in this Agreement shall be construed to prevent the termination of employment of any individual Transferred Employee or any change in the employee benefits available to any individual Transferred Employee in a manner consistent with this Section 6.7 or shall be considered an amendment to any employee benefit plan.

**6.8    Financing**.

(a)    Purchaser shall not permit or consent to or agree to any amendment, restatement, replacement, supplement, termination or other modification or waiver of any provision or remedy under the Equity Commitment Letter (other than to increase the amount of Equity Financing available thereunder).   Purchaser shall furnish to Seller a copy of any executed amendment, restatement, replacement, supplement, modification, waiver or Consent of or relating to the Equity Commitment Letter.   For purposes of this Agreement (other than with respect to representations in this Agreement made by or with respect to Purchaser that speak as of the date hereof or another specified date), references to the "Equity Commitment Letters" shall include any such document as permitted or required by this Section 6.8 to be amended, supplemented, replaced, substituted, terminated or otherwise modified or waived, in each case from and after such amendment, supplement, replacement, substitution, termination or other modification or waiver and, for the avoidance of doubt, references to "Equity Financing" shall include, in whole or in part (as applicable), any supplemental, replacement or substitute financing provided for thereunder.

(b)    Purchaser shall use its reasonable best efforts to take, or cause to be taken, all actions that are necessary, proper or advisable to obtain the Equity Financing contemplated by the Equity Commitment Letter, including taking all actions that are necessary, proper or advisable to (i) maintain in effect the Equity Commitment Letters, (ii) satisfy on timely basis all conditions applicable to Purchaser set forth in the Equity Commitment Letter, (iii) consummate the Equity Financing contemplated by the Equity Commitment Letter at or prior to the Closing (if and to the extent required by Section 4.4(c)), (iv) enforce their rights under the Equity Commitment Letter and (v) comply with its obligations pursuant to the Equity Commitment Letter.

(c)    Purchaser shall give the Seller prompt notice (x) of any breach or default by any party to the Equity Commitment Letter, and (y) of the receipt of any written notice or other written communication, in each case received from any Equity Financing Source with respect to any (i) breach of Purchaser's obligations under the Equity Commitment Letters or default, termination or repudiation by any party to any of the Equity Commitment Letters or (ii)  dispute between or among any parties to any of the Equity Commitment Letters.

(d)      In no event shall Purchaser or any of its Affiliates prohibit or seek to prohibit any commercial bank, investment bank or other potential provider of equity financing from providing financing or financial advisory services to any Person in connection with a transaction relating to the Seller Group.

**6.9      Financing Cooperation**.

(a)      Seller shall, and shall cause each of its respective Subsidiaries, Affiliates and Representatives to use reasonable best efforts to provide reasonable cooperation in connection with the arrangement and the consummation of the Debt Financing as may be reasonably requested by Purchaser or any Debt Financing Source that is necessary and customary for financing transactions of the type contemplated by the Debt Financing, including, without limitation:

(i)      reasonable cooperation with the marketing efforts of Purchaser in connection with the Debt Financing and assisting with the preparing of materials for ratings agency presentations, lender presentations, bank information memoranda, private placement memoranda, syndication memoranda, any other offering documents and other customary marketing materials for the Debt Financing, in each case to the extent necessary and customarily prepared in connection with the financings of the type contemplated by the Debt Financing; provided no such cooperation shall require the preparation by the Seller of information that is not otherwise prepared in the ordinary course of business of the Seller and readily available in the books and records of the Seller (other than the Required Information), any information excluded by the proviso in the definition of Required Information or post-Closing pro forma adjustments desired to be incorporated into any information used in connection with the Debt Financing;

(ii)      participate in a reasonable number of bank meetings, rating agency meetings, investor and lender meetings, accountant meetings, presentations, road shows and due diligence sessions (including customary one-on-one meetings with prospective Debt Financing Sources and investors and senior management and representatives of the Seller with appropriate seniority and expertise) during normal business hours, with reasonable advance notice and at times and locations to be mutually agreed and which may be electronic or via conference call, and furnishing Purchaser as promptly as practicable all Required Information (to the extent reasonable and customary in connection with the Debt Financing being actively and actually pursued); provided no such preparation of materials shall require the preparation by the Seller of information that is not otherwise prepared in the ordinary course of business of the Seller and readily available in the books and records of the Seller (other than constituting the Required Information), any information excluded by the proviso in the definition of Required Information or post-Closing pro forma adjustments desired to be incorporated into any information used in connection with the Debt Financing;

(iii)      assisting with the preparation of the definitive financing documentation with respect to the Debt Financing, including perfection certificates and schedules to such

73

definitive financing documentation with respect to the Debt Financing and otherwise reasonably facilitating the granting a security interest (and perfection thereof) in collateral thereto (relating to the Transferred Assets);

(iv)    furnishing to Purchaser at least four (4) Business Days prior to the Closing Date (to the extent a written request is received by Seller at least eight (8) Business Days prior to the Closing Date) all documentation and other information required by regulatory authorities under applicable "beneficial ownership", "know-your-customer" and anti-money laundering rules and regulations, including USA PATRIOT Act of 2001 and the requirements of 31 C.F.R. §1010.230;

(v)    providing, or procuring delivery of, such customary authorization letters and representation letters (in each case, containing customary exculpation provisions) to the Debt Financing Sources (subject to execution at Closing) as may reasonably be requested by any Debt Financing Source authorizing the distribution of information to prospective lenders or investors and containing customary representations regarding the presence of or absence of material non-public information relating to the Seller and the accuracy (in all material respects) of the information contained therein;

(vi)    [Reserved]; and

(vii)    solely in the event that a high yield note or other bond financing is actually being pursued and solely at the expense of the Purchaser (who shall pay all such costs directly), requesting its independent auditors to (A) provide drafts and executed versions of customary auditors consents and customary comfort letters (including "negative assurance" comfort and change period comfort) with respect to historical financial information relating to the Seller Group as reasonably requested by Purchaser and/or the Seller to the extent necessary or customary for financings of the type contemplated by the Debt Financing being pursued, and (B)  attend a reasonable number of accounting due diligence sessions at reasonable times and places to be mutually agreed (all of which shall be conducted virtually).

(b)    Notwithstanding the foregoing, nothing in this Section 6.9 shall require the Seller or any of its Affiliates to (i) take any action in respect of the Debt Financing to the extent that such action would cause any condition to Closing set forth in Article 8 to fail to be satisfied by the Closing Date or otherwise result in a breach of this Agreement by the Seller; (ii) take any action in respect of the Debt Financing that would conflict with or violate the Seller's or any of its Subsidiaries' organizational documents or any applicable Law, or result in the contravention of, or violation of, breach of, or default under, any contract to which Seller or any of its Subsidiaries is a party; (iii) take any action to the extent such action would unreasonably interfere with the business or operations of the Seller; (iv) execute and deliver any letter, agreement, document or certificate in connection with the Debt Financing (except notices of prepayment, borrowing notices, authorization letters and/or representation letters (in each case, to the extent a high yield note or other bond financing is actually being pursued), or "know-your-customer" documentation

74

referred to herein) or take any corporate action that is not contingent on, or that would be effective prior to, the occurrence of the Closing; (v) pay any commitment fee or other fee or payment to obtain Consent or incur any liability with respect to or cause or permit any Lien to be placed on any of their respective assets in connection with the Debt Financing prior to the Closing Date;[1] (vi) provide access to or disclose information where Seller determines that such access or disclosure would reasonably be expected to jeopardize the attorney-client privilege or contravene any applicable Law or Contract (not entered into in contemplation of this limitation) (but shall use reasonable best efforts to grant such access or provide such disclosure in a manner which would not jeopardize such privilege or contravene any such Law or Contract); (vii) subject to any of the Seller Group's respective directors, managers, officers or employees to actual or potential personal liability; (viii) cause the directors and managers of the Seller Group to adopt resolutions approving the agreements, documents and instruments pursuant to which the Debt Financing is obtained unless Purchaser shall have determined that such directors and managers are to remain as directors and managers of the Seller Group on and after the Closing Date and such resolutions are contingent upon the occurrence of, or only effective as of, the Closing; (ix) waive or amend any terms of this Agreement or any other Contract (not entered into in contemplation of this limitation) to which Seller or its Subsidiaries, including the Seller Group, is party; or (x) take any action that would subject it to actual or potential liability, to bear any cost or expense or to make any other payment or agree to provide any indemnity in connection with any debt commitment letter, any fee letter, the definitive documents related to the Debt Financing, the Debt Financing or any information utilized in connection therewith (in each case except concurrently with and/or following the Closing or subject to reimbursement by Purchaser pursuant to the terms of this Agreement).

(c)    Purchaser shall, promptly upon written request by the Seller (upon delivery of reasonably detailed invoice therefor from the Seller), reimburse the Seller for all reasonable and documented out-of-pocket third-party costs and expenses (including reasonable attorney's fees) incurred by the Seller or any of its Affiliates in connection with the cooperation of the Seller or its Subsidiaries in contemplated by this Section 6.9 (it being understood and agreed, however, that the Seller (and not Purchaser) shall be responsible for (i) de minimis expenses, (ii) fees payable to existing legal, financial or other advisors of the Seller with respect to services provided prior to Closing, (iii) any ordinary course amounts payable to existing employees of or consultants to the Seller, or any of its respective Affiliates or Representatives with respect to services provided prior to Closing (but only to the extent that such costs and expenses would have been so incurred regardless of the requirements set forth in Section 6.9(a)), and (iv) any amounts that would have been incurred in connection with the transactions contemplated hereby regardless of the Debt Financing (including the preparation and/or delivery of financial information, payoff letters and guaranty lien releases)), Purchaser shall indemnify and hold harmless the Seller, its Affiliates and their respective Representatives from and against any and all losses (excluding lost profits and losses from any consequential, indirect, special or punitive damages (as opposed to direct or actual damages)), damages, claims, costs or expenses actually suffered or incurred by any of them of any type in connection with compliance by such Persons with their obligations under Section 6.9(a),

75

except to the extent such losses, damages, claims, costs or expenses result from any documents, materials or other information provided by any of the Seller or its Representatives or the gross negligence, bad faith or willful misconduct of the Seller, any of its Affiliates or their respective representatives, and the foregoing obligations shall survive termination of this Agreement. Notwithstanding the foregoing, in the event the Purchaser elects to pursue a high yield notes or other bond financing, and in connection therewith requests assistance or other actions that would not be required in the case of a term loan financing, all such incremental costs shall be at the expense of the Purchaser, and any would-be-out-of-pocket third party costs and expenses will be paid directly by the Purchaser.

