DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Tel.: (212) 450-4000
Brian M. Resnick
Angela M. Libby
Stephen D. Piraino
Richard J. Steinberg
Sihui (Sophy) Ma
Mordechai Rivkin

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **SLEEP NUMBER CORPORATION,** *et al.*, | **Case No. 26-11399 (KYP)** |
| **Debtors.**[1] | **Jointly Administered** |

**REPLY IN SUPPORT OF THE DEBTORS' MOTION FOR INTERIM AND FINAL
ORDERS AUTHORIZING (I) THE DEBTORS TO (A) HONOR PREPETITION
EMPLOYEE OBLIGATIONS AND DIRECTOR OBLIGATIONS AND (B) MAINTAIN
EMPLOYEE BENEFITS PROGRAMS AND PAY RELATED ADMINISTRATIVE
OBLIGATIONS,  (II) CURRENT AND FORMER EMPLOYEES TO PROCEED WITH
OUTSTANDING WORKERS' COMPENSATION CLAIMS, AND (III) FINANCIAL
INSTITUTIONS  TO HONOR AND PROCESS RELATED CHECKS AND TRANSFERS**

---

[1]  The Debtors' names and last four digits of their respective employer identification numbers are as follows: Sleep Number Corporation (7886); Select Comfort Retail Corporation (9757); Select Comfort Canada Holding Inc. (4273); Select Comfort SC LLC (5901); and Sleep Number Health Corporation (2499).  The Debtors' mailing address is 1001 Third Avenue South, Minneapolis, MN 55404.

Sleep Number Corporation and its subsidiaries (collectively, the "**Debtors**"), each of which is a debtor and debtor in possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby file this reply ("**Reply**")[2] in support of the *Motion of the Debtors for Entry of Interim and Final Orders Authorizing (I) the Debtors to (A) Honor Prepetition Employee Obligations and Director Obligations and (B) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (II) Current and Former Employees to Proceed with Outstanding Workers' Compensation Claims, and (III) Financial Institutions to Honor and Process Related Checks and Transfers* [ECF No. 5] (the "**Wages Motion**") and in response to the *United States Trustee's Objection to Motion of the Debtors for Entry of Interim and Final Orders Authorizing (I) the Debtors to (A) Honor Prepetition Employee Obligations and Director Obligations and (B) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (II) Current and Former Employees to Proceed with Outstanding Workers' Compensation Claims, and (III) Financial Institutions to Honor and Process Related Checks and Transfers* [ECF No. 366] (the "**Objection**") filed by the United States Trustee for Region 2 (the "**U.S. Trustee**"). The Wages Motion is supported by the *Declaration of Amy O'Keefe in Support of the Chapter 11 Proceedings and First Day Pleadings* [ECF No. 3] (the "**First Day Declaration**"). In further support of the Wages Motion, the Debtors hereby submit the *Declaration of Amy O'Keefe in Support of the Motion of the Debtors for Entry of Interim and Final Orders Authorizing (I) the Debtors to (A) Honor Prepetition Employee Obligations and Director Obligations and (B) Maintain Employee Benefits Programs and Pay Related Administrative*

---

[2] Capitalized terms used but that are not defined herein shall have the meanings ascribed to such terms in the Wages Motion, the First Day Declaration, and *Second Interim Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [ECF No. 226] (the "**Second Interim DIP Order**"), as applicable.

*Obligations, (II) Current and Former Employees to Proceed with Outstanding Workers'*
*Compensation Claims, and (III) Financial Institutions to Honor and Process Related Checks and*
*Transfers* (the "**Wages Declaration**"), attached hereto as **Exhibit A**, and further represent as
follows:

## PRELIMINARY STATEMENT

1.      The U.S. Trustee's Objection should be overruled.  The Objection asks the Court
to deny a customary, targeted retention program (the "**Non-Insider KERP**") supported by the
Official Committee and uncontested by any of the Debtors' economic stakeholders for 38 non-
insider employees (collectively, the "**Participants**") whose continued service is necessary to
stabilize the Debtors' operations, preserve the sale process, and close a value-maximizing
transaction.  The U.S Trustee's request rests on the faulty premise that the Non-Insider KERP is
not a "retention plan" simply because the Stalking Horse APA contemplates the purchaser offering
employment to certain employees included on a list to be determined by the Debtors' CEO, which
the U.S. Trustee alleges to "upon information and belief, include the Participants," and the
purchaser has a walk right if fewer than 85%[3] of such employees accept the offer.  Obj. ¶33.  As
of the date hereof, such "list" is still subject to ongoing discussions between the CEO and the
Purchaser.  To what extent the 38 Participants will be included on the list is still in flux and
therefore has not been communicated to the Participants, making this provision in the APA
irrelevant to the question of whether the Non-Insider KERP was necessary and appropriate to
retain the Participants during these Chapter 11 Cases. Wages Decl. ¶13.  In addition, as is typical
in Section 363 sales, the Stalking Horse APA represents just one possible outcome of the Chapter

---

[3] In fact, such walk right was removed from the Final APA, which shows that it was inappropriate for the U.S. Trustee
to use provisions of the Stalking Horse APA, which is subject to further modifications and movement, to show that
the outcome of the sale was certain at the time the Non-Insider KERP was designed. *See* Final APA at Art. 8.2.

