**FOR PUBLICATION**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x

In re:                                                           Chapter 11

SLEEP NUMBER CORPORATION, *et al.*          Case No. 26-11399 (KYP)

          Debtors.                                       Jointly Administered

------------------------------------------------------------------x

## MEMORANDUM DECISION OVERRULING OBJECTION OF UNITED STATES TRUSTEE TO DEBTORS' PAYMENTS UNDER <u>NON-INSIDER RETENTION PLAN</u>

**APPEARANCES:**

DAVIS POLK & WARDWELL LLP
*Counsel to Debtors*
450 Lexington Avenue
New York, New York 10017
By:    Brian M. Resnick, Esq.
        Angela M. Libby, Esq.
        Stephen D. Piraino, Esq.
        Richard J. Steinberg, Esq.
        Sihui (Sophy) Ma, Esq.
        Mordechai Rivkin, Esq.
            Of Counsel

WILLIAM K. HARRINGTON
UNITED STATES TRUSTEE, REGION 2
One Bowling Green, Room 534
New York, NY 10004
By:    Andrea B. Schwartz, Esq.
        Daniel Rudewicz, Esq.
            Of Counsel

**HONORABLE KYU YOUNG PAEK**
**UNITED STATES BANKRUPTCY JUDGE**

### <u>INTRODUCTION</u>

      Sleep Number Corporation and its affiliated debtors ("Sleep Number" or

"Debtors") filed these Chapter 11 bankruptcy cases to effectuate a going-concern sale of

its business.  To ensure that certain employees remain with Sleep Number through the sale, and to compensate those employees for the additional work stemming therefrom, Sleep Number created a plan to pay retention awards to 38 non-insider employees in the aggregate amount of $1.825 million payable upon completion of the sale ("Non-Insider Retention Plan").  The Office of the United States Trustee for Region 2 ("U.S. Trustee") objects to the Non-Insider Retention Plan.  For the reasons stated, the U.S. Trustee's objection is OVERRULED.

## JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* (M-431), dated January 31, 2012 (Preska, C.J.) referring bankruptcy cases and proceedings to the Bankruptcy Judges of the Southern District of New York.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B) and (O).

## BACKGROUND[1]

### A.    The Non-Insider Retention Plan

Sleep Number is a retail mattress company that assembles and sells adjustable "smart" beds directly to customers and employs just under 3,000 people.  (O'Keefe

---

[1]    Sleep Number Executive Vice President and Chief Financial Officer Amy O'Keefe ("Ms. O'Keefe") provided testimony on the Non-Insider Retention Plan.  Her direct testimony was set forth in her July 19, 2026 declaration ("O'Keefe Declaration") (ECF Doc. # 403 at ECF pp. 17-24).  The O'Keefe Declaration was admitted into evidence.  (*See Transcript of July 20, 2026 Hr'g* ("Tr.") at 47:7-14.)  Counsel for the U.S. Trustee cross-examined Ms. O'Keefe at the July 20, 2026 hearing, and such examination appears at Tr. at 47:24-82:7.  Debtors' counsel's re-direct examination of Ms. O'Keefe appears at Tr. at 82:12-84:16.

"ECF Doc. # _" refers to documents filed on the electronic docket of this bankruptcy case.  "ECF p. _" refers to the page number imprinted across the top of the page by the Court's electronic filing system.

Declaration ¶ 9; Tr. at 50:23-52:6.)  Sleep Number is governed by the following corporate hierarchy listed in descending order based on level of authority:

1.  the board of directors ("Board");

2.  Linda Findley, Chief Executive Officer ("CEO");

3.  the Executive Leadership Team ("ELT") consisting of (i) the CEO; (ii) Amy O'Keefe as Chief Financial Officer; (iii) the Chief Product, Strategy and Technology Officer; (iv) the Chief Marketing Officer; (v) the Chief Retail and People Officer; (vi) the Chief Legal and Risk Officer and Secretary; and (vii) the Chief Supply Chain and Transformation Officer;[2] and

4.  a five-member management committee ("Management Committee").

(O'Keefe Declaration ¶¶ 5, 10; Tr. at 58:3-62:3.)