(d)      The Seller hereby expressly authorizes and consents, on behalf of itself and its Affiliates or Representatives, to the reasonable use of the Seller Group's logos, names and trademarks solely relating to the Business in connection with the Debt Financing; provided that such logos, names and trademarks shall be used solely in a manner that is not intended to or reasonably likely to harm or disparage the Seller Group's, or their reputation or goodwill.

(e)      All material non-public information provided by the Seller Group or any of their Affiliates or any of their respective representatives, pursuant to this Section 6.9 shall be kept confidential in accordance with the Confidentiality Agreement, except that Purchaser shall be permitted to disclose such information to the financing sources (including the Debt Financing Sources), other potential sources of capital, ratings agencies and prospective lenders during syndication of the Debt Financing or any permitted replacement, amended, modified or alternative financing subject to the potential sources of capital, ratings agencies and prospective lenders and investors entering into customary confidentiality undertakings with respect to such information (including through a notice and undertaking in a form customarily used in confidential information memoranda for senior credit facilities or through a customary confidentiality notice contained in an offering memorandum, private placement memorandum or other offering document restricting the use and further distribution of the information contained therein, in each case as applicable for the type of financing actually being pursued).

(f)      Purchaser acknowledges and agrees that, notwithstanding anything in this Agreement to the contrary, the obligations to perform its agreements hereunder, including to consummate the Closing subject to the terms and conditions hereof, are not conditioned on obtaining the Debt Financing or any alternative debt financing or on the performance of any Debt Financing Source. Notwithstanding anything to the contrary in this Agreement, it is understood and agreed by the parties that (i) for purposes of the conditions set forth in Section 8.2 as applied to the Seller's or the Seller Group's obligations under this Section 6.9 and (ii) for all other purposes of this Agreement (including Article 9 hereof), the obligations of the Seller, the Seller Group, and in each case any Affiliates and/or Representatives thereof, shall be deemed to be satisfied and complied with unless the Seller's or any other member of the Seller Group's Intentional Breach of its obligation under this Section 6.9 is the direct cause of the failure to obtain any committed Debt Financing. For purposes of this Section 6.9, "Intentional Breach" means a breach by the Seller or any other member of the Seller Group that is an act or omission knowingly and willfully undertaken or omitted by such Person with the intent of causing a breach

76

of Section 6.9 of this Agreement and remains uncured following written notice thereof stating with particularity the alleged breach and ten (10) day opportunity to cure.

**6.10    No Successor Liability**. The Parties intend that upon the Closing, Purchaser and its respective Affiliates shall not, and shall not be deemed to: (a) be a successor (or other such similarly situated party), or otherwise be deemed a successor, to any member of the Seller Group, including a "successor employer" for the purposes of the IRC, ERISA, or other applicable Laws; (b) have any responsibility or Liability for any obligations of any member of the Seller Group, or any Affiliate of the Seller Group, based on any theory of successor or similar theories of Liability; (c) have, de facto or otherwise, merged with or into any member of the Seller Group; (d) be an alter ego or a mere continuation or substantial continuation of any member of the Seller Group (and there is no continuity of enterprise between Purchaser and any member of the Seller Group), including within the meaning of any foreign, federal, state or local revenue, pension, ERISA, COBRA, WARN Act, Tax, labor, employment, environmental, or other Law, rule or regulation (including filing requirements under any such Laws, rules or regulations), or under any products liability Law or doctrine with respect to any member of the Seller Group's Liability under such Law, rule or regulation or doctrine; or (e) be holding itself out to the public as a continuation of any member of the Seller Group or their respective estates. The parties agree that, to the fullest extent permitted under Section 363(f) of the Bankruptcy Code and any other applicable Law, the Sale Order shall contain findings of fact and conclusions of Law consistent with this Section 6.10.

**6.11    Reporting and Information Rights**. From the date hereof through the earlier of the Closing Date or the termination of this Agreement pursuant to Article 9: (i) the Seller shall use commercially reasonable efforts to provide to Purchaser and its Representatives, concurrently with and in the same form as required to be provided to the lenders under the DIP Financing Agreement (or their agents or advisors), all budget variance reports, financial reports, cash flow forecasts, liquidity updates, notices and other deliverables required to be provided to such lenders under the DIP Order or the DIP Financing Agreement; (ii) the Seller shall use commercially reasonable efforts to provide Purchaser with reasonable advance notice of, and permit Purchaser and its Representatives to participate in, all scheduled and ad hoc calls and meetings between the Seller Group and such lenders (or their agents or advisors) regarding the financial performance, operations or budget compliance of the Business; and (iii) the Seller shall, upon reasonable request by Purchaser (but not more frequently than weekly), make members of the Seller Group's senior management available for calls with Purchaser and its Representatives to discuss the operations of the Business, compliance with the Approved Budget and such other matters as Purchaser may reasonably request. Notwithstanding anything to the contrary in this Agreement, a breach by the Seller, or its respective Subsidiaries, Affiliates and/or Representatives, of this Section 6.11 shall not constitute a breach for purposes of Article 9, a failure to satisfy a condition precedent set forth in Section 8.2, or a breach of this Agreement for any other purpose unless any such breach is a Willful Breach.

**6.12    Transition Services Agreement**. During the period from and after the date of this Agreement until the earlier of (i) the Closing Date and (ii) the termination of this Agreement in accordance with Article 9, the parties shall negotiate in good faith and use commercially reasonable efforts to identify, agree upon, and finalize the terms of a transition services agreement

intended to provide for an orderly transition (the "**Transition Services Agreement**") to be entered into by Seller and Purchaser at Closing, pursuant to which Seller shall provide to Purchaser, or shall cause its Affiliates to provide to Purchaser, benefit plans, payroll and certain other critical transition services reasonably agreed by the Seller and Purchaser for a period following the Closing to facilitate Purchaser's orderly transition and integration of the Business and the Transferred Assets, the fees and costs of which shall be borne one hundred percent (100%) by Purchaser.

6.13   **A&G Realty Partners Cooperation**. The Seller shall use commercially reasonable efforts to cause A&G Realty Partners, as real estate advisor to the Seller, to cooperate with Purchaser and its professionals (including any real estate consultants or advisors retained by or on behalf of Purchaser) in connection with matters relating to the Real Property Leases and the real property used in the Business, including by providing reasonable access to information, analyses and work product prepared by or on behalf of A&G Realty Partners in connection with its engagement by the Seller, and by making its personnel reasonably available for discussions and consultations with Purchaser's professionals regarding such matters. Notwithstanding anything to the contrary in this Agreement, during the period from the date hereof through the Closing Date, no member of the Seller Group shall enter into, execute, amend, modify, supplement, extend, renew, terminate, waive any rights under, or consent to any of the foregoing with respect to, any Real Property Lease or any other lease, sublease, license or other occupancy agreement to which any member of the Seller Group is a party (including any Assigned Contract or Designated Contract that is a Real Property Lease), without, in each case, the prior written consent of the chief executive officer of Seller.

6.14   **Marketing Expenditures**. During the period commencing on the date of this Agreement and continuing through the Closing Date, Seller shall, and shall cause each member of the Seller Group to, spend or cause to be spent, at least the amount allocated towards Marketing Expenditures in connection with the Business as set forth in the Approved Budget as in effect as of the date of this Agreement. All Marketing Expenditures made pursuant to this Section 6.14 shall be made: (i) in the same format as the Marketing Expenditures made by the Seller Group immediately prior to the Petition Date, including with respect to the creative format, messaging style, brand standards, promotional structure, and customer-facing presentation of all marketing materials and campaigns; and (ii) across the same media channels as the media channels utilized by the Seller Group immediately prior to the Petition Date. For the avoidance of doubt, Seller shall not: (1) consolidate, eliminate, or substantially reduce Marketing Expenditures in any media channel that was utilized immediately prior to the Petition Date without Purchaser's prior written consent; (2) shift Marketing Expenditures from one channel to another in a manner that is materially inconsistent with the channel allocation in effect immediately prior to the Petition Date without Purchaser's prior written consent; or (3) alter the format, creative standards, brand presentation, or promotional structure of any marketing campaign or materials in a manner that is materially inconsistent with the format in use immediately prior to the Petition Date without Purchaser's prior written consent. To the extent that excess cash is available to the Seller during the period between the date of this Agreement and the Closing Date, Seller shall apply such excess cash to increase the Marketing Expenditures up to the amount necessary to bring the cumulative

78

Marketing Expenditures into conformity with the projected marketing forecast set forth on <u>Exhibit A</u> hereto; provided, that, in no event shall Seller be required to make aggregate cumulative Marketing Expenditures in excess of $30,000,000.

**6.15**   **Critical Vendor Payments**. During the period commencing on the date of this Agreement and continuing through the Closing Date, Seller shall, and shall cause each member of the Seller Group to, make all Critical Vendor Payments as set forth in the Approved Budget as in effect as of the date of this Agreement.

**6.16**   **Employee Compensation**. From the date hereof through the Closing Date, Seller shall, and shall cause each member of the Seller Group to, pay or cause to be paid all wages, salaries, commissions, bonuses, and other compensation owed to Business Employees on or before the regularly scheduled payroll dates applicable to such Business Employees, and in no event shall any Business Employee be paid in arrears or on a delayed basis relative to the applicable payroll schedule in effect as of the date hereof.