11 Cases, since it is subject to a competitive auction process intended to elicit higher and better offers, as well as a fiduciary out permitting the Debtors to pursue an alternate transaction. *See* Stalking Horse APA at Art. 10.19.  There was no guarantee or requirement that these offers or alternative transaction would contain the same obligation that the purchaser offer employment to any of the Debtors' employees.  In addition to presenting the terms of the Stalking Horse APA as if they were final, the U.S. Trustee also disregards the work required to get to a closing and that, until a sale closes, the Participants remain employees of the Debtors, face increased workloads and uncertainty, and are free to leave.  Employees are the lifeblood of the Debtors' business and the Debtors' good faith business judgment that the Non-Insider KERP inures to the benefit of their estates is well supported by the evidentiary record.

2.    The evidentiary record answers the U.S. Trustee's remaining Objections.  *First*, the Participants are not insiders of the Debtors.  The Participants are not members of the Board, were not appointed by the Board, are not named executive officers or officers for purposes of Section 16 of the Exchange Act, and are not members of the Executive Leadership Team that sets the Debtors' corporate policy and strategic direction.  Although some Participants have titles such as vice president, director, or senior director, those titles reflect supervisory responsibility—not insider status.  The undisputed record shows that none of the Participants dictates corporate policy, controls the strategic direction of the Debtors, exercises discretionary control over substantial budgetary amounts, or is authorized to dispose of significant corporate assets. Wage Decl. ¶¶ 5-11.

3.    *Second*, the Non-Insider KERP represents a sound exercise of the Debtors' business judgment and, even under a heightened standard if it were to apply, is easily justified by the facts and circumstances of these Chapter 11 Cases.  While the U.S. Trustee seems to argue that no facts

4

or circumstances could possibly justify a Non-Insider KERP in a sale case (Obj. ¶ 32), this assertion has no basis in the applicable law and is not supported by the facts of these Chapter 11 Cases.  Rather, the Non-Insider KERP provides modest retention payments to key employees who perform accounting, treasury, engineering, technology, administrative, and operational functions. Wage Decl. ¶ 5.  These employees were carefully selected by senior leadership after rigorous consideration of the criticality of their roles to the sale process and business operations, their performance and potential, their retention risk, and the difficulty of replacing them.  Wage Decl. ¶ 14.  None of the Participants was involved in formulating the Non-Insider KERP, and each has specialized experience required to implement the many workstreams necessary to prepare for and successfully close the sale transactions. Wage Decl. ¶¶ 12; 14.  In addition, it is dangerous from a policy perspective to prohibit debtors from implementing prepetition retention programs in sale cases because it makes it less likely that the debtors will be able to retain employees who are instrumental to the success of 363 sales and the value ultimately realized by the estate's stakeholders therefrom.

4.      *Finally,* the Non-Insider KERP is not, as the U.S. Trustee suggests, a cost imposed on creditors for the purchaser's benefit – indeed, out of the thousands of the Debtors' creditors, not one has objected (formally or informally) to its implementation, including the DIP Secured Parties and the Official Committee. Obj. ¶4.  Indeed, we understand that the Official Committee will be submitting a statement in support of this relief. The Debtors commenced these cases to preserve Sleep Number as a going concern through an expedited sale process, and they have emphasized that speed is critical to preserving employee, customer, vendor, and supplier confidence.  First Day Decl.  ¶¶ 5; 57.  The Stalking Horse Bid set a floor for higher and better offers, but its terms—including the ones the U.S. Trustee relies so heavily on in its Objection—

were ultimately subject to revision through a later auction process and did not eliminate execution risks or guarantee that the Debtors will have the workforce needed to reach closing. Furthermore, the KERP was communicated to the Participants at the end of May 2026, meaning the KERP has served its purpose since before the terms of the Stalking Horse Bid were even known to the Participants. Sustaining the Objection would harm—not help—the Debtors' efforts to the detriment of all stakeholders by jeopardizing the estates at a critical juncture when the employees whose knowledge and continuity to consummate the sale transaction are needed most. The Court should therefore overrule the Objection and approve the relief requested in the Wages Motion on a final basis.

## ARGUMENT

### I.    The Non-Insider KERP is Retentive

5.    The U.S. Trustee argues that the Non-Insider KERP is not a "retention plan" because the Debtors "have no intention of retaining the [P]articipants," who may be employed by the purchaser at the close of the sale transaction. Obj. ¶ 1. This argument is illogical. Until the sale closes, the Participants are indeed employees of the Debtors and the Debtors indeed need to retain them in order to facilitate and close a value-maximizing sale transaction. The U.S. Trustee not only treats a potential sale closing as a certainty, but also, at the same time, ignores the importance of the Participants' continued employment since before the chapter 11 filing and retention by the Debtors as a necessary means of achieving a successful sale.