In May 2026, senior Sleep Number leadership, including Ms. O'Keefe, formulated a plan to pay retention awards to 38 non-insider employees ("Employee Participants") with the assistance of compensation advisors and attorneys.  (O'Keefe Declaration ¶¶ 5, 12; Tr. at 83:25-84:14.)  The retention awards range from $10,000.00 to $125,000.00, and the sum of the awards to all Employee Participants totals $1.825 million.  (O'Keefe Declaration ¶ 5.)  None of the Employee Participants are on the Board, the ELT, or the Management Committee.  (*Id.* ¶¶ 5-7, 10-11; Tr. at 61:15-62:3.)  None of the Employee Participants were appointed by the Board.  (O'Keefe Declaration ¶ 5.)  None of the Employee Participants are involved in setting Sleep Number's corporate policy.  (*Id.* ¶¶ 9-10.)

---

[2]      Except for the CEO, each member of the ELT held a second title of either "Executive Vice President" or "Senior Vice President."  (O'Keefe Declaration ¶ 10.)

Nine of the Employee Participants have job titles with the words "vice president" in them. (O'Keefe Declaration ¶ 6.) However, none of these nine employees are considered "officers" for purposes of section 16 of the Securities Exchange Act of 1934. (*Id.*) Although "vice president" denotes increased responsibility at Sleep Number, all Sleep Number vice presidents report to either senior vice presidents or executive vice presidents. (*Id.*; *see supra* note 2.) None of these nine employees are senior or executive vice presidents.

Thirteen of the Employee Participants have job titles with the words "director" or "senior director" in them. (O'Keefe Declaration ¶ 7.) However, none of these thirteen employees are members of Sleep Number's Board. (*Id.*) The terms "director" and "senior director" included in these thirteen employees' job titles signify a certain amount of supervisory responsibility, but these employees are junior in seniority to the nine "vice presidents" described in the prior paragraph. (*Id.*)

The remaining sixteen Employee Participants provide various management and support functions for the Debtors. (*Id.* ¶ 8.)

Sleep Number leadership decided to enact the Non-Insider Retention Plan in recognition that:

- each Employee Participant has specialized knowledge of Sleep Number's business that makes them a key part of many of the company's workflows and processes;

- retaining the Employee Participants is essential to maintaining stability during the sale process and to ensuring a smooth transition to new ownership;

- losing the Employee Participants would erode the enterprise value of the Debtors;

4

- there is a risk that the Employee Participants would seek alternative employment absent the retention awards given the uncertainty created by the Debtors' bankruptcy; and

- the sale process would subject the Employee Participants to increased work demands not accounted for by their normal salary.

(*Id.* ¶¶ 12-14.)

The letters informing the Employee Participants of the Non-Insider Retention Plan were sent to the employees on or around May 26, 2026 (each, an "Award Letter").[3] The letters stated the amount of the retention award and that such amount would be paid if the employee continued in active employment with Sleep Number through December 31, 2026. (Award Letter § 1.) The Award Letter further stated that the retention award would be accelerated and paid in the event of a change in control. (*Id.* § 2(g).) Thus, the Employee Participants stand to receive the retention awards upon completion of a going-concern sale of the company.

**B.      The Bankruptcy Filing and the Going-Concern Sale**

The Debtors filed petitions for relief under Chapter 11 of the Bankruptcy Code on June 12, 2026 ("Petition Date"). The Debtors have continued in possession of their property and have continued to operate their businesses as debtors in possession under 11 U.S.C. §§ 1107(a) and 1108. On June 23, 2026, the United States Trustee appointed an Official Committee of Unsecured Creditors ("Creditors Committee") pursuant to 11 U.S.C. § 1102(a)(1). (ECF Doc. # 110 (notice of appointment of Creditors Committee).)

---

[3]      A redacted version of an Award Letter is available at ECF Doc. # 438 at ECF pp. 19-22.

In her declaration supporting numerous first-day pleadings, Ms. O'Keefe explained that the Debtors had been engaged in a months-long robust marketing process to sell Sleep Number as a going-concern. This process was supported by the Debtors' pre-petition secured lenders who are owed approximately $672.5 million and agreed to provide the Debtors with additional financing of up to $65 million in bankruptcy. (ECF Doc. # 3 (Ms. O'Keefe's first-day declaration).) On July 2, 2026, the Court approved the bidding procedures for the auction as well as the asset purchase agreement with the "stalking horse" bidder SNBR Inc. ("SNBR"), which ensured that the Debtors' bankruptcy estates would receive at minimum $415 million for the sale of the company. (ECF Doc. # 167 (order approving, *inter alia*, the bid procedures and stalking horse asset purchase agreement).)