**ARTICLE 7**
**POST-CLOSING COVENANTS**

**7.1**   **Access to Information; Books and Records**.  From and after the Closing, for a period of three (3) years, and without prejudice to the obligations of Purchaser pursuant to <u>Section 7.3(b)</u>, Purchaser and its Affiliates shall, in each case at the sole cost and expense of the Seller Group, (a) afford the Seller Group and their respective Representatives reasonable access, during normal business hours, upon reasonable advance notice and under reasonable circumstances, to the books and records of Purchaser, its Affiliates and the Business, for the purposes of (i) preparing Tax Returns, (ii) monitoring or enforcing rights or obligations under this Agreement or any Related Document, (iii) complying with the requirements of any Governmental Authority, or (iv) administering, or satisfying their obligations in connection with, the Bankruptcy Cases, and for such purposes shall permit the Seller Group and their respective Representatives to examine and copy such books and records to the extent reasonably requested by such party and (b) cause their Representatives to furnish all information reasonably requested by any member of the Seller Group or their Representatives in connection with financial or regulatory reporting, audit, third party litigation, preparing or filing of any Tax Return or the defense of any Tax claim or assessment; <u>provided</u>, <u>however</u>, that nothing in this <u>Section 7.1</u> shall require Purchaser or its Affiliates to furnish to the Seller Group or their respective Representatives any material that is subject to an attorney-client privilege or an attorney work-product privilege or which may not be disclosed pursuant to applicable Law.  For a period of three (3) years following the Closing Date, or such longer period as may be required by applicable Law or necessitated by applicable statutes of limitations, Purchaser shall, and shall cause its Affiliates to, maintain all such books and records in the jurisdiction in which such books and records were located prior to the Closing Date and shall not destroy, alter or otherwise dispose of any such books and records.  On or prior to the end of such period, Seller shall affirmatively inform Purchaser in writing it has an ongoing need for books and records, after which the Purchaser shall and shall cause its Affiliates to, provide the Seller or its respective successor with at least ten (10) Business Days prior written notice before destroying, altering or otherwise disposing of any such books and records, during which period the Seller may elect to take possession, at its own expense, of such books and records.

79

**7.2**     **Post-Closing Receipt and Possession of Assets and Liabilities**.

(a)     After the Closing Date, the Seller shall, or shall cause the applicable member of the Seller Group to, at the Seller's sole cost and expense, transfer promptly to Purchaser, and Purchaser shall accept from the Seller, from time to time any assets constituting Transferred Assets or Liabilities constituting Assumed Liabilities held by the Seller. After the Closing Date, Purchaser shall transfer promptly to the Seller, at the Purchaser's sole cost and expense, and the Seller shall accept from Purchaser, from time to time, any assets constituting Excluded Assets or Liabilities constituting Excluded Liabilities held by Purchaser. After the Closing, subject to the terms and conditions in this Agreement, each of Purchaser and Seller shall use its commercially reasonable efforts to take or cause to be taken all appropriate action, do or cause to be done all things necessary or advisable, and sign and deliver such documents and other instruments, as may be required to carry out the provisions of this Agreement and make effective the transactions contemplated by this Agreement, including the transfer of the Transferred Assets.

(b)     Following the Closing Date, the Seller and Purchaser shall reasonably cooperate to promptly liquidate, dissolve and wind up the Seller Group.  Purchaser agrees that it will promptly take such actions as are reasonably requested by the Seller to assist in the liquidation, dissolution and winding up of the Seller Group so long as such actions do not require Purchaser to expend any money or make any funding in connection therewith.

(c)     If, after the Closing, either party shall receive any payments or other funds due to the other party pursuant to the terms of this Agreement, then the party receiving such funds shall promptly forward such funds to the proper party.  No party shall have any right of set-off or may withhold funds required to be paid to the other party under this Section 7.2.

**7.3**     **Tax Matters**.

(a)     For purposes of this Agreement, with respect to any Transferred Asset, the Seller and Purchaser shall apportion the liability for Property Taxes for any Straddle Period applicable to such Transferred Asset in accordance with this Section 7.3(a).  The Property Taxes described in this Section 7.3(a) shall be apportioned between the Seller and Purchaser as of the Closing Date, with Purchaser liable for that portion of the Property Taxes for a Straddle Period (i) with respect to any Property Taxes that are *ad valorem* taxes imposed on a periodic basis, equal to the Property Taxes for such Straddle Period *multiplied by* a fraction, the numerator of which is the number of days remaining in such Straddle Period after the Closing Date, and the denominator of which is the total number of days in such entire Straddle Period or (ii) with respect to any other Property Taxes, allocated to the portion of such Straddle Period beginning after the Closing Date based on an interim closing of the books as of the end of the Closing Date.  The Seller shall be liable for that portion of the Property Taxes for a Straddle Period for which Purchaser is not liable under the preceding sentence.  The party responsible under applicable Law for paying a Tax described in this Section 7.3(a) shall be responsible for administering the payment of such Tax.  Purchaser and its Affiliates shall not make or change any Tax election, amend, refile or otherwise modify (or grant an extension of any statute of limitation with respect to) any Tax Return, or take any other

80

action that could cause or result in an increase in any Tax Liability or reduce any Tax benefit in respect of any Pre-Closing Tax Period or Straddle Period relating to the Seller Group or the Business without the prior written consent of the Seller.

(b)      After the Closing, each of the Seller and Purchaser shall (and shall cause their respective Affiliates to):

(i)      reasonably cooperate in preparing for and defending any audits or proceedings of or disputes with Governmental Authorities regarding any Tax Returns required to be filed by, or Taxes related to the Transferred Assets or the Business due from, the Seller for any Pre-Closing Tax Period or Straddle Period; or

(ii)      maintain and preserve until the expiration of the applicable statutes of limitations, and make available to the other parties as reasonably requested and to any Governmental Authority as reasonably required, all information, records and documents relating to Taxes related to the Transferred Assets or the Business for any Pre-Closing Tax Period or Straddle Period, and make employees available to the other parties as reasonably requested during business hours to supplement or explain such information, records and documents; and (iii)   furnish the other parties with copies of all correspondence received from any Governmental Authority in connection with any Tax audit, proceeding, assessment or information request relating to Taxes related to the Transferred Assets or the Business for a Pre-Closing Tax Period or Straddle Period, and furnish the other parties with copies of all records and documents relating to Taxes related to the Transferred Assets or the Business for a Pre-Closing Tax Period or Straddle Period that are proposed to be destroyed (and not otherwise in the possession of such other party).

(c)      Purchaser shall pay, or cause to be paid, to the Seller the amount of any refunds of Taxes that are Excluded Liabilities paid by the Seller.  Purchaser shall use commercially reasonable efforts, and shall cause its Affiliates to use commercially reasonable efforts, at Seller's expense, to take any action reasonably requested by the Seller in writing to pursue any claims for such refunds of the Seller.  Purchaser shall make payment of any such refunds described in this Section 7.3(c), net of any reasonable costs (including Taxes) incurred by Purchaser and its Affiliates in obtaining such refunds, to the Seller within five (5) days of receipt of the refund.  If, in lieu of receiving any such refund, Purchaser or any of its Affiliates reduces a liability for Taxes with respect to a taxable period or portion thereof beginning after the Closing Date, Purchaser shall promptly pay or cause to be paid to the Seller the amount of such reduction in liability for Taxes.

(d)      In the event of a conflict between the provisions of this Section 7.3 and any other Section of this Agreement, this Section 7.3 shall govern and control with respect to Tax matters.

## ARTICLE 8
## CONDITIONS PRECEDENT

**8.1      Conditions to Each Party's Obligation**. The respective obligations of the parties hereto to effect the Transactions are subject to the satisfaction (or, to the extent permitted by

81

applicable Law, waiver by the Seller and Purchaser in writing), at or prior to the Closing, of the following conditions:

(a)     HSR Act.  Any applicable waiting periods, together with any extensions thereof, under the HSR Act shall have expired or been terminated.

(b)     No Injunctions or Restraints.  No Order issued by any Governmental Authority of competent jurisdiction shall be in effect which restrains, enjoins or otherwise prohibits the consummation of the Transactions, and no Law shall have been enacted or be deemed applicable to the Transactions that makes illegal consummation of the Transactions or prevents, restrains, enjoins or otherwise prohibits the consummation of the Transactions shall be in effect.

(c)     Sale Order.  The Bankruptcy Court shall have entered the Sale Order and such Sale Order shall be a Final Order (unless such Final Order requirement is waived by the Seller and Purchaser in each of their respective sole discretions).

**8.2     Conditions to Obligation of Purchaser**.  The obligations of Purchaser to effect the Transactions is subject to the satisfaction (or, to the extent permitted by applicable Law, waiver by Purchaser in writing), at or prior to the Closing, of the following conditions:

(a)     Representations and Warranties.  (i) Each of the representations and warranties of the Seller set forth in Sections 3.1(a) and 3.2 shall be true and correct in all material respects as of the Closing Date as though made on the Closing Date, except to the extent expressly made as of an earlier date (in which case such representations and warranties shall be true and correct in all material respects as of such earlier date) and (ii) each of the other representations set forth in Article 3 shall be true and correct in all respects (without giving effect to any qualifications or limitations as to "materiality," "Material Adverse Effect" or words of similar import set forth therein) as of the Closing Date as though made on the Closing Date, except to the extent expressly made as of an earlier date, in which case as of such earlier date, except in the case of this clause (ii), in each case, where the failure of such representations and warranties to be so true and correct would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)     Performance of Covenants and Obligations.  The Seller shall have performed or complied (i) in all material respects with the obligations and covenants, other than those covenants set forth in Section 6.14, Section 6.15, and Section 6.16, (ii) in all respects with the obligations and covenants set forth in Section 6.15, except for any failure to meet the Critical Vendor Payments as set forth in the Approved Budget as in effect as of the date of this Agreement in an amount that is less than $500,000, and (iii) in all respects with the obligations and covenants set forth in Section 6.14 and Section 6.16, in each case, required to have been performed or complied with by it under this Agreement at or prior to the Closing.

(c)     Closing Deliverables.  The Seller shall have delivered to Purchaser the closing certificate required to be delivered by the Seller pursuant to Section 2.9(c)(i).

82

(d)      No Material Adverse Effect.  Since the Petition Date, there shall not have occurred any Material Adverse Effect.

(e)      No Litigation. There shall not be pending by the Federal Trade Commission or the United States Department of Justice Antitrust Division any judicial or administrative proceedings pursuant to the Antitrust Laws that seek to prevent, restrain, enjoin or otherwise prohibit the consummation of the Transactions.

(f)      Employee Acceptance Threshold. As of the date that is three (3) Business Days prior to the Closing Date, the Required Employee Acceptance Threshold shall have been satisfied unless waived by Purchaser.