6.    The Non-Insider KERP is consistent with the Debtors' goal in these cases—to maximize value for all stakeholders through an expedited sale process. Wage Decl. ¶ 12. While, as the U.S. Trustee suggests, the ultimate purchaser of the Company may offer to employ the Participants at the close of the sale transaction, that offer would not come until closing, may not be on the same terms, and therefore does not eliminate the need for a retention plan in the interim

6

during the Chapter 11 Cases.  Until a sale closes, the Participants remain employed by the Debtors and are free to leave at any time.  This would result in a loss of talent and replacement costs, which would erode value and might jeopardize the success of the sale. Wage Decl. ¶ 13.

7.      An expedited sale timeline increases, not decreases, the need for retention rewards. As detailed by Ms. O'Keefe in the Wages Declaration, the Participants will be subject to increased workloads leading up to the sale closing.  Wage Decl. ¶ 13.  This, coupled with the lack of finality with respect to the Stalking Horse Bid[4]  and the uncertainty associated with a chapter 11 filing more generally, may cause them to seek alternative employment opportunities. Wage Decl. ¶ 13. Therefore, contrary to the U.S. Trustee's assertion that the Debtors "have no intention of retaining the [P]articipants," the Debtors implemented the Non-Insider KERP with the express intention of retaining these Participants to "stabilize the Debtors' operations, prepare for a sale, and most importantly, close that sale." Obj. ¶ 1.  Wages Decl. ¶ 12.

8.      In short, the U.S. Trustee's argument overlooks the fact that, at the time the Non-Insider KERP was implemented, the ultimate success of the sale process was not, and still is not, guaranteed until the transaction closes.  The Participants' continued employment has been and is a critical part of what makes that closing achievable.  Denying the Debtors' authority to honor the Non-Insider KERP would create risk to the sale process that the Debtors are trying to avoid – disruption to employee continuity, loss of institutional knowledge, and diminution of estate value before closing.

**II.      The Non-Insider KERP Does Not Harm Other Estate Creditors or Stakeholders**

---

[4] To add to this uncertainty, the Official Committee publicly expressed "concerns regarding the certainty of closing the Stalking Horse [APA]" in the statement they filed in support of the Debtors' bidding procedures. *See Statement of the Official Committee of Unsecured Creditors in Support of the Bidding Procedure Motion* [ECF No. 161].  This uncertainty renders the U.S. Trustee's argument presumptuous that Participants would rely on the terms of the Stalking Horse APA when making employment decisions.

9.      In addition to arguing that the Non-Insider KERP is not a true retention plan, the U.S. Trustee further attacks payments under the Non-Insider KERP as being "to the detriment of all the other creditors of the estates,"[5] and that the Debtors have proffered no evidence that the Non-Insider KERP is "necessary" to provide a "benefit to the Debtors." Obj. ¶ 4.  This is not so. In fact, as set forth in the Wages Declaration, these Participants are necessary to prepare for and close any sale and their loss "would substantially harm the Debtors' restructuring efforts." Wages Decl. ¶¶12, 14.

10.      It is revealing that the U.S. Trustee's Objection represents the lone objection to the relief sought by the Debtors.  Importantly, the Debtors have received no other objections to the Wages Motion, formal or informal, from any creditor or party-in-interest of the Debtors.  The DIP Secured Parties have reviewed and have not objected to the relief sought in the Wages Motion. Most importantly, counsel to the Official Committee—the only other estate fiduciary in these Cases—has received and reviewed the diligence information from the Debtors regarding the Non-Insider KERP and fully supports the relief sought by the Debtors through the Wages Motion.  *See* Hr'g Tr. 43:21-24, *In re Voyager Digital Holdings, Inc.*, No. 22-10943 (MEW) (Bankr. S.D.N.Y August 24, 2022), ECF No. 416 (noting the importance of committee support and approving non-insider KERP because "the two entities here who are charged with exercising fiduciary responsibilities" supported the motion); Hr'g Tr. 56:19-25, *In re Big Lots, Inc., et al.*, No. 24-11967 (JKS) (Bankr. D. Del. Oct. 9, 2024), ECF No. 480 (approving non-insider severance plan supported by committee and noting, "I place significant weight on the position of the Official Committee of Unsecured Creditors").

---

[5] In support of this conclusion, the U.S. Trustee again cites to the Stalking Horse APA, which excludes retention payments from the liabilities assumed by the Stalking Horse Bidder, and inexplicably argues that as a result the cost of the Non-Insider KERP advantages the purchaser and is detrimental to the Debtors' general creditors.  Obj. ¶ 4.