The auction was held on July 13, 2026, and after multiple rounds of bidding, SNBR emerged as the winning bidder with a total bid of $701,800,000.00. (ECF Doc. # 401 (notice of auction results).) The Court approved the sale at a July 20, 2026 hearing and entered a corresponding order the following day. (ECF Doc. # 430 (order approving sale).) There are still a number of matters to address, including ongoing negotiations with contract counterparties (*e.g.*, landlords, vendors, service providers), and the sale is scheduled to close on or around July 31, 2026.[4]

### C.    The Employee Motion

Among the first-day motions filed by the Debtors was their motion to, among other things, pay pre-petition wages owed to employees and maintain employee benefits

---

[4]    The sale order carved out a dispute between the U.S. Trustee and the Debtors as to the propriety of SNBR's satisfaction of the Debtors' severance obligations owed to officers and directors. A hearing on that matter is scheduled for August 3, 2026. (ECF Doc. # 432 (notice of hearing on severance payment issue).)

programs ("Employee Motion").[5] Authorization for payments under the Non-Insider Retention Plan was among the relief sought by the Debtors in the Employee Motion. (Employee Motion ¶ 39.)

The U.S. Trustee filed an objection to the Debtors' proposed payments under the Non-Insider Retention Plan[6] arguing that (i) the Employee Participants are statutory "insiders," which would subject the retention awards to the strict standard set forth in 11 U.S.C. § 503(c)(1), and, (ii) even if the Employee Participants are not statutory insiders, the Debtors have not provided adequate justification for the retention awards under 11 U.S.C. § 503(c)(3).

The Debtors filed their reply brief as well as the O'Keefe Declaration on July 19, 2026. (ECF Doc. # 403.) At the July 20, 2026 hearing, the O'Keefe Declaration was admitted in evidence as Ms. O'Keefe's direct testimony, and counsel for the U.S. Trustee cross-examined Ms. O'Keefe. (*See supra* note 1.) Following the evidentiary hearing, each party filed an additional submission on July 27, 2026 (ECF Doc. ## 449 and 450), and the Court heard oral argument the following day. Following oral argument, the Court overruled the U.S. Trustee's objection on the record and stated that it would issue

---

[5] *See Motion of the Debtors for Entry of Interim and Final Orders Authorizing (I) the Debtors to (A) Honor Prepetition Employee Obligations and Director Obligations and (B) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (II) Current and Former Employees to Proceed With Outstanding Workers' Compensation Claims, and (III) Financial Institutions to Honor and Process Related Checks and Transfers*, dated June 12, 2026 (ECF Doc. # 5).

[6] *See United States Trustee's Objection to Motion of the Debtors for Entry of Interim and Final Orders Authorizing (I) the Debtors to (A) Honor Prepetition Employee Obligations and Director Obligations and (B) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (II) Current and Former Employees to Proceed With Outstanding Workers' Compensation Claims, and (III) Financial Institutions to Honor and Process Related Checks and Transfers*, dated July 14, 2026 (ECF Doc. # 366).

a memorandum decision explaining its ruling.  This constitutes that memorandum

decision.

## **DISCUSSION**

There are two matters before the Court: (i) whether the Employee Participants

are statutory insiders such that the retention awards are subject to scrutiny under 11

U.S.C. § 503(c)(1), and, if not, (ii) whether the payments under the Non-Insider

Retention Plan meet the requirements under 11 U.S.C. § 503(c)(3).  These matters are

addressed in the sections that follow.

**A.      The Employee Participants are Not Statutory "Insiders"**

A debtor's ability to pay a retention bonus to an "insider" is "severely restricted."