(g)      Required Executives. As of the date that is three (3) Business Days prior to the Closing Date, eighty five percent (85%) of the Required Executives shall have accepted employment with the Purchaser or one of its Affiliates, unless such condition is waived by Purchaser.

**8.3      Conditions to Obligations of the Seller**.  The obligation of the Seller to effect the Transactions is subject to the satisfaction (or, to the extent permitted by applicable Law, waiver by the Seller in writing), at or prior to the Closing, of the following conditions:

(a)      Representations and Warranties.  Each of the representations and warranties of Purchaser set forth in Article 4 shall be true and correct in all material respects (without giving effect to any qualifications or limitations as to "materiality" or words of similar import set forth therein) as of the Closing as though made at and as of such time (other than such representations and warranties as are made as of an earlier date, which shall be so true and correct as of such date), except where the failure of such representations and warranties to be so true and correct would not, individually or in the aggregate, prevent, hinder or delay the consummation of the Transactions or the ability of Purchaser to perform its obligations under this Agreement.

(b)      Performance of Covenants and Obligations of Purchaser.  Purchaser shall have performed or complied in all material respects with all obligations and covenants required to have been performed or complied with by it under this Agreement at or prior to the Closing.

(c)      Closing Deliverables.  Purchaser shall have delivered to the Seller the closing certificate required to be delivered by Purchaser pursuant to Section 2.9(b)(i).

**8.4      Waiver of Condition; Frustration of Conditions**.  All conditions to the Closing shall be deemed to have been satisfied or waived from and after the Closing.  Neither Purchaser nor the Seller may rely on the failure of any condition set forth in this Article 8, as applicable, to be satisfied if such failure was primarily caused by such party's failure to use, as required by this Agreement, its reasonable best efforts to consummate the Transactions.

83

# ARTICLE 9
# TERMINATION

**9.1**   **Events of Termination**.  Notwithstanding anything to the contrary, this Agreement may be terminated at any time prior to the Closing:

(a)   by mutual written consent of Purchaser and the Seller;

(b)   by Purchaser or the Seller, by written notice to Purchaser or the Seller from the other, if (i) the Bankruptcy Court shall enter an order approving a Competing Bid or any sale or other disposition of all or substantially all of the Transferred Assets to a Person other than Purchaser or any of its Affiliates (each, an "**Alternate Transaction**") and (ii) either (A) the Purchaser is not serving as the Back-Up Bid or (B) such Alternate Transaction is consummated;

(c)   by Purchaser if (i) the Bid Procedures Motion is withdrawn, or the Seller publicly announces its intention to withdraw such motion, (ii) a motion is filed to voluntarily dismiss the Bankruptcy Cases, (iii) a motion is filed for conversion of the Bankruptcy Cases to Chapter 7 of the Bankruptcy Code, or (iv) a motion is filed for appointment of an examiner with expanded powers pursuant to Section 1104 of the Bankruptcy Code or a trustee in the Bankruptcy Cases;

(d)   by Purchaser, by written notice from Purchaser to Seller, if any of the Bankruptcy Court Milestones set forth in Section 5.9 are not met and have not been extended by written agreement between Purchaser and Seller (email from counsel being sufficient);

(e)   by Purchaser if (i) following entry by the Bankruptcy Court of the Bid Procedures Order, such order is (x) amended, modified or supplemented in a manner materially adverse to Purchaser without Purchaser's prior written consent or (y) voided, reversed or vacated, or (ii) following entry by the Bankruptcy Court of the Sale Order, the Sale Order is (x) amended, modified or supplemented in a manner materially adverse to Purchaser without Purchaser's prior written consent or (y) voided, reversed or vacated;

(f)   by Purchaser, by written notice from Purchaser to the Seller, if there has been a breach or inaccuracy of a covenant, representation or warranty made by the Seller in this Agreement, such that the conditions in Section 8.1 or Section 8.2 are not capable of being satisfied and which breach is incapable of being cured or, if capable of being cured, has not been cured by the Seller prior to the earlier of (i) fifteen (15) Business Days after receipt of written notice from Purchaser requesting such breach be cured or (ii) the Outside Date; provided, however, that the right to terminate this Agreement pursuant to this Section 9.1(e) shall not be available to Purchaser if the conditions in Section 8.1 or Section 8.2 are not capable of being satisfied because there is then a breach or inaccuracy of a covenant, representation or warranty made by Purchaser in this Agreement;

(g)   by the Seller, by written notice from the Seller to Purchaser, if there has been a breach or inaccuracy of a covenant, representation or warranty made by Purchaser in this Agreement, such that the conditions in Section 8.1 or Section 8.3 are not capable of being satisfied

and which breach is incapable of being cured or, if capable of being cured, has not been cured by Purchaser prior to the earlier of (i) fifteen (15) Business Days after receipt of written notice from the Seller requesting such breach be cured or (ii) the Outside Date; provided, however, that the right to terminate this Agreement pursuant to this Section 9.1(f) shall not be available to the Seller if the conditions in Section 8.1 or Section 8.3 are not capable of being satisfied because there is then a breach or inaccuracy of a covenant, representation or warranty made by the Seller in this Agreement;

(h)      by Purchaser or the Seller, by written notice from Purchaser or the Seller to the other, if any Governmental Authority of competent jurisdiction shall have issued an Order that has become a Final Order or enacted any Law, in each case, restraining, enjoining or otherwise prohibiting the consummation of the Transactions;

(i)      by Purchaser or the Seller, by written notice from Purchaser or the Seller to the other, if the Closing has not occurred on or prior to the Outside Date; provided, however, that the party exercising the right to terminate this Agreement pursuant to this Section 9.1(i) shall not have been primarily responsible for such failure of the Closing to occur through a breach or inaccuracy of a covenant, representation or warranty contained in this Agreement; or

(j)      by Seller by written notice to Purchaser if the boards of directors of any of Seller Group determine that proceeding with the Transactions or failing to terminate this Agreement would be inconsistent with their fiduciary obligations under applicable Law consistent with Section 10.19 hereof.

**9.2**      **Effect of Termination**.

(a)      In the event that this Agreement shall be terminated pursuant to Section 9.1, (i) subject to the terms of the Confidentiality Agreement, Purchaser shall, and shall ensure that its Representatives shall, destroy all Confidential Information (as defined in the Confidentiality Agreement) pursuant to the terms therein and (ii) all further obligations of the parties hereto under this Agreement shall terminate without further Liability or obligation to the other parties hereto, except in the case of Fraud or a Willful Breach of this Agreement prior to such termination; provided, however, that, notwithstanding the foregoing, the Liabilities and obligations under (A) the Confidentiality Agreement, and (B) Section 6.2(c), this Section 9.2 and Article 10 shall continue in full force and effect.

(b)      Notwithstanding anything to the contrary in this Agreement, in consideration for Purchaser having expended considerable time and expense in connection with this Agreement and the negotiation thereof, upon termination of this Agreement pursuant to (i) any of Section 9.1(b), Section 9.1(c), Section 9.1(f), or Section 9.1(j) the Seller shall pay Purchaser the Bid Protections, and (ii) any of Section 9.1(d), Section 9.1(e), Section 9.1(h) or Section 9.1(i) (by Purchaser), the Seller shall pay Purchaser the Expense Reimbursement only, in each case within five (5) (by Seller), Business Days after such termination of this Agreement (or, if later, five (5) Business Days after the date on which the Purchaser provides Seller with reasonable documentation supporting

85

Purchaser's request therefor), by wire transfer(s) in immediately available funds to one or more bank accounts of Purchaser (or any of its Affiliates or designees as applicable) designated in writing by Purchaser to Seller. Subject to the following sentence, the Seller Group's Liability hereunder for any and all breaches of this Agreement or any other Actions relating to this Agreement or any Related Document shall be capped at an amount equal to the Bid Protections Aggregate Amount. Notwithstanding the foregoing, nothing in this Section 9.2(b) or in this Agreement shall limit or release any Liability of any parties hereto to the extent arising out of or resulting from Fraud or Willful Breach. Purchaser acknowledges and agrees that, except in the case of Fraud or Willful Breach, upon the payment of the Bid Protections Aggregate Amount or the Expense Reimbursement Cap, as applicable, to Purchaser pursuant to this Section 9.2, such payment shall, notwithstanding anything to the contrary contained herein, be the sole and exclusive remedy of Purchaser, its Affiliates and any other Person against the Seller Group in connection with such termination or relating to this Agreement, any Related Document or the transactions contemplated hereby or thereby; provided, however, that the foregoing shall not limit any Liability of the Seller Group for Willful Breach or Fraud.

(c) If any member of the Seller Group pays to Purchaser or any of its Affiliates an amount equal to the Bid Protections or the Expense Reimbursement pursuant to Section 9.2(b), Purchaser and its former, current or future equityholders, controlling persons, directors, officers, employees, agents, general or limited partners, managers, management companies, members, stockholders, Affiliates or assignees and any and all former, current or future equityholders, controlling persons, directors, officers, employees, agents, general or limited partners, managers, management companies, members, Affiliates or assignees of any of the foregoing, and any and all former, current or future heirs, executors, administrators, trustees, successors or assigns of any of the foregoing, and each Affiliate, officer, director, employee, controlling person, advisor, agent, attorney or representatives of any such Person (each, a "**Purchaser Related Party**" and, collectively, the "**Purchaser Related Parties**"), will be deemed to have fully released and discharged each member of the Seller Group and its former, current or future equityholders, advisors, controlling persons, directors, officers, employees, agents, general or limited partners, managers, management companies, members, Affiliates or assignees and any and all former, current or future equityholders, controlling persons, directors, officers, employees, agents, general or limited partners, managers, management companies, members, Affiliates or assignees of any of the foregoing, and any and all former, current or future heirs, executors, administrators, trustees, successors or assigns of any of the foregoing, from any Liability, including that relate to the termination of this Agreement, and neither Purchaser, any Purchaser Related Party nor any other Person shall have any other remedy or cause of action under or relating to this Agreement or any applicable Law, including for reimbursement of expenses; provided, however, that the foregoing release shall not apply to, and shall not release or discharge any Liability arising from, Willful Breach of this Agreement or Fraud by any member of the Seller Group occurring prior to such termination.