### III.    The Non-Insider KERP Participants Are Not Insiders and Thus Section 503(c)(1) Does Not Preclude the Relief Sought by the Motion

11.    The U.S. Trustee next objects to the Non-Insider KERP on the grounds that the Debtors "have not put forth any evidence in this Court to establish that the [Participants] are not insiders." Obj. ¶ 29.  Tellingly, the U.S. Trustee, who has been provided extensive diligence by the Debtors' regarding the Non-Insider KERP Participants, does not allege that any of the Participants are in fact insiders. Obj. ¶ 29.  The objection appears to simply be that the information provided to the U.S. Trustee has not yet been included in the evidentiary record.  Accordingly, the Debtors believe that this Objection is answered by the evidence contained in the Wages Declaration and should be overruled.

12.    The Bankruptcy Code defines an "insider" to include, among other things, "a director of the debtor," "an officer of the debtor" and a "person in control of the debtor."  11 U.S.C. § 101(31).  Individuals who do not fall within the statutory definition may still qualify as "non-statutory" insiders. *See In re Borders Grp., Inc.*, 453 B.R. 459, 468 (Bankr. S.D.N.Y. 2011). Courts evaluate whether particular employees are insiders on a case-by-case basis, based on the totality of the circumstances; the test is whether the employee "has 'at least a controlling interest in the debtor or . . . exercise[s] sufficient authority over the debtor so as to unqualifiably dictate corporate policy and the disposition of corporate assets." *See In re Glob. Aviation Holdings Inc.*, 478 B.R. 142, 148 (Bankr. E.D.N.Y. 2012) (quoting *In re Borders Grp.*, 453 B.R. at 469); *see also In re Velo Holdings Inc.,* No. 12-11384, 2012 WL 2015870, at *5 (Bankr. S.D.N.Y. Jun. 06, 2012) (applying the same test).  While certain titles may create a presumption that an individual is an officer or director of the debtor, evidence that an individual does not actually participate in the management of the debtor company rebuts that presumption. *In re Foothills Texas, Inc.*, 408 B.R.

9

573, 583 (Bankr. D. Del. 2009) [6]; *Borders Grp., Inc.*, 453 B.R. at 469-70 (holding that certain "director-level" employees were not insiders and noting that while companies often give employees certain high-ranking titles, they often "do not give them decision making authority akin to an executive").

13.    As set forth in greater detail in the Wages Declaration, the Participants in the Non-Insider KERP are not insiders of the Debtor.  As an initial matter, no Participant: (a) sits on the Debtors' board of directors; (b) is listed as an executive officer on the Debtors' SEC filings; (c) was appointed by the Debtors' board of directors; (d) exercises managerial control over the Debtors' "core business"; or (e) has the power to dictate corporate policy or the strategic direction of the Debtors. Wages Decl. ¶¶ 5-6; 9; 11 U.S.C. § 101(31); *Glob. Aviation Holdings, Inc.*, 478 B.R. at 148, 150.

14.    The Non-Insider KERP Participants generally oversee discrete parts of the Debtors' business, and do not have decision-making authority akin to an executive officer.  They do not take part in deliberations regarding corporate strategy, do not direct the operations of the Debtors' core business, and each is supervised by, and reports through, multiple levels of senior management. *See* Wages Decl. ¶¶ 5-11 (describing Participants' responsibilities and positions in mid-level corporate decision-making hierarchy).  Even though certain of the Participants hold the title of "Vice President," "Director" or "Senior Director," [7] this indicates a level of supervisory

---

[6] In Paragraph 25 of the Objection, the U.S. Trustee, citing to *Foothills*, seemingly asserts that the Debtors carry the burden to rebut a general presumption that Non-Insider KERP Participants are insiders.  In addition to being a non-binding case from outside this jurisdiction, this reading of *Foothills* is incomplete.  Rather, *Foothills* stands for the narrow proposition that "a person holding the title of an officer, including a vice president, is presumptively . . . an officer and, thus, an insider. To overcome that presumption requires the submission of evidence sufficient to establish that the officer does not, in fact, participate in the management of the debtor." *Foothills*, 408 B.R. at 583.  As discussed herein, while some of the employee Participants may hold titles indicating insider status, the Debtors have successfully rebutted this presumption with evidence that these Participants do not participate in the management of the company or influence corporate decision-making.

[7] In fact, nine Participants hold the title of "Vice President" and 13 hold the title of either "Director" or "Senior Director." Wages Decl. ¶¶ 5-7.

responsibility within the Debtors' organization, and does not, considering the totality of the circumstances presented in the Wages Declaration, establish that they are insiders of the Debtors. Wages Decl. ¶¶ 6-7. *See In re Glob. Aviation Holdings, Inc.*, 478 B.R. at 148 (noting "[c]ompanies often give employees the title 'director' or 'director-level' but do not give them decision-making authority akin to an executive.") (citing *Borders Grp., Inc*., 453 B.R. at 468).