*In re Glob. Home Prods., LLC*, 369 B.R. 778, 785 (Bankr. D. Del. 2007).  Section

503(c)(1) of the Bankruptcy Code states:

(c) Notwithstanding subsection (b), there shall neither be allowed, nor paid –

(1) a transfer made to . . . an *insider* of the debtor for the purpose of inducing such person to remain with the debtor's business, absent a finding by the court based on evidence in the record that –

(A) the transfer . . . is essential to retention of the person because the individual has a bona fide job offer from another business at the same or greater rate of compensation;

(B) the services provided by the person are essential to the survival of the business; and

(C) either –

(i) the amount of the transfer made to . . . the person is not greater than an amount equal to 10 times the amount of the mean transfer . . . of a similar kind given to nonmanagement employees for any purpose during the calendar year in which the transfer is made . . .; or

(ii) if no such similar transfers were made to . . . such nonmanagement employees during such calendar year, the amount of the transfer . . . is not greater than an amount equal

8

to 25 percent of the amount of any similar transfer . . . to . . . such insider for any purpose during the calendar year before the year in which such transfer is made . . . .

11 U.S.C. § 503(c)(1) (emphasis added).  Section 503(c) was enacted as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 to "eradicate the notion that executives were entitled to bonuses simply for staying with the Company through the bankruptcy process." *In re Mesa Air Grp., Inc.*, No. 10–10018 (MG), 2010 WL 3810899, at *2 (Bankr. S.D.N.Y. Sept. 24, 2010) (quoting *Glob. Home Prods.*, 369 B.R. at 783-84).

When the debtor is a corporation, the term "insider" includes –

(i)   director of the debtor;

(ii)  officer of the debtor;

(iii) person in control of the debtor;

(iv) partnership in which the debtor is a general partner;

(v)  general partner of the debtor; or

(vi) relative of a general partner, director, officer, or person in control of the debtor.

11 U.S.C. § 101(31)(B).  Neither "director" nor "officer" is defined in the Bankruptcy Code.  However, "director" is generally understood to mean "an individual who sits on the board of directors of a corporation." *In re Borders Grp., Inc.*, 453 B.R. 459, 468 (Bankr. S.D.N.Y. 2011).  "Officer" is generally understood to mean a "person elected or appointed by the board of directors to manage the daily operations of a corporation, such as the CEO, president, secretary, or treasurer." *Id.* (quoting BLACK'S LAW DICTIONARY 1193 (9th ed. 2009)).  An individual's title alone is "insufficient to establish that an individual is a director or officer." *Id.* at 468-69.  "Insider status can also be determined on a case-by-case basis based on the totality of the circumstances, including

9

the degree of an individual's involvement in a debtor's affairs." *Id*. at 469. "In such cases, insiders must have at least a controlling interest in the debtor or exercise sufficient authority over the debtor so as to unqualifiably dictate corporate policy and the disposition of corporate assets." *Id*. at 469 (quoting *Hunter v. Babcock* (*In re Babcock Dairy Co*.), 70 B.R. 657, 661 (Bankr. N.D. Ohio 1986)) (alteration and internal quotation marks omitted).

Here, none of the Employee Participants are "insiders" within the meaning of 11 U.S.C. § 101(31)(B). They are not members of the Board, the ELT, or the Management Committee. None of the Employee Participants were appointed by the Board. Although some of the Employee Participants have the words "vice president" or "director" in their job titles, those terms were used to signify increased responsibility or a supervisory role. *In re Glob. Aviation Holdings Inc.*, 478 B.R. 142, 148 (Bankr. E.D.N.Y. 2012) ("The fact that some of the KERP Employees have the word 'director' in their titles does not make them insiders. . . . Likewise, titles such as 'vice president' are not determinative."). The terms did not signify that those individuals were Board members or high-ranking executives. *Accord Borders Grp. Inc.*, 453 B.R. at 469 ("Companies often give employees the title 'director' or 'director-level,' but do not give them decision-making authority akin to an executive."). In fact, Ms. O'Keefe's declaration and credible testimony established that, while the Employee Participants serve certain critical business functions, they are not the ones dictating Sleep Number's corporate policy or making critical financial decisions.

The U.S. Trustee argues that at least some of the Employee Participants are insiders because they report directly to, and perform work for, insiders. This argument lacks merit. Directors and officers do not work in isolation when making important

10

decisions for a corporation. It should come as no surprise that officers receive contribution from corporate subordinates. Ms. O'Keefe testified that some of the Employee Participants provide direct support to Sleep Number officers. (Tr. at 68:5-70:25.) But an employee does not transform into an insider merely because they report to, or perform tasks for, an insider.