**ARTICLE 10**
**GENERAL PROVISIONS**

**10.1** **Survival of Representations, Warranties and Covenants**.  All covenants and agreements contained in this Agreement that by their term are to be performed in whole or in part, or which prohibit actions, subsequent to Closing shall, solely to the extent such covenants and agreements are to be performed, or prohibit actions, subsequent to Closing, survive the Closing in accordance with their terms until fully performed or satisfied.  All other covenants and agreements contained herein, and all representations and warranties contained herein or in any certificated deliveries hereunder shall not survive Closing and shall therefore terminate, including any Action for damages in respect of any breach or inaccuracy thereof.  For the avoidance of doubt, the provisions of Section 6.2(c), Article 7, Section 9.2, this Article 10 and the Confidentiality Agreement shall survive the Closing.

**10.2** **Entire Agreement**.  This Agreement, including the Schedules hereto, the Confidentiality Agreement and the Related Documents, contain the entire understanding of the parties hereto with respect to the subject matter contained herein and therein.  This Agreement supersedes all prior and contemporaneous agreements, arrangements, contracts, discussions, negotiations, undertakings and understandings (including any letters of intent or term sheets), whether written or oral, among the parties with respect to such subject matter (other than the Confidentiality Agreement and the Related Documents) or any prior course of dealings.  The parties hereto have voluntarily agreed to define their rights, Liabilities and obligations respecting the Transactions exclusively in contract pursuant to the express terms and conditions of this Agreement, including the Schedules hereto, the Confidentiality Agreement and the Related Documents, and the parties hereto expressly disclaim that they are owed any duties or entitled to any remedies not expressly set forth in this Agreement, including the Schedules hereto, the Confidentiality Agreement and the Related Documents.  Furthermore, the parties each hereby acknowledge that this Agreement, including the Schedules hereto, the Confidentiality Agreement and the Related Documents embody the justifiable expectations of sophisticated parties derived from arm's-length negotiations, and all parties to this Agreement, the Confidentiality Agreement and the Related Documents specifically acknowledge that no party has any special relationship with another party that would justify any expectation beyond that of an ordinary purchaser and an ordinary seller in an arm's-length transaction.  The sole and exclusive remedies for any Related Claims shall be those remedies available at law or in equity for breach of contract only (as such contractual remedies have been further limited or excluded pursuant to the express terms of this Agreement); and the parties hereby agree that neither party hereto shall have any remedies or cause of action (whether in contract or in tort or otherwise) of any statements, communications, disclosures, failures to disclose, representations or warranties not set forth in this Agreement.

**10.3** **Amendment; No Waiver**.  This Agreement and the Related Documents may be amended, supplemented or changed, and any provision hereof or thereof can be waived, only by a written instrument making specific reference to this Agreement (and, if applicable, the Related Documents) executed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought.  The waiver by any party of a breach of any provision of this Agreement or the Related Documents shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any party to exercise, and no delay in exercising any right, power or remedy

87

hereunder shall operate as a waiver thereof, nor shall a single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

**10.4    Severability; Specific Versus General Provisions**.   Whenever possible, each provision of this Agreement and the Related Documents shall be interpreted in such manner as to be effective and valid under applicable Law, but if any term or other provision of this Agreement or the Related Documents is invalid, illegal, or incapable of being enforced by any Law or public policy, all other terms or provisions of this Agreement and the Related Documents shall nevertheless remain in full force and effect so long as the economic or legal substance of the Transactions is not affected in any manner materially adverse to any party.   Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, in whole or in part, such term or provision is hereby deemed modified to give effect to the original written intent of the parties to the greatest extent consistent with being valid and enforceable under applicable Law.   No party hereto shall assert, and each party shall cause its respective Affiliates or related parties not to assert, that this Agreement or any part hereof is invalid, illegal or unenforceable.

**10.5    Expenses and Obligations**.   Except as otherwise provided in this Agreement, all costs and expenses incurred by the parties hereto in connection with the Transactions, including the costs, expenses and disbursements of counsel and accountants, shall be borne solely and entirely by the party that has incurred such expenses; provided, however, that Purchaser shall pay, or promptly reimburse the Seller for, any filing fees which relate to any required governmental filing or notification under any applicable Antitrust Laws, including filing fees under the HSR Act.

**10.6    Notices**.   All notices, consents, waivers, and other communications under this Agreement or the Related Documents must be in writing and will be deemed to have been duly given (a) if personally delivered, on the date of delivery, (b) if delivered by express courier service of national standing for next day delivery (with charges prepaid), on the Business Day following the date of delivery to such courier service, (c) if delivered by electronic mail (unless the sender receives an automated message that the email has not been delivered) on the date of transmission if on a Business Day before 5:00 p.m. local time of the business address of the recipient party (otherwise on the next succeeding Business Day) and (d) if deposited in the United States mail, first-class postage prepaid, on the date of delivery, in each case to the appropriate addresses or email addresses set forth below (or to such other addresses or facsimile numbers as a party may designate by notice to the other parties in accordance with this Section 10.6):

If to Purchaser:

> Sleep Country Canada Inc.
> 7920 Airport Road
> Brampton, ON, L6T 4N8
> Attention:  Stewart Schaefer; Craig DePratto
> Email:  stewart.schaefer@dormezvous.com; craig.depratto@sleepcountry.ca

with a copy to (which will not constitute notice):

88

Goodwin Procter LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018

Attention: Joshua Zachariah; Ed Amer; Kizzy Jarashow; Harrison Freeman; Benjamin
Loveland
Email: JZachariah@goodwinlaw.com; Eamer@goodwinlaw.com
Kjarashow@goodwinlaw.com; HFreeman@goodwinlaw.com;
BLoveland@goodwinlaw.com

If to the Seller:

Sleep Number Corporation
1001 Third Avenue South
Minneapolis, MN 55404
Attention: Samuel R. Hellfeld
Email:      legal@sleepnumber.com

with a copy (which shall not constitute notice) to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017

Attention: Brian M. Resnick
            Robert F. Smith
            Brian Wolfe
            Lee C. Parnes

Emails:     brian.resnick@davispolk.com
            robert.smith@davispolk.com
            brian.wolfe@davispolk.com
            lee.parnes@davispolk.com

**10.7    Counterparts**.  This Agreement may be executed in two or more counterparts (any of which may be delivered by electronic transmission), each of which shall constitute an original, and all of which taken together shall constitute one and the same instrument.  The exchange of a fully executed Agreement (in counterparts or otherwise) by electronic transmission in .PDF format, or other agreed format shall be sufficient to bind the parties to the terms and conditions of this Agreement.  Minor variations in the form of the signature page, including footers from earlier versions of this Agreement or any Related Document, shall be disregarded in determining the party's intent or the effectiveness of such signature.

**10.8    Governing Law**.  This Agreement, the Related Documents and all Related Claims shall be governed by the internal Laws of the State of Delaware (including its statute of limitations), without giving effect to any choice or conflict of law principles or rules that would cause the application of the Laws of any other jurisdiction.

**10.9    Submission to Jurisdiction; Consent to Service of Process**.

(a)    Without limiting any party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to interpret and/or enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any Related Document, any breach or default hereunder or thereunder, or the Transactions, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 10.6; provided, however, that if the Bankruptcy Cases have closed, the parties agree to irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York over all Related Claims, and each party hereto hereby irrevocably agrees that all Related Claims may be heard and determined in such courts. The parties hereto hereby irrevocably and unconditionally waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the laying of venue of any such Related Claim brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(b)    Each of the parties hereto hereby consents to process being served by any party to this Agreement in any Related Claim by the delivery of a copy thereof in accordance with the provisions of Section 10.6 (other than by email) along with a notification that service of process is being served in conformance with this Section 10.9(b). Nothing in this Agreement will affect the right of any party to serve process in any other manner permitted by Law.

**10.10    Waiver of Jury Trial**.   EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT, THE RELATED DOCUMENTS OR ANY RELATED CLAIMS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE IT HEREBY IRREVOCABLY AND UNCONDITIONALLY EXPRESSLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING OR RELATED CLAIM BROUGHT BY OR AGAINST IT, DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE RELATED DOCUMENTS OR ANY RELATED CLAIMS.

**10.11    Rights Cumulative**.   All rights and remedies of each of the parties under this Agreement and the Related Documents will be cumulative, and the exercise of one or more rights or remedies will not preclude the exercise of any other right or remedy available under this Agreement, the Related Documents or applicable Law.

**10.12    Assignment**.   Except as otherwise provided herein, the provisions hereof shall inure to the benefit of, and be binding upon, the successors by operation of law and permitted assigns of the parties hereto. No assignment of this Agreement or any of the rights, interests or obligations under this Agreement may be made by any party hereto at any time, whether or not by operation of law, without the prior written consent of the Seller and Purchaser, and any attempted assignment

90

without the required consent shall be void. Notwithstanding anything to the contrary herein, Purchaser may, without the consent of any other party, assign its rights hereunder including for collateral security purposes to the Debt Financing Sources and any other lender providing financing to Purchaser or any of its Affiliates.

**10.13   Specific Enforcement; Remedies**.   The parties hereto agree that irreparable damage (for which monetary relief, even if available, would not be an adequate remedy) would occur in the event that any of the provisions of this Agreement were not performed by the parties hereto in accordance with their specific terms or were otherwise breached.  It is accordingly agreed that (i) Purchaser, on the one hand, and the Seller, on the other hand, shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in any court of competent jurisdiction without proof of damages or otherwise and that this shall include the right of the Seller to cause Purchaser to fully perform the terms of this Agreement to the fullest extent permissible pursuant to this Agreement and applicable Laws and to thereafter cause this Agreement and the Transactions to be consummated on the terms and subject to the conditions thereto set forth in this Agreement, and (ii) the right of specific performance and other equitable relief is an integral part of the Transactions and without that right, neither the Seller nor Purchaser would have entered into this Agreement.  Remedies shall be cumulative and not exclusive and shall be in addition to any other remedies which any party may have under this Agreement.  Each of the parties hereto hereby (A) waives any defenses in any action for specific performance, including the defense that a remedy at law would be adequate, (B) waives any requirement under any Law to post a bond or other security as a prerequisite to obtaining equitable relief and (C) agrees not to assert that a remedy of specific performance or other equitable relief is unenforceable, invalid, contrary to law or inequitable for any reason, and not to assert that a remedy of monetary damages would provide an adequate remedy or that the parties otherwise have an adequate remedy at Law.  Notwithstanding anything to the contrary, in no event shall this Section 10.13 be used, alone or together with any other provision of this Agreement, to require the Seller to remedy any breach of any representation or warranty of the Seller.