## IV.   Under Section 503(c) of the Bankruptcy Code, the Non-Insider KERP is Appropriate and Should be Approved

15.     Contrary to what the U.S. Trustee asserts, the Non-Insider KERP plainly satisfies the applicable standard under Section 503(c)[8]. Section 503(c)(3) of the Bankruptcy Code proscribes payments on account of "transfers or obligations that are *outside the ordinary course of business"* unless the debtor can establish those obligations are *"justified by the facts and circumstances of the case.*" *See* 11 U.S.C. § 503(c)(3) (italics added). Despite assertions by the U.S. Trustee that Section 503(c)(3) imposes a greater burden than the business judgment rule on the Debtors to prove that the facts and circumstances of these Chapter 11 Cases justify the Non-Insider KERP, that is simply not the law in this jurisdiction.[9] Obj. ¶27. Rather, Courts in this district consistently recognize that satisfying Section 503(c)(3) of the Bankruptcy Code only requires a showing that the proposed plan is within the Debtors' business judgment. *See In re Velo*

---

[8] Further, contrary to what the U.S. Trustee asserts the BAPCPA amendments were not enacted to "eradicate the notion that **employees** were entitled to bonuses solely for staying with the company through bankruptcy." Obj. ¶22 (emphasis added). This assertion misrepresents the bankruptcy court's decision in *In re Global Home Prods.*, 369 B.R. 778, 784 (Bankr. D. Del. 2007). There, the court analyzed a management incentive plan, not a non-insider KERP, under Section 363, rather than 503(c)(3) of the Bankruptcy Code. Far from holding that the amendments were intended to prohibit retention payments to employees, as the U.S. Trustee misleadingly suggests, the court discussed the amendments in *dicta* stating that the amendments were intended to "eradicate the notion that **executives** were entitled to bonuses simply for staying with the Company through the bankruptcy process." *Global Home Prods.*, 369 B.R. at 784 (emphasis added). The Participants in the Non-Insider KERP are not executives for all the reasons discussed herein and the U.S. Trustee has not pointed to any case holding that the BAPCPA amendments were created with the intention of prohibiting retention bonuses to rank and file employees.

[9] Notably, in support of this assertion, the U.S. Trustee cites to a single case from the Bankruptcy Court for the Northern District of Texas, *In re Pilgrim's Pride Corp*., 401 B.R. 229 (Bankr. N.D. Tex. 2009), which is not binding in this jurisdiction.

*Holdings Inc.*, 472 B.R. at 212  (noting "the 'facts and circumstances' language of section 503(c)(3) creates a standard no different than the business judgment standard under section 363(b)"); *see also In re Borders*, 453 B.R. at 473–74 (evaluating debtors' key incentive retention plan under the framework of the business judgment rule); *Dana Corp.*, 358 B.R. at 576–77 (describing six factors that courts may consider when determining whether the structure of a compensation proposal meets the "sound business judgment" test in accordance with section 503(c)(3) of the Bankruptcy Code).

16.    The Non-Insider KERP represents a valid exercise of the Debtors' business judgment.  Without the Non-Insider KERP, the risk of Participants resigning has been real.  Wages Decl. ¶ 13.  Therefore, after due consideration, the Debtors' senior management team implemented the Non-Insider KERP, a targeted retention program which provides modest retention bonuses, to carefully selected Participants whose knowledge and expertise regarding certain aspects of the Debtors businesses are "essential to the complicated mechanics involved in closing a company-wide sale." Wages Decl. ¶¶ 12; 14.

17.    The Non-Insider KERP serves an additional estate-preserving function beyond employee retention.  Following execution of the Final APA[10], the Debtors remain obligated to operate the business in the ordinary course and deliver substantially the same going-concern enterprise to the successful purchaser at closing.  *See* Final APA at Art. 6.1.  The departure of employees possessing critical institutional knowledge during this interim period could disrupt operations, delay closing, diminish the value of the business, or expose the estates to claims for breach of interim operating covenants, purchase price adjustments, or other contractual remedies,

---

[10] "Final APA" means that certain Amended and Restated Asset Purchase Agreement, dated as of July 18, 2026, by and between SNBR Inc., as Purchaser, Sleep Number Corporation, as Seller, and Sleep Number Country Canada In. (for purpose of Section 10.21 only), filed as Exhibit A to the *Notice of Successful Bidder and Auction Results* [ECF No. 401] ("**Notice of Successful Bidder**").

as applicable. By preserving the operational integrity of the business through closing, the Non-Insider KERP protects estate value for the benefit of all stakeholders, regardless of which bidder ultimately prevails at the auction.