The U.S. Trustee relies on *Harrington v. LSC Commc'ns, Inc.* (*In re LSC Commc'ns, Inc.*), 631 B.R. 818 (S.D.N.Y. 2021). There, the District Court was considering whether six employees were statutory insiders. After reviewing the caselaw, District Judge Oetken favored analyzing insider status using an "objective criterion – whether an employee was appointed by the board" – rather than a functional approach, which looks to an employee's responsibilities and authority within the company. *Id.* at 825; *see also id.* ("[T]he Court agrees with the [U.S. Trustee] that with respect to officers *appointed or elected by the Board*, such individuals are 'officers' under the Bankruptcy Code, at least absent a particularly strong showing that they do not perform a significant role in management.") (emphasis in original); *id.* at 826 ("[T]his Court concludes that the Bankruptcy Court erred by inquiring beyond the fact that the six employees were appointed by LSC's board."); *id.* ("Bankruptcy Court erred by analyzing whether the six employees were statutory officers largely under a functional 'control' test, instead of giving considerable weight due to the employees' board appointment and resulting officer status under Delaware law."). The District Court opined that insider status should be analyzed under a functional approach only when the employee in question was not appointed by the board. *Id.* at 826 ("The *Borders* court's admonishment about employee titles comes in the context of employees who had officer-sounding *titles* but

11

who were not board-appointed.  Thus, *Borders* should be read for the proposition that,

*in the absence of board appointment*, a title is insufficient.") (emphases in original).

Here, the Employee Participants were not appointed by Sleep Number's Board.

(O'Keefe Declaration ¶ 5.)  Thus, under the objective criterion set forth in *LSC

Commc'ns*, the Employee Participants are not insiders.  Further, the Employee

Participants are not insiders under the functional approach for the reasons already

stated, *i.e.*, they lack the authority to dictate corporate policy.

Because the Employee Participants are not "insiders" under section 101(31)(B),

the retention payments to them are not subject to scrutiny under section 503(c)(1).

## B.    The Non-Insider Retention Plan Satisfies Section 503(c)(3)

Although the Non-Insider Retention Plan is not subject to section 503(c)(1)

review, it must still pass muster under section 503(c)(3).  The latter provides that there

shall neither be allowed, nor paid –

> other transfers or obligations that are outside the ordinary course of
> business and not justified by the facts and circumstances of the case,
> including transfers made to, or obligations incurred for the benefit of,
> officers, managers, or consultants hired after the date of the filing of the
> petition.

11 U.S.C. § 503(c)(3).  Section 503(c)(3) applies to payments that are both (i) outside the

ordinary course of business, and (ii) not justified by the facts and circumstances of the

case.  The "facts and circumstances" test "creates a standard no different than the

business judgment standard under section 363(b) of the Bankruptcy Code."  *In re Endo

Int'l PLC*, Case No. 22-22549 (JLG), 2022 WL 16935997, at *9 (Bankr. S.D.N.Y. Nov. 14,

2022) (quoting *In re Velo Holdings, Inc.*, 472 B.R. 201, 212 (Bankr. S.D.N.Y. 2012));

*accord Borders Grp., Inc.*, 453 B.R. at 473; *In re Dana Corp.*, 358 B.R. 567, 576-77

12

(Bankr. S.D.N.Y. 2006). In *Dana Corp.*, Judge Lifland set forth the following factors to consider when deciding whether a compensation plan subject to section 503(c)(3) satisfies the business judgment standard:

1)  Is there a reasonable relationship between the plan proposed and the results to be obtained, *i.e.*, will the key employee stay for as long as it takes for the debtor to reorganize or market its assets, or, in the case of a performance incentive, is the plan calculated to achieve the desired performance?

2)  Is the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential?

3)  Is the scope of the plan fair and reasonable; does it apply to all employees; does it discriminate unfairly?

4)  Is the plan or proposal consistent with industry standards?

5)  What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key employees need to be incentivized; what is available; what is generally applicable in a particular industry?

6)  Did the debtor receive independent counsel in performing due diligence in creating and authorizing the incentive compensation?

*Dana Corp.*, 358 B.R. at 576-77 (citations omitted).