**10.14   Third-Party Beneficiaries**.  Except to the extent otherwise expressly referred to herein or as set forth in Section 9.2(b) (with respect to the released parties identified therein), Section 10.15 (with respect to the Nonparty Affiliates), Section 10.16 (with respect to the released parties identified therein), and the next sentence, nothing in this Agreement, express or implied, is intended to confer upon any Person other than the parties hereto any rights or remedies of any nature whatsoever under or by reason of this Agreement.  From and after the Closing, all of the Persons identified as third-party beneficiaries in the first sentence of this Section 10.14 shall be entitled to enforce such provisions and to avail themselves of the benefits of any remedy for any breach of such provisions, all to the same extent as if such Persons were parties to this Agreement. The representations and warranties in this Agreement are the product of negotiations among the parties hereto and are for the sole benefit of the parties hereto.  Any inaccuracies in such representations and warranties are subject to waiver by the parties hereto in accordance with this Agreement without notice or Liability to any other Person.  In some instances, the representations and warranties in this Agreement may represent an allocation among the parties hereto of risks associated with particular matters regardless of the knowledge of any party hereto.  Consequently, Persons other than the parties hereto may not rely upon the representations and warranties in this

Agreement as characterizations of actual facts or circumstances as of the date of this Agreement or as of any other date.

10.15   **No Personal Liability of Directors, Officers and Owners**.  All Related Claims may be made only against (and are those solely of) the entities that are expressly identified as parties in the preamble to this Agreement (each, a "**Contracting Party**," and collectively, the "**Contracting Parties**").  No Person who is not a Contracting Party, including any current, former or future director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney, representative or assignee of, or any investment banker or financial advisor or lender to, any Contracting Party, or any current, former or future director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney, representative or assignee of, or any investment banker or financial advisor or lender to, any of the foregoing (each, a "**Nonparty Affiliate**," and collectively, "**Nonparty Affiliates**"), shall have any Liability pursuant to any Related Claim; and, to the maximum extent permitted by Law, each Contracting Party hereby waives and releases all such Liabilities, claims, causes of action, and obligations against any such Nonparty Affiliates.  Without limiting the foregoing, to the maximum extent permitted by Law, (a) each Contracting Party hereby waives and releases any and all rights, claims, demands, or causes of action that may otherwise be available at Law or in equity, or granted by statute, to avoid or disregard the entity form of a Contracting Party or otherwise impose Liability of a Contracting Party on any Nonparty Affiliate, whether granted by statute or based on theories of equity, agency, control, instrumentality, alter ego, domination, sham, single business enterprise, piercing the veil, unfairness, undercapitalization, or otherwise; and (b) each Contracting Party disclaims any reliance upon any Nonparty Affiliates with respect to the performance of this Agreement or any representation or warranty made in, in connection with, or as an inducement to this Agreement or the Related Documents.

10.16   **General Release**.

(a)      Effective as of the Closing, the Seller, on behalf of itself, its Affiliates and each of their respective successors and assigns (each of the foregoing, a "**Seller Releasing Party**"), hereby fully, irrevocably and unconditionally releases and forever discharges Purchaser and its respective past and present directors, managers, officers, employees, agents, stockholders, members, representatives and Affiliates from and against, and covenants that it will not (directly or indirectly) assert any claim or proceeding of any kind before any Governmental Authority based upon, any and all claims, Actions, causes of action, suits, rights, debts, agreements, Losses and demands whatsoever and all consequences thereof, known or unknown, actual or potential, suspected or unsuspected, fixed or contingent, both in law and in equity, whether existing as of the Closing or arising thereafter, that a Seller Releasing Party has or may have, now or in the future, arising out of, relating to, or resulting from any act or omission, error, negligence, breach of contract, tort, violation of law, matter or cause whatsoever from the beginning of time to the Closing Date.  The foregoing sentence shall not be deemed to be a release or waiver by a Seller Releasing Party of any Action it may have (1) under this Agreement or any of the other Related Documents, (2) as a trade counterparty of any of Purchaser or its Affiliates, or (3) to the extent arising out of or resulting from Fraud or Willful Breach by Purchaser or any of its Affiliates.

(b)      Effective as of the Closing, Purchaser, on behalf of itself, its Affiliates and each of their respective successors and assigns (each of the foregoing, a "**Purchaser Releasing Party**"), hereby fully, irrevocably and unconditionally releases and forever discharges Seller, its Affiliates and its and their respective past and present directors, managers, officers, employees, agents, stockholders, members, representatives and Affiliates from and against, and covenants that it will not (directly or indirectly) assert any claim or proceeding of any kind before any Governmental Authority based upon, all claims, Actions, causes of action, suits, rights, debts, agreements, Losses and demands whatsoever and all consequences thereof, known or unknown, actual or potential, suspected or unsuspected, fixed or contingent, both in law and in equity, whether existing as of the Closing or arising thereafter, that a Purchaser Releasing Party has or may have, now or in the future, arising out of, relating to, or resulting from any act or omission, error, negligence, breach of contract, tort, violation of law, matter or cause whatsoever from the beginning of time to the Closing Date.  The foregoing sentence shall not be deemed to be a release or waiver by a Purchaser Releasing Party of any Action it may have (1) under this Agreement or any of the other Related Documents  , (2) as a trade creditor of any member of the Seller Group, or (3) to the extent arising out of or resulting from Fraud or Willful Breach by any member of the Seller Group or any of its Affiliates.

**10.17  Legal Representation**.  Purchaser and the Seller acknowledge and agree that the Law Firm has represented the Seller Group in connection with the negotiation, preparation, execution, delivery and performance of this Agreement and the Related Documents and the consummation of the Transactions, and that the Seller, its Affiliates and its partners, officers, directors and representatives (each, a "**Seller Group Member**," and collectively, the "**Seller Group Members**") have a reasonable expectation that the Law Firm will represent them in connection with any Action involving any Seller Group Member, on the one hand, and Purchaser or any of its Affiliates and representatives (each, a "**Purchaser Group Member**," and collectively, the "**Purchaser Group Members**"), on the other hand, arising under this Agreement, the Related Documents or the Transactions.  Purchaser hereby, on behalf of itself and the other Purchaser Group Members, irrevocably:  i) acknowledges and agrees that any attorney-client privilege, solicitor-client privilege, work product or other attorney-client or solicitor-client confidential information ("**Attorney-Client Information**") arising from communications prior to the Closing between any Seller (including any one or more officers, directors or stockholders of such Seller), on the one hand, and the Law Firm, on the other hand, are not included in the property, rights, privileges, powers, franchises and other interests that are possessed by or vested in the Business or the Transferred Assets, that any such Attorney-Client Information shall be deemed property of, and controlled solely by, such Seller for the benefit and on behalf of the Seller Group Members and, upon request, convey and transfer any Attorney-Client Information to the Seller; ii) acknowledges and agree that the Seller Group Members shall have the right to retain, or cause the Law Firm to retain, any such documentation or information in the possession of the Law Firm or such Seller Group Members at the Closing that is subject to the attorney-client privilege or solicitor-client privilege; iii) agrees not to access, retain or use any documentation or information constituting Attorney-Client Information and that no Purchaser Group Member shall have any right to waive any attorney-client privilege or other right to confidentiality with respect to such Attorney-Client Information; iv) disclaims the right to assert a waiver by any Seller Group Member with regard to the attorney-client privilege, solicitor-client privilege or other right to

confidentiality with respect to such Attorney-Client Information solely due to the fact that such documentation or information is physically in the possession of Purchaser after the Closing; v) consents to the Law Firm's representation after the Closing of any Seller Group Member in any Action that may relate to a Purchaser Group Member or the Transactions and consent to and waive any conflict of interest arising therefrom without the need for any future waiver or Consent; and vi) consents to the disclosure by the Law Firm to any Seller Group Member of any documentation or information obtained by the Law Firm during the course of its representation of Seller or any Affiliate prior to the Closing, whether related to this Agreement, the Related Documents, the Transactions or otherwise, whether or not such disclosure is made prior to or after the Closing and whether or not the documentation or information disclosed is subject to any attorney-client privilege, solicitor-client privilege or confidentiality obligation to any Seller, any Affiliate of such Seller or any other Person.   In the event that any Action arises after the Closing between any Purchaser Group Member and a Person other than a Seller Group Member, such Purchaser Group Member shall not disclose any documentation or information that is subject to an attorney-client privilege or other rights of confidentiality referenced in this Section 10.17 without the prior written consent of the applicable Seller; provided, however, that if such Purchaser Group Member is requested or required by judicial order or other legal process to make such disclosure, such Purchaser Group Member shall promptly notify the applicable Seller in writing of such requirement (without making disclosure) and shall provide such Seller with such cooperation and assistance as shall be necessary to enable such Seller to prevent disclosure by reason of such attorney-client privilege, solicitor-client privilege or other rights of confidentiality.   This Section 10.17 is for the benefit of the Seller Group Members and such Persons are intended third-party beneficiaries of this Section 10.17.

10.18   **Bulk Sales Laws**.   The Parties intend that pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Transferred Assets shall be Free and Clear of any Liens in the Transferred Assets including any liens or claims arising out of the bulk transfer Laws except Permitted Liens, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.   In furtherance of the foregoing, each party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the transactions contemplated by this Agreement.

10.19   **Fiduciary Obligations**.   Nothing in this Agreement or the Related Documents will require any of Seller Group or any of their respective boards of directors (or equivalent governing bodies) to take any action, or to refrain from taking any action, to the extent any such board of directors (or equivalent governing body) determines that taking or failing to take such action would be inconsistent with such board of directors' (or equivalent governing body's) obligations under applicable Law.   The Seller Group retain the right to pursue any transaction or restructuring strategy, including any Alternate Transaction, that, in the good faith and business judgment of the board of directors (or equivalent governing body), permits such board of directors to comply with its fiduciary duties under applicable Law to maximize the value of their businesses and estates.