18. The U.S. Trustee urges the Court to evaluate the Non-Insider KERP under the six-factor test set out in *In re Dana Corp.*[11] *See* Obj. ¶ 28. Without evaluating whether any of the individual factors have been met, the U.S. Trustee cursorily concludes that "irrespective of any attempt they may make at meeting this standard," the Debtors cannot establish that the Non-Insider KERP is justified under Section 503(c)(3) because they seek "authorization to pay the KERP participants solely to sell the company." Obj. ¶ 32. Ironically, the first factor in the *Dana Corp* test expressly contemplates that retention bonuses may be paid in a sale case. *See Dana Corp.* 358 B.R. at 576 ("Is there a reasonable relationship between the plan proposed and the results to be obtained, i.e., *will the key employee stay for as long as it takes for the debtor to reorganize or market its assets*, or, in the case of a performance incentive, is the plan calculated to achieve the desired performance?"). Here, the Debtors implemented the Non-Insider KERP for the purpose of ensuring that a small number of selected Participants remain employed at the Debtors through the duration of the marketing and sale process. At the time that the Non-Insider KERP was approved, the Debtors were actively engaged in marketing their assets, and far from completing that process, had not even entered into the Stalking Horse APA. The likelihood that these Participants will be employed by the purchaser rather than the Debtors at the consummation of the sale was irrelevant to the Debtors' considerations in designing the Non-Insider KERP. Indeed, the prospect of a successful sale closing further underscores that the Non-Insider KERP was necessary

---

[11] 358 B.R. 567, 576-77 (Bank. S.D.N.Y. 2006). Contrary to the U.S. Trustee's characterization in its objection, in applying this test, the *Dana Corp.* court outlined these factors as a guidepost for "determining if the structure of a compensation proposal and the process for developing the proposal meet the "*sound business judgment*" test," rather than as setting forth a heightened standard. See *Dana Corp.*, 358 B.R. at 576.

to support the sale efforts and was properly "calculated to achieve the desired performance," as mandated by *Dana Corp*.

19.    As set forth in more detail in the Wages Declaration, the Non-Insider KERP likewise satisfies the remaining *Dana Corp* factors. *See* Obj. ¶ 28 (laying out *Dana Corp.* factors). The cost of the Non-Insider KERP is modest—$1.825 million in the aggregate and $10,000-$125,000 per Participant —relative to the value preserved by the sale process, which, pursuant to the terms of the Final APA, will provide approximately $700 million in value to the estates at closing. *See* Wages Decl. ¶ 5; Notice of Successful Bidder. Further, the scope of the plan is fair and targeted— the Participants were selected by management after careful evaluation both because they (1) present retention risk and (2) possess individualized knowledge and skills that make them well suited to ensure a successful sale closing. Finally, in implementing the Non-Insider KERP, the management team consulted with external advisors not only with respect to selection of particular Participants but also regarding industry standards for similar programs. Wages Decl. ¶¶13; 14. In selecting participants for the Non-Insider KERP, senior management worked with the Debtors' advisors to ensure that the program was limited to employees who were positioned at the third organizational level below the executive level and management level. Wages Decl. ¶5.

### CONCLUSION

20.    The Non-Insider KERP is well within the Debtors' business judgment and "justified by the facts and circumstances" of these Chapter 11 Cases, and is necessary to avoid costly losses of key employees whose continuity is essential to stabilizing the Debtors' operations and closing the value-maximizing sale transaction. All parties in interest will benefit if the Participants, none of whom are insiders, remain in the Debtors' employ.

21.    The Debtors respectfully submit that the Proposed Order should be entered.

Dated:   July 19, 2026
         New York, New York

                          DAVIS POLK & WARDWELL LLP

                          /s/ Brian M. Resnick
                          450 Lexington Avenue
                          New York, New York 10017
                          Tel.: (212) 450-4000
                          Brian M. Resnick
                          Angela M. Libby
                          Stephen D. Piraino
                          Richard J. Steinberg
                          Sihui (Sophy) Ma
                          Mordechai Rivkin

                          *Proposed Counsel to the Debtors and Debtors in
                          Possession*

**Exhibit A**

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Tel.: (212) 450-4000
Brian M. Resnick
Angela M. Libby
Stephen D. Piraino
Richard J. Steinberg
Sihui (Sophy) Ma
Mordechai Rivkin

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **SLEEP NUMBER CORPORATION**, *et al.*, | **Case No. 26-11399 (KYP)** |
| **Debtors.**[1] | **Jointly Administered** |

**DECLARATION OF AMY O'KEEFE IN SUPPORT OF MOTION OF
THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING
(I) THE DEBTORS TO (A) HONOR PREPETITION EMPLOYEE OBLIGATIONS AND
DIRECTOR OBLIGATIONS AND (B) MAINTAIN EMPLOYEE BENEFITS
PROGRAMS AND PAY RELATED ADMINISTRATIVE OBLIGATIONS,
(II) CURRENT AND FORMER EMPLOYEES TO PROCEED WITH OUTSTANDING
WORKERS' COMPENSATION CLAIMS, AND (III) FINANCIAL INSTITUTIONS
TO HONOR AND PROCESS RELATED CHECKS AND TRANSFERS**

I, Amy O'Keefe, declare and say:

1.     I am the Executive Vice President and Chief Financial Officer of Sleep Number

Corporation ("**SNBC**" and, together with debtors Select Comfort Retail Corporation, Select

Comfort Canada Holding Inc., Select Comfort SC LLC, and Sleep Number Health Corporation,

"**Sleep Number**," the "**Debtors**," or the "**Company**").