Here, the Non-Insider Retention Plan satisfies the *Dana Corp.* test. First and foremost, the Debtors have set forth several valid business reasons to pay retention awards to the Employee Participants. These employees play important roles in Sleep Number's business, and it was critical to retain their services while Sleep Number explored a sale of the company as a going concern. (O'Keefe Declaration ¶¶ 12, 14.) Losing even some of these employees would have eroded the enterprise value of the Debtors. (*Id.*) Given the uncertainty surrounding the restructuring, there was a risk that the Employee Participants would seek alternative employment. (*Id.* ¶ 14.) This risk proved not to be hypothetical. During Ms. O'Keefe's testimony on July 20, she revealed that one of the Employee Participants resigned that very day. (Tr. at 78:6-19.) Further,

13

the workload of the Employee Participants greatly increased because of the extra work required to support the sale process. (O'Keefe Declaration ¶ 13; *see also* Tr. at 80:8-25 ("[T]he amount of third-party interest in this marketing process was overwhelming. There were data rooms. There were thousands of documents. . . . And an overwhelming amount of information was requested. . . . And then follow-up questions and meetings and [tours]. So there was a significant amount of incremental workload on many of these participants.").) Thus, there was plainly a reasonable relationship between the payments and the Debtors' business objective, *i.e.*, a successful going-concern sale of the company.

Second, the cost of the Non-Insider Retention Plan is reasonable. The entirety of the contemplated payments totals $1.825 million (the actual amount will be less given the July 20 resignation of one Employee Participant). This amount is modest when considering that the goal of the Non-Insider Retention Plan was to help facilitate a successful going-concern sale of the company, which has resulted in a bid by SNBR *in excess of $700 million*. Indeed, no party who could possibly be pecuniarily affected by the loss of $1.825 million from the Debtors' estates has objected to the Non-Insider Retention Plan. In fact, the Creditors Committee, which has a fiduciary duty to act in the best interest of all unsecured creditors, filed a statement in support of the Non-Insider Retention Plan (ECF Doc. # 404 (Creditors Committee joinder)), and opined that

- the Employee Participants are not statutory insiders (*id.* ¶ 2);
- the payments under the plan are within the range of average payments expected under similar programs (*id.* ¶ 3);

14

- retention of the Employee Participants is important to the sale of Sleep Number as a going concern (*id*. ¶ 4); and

- the completion of the sale to SNBR "will be a resounding success to all constituents in these cases, including general unsecured creditors." (*Id*. ¶ 5.)

Third, although the Non-Insider Retention Plan does not apply to all Sleep Number employees, the scope of the plan is fair and reasonable. The Employee Participants were selected by senior leadership through an "identification process focused on various criteria, including the criticality of the position to the sale process and business operations, the performance and potential of the employee, the risk of loss of the employee and the potential difficulty of replacing the employee." (O'Keefe Declaration ¶ 14.) Moreover, senior leadership "carefully considered the award levels necessary to retain the Employee Participants . . . ." (*Id*.)

Fourth, the Non-Insider Retention Plan was formulated "after rigorous consideration and consultation with external advisors regarding the industry standards." (*Id*.; *see also* Tr. at 83:25-84:14.)

The U.S. Trustee argues that the retention awards are unnecessary because the sale to SNBR will likely close in a matter of days and most of the Employee Participants will likely be offered jobs with SNBR. But the success of the sale process was far from certain when the Debtors' senior management formulated the Non-Insider Retention Plan. (O'Keefe Declaration ¶ 12.) Senior management enacted the Non-Insider Retention Plan to stabilize Sleep Number's operations, prevent value erosion, and ease the transition for a purchaser. (*Id*.) Now that the Employee Participants have done their part in contributing to what has been a remarkably successful sale process, it

15

would be wholly inequitable to renege on the incentive offered to them for providing such contribution.

For these reasons, the Court finds that the Debtors exercised sound business judgment in formulating the Non-Insider Retention Plan. Paying the Employee Participants retention awards totaling $1.825 million is "justified by the facts and circumstances" of these cases. 11 U.S.C. § 503(c)(3).

## CONCLUSION

For the reasons stated, the U.S. Trustee's objection to the Non-Insider Retention Plan is OVERRULED.

/s/ Kyu Y. Paek

**Dated: July 28, 2026**
**Poughkeepsie, New York**



_____
**Hon. Kyu Y. Paek**
**U.S. Bankruptcy Judge**