10.20   **Debt Financing Sources**.   Notwithstanding anything in this Agreement to the contrary, Seller and the Seller Group, on behalf of itself and its Subsidiaries, hereby: (a) agrees that any Action, whether in law or in equity, whether in contract or in tort or otherwise, involving any Debt Financing Sources Related Party, arising out of or relating to, this Agreement, the Debt Financing or any of the agreements entered into in connection with the Debt Financing or any of

94

the transactions contemplated hereby or thereby or the performance of any services thereunder shall be subject to the exclusive jurisdiction of any federal or state court in the Borough of Manhattan, New York, New York, so long as such forum is and remains available, and any appellate court thereof and each party hereto irrevocably submits itself and its property with respect to any such Action to the exclusive jurisdiction of such court, and such Action (except to the extent relating to the interpretation of any provisions in this Agreement) shall be governed by the laws of the State of New York (without giving effect to any conflicts of law principles that would result in the application of the laws of another jurisdiction), (b) agrees not to bring or support any Action of any kind or description, whether in law or in equity, whether in contract or in tort or otherwise, against any Debt Financing Sources Related Party in any way arising out of or relating to, this Agreement, the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder in any forum other than any federal or state court in the Borough of Manhattan, New York, New York, (c) agrees that service of process upon Seller or its Subsidiaries in any such Action or proceeding shall be effective if notice is given in accordance with Section 10.6, (d) irrevocably waives, to the fullest extent that it may effectively do so, the defense of an inconvenient forum to the maintenance of such Action in any such court, (e) knowingly, intentionally and voluntarily waives to the fullest extent permitted by applicable Law all rights of trial by jury in any Action brought against the Debt Financing Sources Related Parties in any way arising out of or relating to, this Agreement, the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder, (f) agrees that no Debt Financing Sources Related Party shall be subject to any special, consequential, punitive or indirect damages or damages of a tortious nature, (g) agrees that no Debt Financing Source Related Party will have any liability to the Seller or the Seller Group of their respective Affiliates in connection with this Agreement, the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder, whether in law or in equity, whether in contract or in tort or otherwise, (h) agrees not to commence (and, if commenced, agrees to dismiss or otherwise terminate, and not to assist) any action or proceeding against any Debt Financing Source (and/or any of their Affiliates and/or their Affiliates' Representatives) in connection with this Agreement, any debt commitment letter, the Debt Financing, the definitive agreements entered into in connection with the Debt Financing or in respect of any other document or theory of law or equity and in no event shall the Seller, the Seller Group or any of their respective affiliates be entitled to directly seek specific performance of this Agreement against any Debt Financing Source, and (i) agrees that the Debt Financing Sources Related Parties are express third party beneficiaries of, and may enforce, the foregoing agreements in this Section 10.20 and in Section 10.12 and Section 10.13 and such provisions (and any other provision or definition of this Agreement to the extent an amendment, supplement, waiver or other modification of such provision would modify the substance of this Section) shall not be amended in any way materially adverse to any Debt Financing Source Related Party without the prior written Consent of each related Debt Financing Source. Notwithstanding the foregoing, (i) nothing in this Section 10.20 shall limit the assertion by Purchaser of express rights of Purchaser or any of its Affiliates set forth in any debt commitment letter or definitive documentation in respect of the Debt Financing and (ii) this Section 10.20 shall not apply to the

95

extent any Debt Financing Source, Debt Financing Source Related Party or any other provider of financing is an Affiliate or otherwise affiliated with the Purchaser.

**10.21   Sleep Country Guarantee**.

(a)   Nature of Guarantee. Sleep Country hereby absolutely, unconditionally and irrevocably guarantees to the Seller the full and timely obligation to make the payments required to be paid by Purchaser pursuant to this Agreement, including Sections 2.10(a), 2.11, 2.15 and 6.9(c), when due and payable, including any interest, fees, costs and expenses payable in respect thereof (such obligation, the "**Guaranteed Obligation**"). The obligation of Sleep Country under this Section 10.21 shall constitute a present and continuing guarantee of payment of the Guaranteed Obligation, and not of collectability or performance. Sleep Country agrees that the Guaranteed Obligation will not be discharged and shall remain in full force and effect, except by complete payment of such Guaranteed Obligation, to the extent they become payable. Sleep Country further agrees that its liability under this Section 10.21 with respect to the Guaranteed Obligation is absolute and unconditional and shall be enforceable against Sleep Country to the same extent as if Sleep Country were the primary obligor (and not merely a surety) of the Guaranteed Obligation. When pursuing its rights and remedies hereunder against Sleep Country, Seller shall be under no obligation to pursue such rights and remedies it may have against Purchaser or any other person for the Guaranteed Obligations or any right of offset with respect thereto, and any failure by Seller to pursue such other rights or remedies or to collect any payment from Purchaser or any other person or to realize upon or to exercise any such right of offset shall not relieve Sleep Country of any liability hereunder.

(b)   Limitations.

(i)   The Seller (on behalf of the Seller Group) hereby acknowledges and agrees that: (A) Sleep Country has no obligation or liability in respect of the Guaranteed Obligation to any Person other than the Seller; (B) the only obligation and liability of Sleep Country under this Section 10.21 is for the Guaranteed Obligation; (C) only the Seller has the right to enforce the Guaranteed Obligation; (D) in no event shall Sleep Country's aggregate obligation hereunder exceed the aggregate amount of the Guaranteed Obligation; and (D) other than the Deposit Amount, in each case except in the case of Fraud or Willful Breach of Sleep Country or Purchaser, no other funds will be contributed to Purchaser unless and until the Closing occurs.

(ii)   Notwithstanding anything to the contrary contained in this Section 10.21, the Seller (on behalf of the Seller Group) hereby agrees that, to the extent Purchaser is relieved of all or any portion of the Guaranteed Obligation, either by payment thereof by or on behalf of Purchaser or pursuant to this Agreement or any other written agreement between Seller and Purchaser (any amount so relieved, the "**Reduction Amount**"), the Guaranteed Obligation shall be reduced dollar for dollar by an amount equal to the Reduction Amount and Sleep Country's guaranty of the Guaranteed Obligation shall be reduced by an amount equal to the Reduction Amount.

96

*[Signature pages follow.]*

97

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized representatives, as of the date first written above.

**PURCHASER:**

**SNBR INC.**

By: _____

Name:  Stewart Schaefer
Title:    Chief Executive Officer

**GUARANTOR:**

**SLEEP COUNTRY CANADA INC. (for purposes of <u>Section 10.21</u> only):**

By: _____

Name:  Stewart Schaefer
Title:    Chief Executive Officer

[*Signature Page to Asset Purchase Agreement*]

**SELLER:**

**SLEEP NUMBER CORPORATION**


By:     *Linda Findley*
      44C0D46CF3534C9...

Name:  Linda Findley
Title:   President and Chief Executive Officer

[*Signature Page to Asset Purchase Agreement*]

## EXHIBIT C

**Gottlieb Declaration**

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Tel.: (212) 450-4000
Brian M. Resnick
Angela M. Libby
Stephen D. Piraino
Richard J. Steinberg
Sihui (Sophy) Ma (*pro hac vice* pending)
Mordechai Rivkin

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **Chapter 11** |
| **SLEEP NUMBER CORPORATION,** *et al.*, | **Case No. 26-11399 ([●])** |
| Debtors.[1] | **[Joint Administration Requested]** |

**DECLARATION OF MICHAEL GOTTLIEB IN SUPPORT OF MOTION OF DEBTORS
FOR ENTRY OF ORDERS (I)(A) APPROVING BIDDING PROCEDURES FOR SALE
OF THE DEBTORS' ASSETS, (B) APPROVING THE DESIGNATION OF SNBR INC.,
AN AFFILIATE OF SLEEP COUNTRY CANADA, INC., AS THE STALKING HORSE
BIDDER FOR THE ASSETS, (C) AUTHORIZING AND APPROVING ENTRY INTO
THE STALKING HORSE ASSET PURCHASE AGREEMENT, (D) APPROVING BID
PROTECTIONS, (E) SCHEDULING AN AUCTION FOR, AND HEARING TO
APPROVE, THE SALE OF THE DEBTORS' ASSETS, (F) APPROVING THE FORM
AND MANNER OF NOTICES OF SALE, AUCTION, AND SALE HEARING, AND
(G) APPROVING THE ASSUMPTION AND ASSIGNMENT PROCEDURES,
(II)(A) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF
LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES AND (B) AUTHORIZING
ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND
UNEXPIRED LEASES, AND (III) GRANTING RELATED RELIEF**

---

[1] The Debtors' names and last four digits of their respective employer identification numbers are as follows: Sleep Number Corporation (7886); Select Comfort Retail Corporation (9757); Select Comfort Canada Holding Inc. (4273); Select Comfort SC LLC (5901); and Sleep Number Health Corporation (2499).  The Debtors' mailing address is 1001 Third Avenue South, Minneapolis, MN 55404.

I, Michael Gottlieb, declare as follows:

1.      I am a Managing Director at Guggenheim Securities, LLC ("**Guggenheim Securities**"), an investment banking firm with principal offices located at 330 Madison Avenue, New York, New York, 10017.  Guggenheim Securities is the proposed investment banker for Sleep Number Corporation and certain of its affiliates, as debtors and debtors in possession in the above-captioned cases (collectively, the "**Debtors**").[2]

2.      I submit this declaration (this "**Declaration**") in support of the *Motion of Debtors for Entry of Orders (I)(A) Approving Bidding Procedures for Sale of the Debtors' Assets, (B) Approving the Designation of SNBR Inc., an affiliate of Sleep Country Canada, Inc., as the Stalking Horse Bidder for the Assets, (C) Authorizing and Approving Entry into the Stalking Horse Asset Purchase Agreement, (D) Approving Bid Protections, (E) Scheduling an Auction for, and Hearing to Approve, the Sale of the Debtors' Assets, (F) Approving the Form and Manner of Notices of Sale, Auction, and Sale Hearing, and (G) Approving the Assumption and Assignment Procedures, (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances and (B) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* (the "**Motion**") filed contemporaneously herewith.[3]

3.      Although Guggenheim Securities is expected to be compensated for its work as the Debtors' proposed investment banker in the Chapter 11 Cases, I am not being compensated separately for this Declaration or testimony.  Except as otherwise indicated herein, all of the facts

---

[2] The Debtors anticipate filing an application to retain Guggenheim Securities as their investment banker, effective as of the commencement of their chapter 11 cases, shortly hereafter.