---

[1] The Debtors' names and last four digits of their respective employer identification numbers are as follows: Sleep Number Corporation (7886); Select Comfort Retail Corporation (9757); Select Comfort Canada Holding Inc. (4273); Select Comfort SC LLC (5901); and Sleep Number Health Corporation (2499). The Debtors' mailing address is 1001 Third Avenue South, Minneapolis, MN 55404.

1

2.      I have served as the Executive Vice President and Chief Financial Officer of Sleep Number since December 2025 and have more than three decades of experience in the consumer products, technology, and wellness sectors.  Prior to joining Sleep Number, I served as Chief Financial and Administrative Officer of Avaya LLC, a global communications software company. Prior to Avaya, I spent nearly half of my career at The Black & Decker Corporation. After leaving the Black & Decker Corporation in 2010, I served as Chief Financial Officer for multiple public and private companies, including Weight Watchers International, Drive DeVilbiss Healthcare, Savant Systems, and D&M Holdings.  I have also served on the board of directors of TruBridge, Inc. since October 2024.  I hold a bachelor's degree in accounting from Loyola College and am an inactive Certified Public Accountant.

3.      On the Petition Date,[2] the Debtors commenced these Chapter 11 Cases filing voluntary petitions for relief under the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "**Court**").  As Sleep Number's Chief Financial Officer, I am generally familiar with its day-to-day operations, business, and financial affairs, and the circumstances leading up to the Chapter 11 Cases.  In particular, I am familiar with the Non-Insider Retention Plan that was implemented by the Company prior to the Petition Date.  Together with certain of my colleagues and in collaboration with the Debtors' advisors, I participated in all aspects of the formulation of the program, including the selection of employees for the program and the award amounts to be granted to those employees.

---

[2] Capitalized terms used but not defined herein shall have the meanings assigned to them in the *Motion of the Debtors for Entry of Interim and Final Orders Authorizing (I) the Debtors to (A) Honor Prepetition Employee Obligations and Director Obligations and (B) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (II) Current and Former Employees to Proceed with Outstanding Workers' Compensation Claims, and (III) Financial Institutions to Honor and Process Related Checks and Transfers* (the "**Wages Motion**") or ascribed to them elsewhere herein.

4.      I am over the age of 18 and authorized to submit this declaration (including the schedules hereto, this "**Wages Declaration**"), pursuant the Local Rules, on behalf of the Debtors in support of the Wages Motion.  Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of the relevant documents, information prepared for me by employees of and/or professional advisors to the Company that I have reviewed, and/or my opinion based upon experience, knowledge, and information concerning Sleep Number's operations.  I have reviewed the Wages Motion or have otherwise had its contents explained to me, and it is my belief that the relief sought therein is essential to the uninterrupted operation of the Debtors' business and to the success of the above-captioned Chapter 11 Cases.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

### The Employee Participants

5.      The Non-Insider Retention Plan covers 38 corporate employees (the "**Employee Participants**"), and the retention awards range from $10,000 to $125,000 and are $1.825 million in the aggregate.  The Employee Participants' titles fall into the following categories:  accounting manager, CRM email development manager, director, email developer, executive assistant, principal engineer, product architect, senior accountant, senior director, senior manager, senior network engineer, senior software engineer, senior telecommunicators engineer, treasury analyst and vice president.  All Employee Participants in the Non-Insider Retention Plan are positioned at the third organizational level below the executive level and management level.  None of the Employee Participants were appointed by Sleep Number's Board of Directors.

6.      There are nine Employee Participants with a title of vice president.  None are officers of Sleep Number.  I have personal knowledge of the contents of our public securities filing, as I am intimately involved in their preparation through my role as the Chief Financial Officer,

3

and none of the Employee Participants with a title of vice president are named executive officers or considered officers for purposes of Section 16 of the Exchange Act, and therefore none of the names of the Employee Participants are on file with the SEC.  At Sleep Number, vice president is a title recognizing increased responsibility, but all vice presidents report to either senior vice presidents or executive vice presidents.  The Employee Participants do not include any senior vice presidents or executive vice presidents.

7.      Of the 13 Employee Participants that have a director or senior director title, none is a member of Sleep Number's Board of Directors.  Sleep Number has four subsidiaries—Select Comfort Retail Corporation, Select Comfort Canada Holding Inc, Select Comfort SC LLC and Sleep Number Health Corporation:  No Employee participant is a member of the boards of directors of any of Sleep Number's subsidiaries.  Director and senior director, as relevant here, are titles that Sleep Number uses to signify supervisory responsibility.  Directors and senior directors are junior in seniority to vice presidents.