[3] Capitalized terms used but not defined otherwise herein shall have the meanings ascribed to them in the Motion or the *Declaration of Amy O'Keefe in Support of the Chapter 11 Proceedings and First Day Pleadings* [ECF No. [•]] (the "**First Day Declaration**"), as applicable.

2

set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, the information provided to me by Guggenheim Securities professionals involved in advising the Debtors in the Chapter 11 Cases, or information provided to me by the Debtors.  If called upon to testify, I could and would testify to the facts set forth herein on that basis.  I am over the age of 18 years and am authorized to submit this Declaration.

### Background and Qualifications

4.       I have been employed at Guggenheim Securities since 2014.  I have over 20 years of experience, including as an investment banker advising companies in the retail and consumer sectors.  My areas of expertise include, among other things, (a) M&A and asset sales, (b) analyzing business plans and related financial projections for companies, (c) developing valuations, and (d) sizing, structuring, raising, and executing all aspects of financing transactions. Among others, I have represented Ascena Retail Group, Big Lots, NBG Home, Destination XL, Fullbeauty Brands, Walmart, CVS Caremark and DineEquity.

5.       Prior to joining Guggenheim Securities I was a Director and member of the Retail group at Barclays Capital where I worked from 2007 to 2014.  I hold a Bachelor of Arts degree in Economics from The Johns Hopkins University and a Master of Business Administration degree from the NYU Stern School of Business.

### The Retention of Guggenheim Securities

6.       Guggenheim Securities has been engaged as investment banker to the Debtors, and members of my team and I have been working closely with the Debtors, since February 2026. Since being engaged by the Debtors, Guggenheim Securities has rendered investment banking advisory services to the Debtors in connection with the Debtors' evaluation of financing and strategic alternatives in light of their financial position.  Additionally, Guggenheim Securities has

3

worked with the Debtors' management team and other professionals retained by the Debtors and has become familiar with the Debtors' capital structure, financial condition, liquidity needs, and business operations.

### The Marketing and Sale Process

7.      As more fully described in the First Day Declaration, prior to the commencement of these Chapter 11 Cases, after considering a wide range of potential strategic alternatives and engaging in extensive discussions with relevant stakeholders, the Debtors, in consultation with their advisors, concluded that, based on recent performance trends, the most viable pathway to maintain its business and preserve liquidity was to pursue a going concern sale.

8.      Accordingly, in February 2026, the Debtors, with the assistance of Guggenheim Securities, commenced a robust months-long marketing process to assess potential interest in a value maximizing sale transaction, including potential interest in serving as a stalking horse in connection with any such sale transaction.  In connection with this marketing process, over 53 financial and strategic parties were contacted.  Several of these parties, including the Stalking Horse Bidder, expressed interest in considering a transaction with the Debtors, and each was offered an opportunity to enter into a non-disclosure agreement to continue in the process. Accordingly, the Debtors executed non-disclosure agreements with 19 interested parties, each of which was provided with a confidential information memorandum and granted access to a data room containing certain confidential information regarding the Assets.  Thereafter, each of these prospective purchasers was granted access to diligence calls and meetings with Guggenheim Securities and the Debtors' management team.

9.      As a result of the above-described marketing process, the Debtors received five proposals from interested parties for the sale of the Assets.  After evaluating these proposals, the

Debtors, in consultation with their advisors, determined that a proposal received from the Stalking Horse Bidder was the best proposal received to date and negotiated the terms of the Stalking Horse Agreement.

10.    Following the approval of the proposed Bidding Procedures, the Debtors, with the assistance of Guggenheim Securities, intend to continue to market the Assets to potential buyers, including parties who submitted proposals during the prepetition marketing process, other potential buyers approached by Guggenheim Securities and/or that expressed inbound interest in the prepetition marketing process, and/or parties that did not participate in the prepetition marketing process.

### The Bidding Procedures and Selection of a Stalking Horse Bidder

11.    As noted in the Motion, the Debtors seek approval of the Bidding Procedures to facilitate a value-maximizing sale of the Assets in an expeditious but efficient manner.  The Bidding Procedures contain provisions relating to, among other things, (a) the Assets available for sale, (b) the manner in which bids and bidders become "qualified," (c) the provision of diligence by the Debtors to bidders, (d) the receipt and negotiation of bids received, (e) the conduct of any Auction, and (f) the selection and approval of the Successful Bidder(s) and Alternate Bidder(s). In addition, the Bidding Procedures contain the following proposed dates and deadlines:

| | |
|---|---|
| **June 25, 2026** | The deadline for the Debtors to file the Potential Assumption and Assignment Notice (the "**Potential Assumption Notice Deadline**") |
| **July 2, 2026** | Hearing to consider approval of the Bidding Procedures and for entry of the Bidding Procedures Order, subject to Court availability |
| **July 8, 2026 at 4:00 p.m.** | The deadline by which all binding Bids must be submitted to the Debtors by Potential Bidders (the "**Bid Deadline**") |

5

| | |
|---|---|
| July 10, 2026 at 4:00 p.m. | The deadline to object to this Motion and the sale of the Assets (including with respect to the identity of the Stalking Horse Bidder and adequate assurance of future performance by the Stalking Horse Bidder) (the "**Sale Objection Deadline**"), with the exception of objections solely related to the identity of the Successful Bidder and adequate assurance of future performance by the Successful Bidder (in each case, other than the Stalking Horse Bidder) |
| July 10, 2026 at 4:00 p.m. | The deadline for a Counterparty to object to its Proposed Cure Cost or the Potential Assumption and Assignment Notice (the "**Cure Objection Deadline**"), with the exception of objections solely related to the identity of the Successful Bidder and adequate assurance of future performance by the Successful Bidder (in each case, other than the Stalking Horse Bidder)[4] |
| July 13, 2026 at 10:00 a.m. | Auction (if any) to be held at the New York offices of Davis Polk (or such other location as the Debtors may designate in accordance with the Bidding Procedures) |
| July 13, 2026 | Target date for the Debtors to file the Notice of Auction Results and Proposed Assumption and Assignment Notice (the "**Post-Auction Notice Deadline**") |
| July 14, 2026 at 4:00 p.m. | The deadline for a Counterparty to object to the Proposed Assumption and Assignment Notice, if applicable (the "**Post-Auction Objection Deadline**") |
| July 15, 2026 | Hearing to consider approval of the Sale Transaction and for entry of the Sale Order, subject to Court availability |
| July 31, 2026 | Closing of the Sale Transaction (subject to obtaining required regulatory approvals) |

12.     Additionally, pursuant to the Motion, the Debtors also seek authority to enter into the Stalking Horse Agreement with the Stalking Horse Bidder. In connection therewith, the Debtors seek approval of certain Bid Protections. Specifically, as noted in the Motion, the Stalking Horse Agreement provides for: (a) the payment of a Break-Up Fee in an amount not to exceed 3%

---

[4] The Cure Objection Deadline shall be 14 days after the Potential Assumption Notice Deadline.

6

of the Purchase Price to be paid by the Stalking Horse Bidder, and (b) the Expense Reimbursement, which seeks the reimbursement of the reasonable and documented fees and out-of-pocket expenses of the Stalking Horse Bidder in an amount up to $4,000,000.  Additionally, in accordance with the terms and conditions of the Bidding Procedures, the Stalking Horse Bid will be subject to higher or otherwise better bids, so as to permit the Debtors to, ultimately, identify the Successful Bidder that will have submitted the highest or otherwise best bid.

13.     Based on my experience, I believe that the proposed Bidding Procedures have been designed to maximize the value received for the Assets by facilitating a competitive bidding process in which all Potential Bidders are encouraged to participate and submit competing bids within the specified time as, I understand, is required by the Stalking Horse Agreement and DIP Loan Agreement.  Additionally, given the robust prepetition marketing process described above (including the number of parties that have been contacted, executed non-disclosure agreements and started to engage in due diligence), the post-petition marketing process contemplated to be undertaken (as described above and in the Motion), the amount of diligence materials anticipated to be made available to such Potential Bidders, and the Debtors' liquidity position, it is my view, based on my experience as an investment banker, that the proposed Bidding Procedures are reasonable under the circumstances of the Chapter 11 Cases.

14.     With respect to the Bid Protections, in my experience, it is my view that stalking horse bidders typically require bid protections similar to the type of Bid Protections set forth in the proposed Bidding Procedures (including both the Break-Up Fee and Expense Reimbursement) and that such terms are customary and usual under the circumstances.  Here, the negotiations around the Stalking Horse Agreement extended for multiple weeks.  In my view, based solely on the discussions that I participated in and observed during the course of these negotiations, as well as

7

my experience with other sale processes, these negotiations were conducted in good faith and at arm's length and that the Stalking Horse Bid Protections were an integral component of the overall terms of the Stalking Horse Agreement. I am also not aware of any collusive conduct between the Stalking Horse Bidder and any of the other parties who submitted proposals during the prepetition marketing process. Additionally, based on my experience as an investment banker, designating a stalking horse bidder establishes a floor for bidding that may ultimately increase the consideration given in exchange for the Assets.

15.    Finally, the timeline proposed by the Debtors in the Bidding Procedures provides approximately four weeks between the commencement of prepetition marketing efforts and the Bid Deadline. Under the circumstances described herein and in the Motion (including the robust prepetition marketing process and the milestone requirements under the DIP Loan Agreement referred to above), and taking into account the time that a number of the most likely interested parties have already been engaged in conducting a significant amount of due diligence during the prepetition marketing process, I believe that, based on my experience as an investment banker, the proposed timeline provides interested parties with a reasonable amount of time to obtain information and formulate and submit a timely and informed bid to purchase the Assets, and to thereby enable the Debtors to pursue the value-maximizing sale transaction(s) that the Bidding Procedures have been designed to facilitate. Additionally, at the Auction, as set forth in the proposed Bidding Procedures, the Debtors will have an opportunity to consider all potential competing offers and select the offer for the Assets that they deem to be the highest or otherwise best offer.

8

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated:   June 12, 2026
              New York, New York

By: /s/ _____

Michael Gottlieb
Guggenheim Securities, LLC

9