8.      The remaining 16 Employee Participants provide various management and support functions for the Debtors, including with respect to accounting and treasury operations, software and network engineering and operations and administrative and operational support throughout the organization.

9.      While some of the Employee Participants oversee discrete parts of the business, such as payroll, quantitative analytics, real estate, the Sleep Number "app" and corporate-level IT, none of these roles go to the core of the Sleep Number business, which is to produce industry-leading smart beds.  And, none of those Employee Participants dictate corporate policy or are responsible for the strategic direction of Sleep Number.

4

10.     I am a member of the Executive Leadership Team (the "**ELT**") at Sleep Number. The ELT is responsible for setting corporate policy and making strategic decisions.  In addition to myself, the ELT consists of Linda Findley, President and Chief Executive Officer; Melissa Barra, Executive Vice President and Chief Product, Strategy and Technology Officer; Amber Minson, Executive Vice President and Chief Marketing Officer; Christopher Krusmark, Executive Vice President and Chief Retail and People Officer; Samuel Hellfeld, Executive Vice President and Chief Legal and Risk Officer and Secretary; and Tanya Skogerboe, Senior Vice President and Chief Supply Chain and Transformation Officer.  None of the Employee Participants are members of the ELT.  None of the Employee Participants regularly participate in the ELT meetings, and if an Employee Participant were to participate, which happens on occasion, it would be to present on a specific matter but not to take part in deliberations or decision making of the ELT.  Therefore, the Employee Participants are not involved in setting Sleep Number's corporate policy.

11.     As a member of senior management, I regularly participate in meetings of the Board of Directors.  None of the Employee Participants are regular participants in those meetings.[3]  While each of the Employee Participants is a valued member of the Sleep Number team, none are part of the nucleus of the senior management team.  As the Chief Financial Officer, I have ultimately oversight of, and responsibility for, budgets, including having direct knowledge of which employees have discretion over substantial budgetary amounts.  None of the Employee Participants have discretionary control over substantial budgetary amounts or are involved in significant budgetary matters.  I also have personal knowledge of the process surrounding

---

[3] One Employee Participant attends meetings of the audit committee of the Board of Directors and one Employee Participant attends meetings of the compensation committee of the Board of Directors; both occasionally present to the full Board of Directors, but only regarding the work of the applicable committee.  Neither Employee Participant is involved in any way in deliberations or decision making of the Board of Directors.

5

significant dispositions of corporate assets, including who is authorized to do so, and none of the Employee Participants is authorized to do so.

## The Non-Insider Retention Plan

12.    In May, when senior leadership, including myself, approved the Non-Insider Retention Plan, I believed the Non-Insider Retention Plan was necessary to retaining the Employee Participants throughout the duration of the sale process, which while at the time, we hoped would be successful, we had no certainty that it would be. Further, I still believe that retaining the Employee Participants at this critical juncture in the case is necessary to ensure a smooth transition to new ownership through the ongoing sales process. Each of the Employee Participants has specialized knowledge of the business that makes them a key part of the many workstreams necessary to stabilize the Debtors' operations, prepare for a sale and, most importantly, close that sale. For example, certain of the Employee Participants have extensive knowledge about treasury systems, and that knowledge is essential to the complicated mechanics involved in closing a company-wide sale. Similarly and by way of further example, the expertise of certain Employee Participants will be necessary for employee matters related to the sale. Given my personal knowledge of the sale process, it is essential to give the Employee Participants the certainty that they will be entitled to their retention payments to ensure a smooth sale process.

13.    I believe that the Employee Participants are also subject to increased work demands for which they need to be properly compensated. Absent this retention program, there is significant risk to the business that Employee Participants would seek alternative employment. As of the date hereof, the Debtors are still in discussions with the Purchaser as to whether any or all of the Employee Participants will be offered continued employment by the Purchaser. I believe that the loss of talent from the Employee Participants would be extremely detrimental to the

6

Debtors' restructuring and strategic objectives, and the cost to replace these employees would also significantly erode value.

14.    The Employee Participants were selected by the Debtors' senior leadership, including myself, after rigorous consideration and consultation with external advisors regarding the industry standards.  None of the Employee Participants were involved in the formulation of any aspect of the Non-Insider Retention Plan.  The identification process focused on various criteria, including the criticality of the position to the sale process and business operations, the performance and potential of the employee, the risk of loss of the employee and the potential difficulty of replacing the employee.  Senior leadership, including myself, also carefully considered the award levels necessary to retain the Employee Participants, and I believe the award levels are appropriate.  I believe that without the Non-Insider Retention Plan, there is significant risk that the Employee Participants will seek alternative employment, which would substantially harm the Debtors' restructuring efforts.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and

correct to the best of my knowledge, information and belief.

Dated:   July 19, 2026
         New York, New York


By:   */s/ Amy O'Keefe*
      Executive Vice President and Chief
        Financial Officer
      Sleep Number Corporation

8